# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **TAYLOR ENERGY COMPANY LLC,** ) | |
| **1 LEE CIRCLE** ) | |
| **NEW ORLEANS, LA 70130** ) | **CIVIL ACTION NO.:** |
| ) | **20-1086** |
| **Plaintiff,** ) | |
| **vs.** ) | |
| ) | |
| **UNITED STATES OF AMERICA,** ) | |
| **ACTING BY AND THROUGH THE** ) | |
| **UNITED STATES COAST GUARD** ) | |
| **NATIONAL POLLUTION FUNDS CENTER,** ) | |
| **US COAST GUARD STOP 7605** ) | |
| **2703 MARTIN LUTHER KING JR AVE SE** ) | |
| **WASHINGTON, DC 20593-7605** ) | |
| ) | |
| **Defendant.** ) | |

## COMPLAINT TO VACATE AND
## SET ASIDE FINAL AGENCY ACTION AND FOR OTHER RELIEF

TO:   THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA
      AND THE HONORABLE JUDGES THEREOF

The Complaint of Plaintiff, Taylor Energy Company LLC ("Taylor Energy"), through its

undersigned counsel, and against Defendant, the United States of America, acting by and through

the United States Coast Guard National Pollution Funds Center, avers as follows:

## THE PARTIES

1.

At all material times, Taylor Energy was and is a limited liability company organized and

existing under the laws of the State of Louisiana, with its principal place of business in New

Orleans, State of Louisiana. Taylor Energy's only member is Phyllis M. Taylor, a Louisiana resident domiciled in Orleans Parish, State of Louisiana.

2.

Made defendant is the United States of America, acting by and through the United States Coast Guard National Pollution Funds Center. The National Pollution Funds Center ("NPFC") is a unit of the United States Coast Guard, which is an agency of the United States under the Department of Homeland Security. The NPFC resides in the District of Columbia.

## JURISDICTION AND VENUE

3.

Taylor Energy brings this action to review final agency action under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.* This Court has federal question jurisdiction over this action as a civil action arising under the Constitution and laws of the United States, including the Oil Pollution Act of 1990, 33 U.S.C. §§ 2700-2762 and the attendant regulations, pursuant to 28 U.S.C. § 1331, and under its admiralty jurisdiction pursuant to 28 U.S.C. § 1333. The Administrative Procedure Act expressly waives sovereign immunity of the United States of America, including the NPFC, for the actions alleged herein.

4.

Venue in the United States District Court for the District of Columbia is proper pursuant to 33 U.S.C. § 2717(b), as defendant resides in this district. *See* 33 U.S.C. § 2717(b) ("For purposes of this section, the Fund shall reside in the District of Columbia.").

## NATURE OF ACTION

5.

This action seeks judicial review of the final decision by the NPFC in which it improperly denied Taylor Energy's Claim invoking the act of God defense to its liability under the Oil Pollution Act of 1990 ("OPA"), 33 U.S.C. § 2701 *et seq.,* for the costs of responding to an oil spill in the Gulf of Mexico.[1] Based upon the undisputable facts and applicable legal principles, in denying Taylor Energy's Claim, the NPFC violated the APA and Taylor Energy's rights under the Due Process Clause of the United States Constitution. Consequently, the NPFC's action should be vacated and set aside, and this Court should find that Taylor Energy is entitled to the protections afforded by the act of God defense.

6.

In 2004, Taylor Energy was the lessee of an offshore oil and gas lease in the Gulf of Mexico, issued by the United States Department of the Interior pursuant to the Outer Continental Shelf Lands Act, 43 U.S.C. § 1301, *et seq.*, in connection with an offshore lease tract known as "Mississippi Canyon 20" ("MC20"). It was also the owner and operator of an offshore, fixed steel frame oil and gas production platform situated within MC20 (the "MC20A Platform") (the site of which is sometimes referred to herein as the "MC20 Site"). An oil discharge was caused by the destruction of the MC20A Platform during Hurricane Ivan in September 2004. The extraordinarily powerful waves generated by Ivan caused a massive progressive seafloor failure upslope of the MC20A Platform that migrated downslope to the site of the MC20A Platform destroying the

---

[1] The NPFC's initial claim denial is dated May 14, 2019 (the "Claim Determination") and the denial of Taylor Energy's Reconsideration Request is dated October 10, 2019 (the "Reconsideration Denial").

platform's foundation deep beneath the seafloor, causing it to topple and rupture several of its oil wells. The destruction of the oil wells resulted in the discharge of oil into the Gulf of Mexico and the seafloor sediments.

7.

As the lessee of MC20, Taylor Energy was the "Responsible Party" ("RP") for any discharges of oil from the MC20A Platform under OPA. 33 U.S.C. § 2701(32). Under OPA, an RP for an oil pollution incident is typically strictly liable for resulting Removal Costs and Damages. 33 U.S.C. § 2702. However, OPA expressly provides the RP with specific defenses to liability, including the act of God defense.

8.

33 U.S.C. § 2701(1) defines the term act of God as follows:

> an unanticipated, grave natural disaster or other natural phenomenon of an exceptional, inevitable and irresistible character, the effects of which could not have been prevented or avoided by the exercise of due care or foresight

33 U.S.C. § 2701(1). Taylor Energy satisfies the statutory criteria for invocation of this defense to strict liability. *Id.;* 33 U.S.C. § 2703.

9.

One of the NPFC's responsibilities is to administer the Oil Spill Liability Trust Fund ("OSLTF"). An RP who is entitled to assert a defense, including the act of God defense, may file a claim with the NPFC seeking reimbursement of Removal Costs it has paid or incurred to respond to the oil pollution incident. 33 U.S.C. §§ 2708(b) & 2713(b)(1)(B). The NPFC adjudicates reimbursement claims by RPs, including the initial determination of whether the RP is entitled to a defense under OPA, and if the RP seeks reconsideration of the initial determination, it considers

the reconsideration request. Disposition of the reconsideration request constitutes "final agency action" under OPA. *See* 33 C.F.R. § 136.115(d).

10.

In this action, Taylor Energy seeks judicial review of the NPFC's determination that the extraordinarily powerful waves that caused the massive progressive seafloor failure upslope of the MC20A Platform that toppled the MC20A Platform did not constitute an act of God under OPA, and that Taylor Energy was not entitled to the act of God defense and reimbursement of its Removal Costs.

11.

On May 14, 2019, the NPFC issued a Claim Determination that denied Taylor Energy's claim that it is entitled to invoke the act of God defense. As established in this Complaint, by issuing its Claim Determination without reliance on various expert reports already being compiled in response to the Claim and then only disclosing and relying on these reports in its Reconsideration Denial (yet largely only addressing matters set forth in the initial Claim), the NPFC's actions were end motivated and the NPFC consciously and in bad faith manipulated the administrative record, preventing Taylor Energy from having any meaningful opportunity to review and comment on the expert reports. The result being that the administrative record for this matter is devoid of any response by Taylor Energy to these new reports. Consequently, Taylor Energy has been denied procedural due process of law, under both the Due Process Clause of the Constitution and under the OPA and pursuant to 5 U.S.C. § 706(2)(B) and 5 U.S.C. § 706(2)(D) of the APA.

12.

Taylor Energy timely sought reconsideration of the Claim Determination on July 12, 2019, which the NPFC denied on October 10, 2019. The NPFC's Reconsideration Denial constitutes final agency action pursuant to 33 C.F.R. § 136.115(d).

13.

The NPFC based its Reconsideration Denial on application of a novel phrasing of "act of God" of the agency's own creation, which was never adopted by Congress and runs counter to the language Congress actually enacted in the OPA; and was arbitrary and capricious, an abuse of discretion and otherwise not in accordance with the law. *See* 5 U.S.C. § 706(2)(A); *Motor Veh. Mfrs. Ass'n v. State Farm Ins.*, 463 U.S. 29, 43 (1983); *Water Quality Ins. Syndicate v. United States*, 225 F. Supp. 3d 41, 63 (D.D.C. 2016). It should be vacated and set aside, and this Court should recognize Taylor Energy's entitlement to the protections of the act of God defense.

14.

Additionally, the NPFC's Reconsideration Denial was arbitrary and capricious, an abuse of discretion and otherwise not in accordance with the law because the NPFC failed to consider the scientific evidence submitted by Taylor Energy for the administrative record in reaching its decision, and in many instances "cherry picked" the evidence submitted by Taylor Energy, or reached conclusions that were contradicted by the evidence submitted by Taylor Energy, without even addressing the evidence submitted by Taylor Energy. *See State Farm Ins.*, 463 U.S. at 43; *Water Quality Ins. Syndicate*, 225 F. Supp. 3d at 64.

15.

Furthermore, the NPFC's Reconsideration Denial was arbitrary and capricious, an abuse of discretion and otherwise not in accordance with the law because the NPFC "offered an

explanation for its decision that runs counter to the evidence before the agency." *See State Farm*, 463 U.S. at 43. The Reconsideration Denial, which incorporated wholesale its Claim Determination, was replete with blatant errors, faulty logic, inconsistencies, relied upon insufficient evidence, was speculative, misinterpreted and misconstrued information, relied upon incorrect assumptions, used incorrect methodologies or reasoning, and outright ignored contrary evidence submitted by Taylor Energy.

16.

Simply by way of example, the NPFC's classification of the seafloor failure mechanism as a mudflow or mudslide, as opposed to a massive progressive seafloor failure upslope of the MC20A Platform, is simply incorrect. The two are completely different geological events.

17.

By way of further example, the NPFC's reliance upon a current-day wave prediction model that was *actually informed by Ivan's wave statistics* and additional information that was not known at the relevant times, to somehow suggest that Ivan's waves were in fact predictable, is wholly improper.

18.

At bottom, there are a number of independent bases, under both the Due Process Clause of the Constitution and the APA, on which this Court should vacate and set aside the NPFC's action and find that Taylor Energy is entitled to the protections afforded by the act of God defense.

**LEGAL BACKGROUND**

19.

The APA allows persons and organizations to challenge final agency actions in federal district court. 5 U.S.C. §§ 702, 704.

20.

The APA authorizes suit by "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702.

21.

"[A]gency action" is defined to include "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13).

22.

The APA provides that a court shall hold unlawful and set aside agency final actions found to be "arbitrary and capricious, an abuse of discretion and otherwise not in accordance with the law," 5 U.S.C. § 706(2)(A), "contrary to constitutional right, power, privilege, or immunity," 5 U.S.C. § 706(2)(B), and/or "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

## RELEVANT FACTUAL BACKGROUND[2]

### The MC20A Platform

23.

The MC20A Platform was designed, constructed, and installed by Sohio Petroleum Company ("Sohio"), the original lessee of MC20, during the 1983-1984 timeframe in 480 feet of water, approximately 10 miles southeast of the coast of Louisiana.

---

[2] A comprehensive recitation of the facts supporting this Complaint is set forth in the act of God Claim of Taylor Energy Company LLC dated November 15, 2018 (the "Claim"), attached hereto (without its voluminous exhibits) as Exhibit "A" and the Request for Reconsideration of Taylor Energy Company LLC dated July 12, 2019 (the "Reconsideration Request"), both of which Taylor Energy incorporates herein by reference.

24.

When the MC20A Platform was designed, constructed, and installed, American Petroleum Institute ("API") industry design standards and government regulations required that it be built to withstand the environmental loads that a "100 year storm" would impart on the platform.

25.

The API standards in effect at the time that the MC20A Platform was designed, constructed and installed – 1983/1984 – are the relevant standards. Revisions to those standards *after* 1984 are *irrelevant* to Taylor Energy's invocation of the act of God defense.

26.

The API 100 year storm design standards for offshore structures was adopted as the industry design standard across the offshore industry, and was also incorporated by reference into Department of the Interior regulations governing offshore structures.[3] It remains the industry design standard used by industry and government regulators today.[4]

27.

In order to design a platform capable of withstanding a 100 year storm, Sohio retained an expert in the fields of oceanography and meteorology to provide it with the environmental loads, such as maximum wind speed, wave height and period, wave bottom pressures, and currents that

---

[3] API Recommended Practice (RP) 2A, 13th edition, Planning, Designing, and Constructing Fixed Offshore Platforms was the applicable standard in 1983.

[4] *See* 30 C.F.R. §250.901. Furthermore, the current API 100 year storm design standard for offshore structures was recently applied by the government as the appropriate and applicable standard at MC20 in connection with the design and installation of a containment system designed and installed in 2019 by Couvillion Group, LLC, a contractor selected by the United States Coast Guard. Indeed, as set forth in discovery responses provided by Couvillion Group, LLC in a case in the United States District Court for the Eastern District of Louisiana, Case No. 18-14051 c/w 18-14046, within the last several months, "the containment system was designed to withstand a 100 year storm based on API standards."

a 100 year storm would be expected to generate at the MC20A Platform site. Sohio provided that met-ocean (meteorology and oceanography) information to structural engineers and geotechnical engineers, who used it to structurally design the platform so that it was capable of withstanding the environmental loads.

28.

One of the criteria that Sohio's consultants evaluated was the effect that hurricane waves would have on the seafloor sediments at the proposed platform site, and in the area upslope of the platform. After proper geotechnical analysis, they concluded that the bottom sediments at the proposed platform site were strong enough to withstand the bottom pressure forces that waves associated with a 100 year storm would impart on them. However, they determined that such waves might cause sediments upslope of the platform site to fail and descend down across the platform site as a mud "overflow" event that would flow sediments over the seafloor at the platform site. They determined that a maximum likely mudflow could be 35 feet thick, and might drag an additional 10 feet of bottom sediments along with it as it proceeded downslope. They recommended that Sohio design the platform such that it would be capable of withstanding a 45 foot thick mudflow impacting the platform's foundation piles.

29.

To address this concern, the platform's design included features such as an over-strengthened steel frame platform jacket, which was designed to withstand a mudflow much thicker than the 45 foot 100 year design event mudflow.[5]

---

[5] First, a 38-foot high window above the seafloor was created with no framing between the platform legs in order to reduce the drag on the structure from a mudflow overriding the seafloor. Second, the jacket legs were extended 30 feet below the seafloor in order to increase the lateral capacity of

30.

Sohio's consultants also recommended that Sohio perform periodic surveys of the seafloor in the area around and upslope of the MC20A Platform site. The stated purpose of such surveys was to detect the buildup of significant amounts of sediments upslope of the platform that might move downslope during a hurricane as a large mudflow (*i.e.,* a shallow type of mudslide at or near the seafloor) and topple the platform. The Department of the Interior added a stipulation requiring Sohio to perform such surveys every two years, or after a major hurricane passed through the area.

31.

Every significant action taken by Sohio, and later by Taylor Energy, related to the MC20A Platform and its wells was overseen and approved by the then Minerals Management Services ("MMS"), a part of the Department of the Interior. For example, the MMS and its independent consultants, relying upon the then applicable API 100 year storm design standards, reviewed and approved the design, construction, and installation of the MC20A Platform.

---

the piles. Third, a stronger steel was used for the upper 127 feet of the steel pipe piles extending below the seafloor. All eight structural piles of the MC20A Platform were made of ASTM A-572 Grade 50 ksi steel with 72" outside diameter and a wall thickness varying from 1.5" to 3.0" along the pile length. The four interior piles had a penetration into the soil of 431' and the four corner piles had a penetration into the soil of 507'. Conventional eight-pile platforms installed in water depths similar to the MC20A Platform would have less robust piles, likely with a 48" or 60" outside diameter and a wall thickness of ¾" to 2" with penetrations up to 350' depending on the soil strength at the particular offshore platform site. Ultimately, the MC20A Platform was designed to withstand a mudflow that could have been as high as 55 or 56 feet above the mudline. However, despite these precautions that were intended to provide added resistance against failure in the event of a mudflow or mudslide, the failure mechanism that toppled the MC20A Platform was not a mudflow or mudslide but rather a massive progressive seafloor failure upslope of the MC20A Platform that migrated downslope and ultimately undercut the pile design features and sheared the platform foundation piles deep beneath the seafloor.

32.

The MC20A Platform met or exceeded all applicable industry standards, complied with all applicable government regulations, was approved by all relevant governmental agencies when it was installed, and remained in compliance with such standards and regulations until it was toppled some twenty years later in September 2004 by the effects of Hurricane Ivan's waves and the consequential massive progressive seafloor failure upslope of MC20. Indeed, nothing in the Claim Determination or Reconsideration Denial takes issue with Taylor Energy's showing in its Claim that the design and construction of the MC20A Platform complied with all applicable industry standards and government regulations, and received all necessary agency approvals prior to its installation.

33.

Notably, the failure of the MC20A Platform was *not* caused by a mudflow or a mudslide, as addressed above, which are sediment movements that occur above or near the seafloor. Rather, the failure resulted from a massive progressive seafloor failure, which is a *distinct geological event* that occurred *deep below* the mudline. Accordingly, the precautions that Sohio took to address a potential mudflow or mudslide were prudent but irrelevant to the separate geological event (*i.e.,* the wave pressure induced massive progressive seafloor failure) that serves as the basis for Taylor Energy's Claim.

34.

Taylor Energy acquired its interest in the MC20A Platform and the associated wells in 1994.

35.

In 1996 and 2001, geophysical surveys were conducted of the areas upslope of the MC20A Platform.  Those surveys did *not* detect a buildup of significant amounts of sediments upslope of the platform that might move downslope and threaten the platform. In fact, the 2001 survey detected a *decrease* in the elevations of the mudlobe[6] crests located upslope of the MC20A Platform of up to 30 feet, meaning that the risk of a large mudflow originating on those mudlobe crests during a hurricane had decreased since the platform was erected in 1984. Taylor Energy also submitted to the administrative record a report which showed that no major hurricanes passed through the MC20 area after the 1996 or 2001 surveys were conducted that would have caused a significant amount of sediment to accumulate upslope of the platform and increase the risk of a large mudflow.

36.

Moreover, Taylor Energy submitted to the administrative record studies of the MC20 seafloor sediments conducted after the MC20A Platform toppled in 2004 which concluded that the MC20A Platform was *not* toppled by a mudflow or mudslide. Rather, it was toppled by a massive progressive seafloor failure. During the seafloor failure, a large slab of the seafloor sediment surrounding the MC20A Platform shifted and slid downslope, to a depth approximately 100 feet beneath the surface of the seafloor.

---

[6] A mudlobe is a depositional feature that stops on the continental shelf where there has been no previous instabilities or mudflow activity.  Essentially, it is an instability feature resulting from sediment movement that is initiated in shallow water and under the influence of gravity progresses as a mudflow that results in a mudlobe.

37.

From its installation in 1984 until it was toppled, the MC20A Platform withstood the waves (and other forces) generated by several major hurricanes that passed nearby, none of which triggered any detrimental changes to the seafloor that threatened the platform.

38.

In 2003, the year prior to the toppling of the MC20A Platform, Taylor Energy was the MMS District SAFE Award winner for the MMS New Orleans District office having jurisdiction over the MC20 Site. According to MMS, "[t]he SAFE Award recognizes and commends those operating companies that expend extra effort and conduct their operations in a safe and pollution-free manner, adhering to all regulatory requirements, employing trained and motivated personnel, and taking extra steps to enhance the safety of operations and environmental protection."

39.

As of September 2004, immediately before the MC20A Platform was toppled, three of the wells had been temporarily abandoned, seven had been shut in, and 18 were producing oil or gas. Four were capable of producing hydrocarbons without gas lift while Taylor Energy used gas lift to enable or enhance the production of hydrocarbons from the remaining fourteen producing wells.[7]

---

[7] Gas lift is a method of increasing the natural flow rate of an oil well, which may not otherwise be capable of producing absent this assistance. Gas lift technology works by pumping pressurized gas down the casing annulus into the wellbore. This introduces natural gas into the fluid column such that the well bore liquids become lighter and the existing reservoir pressures can once again cause them to flow. The compressor used to supply the gas lift source (pressurized input gas) for the wells was shut off when the MC20A Platform was evacuated prior to Hurricane Ivan's arrival. With no gas lift source feed being injected, the resulting effect was to disable the production capabilities in these low-pressure wells.

**Hurricane Ivan's Waves, The Seafloor Failure and Toppling of the Platform**

40.

Hurricane Ivan was a classical, long-lived Cape Verde hurricane that reached Category 5 strength on the Saffir-Simpson hurricane scale. Shortly after entering the southern Gulf of Mexico early on September 14, 2004, Hurricane Ivan turned north northwestward and then northward. During a 36-hour period after entering the Gulf of Mexico, while Hurricane Ivan was still a Category 4 or 5 hurricane, the track line of Hurricane Ivan had the storm tracking directly towards MC20. As Hurricane Ivan neared the northern U.S. Gulf coast, it weakened slightly and made landfall at approximately 0150 hours CDT on September 16, just west of Gulf Shores, Alabama, as a Category 3 Hurricane with sustained winds (1 minute average) of 105 knots (120 mph). At its closest, it passed approximately 40 miles east of the MC20A Platform.

41.

As Hurricane Ivan approached the MC20A Platform, Taylor Energy secured the platform and its wells and evacuated its personnel working on the platform. Nowhere in its Claim Determination or Reconsideration Denial did the NPFC find that there were any additional steps that Taylor Energy could have taken as the storm approached that would have prevented the failure of the MC20A Platform or reduced the amount of the discharge.

42.

The waves generated by Hurricane Ivan were measured by several instruments installed in the northern Gulf of Mexico on offshore platforms, buoys, and the seafloor. This includes the U.S. Naval Research Laboratory (NRL) Slope to Shelf and Exchange Dynamics field sensor, whose readings are critical to the scientific record of this case and strongly contradict the NPFC's findings. Yet, the NPFC improperly disregarded its readings, and seeks to read those

measurements out of the administrative record. The tallest waves measured during Hurricane Ivan reached 91 feet, which were by far the largest waves ever measured in the Gulf of Mexico, or the United States. The height of these waves greatly exceeded the tallest wave measured during Hurricane Camille in 1969, the previous record, which was 71.47 feet.

43.

The highest waves generated by a hurricane are in its northeast quadrant. Because none of the wave-measuring devices that measured Hurricane Ivan's waves were located in the area in which the storm would have generated its most extreme waves, scientists extrapolated Hurricane Ivan's maximum wave heights from recorded wave measurements. They concluded that the inferred maximum wave height for Hurricane Ivan was a staggering 131 feet. By comparison, the maximum inferred wave height of Hurricane Camille's waves was 85 feet.

44.

Hurricane Ivan also generated waves with exceptionally long periods. A wave's period is the time, in seconds, between successive wave crests passing over a stationary point. The longest measured spectral peak wave period for Hurricane Ivan was 19 seconds prior to the data recording devices discontinuing the measurement capture and transmission, which failure occurred prior to the peak of the storm and thus did not capture the most extreme waves.

45.

The magnitude of the pressure force that a wave exerts on seafloor sediments is a function of the wave's height and period, and the water depth. The higher a wave is, the greater the pressure it will exert on the sediments. Likewise, the longer the wave period is, the greater the pressure it will exert on the sediments.

46.

Higher waves with longer periods exert greater pressure on the seafloor sediments than do shorter waves with shorter periods.

47.

Water depth is a significant factor in determining the magnitude of the pressure force that a wave exerts on the seafloor. The same wave will impart less force on bottom sediments in deeper water than it will impart on bottom sediments in shallower water.

48.

Prior to Hurricane Ivan, it was generally accepted within the offshore industry, and among academics and government regulators, that the pressure forces imparted by hurricane waves on bottom sediments were inconsequential in waters deeper than 400 feet.

49.

The MC20A Platform was situated in 480 feet of water.

50.

Oceanographers have developed sophisticated models that can be used to "hindcast" the parameters of hurricane waves at a specific location in the northern Gulf of Mexico. Using such a model, a preeminent oceanographic expert retained by Taylor Energy prepared a hindcast of Hurricane Ivan's waves at the MC20A Platform site since no direct measurements were available at the MC20 Site. The maximum hindcast wave height at MC20 was between 64–79 feet, which was similar to the 69.6 feet maximum wave height of the 100 year storm wave predicted in 1983 by Sohio's consultants.

51.

However, the periods of the hindcasted waves at the MC20A Platform during Hurricane Ivan were substantially longer than the wave period parameters predicted for a 100 year storm wave in 1983 by Sohio's consultants. The "spectral peak wave period" hindcast for MC20 during Hurricane Ivan equaled or exceeded 16 seconds for more than 12 hours before the peak of Hurricane Ivan. This "spectral peak wave period" was 4 seconds longer than the predicted spectral peak wave period length of 12 seconds predicted for the 100 year storm wave in 1983. In fact, many of the individual hindcasted waves at MC20 during Hurricane Ivan had periods exceeding 20 seconds, and the longest hindcasted wave period was 22.75 seconds.

52.

In 1983, Sohio's consultants had calculated that the 100 year storm design wave would impart 249 pounds per square feet ("psf") of pressure amplitude on the seafloor sediments at the MC20 Site. But expert analysis established that the hindcast waves at the MC20 Site during Hurricane Ivan would have exerted a maximum bottom pressure between 373 and 572 psf (an *average* of 473 psf of maximum bottom pressure). These experts also established that the *highest* maximum bottom pressure generated by the hindcast waves of  572 psf would have been more than twice the bottom pressure that the 1983 100 year storm design wave would have exerted.

53.

Taylor Energy submitted to the NPFC as part of the administrative record scientific evidence that establishes the points set forth in paragraphs 42-52. This undisputed evidence in the administrative record establishes that the cause of these exceptional bottom pressures was the unanticipated, extraordinarily long wave periods generated by Hurricane Ivan at MC20. Although extremely large waves were present at the MC20A Platform and the wave heights were generally

consistent with what was predicted in 1983, many wave periods of over 20 seconds occurred, which is undisputed by the NPFC. This was much greater than the design wave period of 14 seconds used in the 1983 design study approved by the MMS and pursuant to the then applicable API 100 year storm design standards upon which the MC20A Platform was designed with MMS' approval.

54.

The maximum bottom pressures produced by Hurricane Ivan at MC20 were exceptional, irresistible, unanticipated and unforeseeable, in that they greatly exceeded the bottom pressures predicted for the 100 year storm design wave in 1983.

55.

The extraordinary bottom pressures exerted by Hurricane Ivan's waves caused a massive progressive seafloor failure upslope of the MC20A Platform (specifically, 2,500 feet to the northwest of the MC20A Platform) that migrated across the MC20 seafloor. The seafloor failure was essentially a submarine landslide that extended over a large regional area, ending several thousand feet downslope of the original platform site.

56.

The platform collapsed as the result of the wave induced massive progressive seafloor failure. The failure planes associated with the seafloor failure were approximately 100 feet *below* the seafloor surface. The deep-seated movements of the sediments against the platform foundation pilings caused them to fail and break at a depth greater than 100 feet below the pre-Ivan seafloor. The failure at this depth could only be caused by the movement of the seafloor sediments themselves at or near the same depth.

57.

To reiterate a point that is important to the proper resolution of this case, a massive progressive seafloor failure is not the same natural phenomenon as a mudflow or mudslide.

58.

The evidence in the administrative record demonstrates that the MC20A Platform was not toppled by a mudflow or mudslide, as the NPFC found.

59.

A mudflow or mudslide is an event that largely occurs at or above the seafloor surface, with the potential for some distortion or shearing slightly below the existing seafloor. The MC20A Platform was toppled by a massive progressive seafloor failure, which is a scientifically distinct event that occurred approximately 100 feet below the seafloor surface.

60.

Hurricane waves and winds did not knock the platform over. The failure mechanism of the platform (*i.e.,* the shearing of the platform foundation piles deep beneath the seafloor) was not caused by waves or wind knocking the platform over. Rather, it was the massive progressive seafloor failure that started upslope of MC20.

61.

During Hurricane Ivan and thereafter, sediment-filled flows swept through MC20 in the form of turbidity currents, clay and silt-filled slurries, and debris flows that were composed of clay fragments in a fluid-like clay matrix. After the MC20A Platform had toppled, these sediment flows pushed the MC20 Platform downslope to its final resting point, approximately 550–700 feet from the original platform site. The sediment flows brought 40 feet of new sediment into the MC20 area, burying the old seafloor in 40 feet of new, unconsolidated sediments.

62.

Indeed, in studying the aftermath of Hurricane Ivan's exceptional and unanticipated long period waves, the MMS commissioned studies that confirmed seafloor sediment instabilities caused by Hurricane Ivan's waves. The reports concluded that Hurricane Ivan caused significantly more seafloor activity than other storms of its magnitude due to its very long period waves. The reports noted that hurricane waves generated forces on the ocean floor in shallow water, up to a depth of about 400 feet. They further noted that prior to Hurricane Ivan, it was generally accepted that the change in pressure on the seafloor due to the waves at the water surface was essentially inconsequential in water depths greater than 400 feet.

63.

The toppling and downslope movement of the MC20A Platform stripped the stationary well conductors out of the wellhead bay deck. Measured from the previous vertical position of the conductors, the MC20A Platform's movement deflected each well's tubular assembly within the conductors at an 87-degree angle. The deflection of the well conductors occurred approximately 153 feet beneath the post-Ivan seafloor. The downslope movement also sheared off the wellhead valves as the top of the conductors stripped through the wellhead and out of the MC20A Platform's wellhead bay deck. This damage to the wells allowed the wellbores to discharge oil and natural gas into the water and seafloor sediments.

**Taylor Energy's Response to the MC20 Incident**

64.

Taylor Energy discovered that the MC20A Platform was lost on September 16, 2004, immediately after Hurricane Ivan had exited the Gulf of Mexico.

65.

It promptly notified the MMS that the MC20A Platform was missing, and called the United States Coast Guard to report the missing platform.

66.

On September 17, 2004, during a Taylor Energy directed overflight, a light sheen was observed in the area where the platform had been installed. As soon as the helicopter returned and reported the sheen to Taylor Energy, Taylor Energy promptly reported the discharge to the National Response Center.

67.

Taylor Energy was subsequently designated by the Coast Guard as the "Responsible Party" or "RP" for the MC20 Incident in accordance with OPA. As the Responsible Party, unless a defense to liability applies, Taylor Energy is strictly liable under OPA for Removal Costs and Damages resulting from the MC20 Incident. 33 U.S.C. § 2702.

68.

As RP, Taylor Energy undertook extensive Removal Actions to stop oil from discharging from the MC20 wells, to mitigate, prevent or minimize the substantial threat of future discharges from the wells to contain and collect oil releases from the seafloor sediments, and to minimize or mitigate damage to natural resources. Taylor Energy carried out these Removal Actions under the direction and supervision of the "Unified Command" for the MC20 Incident.

69.

In the fall of 2007, the Unified Command was established for the MC20 Incident pursuant to the National Contingency Plan and included officials from Taylor Energy, the United States Coast Guard, and the MMS (after reorganization and the division of the MMS into the Bureau of

Ocean Energy Management and the Bureau of Safety and Environmental Enforcement ("BSEE"),

BSEE participated in the Unified Command for a number of years).

70.

In fulfilling its responsibilities as the Responsible Party, Taylor Energy has fully

cooperated with and responded to various directives of the Coast Guard and other authorities and

has been an active and fully cooperative participant in the numerous Unified Command meetings

that were convened by the various Federal On-Scene Coordinators that have been designated by

the Coast Guard.

71.

For more than a decade, the Coast Guard and Taylor Energy, under the Unified Command

structure, have engaged in extensive and comprehensive collaborative scientific studies,

assessments, and evaluations to address the MC20 Incident, including all response actions.

72.

Taylor Energy has fully complied with all administrative orders and has provided all

reasonable cooperation and assistance requested by federal officials.

73.

When an oil platform reaches the end of its useful economic life, its wells are plugged to

prevent any hydrocarbons from escaping to the surface. The conventional method is to insert

cement plugs into the well bores through the tops of the wells at the wellhead bay. However,

because the MC20A Platform's well conductors had been stripped out of the well bay, buried deep

beneath the newly deposited, unconsolidated seafloor sediments, and bent over at an 87-degree

angle, it was technologically and physically impossible to use this conventional method to plug

the ruptured MC20 wells in order to stop or prevent oil discharges from them after Hurricane Ivan had passed.

74.

To abate oil discharges and to eliminate the substantial threat of additional discharges, Taylor Energy incurred substantial Removal Costs, including the costs incurred to determine which of the buried MC20 wells had the potential to flow after Hurricane Ivan following which it incurred significant costs to plug the wells it had identified as having potential to flow.

75.

Between 2005 and 2007, Taylor Energy attempted to excavate the seafloor sediments to reach the buried well conductors below the point where they were bent over, 153 feet beneath the seafloor. This would have allowed Taylor Energy to insert cement plugs through the conductors into the well bores. However, it proved physically impossible to excavate down to the conductors due to the soft, soupy consistency of the seafloor sediments.

76.

After determining that it was physically impossible to reach the conductors in order to conventionally plug the wells, Taylor Energy developed, and successfully executed a plan to drill "intervention wells" to plug the damaged MC20 wells that had the potential to discharge oil in their post-Ivan condition, with the concurrence and approval of the relevant federal authorities. The intervention wells were technically challenging, and exceedingly difficult to execute. A separate, new well – an intervention well – had to be drilled alongside each existing MC20 well – the target well – so that the intervention well intersected the target well thousands of feet beneath the seafloor surface. Taylor Energy ultimately identified nine such target wells and spent

several years and hundreds of millions of dollars successfully drilling intervention wells to plug each of them.

77.

After Taylor Energy completed the fourth intervention well, subsea plumes of oil and gas near the well bay and the downed platform stopped emanating from the MC20 seafloor. Despite abatement of the plumes from the actively leaking wells through the intervention well program, remnant oil trapped in the sediments continued and presently continues to be released into the Gulf, which appears on the surface as a sheen.

78.

In addition to the intervention well program, Taylor Energy removed the platform deck from the seafloor, cleared the seafloor of all debris, and decommissioned the pipelines that had been connected to the platform by flushing and sealing them, thus eliminating the threat of residual oil discharges from those structures.

79.

Other removal actions performed and funded by Taylor Energy included the design, construction and installation of a system of containment domes on the MC20 seafloor to capture oil releases. The containment domes, which were installed in compliance with an initial Coast Guard Administrative Order, Administrative Order 006-08, were connected to a collection system, from which the captured oil was periodically removed for disposal onshore.

80.

Further, pursuant to a subsequent Coast Guard Administrative Order, Administrative Order 12-001, Taylor Energy designed and constructed another set of containment domes that remain on standby.

25

81.

Pursuant to Coast Guard Administrative Order 006-08, since 2008, Taylor Energy has also conducted and continues to conduct regular overflights to monitor the extent of sheening on the ocean surface above MC20. In the event that a release of oil from the MC20 wells required an on-water cleanup, Taylor Energy has oil spill response teams on standby. Since the overflights began in 2008, on the few occasions where the Coast Guard instructed Taylor Energy to deploy an oil spill response team in an effort to address a sheen, oil was recoverable only once (and even in that instance it was merely oily water) because of the thin nature of the sheen.

82.

As of August 31, 2017, the costs of these Removal Actions, paid by Taylor Energy, was $485,859,289.92.

83.

Taylor Energy's insurers have reimbursed it for $131,977,570.22 of the Removal Costs. Deducting that amount, Taylor Energy had incurred $353,881,719.70 in uncompensated Removal Costs as of August 31, 2017. *See* Exhibit "A."

84.

Taylor Energy has worked cooperatively within the Unified Command and continues to incur Removal Costs.

## The NPFC's Denial of Taylor Energy's Act of God Claim

### The Claim Determination

85.

On November 15, 2018, Taylor Energy submitted a claim to the NPFC, asserting that the MC20 Incident was solely caused by an act of God, as that term is defined in OPA (the "Claim").

*See* Exhibit "A." The Claim asserted that Taylor Energy met the statutory criteria established by OPA that must be satisfied to receive reimbursement for its Removal Costs under the act of God defense to its liability for the MC20 Incident. It sought reimbursement from the Oil Spill Liability Trust Fund of the uncompensated Removal Costs that Taylor Energy had incurred.

86.

In support of the Claim, Taylor Energy submitted reports from numerous experts, including leading geotechnical engineers, geologists, oceanographers, and structural engineers. These expert reports documented that a massive progressive seafloor failure that originated upslope of the MC20A Platform, rather than a mudflow or mudslide, caused the toppling of the MC20A Platform, and that the seafloor failure was caused by the extreme waves generated by Hurricane Ivan. The evidence Taylor Energy submitted for the administrative record in support of its Claim established that the waves during Hurricane Ivan were by far the largest and longest waves ever measured in the Gulf of Mexico, or the United States, and that the waves that caused the massive progressive seafloor failure upslope of the MC20A Platform met the definition of an act of God under OPA: they were "an unanticipated, grave natural . . . phenomenon of an exceptional, inevitable, and irresistible character, the effects of which could not have been prevented or avoided by the exercise of due care or foresight." *See* 33 U.S.C. § 2701(1).

87.

Taylor Energy also submitted evidence establishing that it had timely reported the MC20 Incident as required by law, had provided all reasonable cooperation and assistance requested by responsible officials in connection with removal activities, and had not, without sufficient cause, failed to comply with any administrative orders relating to the response to the oil discharge.

88.

On May 14, 2019, the NPFC issued a determination in which it denied the Claim (the "Claim Determination"). The NPFC based its denial of the Claim on its finding that Taylor Energy had not established that the MC20 Incident was solely caused by an act of God.

89.

In reaching its determination that the MC20 Incident was not solely caused by an act of God, the NPFC disregarded the explicit definition of "act of God" in OPA and relied on a definition of the term "act of God" that the agency fabricated for use in this case and which was inconsistent with, and incompatible with, the definition of "act of God" that Congress enacted in OPA, and for this reason is unlawful. Significantly, the NPFC inserted additional non-statutory requirements that Taylor Energy must prove to satisfy its burden, imposing on Taylor Energy the burden to show that Hurricane Ivan's waves at MC20 were "*one of the most* grave, exceptional, inevitable and irresistible [natural phenomena ] of all time," and that the severity of the natural phenomenon must be "unprecedented." *See* Claim Determination at 23, 26 (emphasis added).

90.

Moreover, the Claim Determination failed to address much of the evidence submitted by Taylor Energy. In many instances, the NPFC reached conclusions that were contradicted by the evidence submitted by Taylor Energy, without offering evidence supporting the NPFC's conclusions, and without even addressing the evidence submitted by Taylor Energy. The record will establish that, from the outset, denial of Taylor Energy's Claim was a predetermined outcome and that the NPFC manipulated the evidence before it in the administrative record to achieve this end-motivated result.

91.

In support of its conclusion that the MC20A Platform was not toppled by an act of God, the Claim Determination cited and relied extensively upon an April 2019 report prepared for it by Capt. James Pettigrew (United States Navy, retired). But, Capt. Pettigrew had reviewed only one of the expert reports that Taylor Energy submitted in support of its Claim, prepared by an oceanographer. Curiously, Capt. Pettigrew was charged to perform numerous tasks but his April 2019 report only addressed some of those tasks. Incredibly, the April 2019 Pettigrew report did not contain any information about Capt. Pettigrew's training, education or experience that would qualify him to express opinions in the relevant fields of oceanography, meteorology, geology, geotechnical engineering, or structural engineering. The report is silent as to whether Capt. Pettigrew is qualified to express opinions in any of these fields.

92.

Although the April 2019 Pettigrew report did not reflect that Capt. Pettigrew had reviewed the reports and evidence submitted by Taylor Energy addressing issues in the fields of geotechnical engineering or geology, Capt. Pettigrew also expressed opinions in those fields, which the NPFC then relied upon in its Claim Determination.

93.

In June 2019, after the NPFC had denied Taylor Energy's Claim, and while Taylor Energy was preparing a request for reconsideration of the Claim Determination, Taylor Energy requested that the NPFC provide a statement of Capt. Pettigrew's qualifications to express the expert opinions found in his report. The NPFC refused to provide a list of Capt. Pettigrew's qualifications in June 2019, but eventually provided a copy of Capt. Pettigrew's resume in October 2019 at the same time that it denied Taylor Energy's Reconsideration Request. Capt. Pettigrew's resume

demonstrates that he lacks the relevant experience, education, training or other qualifications to provide expert opinions on the subjects that he addressed in his reports to the NPFC, and that the NPFC relied upon extensively to support its denial of Taylor Energy's Claim.

94.

The NPFC further supported its denial of the Claim on the ground that Taylor Energy had failed to conduct periodic surveys of the seafloor around the MC20A Platform every two years, as required in a stipulation in the OCS lease for MC20. In its Claim, Taylor presented evidence that a survey conducted in 2001 found no evidence of a significant buildup of sediments upslope of the platform site that threatened the platform. To the contrary, the survey demonstrated that mudlobe crests lying upslope of the platform had eroded or subsided by as much as 30 feet. Thus, the risk that upslope sediments might let loose during a hurricane and flow downslope towards the platform had *lessened* between 1984 and 2001, despite the passage of numerous hurricanes through the area in the intervening years. Taylor Energy also submitted a report from an oceanographer who reviewed the storms passing through the Gulf of Mexico between 2001 and 2004, and who concluded that none of them were strong enough, or passed close enough to the MC20A Platform, to cause any significant sediment movement upslope of the platform.

95.

Disregarding this evidence, the NPFC relied on the opinion of Capt. Pettigrew, expressed in his April 2019 report, that Hurricane Lili, which passed through the Gulf of Mexico 150 miles to the west of the MC20A Platform could have caused "some" sediment movement at the MC20A Platform. As with his other opinions, Capt. Pettigrew's resume reflects no relevant training, experience or knowledge that indicates he is qualified to express opinions on the effects of hurricanes on sediment movement at locations far removed from the hurricane in deep water.

Based on Capt. Pettigrew's inadmissible, speculative and unfounded opinion, the NPFC concluded that Taylor Energy had not proven, by a preponderance of the evidence, that had it conducted a survey of the area upslope of MC20 after Hurricane Lili had passed, it would not have found a significant buildup of sediment upslope of the platform that threatened the platform. In reaching this conclusion, the NPFC did not address the fact that between 1984 and 2002, numerous hurricanes had passed closer to the MC20A Platform than Hurricane Lili did, and none of them had caused significant sediment build up near the platform. In fact, as described above, the 2001 survey demonstrated that the elevation of mudlobe crests upslope of the platform had *decreased* between 1984 and 2001, despite the passage of several powerful hurricanes through this area.

96.

The NPFC also ignored the fact that such surveys were required by the MMS for the specific purpose of detecting the buildup of sediments upslope of the platform that could result in a *mudflow or mudslide* descending across the platform site.

97.

Had those surveys been conducted in an effort to identify the potential for a mudflow or mudslide, they would not have shown the existence of conditions that would be relevant to the risk that a massive progressive seafloor failure might occur well beneath the seafloor surface. Those surveys, therefore, would have had no probative value in determining whether there was a risk that the event that actually toppled the MC20A Platform (*i.e.,* massive progressive seafloor failure) could occur.

98.

As noted above, the MC20A Platform collapsed as a result of a massive progressive seafloor failure. Since a mudflow or mudslide did not topple the MC20A Platform, the requirement

that Taylor Energy conduct such surveys was irrelevant to Taylor Energy's Claim. Accordingly, the NPFC's denial of Taylor Energy's Claim on the absence of evidence of an irrelevant survey was arbitrary and capricious, an abuse of discretion and otherwise not in accordance with the law.

99.

The Claim Determination intimated, but did not find, that Taylor Energy had not provided all reasonable cooperation and assistance requested by responsible officials in connection with removal activities. *See* Claim Determination at 39 ("For the purposes of adjudicating this claim, the NPFC has assumed, without deciding, that Taylor was compliant with the provisions of 33 U.S.C. 2703(c)"). The NPFC also intimated, but did not find, that Taylor Energy may have failed without sufficient cause to comply with administrative orders issued by the Coast Guard relating to removal activities. The Claim Determination cited memoranda of interviews of Coast Guard officials who, for limited periods, had been involved in overseeing Taylor Energy's response to the MC20 Incident. Notably, the memoranda do not say that those officials concluded that Taylor Energy had been uncooperative or that it had violated administrative orders. Regardless, the undisputed evidence in the administrative record establishes that Taylor Energy was a fully cooperative RP and did not violate any administrative orders.

100.

Indeed, the suggestion that Taylor Energy had not fully cooperated with government officials was based on an entirely false and incomplete account. This suggestion is in direct conflict with the administrative record of the response to the MC20 Incident.[8]

---

[8] The administrative record includes the proceedings of the Unified Command, which were attached to Taylor Energy's Reconsideration Request. They establish the extensive cooperative conduct of Taylor Energy.

101.

The Claim Determination then found that some of the Removal Costs incurred by Taylor Energy were not recoverable from the OSLTF because the underlying actions for those costs could also be characterized as "well decommissioning" activities. But, OPA expressly allows Taylor Energy to recover any costs that fall within the statute's definition of "Removal Costs." *See* 33 U.S.C. § 2703; 33 U.S.C. § 2701(31) ("'removal costs' means the costs of removal that are incurred after a discharge of oil has occurred or, in any case in which there is a substantial threat of a discharge of oil, the costs to prevent, minimize, or mitigate oil pollution from such an incident."). That definition contains no exclusion for costs that may also be categorized as well decommissioning costs.

102.

Because they were not provided prior to or with the Claim Determination, in response to Taylor Energy's request, the NPFC subsequently provided Taylor Energy with the Pettigrew report, memos of interviews of Coast Guard officials regarding Taylor Energy's cooperation in response activities, and other materials cited by the NPFC in its denial of the Claim. However, the NPFC refused to provide Taylor Energy with copies of any memos documenting interviews of witnesses that were not cited in its Claim Determination, and refused to even disclose to Taylor Energy whether such memoranda existed.

103.

Rather, the NPFC agreed to treat Taylor Energy's documentary request as a request under the Freedom of Information Act ("FOIA"). Citing the "voluminous" nature of Taylor Energy's request, neither the NPFC nor its FOIA Officer provided Taylor Energy with copies of any documents for many months.

104.

After repeated delay by the NPFC and much persistence by Taylor Energy, on February 13, 2020, well after its denial of Taylor Energy's Reconsideration Request, the NPFC finally provided its response to Taylor Energy's FOIA request. Surprisingly and incredibly, this response only consisted of two documents, inconsistent with the NPFC's prior representations relating to the "voluminous" nature of the request. Since the NPFC withheld these documents until after the Reconsideration Request was denied, Taylor Energy could not rely on these materials in exercising its right to challenge the Claim Determination.

### The Reconsideration Request

105.

On July 12, 2019, Taylor Energy timely submitted a request to the NPFC, formally asking that it reconsider its Claim Determination (the Reconsideration Request). *See* Reconsideration Request.

106.

When the Reconsideration Request was submitted, despite prior requests, the NPFC had still not provided a copy of Capt. Pettigrew's resume to Taylor Energy. Accordingly, Taylor Energy was not able to rely on the evidence in his resume in exercising its right to challenge the Claim Determination. The resume showed that while Capt. Pettigrew had earned a master's degree in meteorology and physical oceanography and worked as an oceanographer while serving as an officer in the United States Navy, he lacks relevant experience, education, training or other qualifications to provide expert opinions on the subjects that he addressed in his reports to the NPFC, and that the NPFC relied upon extensively when denying Taylor Energy's Claim. Notably absent from Capt. Pettigrew's resume was any relevant experience in the fields of geotechnical

engineering, structural engineering, or geology. Nor does it appear that that Capt. Pettigrew had any experience in assessing the impacts of hurricane waves on the stability of seafloor sediments in the offshore Mississippi River Delta Region of the Gulf of Mexico. Such an assessment required unique and distinct expertise in the field of geotechnical engineering, and is not the sort of assessment that Capt. Pettigrew would have performed while working as an oceanographer in the United States Navy.

107.

The April 2019 Pettigrew report reflected that the NPFC had only provided Capt. Pettigrew with a report from Taylor Energy's expert in the fields of meteorology and oceanography. Accordingly, even though Capt. Pettigrew offered opinions in the fields of geology and geotechnical engineering, it was apparent that he had not reviewed Taylor Energy's experts' reports in the fields of geotechnical engineering or geology.

108.

In support of its Reconsideration Request, Taylor Energy submitted rebuttal reports from technical experts with decades of experience in the fields of geotechnical engineering and oceanography, including relevant experience assessing the impacts of hurricane waves on seafloor sediments in the offshore Mississippi River Delta Region of the Gulf of Mexico. These rebuttal reports established that most of the opinions expressed by Capt. Pettigrew in his April 2019 report were flawed and/or incorrect.

109.

Taylor Energy also noted, in its Reconsideration Request, that the NPFC's Claim Determination was based on an inapplicable and unlawful definition of an "act of God" that the NPFC had created by adding requirements to the statutory text that were never adopted by

Congress. Indeed, the definition of act of God used by the NPFC in its Claim Determination was incompatible and inconsistent with the clear and unambiguous definition of that term found in OPA.

110.

Taylor Energy's Reconsideration Request also provided a Declaration attaching and authenticating additional evidence that addressed the history of its extensive cooperation with the Coast Guard during the response to the MC20 Incident. The Declaration and attached evidence also established that Taylor Energy had provided all reasonable cooperation and assistance requested by officials in connection with removal activities, and that Taylor Energy had not failed, without sufficient cause, to comply with any administrative orders.

111.

On October 10, 2019, the deadline for it to act, the NPFC issued its Reconsideration Denial of Taylor Energy's Claim. The Reconsideration Denial incorporated, wholesale, its Claim Determination.[9] The NPFC based its denial on its finding that Taylor Energy had not established that the MC20 Incident was solely caused by an act of God. It did not address the issue of Taylor Energy's cooperation.

112.

The Reconsideration Denial relied upon two "new" reports from Capt. Pettigrew, along with his first report, and "new" reports from four other consultants: (1) American Bureau of Shipping Group Consulting, Inc. ("ABSG"); (2) David Evans and Associates ("DEA"); (3) GZA Environmental, Inc. ("GZA"); and (4) Norwegian Geotechnical Institute ("NGI").

---

[9] Additionally, the NPFC furnished certain documents in connection with the Reconsideration Denial.

113.

Although the NPFC had hired these firms to provide opinions relating to Taylor Energy's Claim *before* the NPFC issued its Claim Determination in May 2019, the NPFC did not disclose that fact. Nor did it disclose that it intended to rely on reports from those experts when it considered Taylor Energy's Reconsideration Request. Rather, the NPFC concealed the existence of these experts, and their reports, from Taylor Energy until after it denied Taylor Energy's Reconsideration Request. Accordingly, the NPFC manipulated the record precluding Taylor Energy from any opportunity to review, comment on, or rebut the expert reports that the NPFC relied on to deny the Claim. Taylor Energy had no opportunity to respond to these "new" reports and thereby make that response a part of the administrative record that is before this Court. The NPFC's failure to allow Taylor Energy the opportunity to review and challenge these expert reports, despite relying heavily on the reports to deny Taylor Energy's $353,881,719 Claim, violated Taylor Energy's rights under the Due Process Clause of the United States Constitution. Furthermore, the NPFC violated its own regulations governing submission of reconsideration requests, in that the regulations cannot reasonably be interpreted to allow the NPFC to use and rely upon reports from experts when ruling on a reconsideration request when the RP has not been afforded a reasonable opportunity to review and respond to those reports.

114.

As was the case with the April 2019 Pettigrew report, the new reports from these four firms demonstrate that much of the evidence submitted with Taylor Energy's Claim, and much of the evidence submitted with Taylor Energy's Reconsideration Request, was either not shared with or was ignored by ABSG, DEA, GZA and NGI. By failing to disclose the reports of Taylor Energy's experts to its own experts and by relying heavily on the reports of its experts prepared without

consideration of the affirmative case made by Taylor Energy's experts, the NPFC entirely failed to consider important aspects of the Reconsideration Request.

### 115.

In its Reconsideration Denial, the NPFC reviewed Taylor Energy's position on each element of the act of God defense: "exceptional and unanticipated"; "inevitability and irresistibility"; "due care and foreseeability"; and "sole cause." It then set forth a discussion and analysis of the "Independent Subject Matter Experts," and provided its "response." There are at least three respects in which the NPFC's decision violates the APA.

### 116.

First, the NPFC based its decision on a definition of "act of God" that it fabricated in this case and that is inconsistent with and incompatible with the definition of act of God that Congress enacted in the OPA. The NPFC disregarded the explicit definition of "act of God" in OPA and compounded its error when it inserted additional non-statutory requirements that Taylor Energy must prove to satisfy its burden, imposing on Taylor Energy the burden to show that Hurricane Ivan's waves at MC20 were "***one of the most*** grave, exceptional, inevitable and irresistible [natural phenomena ] of all time." *See* Claim Determination at 26 (emphasis added); *see also* Reconsideration Denial at 3. The NPFC further erred when it stated that the severity of the natural phenomenon must be "unprecedented." Claim Determination at 23; *see State Farm Ins.*, 463 U.S. at 43; *Water Quality Ins. Syndicate*, 225 F. Supp. 3d at 63 ("'An agency acts arbitrarily or capriciously if it has relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation either contrary to the evidence before the agency or so implausible as to not reflect either a difference in view or agency expertise.' *Defs. of Wildlife,* 815 F.3d at 9").

117.

Second, the NPFC failed to consider the scientific evidence submitted by Taylor Energy for the administrative record in reaching its decision. *See State Farm Ins.*, 463 U.S. at 43; *Water Quality Ins. Syndicate*, 225 F. Supp. 3d at 64 ("Notably, 'an agency's refusal to consider evidence bearing on the issue before it constitutes arbitrary agency action within the meaning of § 706,' as does ignoring 'evidence contradicting its position.' *Butte Cty.,* 613 F.3d at 194.").

118.

In *Water Quality Ins. Syndicate,* this Court stated as follows:

> The D.C. Circuit has not hesitated to reject agency determinations under APA's substantial evidence standard when an agency ignores factual matters or fails to respond adequately to meritorious arguments raised in opposition to the agency's action. *See, e.g., Nat'l Ass'n of Clean Water Agencies v. EPA,* 734 F.3d 1115, 1136-38 (D.C. Cir. 2013) (rejecting agency rule under APA substantial evidence standard where group challenging rule presented credible evidence contrary to agency findings and agency offered only "mere assertion" that rule accounted for contrary evidence in reply); *Butte Cty.,* 613 F.3d at 194 (rejecting agency finding under APA substantial evidence standard where agency failed to "articulate a satisfactory explanation" and agency "ignore[d] evidence contradicting its position" (internal quotation marks and citations omitted)); *Dillmon,* 588 F.3d at 1091 (rejecting agency decision as unsupported by substantial evidence where agency failed to offer "compelling reason for refusing to believe [the plaintiff]" and overturning previous factfinder's credibility determination); *Safe Extensions, Inc.,* 509 F.3d at 605 (rejecting agency decision where "the FAA has provided absolutely no evidence to back it up" since "[a]s we have said many times before, '[a]n agency's unsupported assertion does not amount to substantial evidence.'" (*quoting Algonquin Gas Transmission Co. v. FERC,* 948 F.2d 1305, 1313 (D.C. Cir. 1991))).

225 F. Supp. 3d at 68. In overturning the NPFC decision, this Court further relied on the fact that the NPFC decision "ignores critical context provided in the Coast Guard investigative record and amounts to cherry-picking of evidence that, when considered as a whole, raises significant doubt about the ultimate conclusion reached" and "[t]he NPFC is not free to ignore, without explanation, the record evidence and factual findings highlighted by Coast Guard investigators, who have close

familiarity with the environmental and operating conditions and the actual events under review….".  *Id.* at 69.

### 119.

Just as it did with the Claim Determination, the NPFC failed in the Reconsideration Denial to address much of the evidence provided by Taylor Energy. In many instances, the NPFC "cherry picked" the evidence submitted by Taylor Energy, or reached conclusions that were contradicted by the evidence submitted by Taylor Energy, without even addressing the evidence submitted by Taylor Energy. Again, this reflects the end-motivated nature of the NPFC's handling of Taylor Energy's Claim.

### 120.

Third, the NPFC "offered an explanation for its decision that runs counter to the evidence before the agency." *See State Farm*, 463 U.S. at 43. The Reconsideration Denial, which incorporated wholesale its Claim Determination, was replete with blatant errors, faulty logic, inconsistencies, relied upon insufficient evidence, was speculative, misinterpreted and misconstrued information, relied upon incorrect assumptions, used incorrect methodologies or reasoning, and outright ignored contrary evidence submitted by Taylor Energy.

### 121.

Accordingly, the Reconsideration Denial violated the OPA and was arbitrary, capricious, an abuse of discretion and otherwise not in accordance with the law.

### 122.

The NPFC's "final agency action" on Taylor Energy's Claim was incorrect and invalid under the applicable APA standard of review.

## CAUSES OF ACTION

### COUNT I
### THE NPFC COMMITTED PROCEDURAL ERRORS THAT VIOLATE THE DUE PROCESS CLAUSE AND THAT VIOLATE ITS OWN REGULATIONS AND THE APA

123.

Taylor Energy incorporates by reference the preceding paragraphs of this Complaint and the details set forth in the documents referenced in this Complaint (*i.e.*, the Claim, the Claim Determination, the select documents provided by the NPFC, the Reconsideration Request, the Reconsideration Denial, and the select documents provided in connection therewith),[10] as if set forth at length herein.

124.

In denying Taylor Energy's Reconsideration Request, the NPFC committed process errors that violate both the Due Process Clause and the agency's own regulations and the APA.

**Procedural Violations of the Due Process Clause**

125.

Under the Due Process Clause of the Fifth Amendment to the United States Constitution and under the Administrative Procedure Act, 5 U.S.C. § 706(2)(B), Taylor Energy is entitled to and is guaranteed due process of law and procedural safeguards *before* it can be deprived of protected property rights.

---

[10] Due to the voluminous nature of these documents and in light of Local Rules 5.1(e) and 7(n), Taylor Energy has only attached the Claim (without its voluminous exhibits) to the instant Complaint (Exhibit "A" hereto); however, this Complaint expressly references and incorporates these additional documents, which are included in the administrative record.

126.

Taylor Energy's constitutionally protected property rights include a meaningful opportunity to review and comment on all expert reports to be relied upon by the NPFC in making its determination as to Taylor Energy's Claim and Reconsideration Request.

127.

Additionally, Taylor Energy is entitled to have the administrative record for its Claim and Reconsideration Request, and the record upon which the instant formal adjudication before the District Court will be determined, contain its response to and comment on any and all evidence relied upon by the NPFC for its final agency action. By referencing and relying heavily upon "new" expert reports, for the first time, in its Reconsideration Denial, the NPFC consciously and deliberately deprived Taylor Energy of this protected property right and thereby violated Taylor Energy's constitutional right to due process of law.

128.

The NPFC's actions, including, but not limited to, its intentional withholding of opinions and failure to identify expert reports in its possession at the time it issued its original Claim Determination, were contrived, end-motivated, a departure from its standard procedure, and a conscious manipulation of the administrative process and the related administrative record. So too was the NPFC's *selective* use of work performed and opinions offered by experts pursuant to certain task orders, while ignoring or burying work and opinions performed pursuant to other task orders that presumably did not support its pre-determined conclusions or desired outcome.

129.

Indeed, on May 14, 2019, the NPFC issued its Claim Determination denying Taylor Energy's Claim. The next day, May 15, Capt. Pettigrew issued a second report. The NPFC did not

produce a copy of the May 15 report on June 6 when it produced copies of the documents on which it relied in its initial denial of Taylor Energy's Claim.

130.

Similarly, other experts (*e.g.,* ABSG, DEA, GZA and NGI) had been retained *prior to* the issuance of the NPFC's Claim Determination, yet neither these experts nor their opinions, were identified, disclosed or relied upon until the NPFC's Reconsideration Denial. Instead, they were identified and disclosed to Taylor Energy for the first time in the Reconsideration Denial dated October 10, 2019. Accordingly, Taylor Energy had no opportunity to respond or to present evidence to rebut these "new" reports in support of its Reconsideration Request, and thereby make its response to the reports a part of the administrative record upon which judicial review will be based.

**Procedural Violations of the NPFC's Regulations and the APA.**

131.

With the exception of the August 19, 2019 (third) report issued by Capt. Pettigrew (which was provided to Taylor Energy only *after* its Reconsideration Request had been submitted), the "new" reports relied upon by the NPFC in denying Taylor Energy's Reconsideration Request did not even address the arguments that Taylor Energy made in its Reconsideration Request or the expert rebuttal reports provided in connection therewith. Rather, these "new reports" only addressed issues that were the subject of Taylor Energy's original Claim.

132.

The reconsideration process set forth in 33 C.F.R. § 136.115(d) affords Taylor Energy an opportunity to submit "additional support" for its Claim; nothing permits the NPFC to introduce

or rely upon new, additional information or expert reports in its Reconsideration Denial. *See* 33 C.F.R. § 136.115(d).

133.

In denying the Reconsideration Request, there was no basis for the NPFC's reliance upon new, additional information or expert reports on which Taylor Energy had no opportunity to comment or introduce rebuttal information. The NPFC's actions violated its own regulations and the APA. *See* 33 C.F.R. § 136.115(d); *see also Gomez v. United States*, 490 U.S. 858, 864, 109 S. Ct. 2237, 2241 (1989) (Under the "avoidance cannon" and well established jurisprudence, courts must "avoid an interpretation of a federal statute that engenders constitutional issues if a reasonable alternative interpretation poses no constitutional question.").

134.

The withholding of the information as set forth above also constituted a process violation that was unlawful under 33 C.F.R. § 136.115(d), and thus unlawful under the APA.

135.

Indeed, by withholding information about the additional experts and their opinions, the NPFC deprived Taylor Energy of an opportunity to submit additional support for its claim, and thereby violated Section 136.115(d) and the APA. *See* 5 U.S.C. § 706(2)(D).

136.

The actions of the NPFC prejudiced Taylor Energy. Simply by way of example, Taylor Energy was not afforded the opportunity to address the specific errors, faulty logic, unsubstantiated conclusions, and improper methodologies (among other things) contained in the May 2019 and

August 2019 reports of Capt. Pettigrew and the reports of ABSG, DEA,[11] GZA and NGI ultimately

relied upon by the NPFC. Had the NPFC not prejudiced Taylor Energy's rights by manipulating

what could be put in the administrative record, Taylor Energy would have demonstrated that the

consultants that prepared the reports lacked the requisite qualifications to express many of the

opinions contained in their reports, and that many of their opinions were incorrect.

137.

As will be shown at trial of this matter, the process and procedure followed by the NPFC

violated Taylor Energy's constitutionally protected due process right to be fairly heard and

deprived Taylor Energy of protected property rights without due process of law. The NPFC's

conduct is constitutionally infirm and caused Taylor Energy substantial harm because it is entitled

to know the evidence and respond thereto if for no other purpose than to make a full and complete

administrative record upon which this Court shall review the NPFC's final agency action. The

NPFC's actions therefore constitute a prejudicial error.

138.

In accordance with the Fifth Amendment to the United States Constitution and 5 U.S.C. §

706, the decisions of the NPFC were unlawful and should be vacated and set aside as they violated

Taylor Energy's constitutionally protected right to due process of law, the NPFC's own

---

[11] Although the NPFC claimed that it "did not closely analyze" the DEA report and the underlying data in its act of God Determination, *see* Reconsideration Denial at p. 7, the DEA report entitled "Taylor Energy MC-20A: Sonar Surveys Comparison" referenced in the Reconsideration Denial and attached thereto contained errors, inaccuracies, and assertions that were categorically false, indicating that the authors and/or the chain of command responsible for this report were either uninformed of the facts or willfully suppressed the evidentiary record. However, due to the manner and time at which the NPFC identified this report, Taylor Energy was deprived of its opportunity to review and respond to this report. Moreover, to the extent that the NPFC relied on this report, such reliance was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the law.

regulations, and the APA. Accordingly, this Court should find that Taylor Energy is entitled to invoke the act of God defense.

139.

At the very least, this Court should strike the "new" expert reports from the record and determine this case without allowing the NPFC to have relied upon such improper reports. Upon doing so, it is readily apparent that the NPFC acted in a manner that was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the law.

**COUNT II**
**THE NPFC VIOLATED THE OPA AND THE APA BY APPLYING AN UNLAWFUL DEFINITION OF ACT OF GOD AND ACTED IN AN ARBITRARY AND CAPRICIOUS MANNER IN VIOLATION OF THE APA BY ENTIRELY FAILING TO CONSIDER TAYLOR ENERGY'S EVIDENCE ON IMPORTANT ASPECTS OF THE MATTER, BASING ITS DECISION ON INSUFFICIENT EVIDENCE, AND BY MAKING FACTUAL FINDINGS THAT WERE NOT SUPPORTED BY THE RECORD AND WERE BLATANTLY ERRONEOUS**

140.

Taylor Energy incorporates by reference the preceding paragraphs of this Complaint and the details set forth in the documents referenced in this Complaint (*i.e.*, the Claim, the Claim Determination, the select documents provided by the NPFC, the Reconsideration Request, the Reconsideration Denial, and the select documents provided in connection therewith), as if set forth at length herein.

141.

A party is entitled to the protection of the act of God defense under OPA if it establishes, by a preponderance of the evidence, that a discharge or the substantial threat of a discharge, and the resulting Removal Costs, were solely caused by an act of God. 33 U.S.C. § 2703(a)(1).

142.

An "act of God" is clearly and unambiguously defined in OPA to mean "**an unanticipated, grave natural disaster or other natural phenomenon of an exceptional, inevitable and irresistible character, the effects of which could not have been prevented or avoided by the exercise of due care or foresight**." 33 U.S.C. § 2701(1) (emphasis added).

143.

Taylor Energy has a complete defense to liability for the Removal Costs under OPA because the discharge and the substantial threat of additional discharges at MC20 resulted solely from an act of God as that term is explicitly defined by Congress. 33 U.S.C. § 2703(a)(1).

144.

Hurricane Ivan produced exceptional, irresistible, unanticipated and unforeseeable wave conditions at the site of the MC20A Platform with return intervals measured in thousands of years. Indeed, the highest waves measured during Hurricane Ivan were by far the largest waves ever measured in the Gulf of Mexico, or the United States, and all well beyond what was foreseeable in 1983/1984 when the platform was designed, constructed, and installed.

145.

Taylor Energy exercised the utmost care in preparing for Hurricane Ivan's approach to the MC20 Site. Indeed, the Reconsideration Denial did not assert that Taylor Energy should have taken greater precautions to secure the site before Hurricane Ivan struck, or otherwise criticize the steps taken or not taken by Taylor Energy as Hurricane Ivan approached. Notwithstanding the due care taken to secure the site, the bottom pressures of Hurricane Ivan's waves, in both height and length, resulted in a massive progressive seafloor failure that toppled the MC20A Platform. There were no

additional measures that Taylor Energy could have taken that would have prevented or avoided this destruction.

146.

Because Hurricane Ivan's waves that caused the massive progressive seafloor failure that toppled the MC20A Platform constituted an act of God, Taylor Energy has a complete defense to liability for Removal Costs under OPA. 33 U.S.C. §§ 2703, 2708(a)(1), & 2713(b)(1)(B). The NPFC's denial of Taylor Energy's Claim was based on the agency's unlawful alteration of the provisions of the text of the statute, and was arbitrary and capricious, an abuse of discretion and otherwise not in accordance with the law.

147.

Taylor Energy has exhausted its administrative remedies, has satisfied all conditions precedent, and hereby seeks this Court's review and invalidation of the NPFC's denial of Taylor Energy's Claim and of its Reconsideration Request. *See* 5 U.S.C. § 706 (granting this Court broad authority to review a final agency action).

**The NPFC Violated the OPA, and Thus the APA, by Applying a Definition of Act of God that It Fabricated for This Matter and That Differs from the Definition Congress Enacted**

148.

The NPFC's denial of Taylor Energy's Claim, and its Reconsideration Request, was based on an incorrect legal standard in that the NPFC created and applied a definition of "act of God" that is inconsistent and incompatible with the definition of that term in OPA. Doing so was arbitrary and capricious, an abuse of discretion and otherwise not in accordance with the law.

149.

When a statute contains an explicit definition, courts must follow that definition. *Stenberg v. Carhart*, 530 U.S. 914, 942 (2000). Moreover, "the possibility of deference [to the Agency's

interpretation] can arise only if a regulation is genuinely ambiguous . . . [a]nd before concluding that a rule is genuinely ambiguous, a court must exhaust all the 'traditional tools' of construction." *Kisor v. Wilkie*, 139 S. Ct. 2400, 2414-15 (2019) (reinforcing the limits of agency deference).

150.

The NPFC violated this principle by disregarding the explicit definition of "act of God" in OPA and compounded its error when it inserted additional requirements that Taylor Energy must prove to meet its burden, imposing on Taylor Energy the burden to show that Hurricane Ivan's waves at MC20 were "***one of the most*** grave, exceptional, inevitable and irresistible [natural phenomena ] of all time." *See* Claim Determination at 26 (emphasis added); *see also* Reconsideration Denial at 3. The NPFC further erred as a matter of law when it stated that the severity of the natural phenomenon must be "unprecedented." Claim Determination at 23.

151.

The NPFC's reliance on an unauthorized extra-statutory definition and its decision to impose additional requirements of its own creation not found in the text of the statute as enacted by Congress was unlawful, arbitrary and capricious, an abuse of discretion, and a *per se* ground for overturning the NPFC's decision. *See State Farm Ins.*, 463 U.S. at 43; *Water Quality Ins. Syndicate*, 225 F. Supp. 3d at 63 (D.D.C. 2016) ("'An agency acts arbitrarily or capriciously if it has relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation either contrary to the evidence before the agency or so implausible as to not reflect either a difference in view or agency expertise.' *Defs. of Wildlife,* 815 F.3d at 9").

152.

Additionally, without finding that OPA's act of God definition was ambiguous, let alone genuinely ambiguous, *see Kisor supra*, the NPFC based its findings on the legislative history of other environmental statutes, cases decided under them, and its view of the overall purpose of OPA. This too was arbitrary and capricious, an abuse of discretion and otherwise not in accordance with the law.

153.

Furthermore, the NPFC failed to cite any law or prior NPFC precedent to support its interpretation of an "act of God" in connection with an offshore facility. Indeed, none of the law relied upon by the NPFC relates to an offshore facility, as we have here.

154.

The NPFC's conclusion that the act of God defense does not apply because Taylor Energy accepted the risk when it purchased an offshore facility in an area with the propensity for hurricanes (*i.e.,* the Gulf of Mexico) was arbitrary and capricious, an abuse of discretion and otherwise not in accordance with the law. Indeed, nothing in OPA provides that the act of God defense does not apply to offshore facilities located in the Gulf of Mexico, yet the NPFC's decision effectively reads the act of God defense out of the statute for such offshore facilities, despite the exceptional, irresistible, unanticipated and unforeseeable wave conditions associated with Hurricane Ivan.

**The NPFC Acted in an Arbitrary and Capricious Manner, in Violation of the APA, by Ignoring Taylor Energy's Evidence on Important Aspects of this Matter, Basing its Decision on Insufficient Evidence, and Making Factual Findings that were not Supported by the Record and were Blatantly Erroneous**

155.

The NPFC's denial of Taylor Energy's Claim and of its Reconsideration Request contained factual findings not supported by the record, blatant errors and faulty logic; relied upon insufficient evidence; was speculative; misinterpreted and misconstrued information; relied upon incorrect assumptions; used incorrect methodology or reasoning; and outright ignored contrary evidence provided by Taylor Energy.

156.

By way of example and without limitation, the NPFC made the following assumptions, speculations and/or factual findings that were erroneous, arbitrary and capricious, an abuse of discretion and otherwise not in accordance with the law with respect to each of the relevant considerations/elements for the act of God defense:[12]

**Exceptional and Unanticipated**

- that the waves generated by Hurricane Ivan were not exceptional and unanticipated;

- that the waves and resulting bottom pressures associated with Hurricane Ivan should have been anticipated and were not exceptional;

- that without the NRL Slope to Shelf and Exchange Dynamics field sensor, other wave measurements recorded throughout the Gulf during Hurricane Ivan would have placed Hurricane Ivan on par with other previously recorded hurricanes;

---

[12] These examples are not intended to be exclusive and were often not limited to a single area of analysis/element, but rather were repeated by the NPFC and its subject matter experts in their discussion relative to several of the elements.

- that if more wave measuring devices had been in place prior to Hurricane Ivan, its waves would not be considered exceptional because other waves of equal size and length to those generated by Hurricane Ivan would have been measured;

- that because *post-Ivan* computer models can predict the waves generated by Hurricane Ivan, those waves would not have been considered exceptional before Hurricane Ivan struck;

- that the waves that could be predicted using the models of Cooper and other authors cited by the NPFC were the same as the waves that occurred at MC20;

- that the notion that "Hurricane Ivan was not a rare event in terms of its intensity (maximum winds and/or minimum central pressure) and other meteorological parameters" is material and that hurricane intensity is even relevant;

- that the frequency of hurricanes (*i.e.,* that hurricanes occur regularly in the region) is material;

- that "GZA refutes Dr. Suhayda's claim that the recurrence interval of Hurricane Ivan's waves exceeded 2,000 years as their hindcast calculations revealed that recurrence intervals of Hurricane Ivan generated wave conditions at the MC-20 were estimated to be on the same order of magnitude of 100 years based on the *post-Ivan* wave statistics for the Gulf of Mexico";

- inaccurately asserting that if a set of waves do not include a "freak wave" (*i.e.,* a wave greater than twice the height of a storm's significant wave height) then the waves and their associated bottom pressures cannot be considered unanticipated or exceptional;

- that Hurricane Ivan is "nowhere near one of the most severe, grave, nor exceptional hurricanes of all time", and that this is material;[13]

- that mudflow or sediment movement is synonymous with a seafloor failure or a slope failure;

- concluding that Sohio should have designed the MC20A Platform in 1983 using a "worst case scenario" design standard, when no such API design standard existed;

- wrongly asserting that Longuet-Higgins height and period wave statistics should have been used by Sohio's consultants when they assessed the capacity of the seafloor at MC20 to withstand the waves of a 100 year storm, when those statistics had not been reduced to design engineering practices, or incorporated into design standards relative to hurricane wave induced bottom pressures in 1983;

- failing to recognize that a hurricane producing waves with a 16.3 second peak spectral period had never been measured, hindcast, expected or anticipated prior to Hurricane Ivan;

- failing to recognize that Hurricane Ivan produced the largest and longest waves ever measured, forecast or hindcast in the Gulf of Mexico, and that as a result of the waves measured during Hurricane Ivan, the API 100 year design wave height was increased from 72 feet to 91 feet in a 2007 revision of the API standards;

- that Dr. Suhayda selected his design criteria on the basis of a single-point measurement;

---

[13] Notably, despite repeated references by the NPFC to the hurricane (or hurricanes) generally, Taylor Energy's Claim does *not* assert that Hurricane Ivan was *the* "act of God." Rather, Taylor Energy asserts that the exceptional, irresistible, unanticipated and unforeseeable wave conditions that resulted in the upslope massive progressive seafloor failure and toppled the MC20A Platform constituted an "act of God."

- that Dr. Suhayda should have used waves with longer periods and smaller wave heights in order to predict the maximum bottom pressure at MC20 during a 100 year storm;

- that "[t]he loss of the Shell Platform "B" during Hurricane Camille 1969 and the loss of the MC-20A platform in 2004 are almost identical in that they occurred in areas within the Gulf of Mexico known to contain geohazards and were the result of mass seafloor sediment movements that occurred well below the surface of the seafloor resulting from elevated sea bottom pressures produced by hurricane force waves";

- that "Hurricane Camille's wave characteristics were not explicitly taken into account during the design of the MC-20A";

- relying on computer simulations based on *post-Ivan* models that include Ivan wave data and the effect of the loop current to run hindcasts to show that Ivan's waves were predictable;

## Inevitability and Irresistibility

- that the waves and bottom pressures generated by Hurricane Ivan were not inevitable or irresistible;

- that the designers of the MC20A Platform were not well-informed about the risks posed by hurricanes;

- that "the effects of the waves and bottom pressures responsible for the failure of the MC-20A platform could have been avoided if Dr. Suhayda had used the correct statistical analysis in his design wave height and period values";

- that "[h]ad Hurricane Camille and the geohazards associated with the MC-20 been better considered during the design and construction of the MC-20A, the loss of the platform

could have been avoided as the platform would have been better constructed to resist the waves and bottom pressures asserted on the seafloor during Hurricane Ivan";

## Due Care and Foreseeability

- that Taylor Energy failed to exercise due care and foresight against the effects of Hurricane Ivan;

- that the designers of the MC20A Platform and Dr. Suhayda did not take into account the seafloor failure caused by Hurricane Camille at SP70, did not model the possibility of a seafloor failure on the "most dangerous scenario" or include a factor of safety in their assessment of those risks;

- that "had the designers of the MC-20A been better informed of the potential for hazards associated with MC-20, perhaps the design of the MC-20A would have been more resistant to the weather events of Hurricane Ivan";

- that Sohio should have used a non-existent "worst case" storm design standard;

- that Hurricane Lili and Tropical Storm Isadore could have caused "some movement of bottom sediment in the area of MC20";

- that at least seven storms "*could have* contributed to significant sediment movement in the areas upslope of the MC-20 platform site or significant sediment accumulation on the mudlobe crests in the area of the platform" (emphasis added);

- that certain storms "*could have* impacted the sedimentation conditions of the Mississippi Canyon region" (emphasis added);

- the suggestion that information regarding Loop Currents and eddies was known, much less developed, at the time that the MC20A Platform was designed and installed;

- that the recurrence interval of "storms with intensities similar to Hurricane Ivan within the entire Gulf of Mexico is approximately 5 to 10 years";

**Sole Cause**

- that the waves at MC20 were not the sole cause of the toppling of the platform;

- that the failure of Taylor Energy and/or Sohio to conduct geotechnical surveys was a cause of the incident;

- that the "act of God" as set forth in Taylor Energy's Claim was not the sole cause of discharge; and

- that Hurricane Ivan's winds or other natural phenomenon involved in the chain of causation were not acts of God and that this is material.

Consequently, the NPFC's reliance on these assumptions, speculations and/or factual findings as the basis for denying Taylor Energy's act of God defense was arbitrary and capricious, an abuse of discretion and otherwise not in accordance with the law.

157.

Separate and apart from the erroneous assumptions, speculations, and/or factual findings set forth in paragraph 156, additional examples of errors that render the NPFC's decision arbitrary and capricious, an abuse of discretion and otherwise not in accordance with the law, include, but are not limited to the following:

**Exceptional and Unanticipated**

- the NPFC misinterpreted and misconstrued the Cooper reference with regard to the exceptionality of Hurricane Ivan's waves;

- the NPFC failed to acknowledge the numerous technical references cited by Dr. Suhayda indicating that the waves generated by Hurricane Ivan were extraordinary and exceptional

(*e.g.,* Wang (2005), Panchang and Li (2006), Cox (2005), Forristall (2007), Jensen (2007), and Resio (2007));

- the NPFC misinterpreted and misconstrued the Cooper reference with regard to "freak" waves;

- the NPFC's discussion related to measurements of wave heights (particularly with regard to the NRL sensors) was illogical, and ignored that fact that GZA used data from the NRL sensors to verify its hindcast of Hurricane Ivan;

- the NPFC made a blatant error in misinterpreting and misconstruing the information Taylor Energy provided about the recurrence interval of Hurricane Ivan's waves;

- the NPFC repeatedly misinterpreted and misconstrued the work performed in 1983, including but not limited to (a) the scope of Dr Suhayda's work (*i.e.,* it did not encompass any geotechnical analysis of seafloor stability); (b) the objectives and methodologies in connection with Dr. Suhayda's work (*i.e.,* the design wave height was prescribed in the API standard, no selection of a design wave period from a statistical distribution, no association of a probability to the wave periods, no determination of the maximum wave pressures at the MC20 Site, no determination of the storm wave statistics, irrelevant reference to Longuet-Higgins (1974) study as joint probabilities were not relevant to the work performed by Dr. Suhayda on behalf of Sohio); and (c) what the design process was in 1983;

- the NPFC repeatedly ignored the work of Jim Hooper (among others);

- the NPFC's statements regarding the "wave bottom pressures" misrepresented and misconstrued information offered by Dr. Suhayda;

- the NPFC's reference to Panchang and Li did not support the proposition for which it was cited. Panchang and Li in fact found that the return of Hurricane Ivan's waves was very long, in the range of 1,000 to 10,000 years;

- the NPFC and Capt. Pettigrew ignored relevant information related to wave measurements (*e.g.*, other locations where measurements were made) and Capt. Pettigrew misrepresented the accuracy of the wave height predictions;

- the NPFC raised irrelevant issues such as waves generated by Hurricane Ivan when it was hundreds of miles away from MC20;

- the NPFC misinterpreted, misconstrued and ignored information presented by Taylor Energy, for instance, with regard to the recurrence interval of Hurricane Ivan's waves;

- the NPFC incorrectly based its statements and conclusions on new, *post-Ivan* API wave design standards;

- the NPFC ignored and utterly failed to address information provided by Taylor Energy that "[t]he deepwater wave heights produced by Hurricane Ivan could not have been forecast for a storm of Ivan's meteorological characteristics using the state of the art practice methods available at the time the MC20 platform was designed";

- the NPFC incorrectly relied on new, *post-Ivan* wave prediction models that incorporated wave data from a number of severe hurricanes such as Ivan, Katrina, and Wilma to claim that Ivan's waves were not exceptional;

- the NPFC's discussion about seafloor stability issues (among various others) had no relevance to the issue of Hurricane Ivan's exceptional waves;

- the NPFC's discussion regarding the Monte Carlo simulations by GZA was nonsensical and irrelevant to the issue of whether the waves were exceptional. Further the NPFC's

understanding of GZA's work was incorrect and a gross misrepresentation of the modeling work GZA performed;

- the NPFC retained consultants with no experience dealing with design standards for platforms in the Gulf of Mexico, and who were otherwise not qualified to render many of the opinions set forth in their reports to the NPFC. The inexperience of the NPFC's consultants was compounded by the failure of the NPFC to provide its consultants with all of the evidence submitted by Taylor Energy in support of its claim that was relevant to the issues addressed by the NPFC's consultants. This resulted in the creation of reports by the NPFC's consultants that overlooked evidence in the record undermining their conclusions, and the expression of opinions by the NPFC's consultants that are beyond the scope of their expertise. These factors resulted in the NPFC basing its decision to deny Taylor Energy's Claim on the erroneous conclusions of its consultants;

**Inevitability and Irresistibility**

- the NPFC continued to misunderstand, misinterpret and misconstrue Dr. Suhayda's 1983 work;

- the NPFC continued to misunderstand, misinterpret and misconstrue what constitutes and what is involved with a structural design study, including, but not limited to the 100 year design wave;

- the NPFC continued to misunderstand the cause of the failure (*i.e.,* that the platform was toppled by a progressive seafloor failure rather than a mudflow or mudslide);

**Due Care and Foreseeability**

- the NPFC continued to misunderstand, misinterpret and misconstrue the design analysis that was conducted in 1983;

- the NPFC ignored extensive documentation of efforts to address and account for the known possibilities that MC20 could be affected by seafloor sediment movements;

- the NPFC continued to misunderstand, misinterpret and misconstrue Dr. Suhayda's 1983 work in particular;

- the NPFC based its decision on the limited data and evaluations of seafloor stability performed by GZA, while ignoring other relevant data and information;

- the NPFC's statements that Woodward-Clyde purportedly failed to account for Hurricane Camille in the design of the MC20A Platform were erroneous;

- Capt. Pettigrew, and in turn the NPFC, relied on pure speculation related to storms that "could have" impacted sedimentation conditions at MC20;

- the expert opinions relied upon by the NPFC were not expressed on a more probably than not basis to a reasonable scientific certainty, rather they were largely based on speculation and the notion that certain events "could have occurred";

- The NPFC's conclusion as to the foreseeability of Hurricane Ivan's waves, and specifically, the wave height and period combinations it generated was not based on sufficient evidence, was based on faulty logic, and misrepresented, misconstrued and ignored information presented by Taylor Energy.

**Sole Cause**

- the NPFC failed to address or explain how the failure to conduct geophysical surveys every other year contributed to the collapse of the MC20A Platform, and its conclusions related to this issue were based on faulty logic and pure speculation; and

- the NPFC continued to misunderstand the cause of the failure.

158.

By way of additional example, and without limitation, the NPFC's reliance upon *new, recent* wave models, which were informed by Hurricane Ivan itself, as opposed to the design wave based on the standard in place in 1983 (*i.e.,* the API 100 year standard) was arbitrary and capricious, an abuse of discretion and otherwise not in accordance with the law, as well as a violation of Taylor Energy's due process rights. Indeed, the post-Ivan wave standards and the models relied upon by the NPFC were adjusted upward to account for the magnitude of Hurricane Ivan's exceptional and unanticipated waves; therefore, the NPFC's logic in this regard was faulty and legally improper.

159.

Relatedly, the NPFC acted in a manner that was arbitrary and capricious, an abuse of discretion and otherwise not in accordance with the law when it selectively ignored GZA's conclusion that "the design team was highly qualified and the exploration scope of work and analytical methods were consistent with the contemporary industry standard of practice."

160.

By way of additional example, and without limitation, the NPFC and its experts lacked an understanding of the platform design process in 1983, and misunderstood, misinterpreted and/or mischaracterized the scope of work performed by Dr. Suhayda in the 1980s. This was arbitrary and capricious, an abuse of discretion and otherwise not in accordance with the law.

161.

By way of additional example and without limitation, the NPFC's denial of the Claim was in large measure based on the Pettigrew reports. The reports expressed expert opinions that were clearly erroneous and/or outside the limited expertise of Capt. Pettigrew, and thus lacked adequate

foundation. Simply stated, Capt. Pettigrew was not competent to assert the opinions set forth in his reports, and he failed to satisfy the minimum competency requirements for the opinions he sought to render. The NPFC's denial of Taylor Energy's Claim based on the opinions of Capt. Pettigrew was arbitrary and capricious, an abuse of discretion and otherwise not in accordance with the law because Capt. Pettigrew lacked the requisite knowledge, experience, and training to provide opinions on certain key issues that he addressed and upon which the NPFC relied in its denial of Taylor Energy's Claim.

162.

By way of further example and without limitation, the NPFC's denial of the Claim failed to address, or even mention, the substantial evidence submitted by Taylor Energy in support of its Claim, including without limitation, the reports of experts Jim Hooper, Dr. Robert Gilbert, Dr. Stephen Wright, Mary Nodine, Tommy Laurendine and Gavin Fury. Failing to do so was arbitrary and capricious, an abuse of discretion and otherwise not in accordance with the law. *See Boquet Oyster House, Inc. v. United States*, No. 09-3537, 2011 U.S. Dist. LEXIS 126295 (E.D. La. Oct. 31, 2011) (providing that an agency cannot "arbitrarily reject[ ] a claimant's expert without justification"; rather, the agency must explain why it finds an expert's report to be unpersuasive); *see also State Farm Ins.*, 463 U.S. at 43; *Water Quality Ins. Syndicate*, 225 F. Supp. 3d at 64 ("Notably, 'an agency's refusal to consider evidence bearing on the issue before it constitutes arbitrary agency action within the meaning of § 706,' as does ignoring 'evidence contradicting its position.' *Butte Cty.,* 613 F.3d at 194."); *id* at 68 ("The D.C. Circuit has not hesitated to reject agency determinations under APA's substantial evidence standard when an agency ignores factual matters or fails to respond adequately to meritorious arguments raised in opposition to the agency's action.").

163.

Moreover, the NPFC's failure to provide its subject matter experts with this information from Taylor Energy's experts was arbitrary and capricious, an abuse of discretion and otherwise not in accordance with the law.[14]

164.

In addition to the NPFC's cherry-picking of information with which to provide its subject matter experts, it is apparent from the record that the NPFC charged its subject matter experts with tasks that it subsequently selectively chose not to rely upon, cite, or otherwise provide in connection with its Claim Determination or Reconsideration Denial, presumably because the experts' findings in connection with those tasks did not support the NPFC's pre-determined decision to deny Taylor Energy's Claim. The NPFC's failure to consider and/or address certain tasks (including the findings in connection with same) was arbitrary and capricious, an abuse of discretion and otherwise not in accordance with the law.  *See State Farm Ins.*, 463 U.S. at 43; *Water Quality Ins. Syndicate*, 225 F. Supp. 3d at 64, 68.

165.

By way of further example and without limitation, the NPFC's denial of the Claim was arbitrary and capricious, an abuse of discretion and otherwise not in accordance with the law to the extent that the Reconsideration Denial (a) cherry-picked conclusions reached by its experts; (b) incorrectly stated the findings of its experts; and (c) reached conclusions inconsistent with its

---

[14] Many of the errors contained within the Claim Determination, Reconsideration Denial and the underlying subject matter expert reports are likely a function of the NPFC's failure to provide its subject matter experts with all relevant evidence. Simply by way of example, if the subject matter experts had been provided with a copy of Jim Hooper's report, they would have understood that Hooper performed geotechnical work that was incorrectly attributed to Dr. Suhayda's scope of work that Dr. Suhayda was accused of having not performed.

experts' data and findings. Additionally, there were inconsistencies between the expert reports of Capt. Pettigrew (*e.g.,* his April 1, 2019 report and his May 15, 2019 report), as well as inconsistencies in the use of data and positions taken amongst the NPFC's various experts. Simply by way of example, there were various inconsistencies regarding the maximum wave height at MC20 during Hurricane Ivan.

166.

For instance, the NPFC incorrectly stated that NGI reviewed the hurricanes and tropical storms that passed through the Gulf of Mexico between 2001 and 2004, and that NGI identified seven such storms that could have contributed to significant sediment movement at MC20. Although that task was included in the scope of work assigned to NGI, it did not address the issue in its report. Additionally, the Reconsideration Denial incorrectly stated that a seventh storm (Hanna) could have caused sediment movements at MC20, despite Capt. Pettigrew's May 15 report stating that Hanna could *not* have caused significant sediment movement at MC20.

167.

By way of further example and without limitation, the NPFC made a series of errors when it misunderstood and misinterpreted the role that wave/bottom interactions at the MC20A Platform site played in causing the failure. Specifically, the NPFC misinterpreted and misunderstood that it was the effect of Hurricane Ivan's waves on bottom sediments upslope of the MC20A Platform site that caused the initial seafloor instability. The initial failure first occurred near the top of the slope 2,500 feet to the northwest of the MC20A Platform site and then progressed down the slope and across the platform site with further wave loading. This error affected the NPFC's decision, making its denial of the Claim arbitrary and capricious, an abuse of discretion and otherwise not in accordance with the law.

64

168.

The record reflects that the seafloor failure was materially different than a mudflow or mudslide and could not have been reasonably anticipated or predicted.

169.

The NPFC's denial based on its assertion that Taylor Energy failed to conduct irrelevant periodic surveys was arbitrary and capricious, an abuse of discretion and otherwise not in accordance with the law. It overlooked the undisputed evidence that a mudflow or mudslide did not topple the MC20A Platform, and rather that its failure resulted from a different geologic event, a massive progressive seafloor failure. In other words, whether Taylor Energy conducted periodic surveys related to mudflow has absolutely nothing to do with its Claim. A mudflow (or mudslide) and a massive progressive seafloor failure are two different types of natural phenomena. The NPFC's denial based on an erroneous predicate (*i.e.,* mudflow or mudslide versus massive progressive seafloor failure, which started upslope of MC20) was arbitrary and capricious, an abuse of discretion and otherwise not in accordance with the law.

170.

Additionally, the NPFC's denial based on its assertion that Taylor Energy failed to conduct irrelevant periodic surveys was speculative, and as such was arbitrary and capricious, an abuse of discretion and otherwise not in accordance with the law. Specifically, the NPFC relied on Capt. Pettigrew's report for its conclusion that other storms "could" have caused sediment movement around the platform. Capt. Pettigrew described the scope of his assignment in his rebuttal report as follows: "I was asked if Hurricane Lili or Tropical Storm Isidore *could* impact the environment and based on the many variables and known properties of this region impact *might* be possible." (Emphasis added).  Not only did Capt. Pettigrew lack the qualifications to provide expert opinions

on this topic, but his opinions were not expressed to a reasonable degree of scientific certainty. He never concluded that the storms were likely, on a more probable than not basis, to cause significant sediment movement that would have been seen as a threat to the MC20A Platform. Rather, he simply stated that the storms "could" impact the environment and that an unspecified impact "might" be possible.

171.

The NPFC's assertion that Hurricane Ivan's waves were not the sole cause of the massive progressive seafloor failure that toppled the MC20A Platform was based on an improper application of the "sole cause" element. This assertion was therefore arbitrary and capricious, an abuse of discretion and otherwise not in accordance with the law. Indeed, the "act" or force at issue here is the exceptional and unanticipated waves and the resultant massive progressive seafloor failure.

172.

The NPFC's legal conclusion that Removal Costs that may also be categorized as well decommissioning costs are not recoverable by a Responsible Party under 33 U.S.C. § 2708 was legally incorrect. The plain language of the statute expressly provides for the recovery of any costs that fall within OPA's definition of Removal Costs. There is no exclusion in that definition or elsewhere in the statute for costs that may also be categorized as well decommissioning costs. It was thus arbitrary and capricious, an abuse of discretion and otherwise not in accordance with the law for the NPFC to deny reimbursement of the Removal Costs incurred by Taylor Energy on such grounds.

173.

Finally, the NPFC applied the wrong legal standard to the Claim. Indeed, OPA requires Taylor Energy to only prove its claim by a "preponderance of the evidence", yet the NPFC held Taylor Energy to a higher standard.

## COUNT III
## THE NPFC WOULD HAVE ERRED IF IT HAD FOUND TAYLOR ENERGY AS NON-COOPERATIVE

174.

Taylor Energy incorporates by reference the preceding paragraphs of this Complaint and the details set forth in the documents referenced in this Complaint (*i.e.*, the Claim, the Claim Determination, the select documents provided by the NPFC, the Reconsideration Request, the Reconsideration Denial, and the select documents provided in connection therewith), as if set forth at length herein.

175.

33 U.S.C. § 2703(c) imposes limitations on a complete defense to liability where a responsible party fails to provide all reasonable cooperation and assistance requested by a responsible official in connection with removal activities or fails, without sufficient cause, to comply with an order issued under proper authority.

176.

As part of its Claim Determination the NPFC did *not* find that Taylor Energy had failed to provide all reasonable cooperation and assistance requested by the Coast Guard in responding to the MC20 Incident. *See* Claim Determination at 39 ("For the purposes of adjudicating this claim, the NPFC has assumed, without deciding, that Taylor was compliant with the provisions of 33 U.S.C. 2703(c)"). The NPFC also did *not* find that Taylor Energy failed without sufficient cause

to comply with the Coast Guard's administrative orders relating to the response to the Incident. However, the NPFC intimated that it could have denied the Claim on those grounds.

177.

Under the APA, an agency decision can be upheld in court only upon a basis for its action that is set forth in the actual decision. Since the NPFC did not base its Claim Determination or Reconsideration Denial on the ground that Taylor Energy had not been cooperative, it cannot defend its decision on this basis.

178.

Because the NPFC's discussion of Taylor Energy's cooperation and assistance was factually incorrect and contrary to the extensive evidence in the administrative record, it would have been arbitrary and capricious, an abuse of discretion and otherwise not in accordance with the law for the NPFC to have denied the Claim on that basis.

**COUNT IV**
**DECLARATORY JUDGMENT**

179.

Taylor Energy incorporates by reference the preceding paragraphs of this Complaint and the details set forth in the documents referenced in this Complaint (*i.e.*, the Claim, the Claim Determination, the select documents provided by the NPFC, the Reconsideration Request, the Reconsideration Denial, and the select documents provided in connection therewith), as if set forth at length herein.

180.

In accordance with 28 U.S.C. § 2201, *et seq.* and 5 U.S.C. § 703, Taylor Energy is entitled to a declaratory judgment as follows:

(A)      Declaring that the NPFC violated the Due Process Clause of the Fifth Amendment to the United States Constitution and the Administrative Procedure Act, including 5 U.S.C. § 706(2)(B) and 5 U.S.C. § 706(2)(D), and finding that Taylor Energy's due process rights were violated by the NPFC's reliance upon various "new" expert reports without providing Taylor Energy with a meaningful opportunity to review and comment on all expert reports to be relied upon by the NPFC and by precluding Taylor Energy from including in the administrative record its analysis of and response to said expert reports; and

(B)      Declaring and vacating and setting aside the NPFC's decisions as being unlawful and in violation of 5 U.S.C. § 706 as arbitrary, capricious, an abuse of discretion and otherwise contrary to law because (i) the NPFC applied a definition of act of God that is not found in the OPA and violates the terms of that statute; (ii) the NPFC entirely failed to consider Taylor Energy's evidence on important aspects of the matter; (iii) the NPFC based its decision on insufficient evidence; and/or (iv) the NPFC made factual findings that were not supported by the record and were blatantly erroneous.

WHEREFORE Taylor Energy respectfully requests that this Court:

1.      review the NPFC's action, inaction, and its denial of the Claim;

2.      strike the following expert reports from the Administrative Record:  the May 15, 2019 report of James Pettigrew; the reports of (1) American Bureau of Shipping Group Consulting, Inc.; (2) David Evans and Associates; (3) GZA Environmental, Inc.; and (4) Norwegian Geotechnical Institute; and those portions of the August 2019 report of James Pettigrew that are not a response to the July 2019 rebuttal reports of Taylor Energy's expert witnesses;

3.      vacate and set aside the Claim Determination and Reconsideration Denial as a due process violation, arbitrary and capricious on one or more of the bases set forth herein, and/or an

abuse of discretion and otherwise not in accordance with the law and contrary to OPA and the APA, and find that Taylor Energy is entitled to the protections and remedies afforded by the act of God defense;

4.      based upon Taylor Energy's entitlement to the act of God defense, award Taylor Energy its Removal Costs in the amount of THREE HUNDRED AND FIFTY THREE MILLION, EIGHT HUNDRED AND EIGHTY ONE THOUSAND, SEVEN HUNDRED AND NINETEEN DOLLARS ($353,881,719) as of August 31, 2017;[15]

5.      alternatively, in the event that the Court finds that it does not have authority to render the requested monetary award, remand this matter to the NPFC, ordering that the NPFC recognize Taylor Energy's act of God defense and ordering that it adjudicate the amount of Removal Costs that Taylor Energy is entitled to be reimbursed from the OSLTF;

6.      award Taylor Energy its reasonable attorneys' fees, expert fees, costs, interest and disbursements incurred herein, *see* **28 U.S.C. § 2412(d);** and

7.      award Taylor Energy such other and further relief as the Court may deem just and proper.

---

[15] The estimated balance of the Oil Spill Liability Trust Fund at the end of 2020 is projected to be slightly less than $3 Billion. *See* https://www.whitehouse.gov/wp-content/uploads/2020/02/balances_fy21.pdf.

DATED this 27th day of April, 2020.

Respectfully submitted,

s/ Carl D. Rosenblum
CARL D. ROSENBLUM, T.A. (LA #02083)
(Application for *Pro Hac Vice* Admission Pending)
ALIDA C. HAINKEL (LA #24114)
(Application for *Pro Hac Vice* Admission Pending)
LAUREN C. MASTIO (LA #33077)
(Application for *Pro Hac Vice* Admission Pending)
TAYLOR K. WIMBERLY (LA #38942)
(Application for *Pro Hac Vice* Admission Pending)
JONES WALKER LLP
201 St. Charles Avenue, 49th Floor
New Orleans, Louisiana 70170-5100
Telephone: (504) 582-8000
Facsimile: (504) 589-8296
E-mail: crosenblum@joneswalker.com

And

s/ Nicholas M. DePalma
NICHOLAS M. DEPLAMA (DC Bar No. 974664)
PAUL A. DEBOLT (DC Bar No. 450904)
(Application for Admission Pending)
Venable LLP
600 Massachusetts Avenue, NW
Washington, D.C. 20001
Telephone:  (202) 344-4000
Email: NMDePalma@Venable.com

**Attorneys for Taylor Energy Company LLC,
Plaintiff**