**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **TAYLOR ENERGY COMPANY, LLC,** | ) | |
| **1 LEE CIRCLE** | ) | |
| **NEW ORLEANS, LA 70130** | ) | |
| | ) | |
| **Plaintiff/Counterclaim-Defendant,** | ) | **Case No.:  20-01086-JDB** |
| | ) | |
| **v.** | ) | |
| | ) | |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| **U.S. Department of Justice** | ) | |
| **Environmental and Natural Resources Division** | ) | |
| **Environmental Defense Section** | ) | |
| **Environmental Enforcement Section** | ) | |
| **P.O. Box 7611, Ben Franklin Station** | ) | |
| **Washington, D.C. 20044** | ) | |
| | ) | |
| **Defendant/Counterclaim-Plaintiff.** | ) | |
| _____ | ) | |

**ANSWER AND COUNTERCLAIMS OF DEFENDANT/COUNTERCLAIM-PLAINTIFF**
**UNITED STATES OF AMERICA**

**UNITED STATES' ANSWER**

The United States of America, for itself and on behalf of the United States Coast Guard

National Pollution Funds Center, (collectively "United States") responds as follows to the

Complaint of Taylor Energy Company, LLC ("Taylor Energy").

1.       The United States admits the allegations in Paragraph 1 on information and belief.

2.       Admit.

3.       The allegations in Paragraph 3 assert conclusions of law, and therefore no

response is required.

4.       The allegations in Paragraph 4 assert conclusions of law, and therefore no

response is required.

1

5.      Admit Taylor Energy seeks judicial review of a final decision from the National Pollution Funds Center ("NPFC"). The remaining allegations in Paragraph 5 assert conclusions of law, and therefore no response is required.

6.      The United States admits the first and second sentences of Paragraph 6. The United States admits oil has discharged into the Gulf of Mexico and seafloor sediments from Taylor Energy's MC-20 facility. The United States denies all other allegations of Paragraph 6.

7.      The allegations in Paragraph 7 assert conclusions of law, and therefore no response is required.

8.      The allegations in the first sentence of Paragraph 8 quote 33 U.S.C. § 2701(1), to which no response is required. The U.S. Code speaks for itself and is the best evidence of its content; to the extent the allegations are inconsistent with the code, they are denied. The allegations in second sentence of Paragraph 8 assert conclusions of law, to which no response is required.

9.      The United States admits the first sentence in Paragraph 9. The United States admits the NPFC maintains a claims procedure pursuant to 33 U.S.C. § 2713 and 33 CFR 136. The remaining allegations in Paragraph 9 characterize provisions of the U.S. Code. The U.S. Code speaks for itself and is the best evidence of its content. Paragraph 9 also contains legal conclusions that require no response.

10.      Paragraph 10 contains Taylor Energy's characterization of this action and arguments, to which no response is required. To the extent a response is required, denied.

11.      The United States admits the first sentence in Paragraph 11. All other allegations in this Paragraph are denied.

12.    The allegations in Paragraph 12 assert conclusions of law, and therefore no response is required.

13.    The first sentence of Paragraph 13 characterizes the NPFC's October 10, 2019 Reconsideration Denial, which speaks for itself and is the best evidence of its contents.  To the extent the allegations of the first sentence of Paragraph 13 are inconsistent with the Reconsideration Denial, the United States denies those allegations.  The second sentence of Paragraph 13 consists of legal conclusions that require no response.

14.    Deny.

15.    Deny.

16.    Deny.

17.    Deny.

18.    Deny.

19.    The allegations in Paragraph 19 assert conclusions of law, and therefore no response is required.

20.    Paragraph 20 consists of Taylor Energy's characterization of 5 U.S.C. § 702. The U.S. Code speaks for itself and is the best evidence of its content; to the extent the allegations are inconsistent with the Code, they are denied.

21.    Paragraph 21 consists of Taylor Energy's characterization of 5 U.S.C. § 551(13). The U.S. Code speaks for itself and is the best evidence of its content; to the extent the allegations are inconsistent with the Code, they are denied.

22.    Paragraph 22 consists of Taylor Energy's characterization of 5 U.S.C. §§ 706(2)(A), 706(2)(B), and 706(2)(D). The U.S. Code speaks for itself and is the best evidence of its content; to the extent the allegations are inconsistent with the Code, they are denied.

23.     Admit.

24.     Deny.

25.     Deny.

26.     Deny, including the footnotes.

27.     Paragraph 27 contains Taylor Energy's characterization of this action and arguments, to which no response is required. To the extent a response is required, the allegations in this Paragraph are denied.

28.     The allegations in Paragraph 28 are Taylor Energy's characterization of an unidentified consultant's report, to which no response is required.

29.     Paragraph 29, including the footnotes, is Taylor Energy's description of the design of Platform MC-20A and its own characterization of what the Platform was designed to withstand, to which no response is required.

30.     The allegations of the first two sentences of Paragraph 30 are Taylor Energy's characterization of a consultant's recommendations, to which no response is required. As to the last sentence of Paragraph 30, the United States admits the Department of Interior conditioned its approval of the Outer Continental Shelf lease on Block 20 of the Mississippi Canyon ("MC-20 Block") (hereinafter, the "Lease") by mandating the need for high resolution surveys to "monitor the seafloor conditions in Block 20" stating "the surveys shall be conducted just prior to platform installation and every two years thereafter." The Department further conditioned the Lease by requiring the surveys to "be conducted after any major storms in the area." Otherwise, the allegations in Paragraph 30 are denied.

31.     The United States admits that prior to 2011, the Minerals Management Service ("MMS") was an agency within the United States Department of the Interior that managed oil

and gas leases on the Outer Continental Shelf. The United States denies the remaining allegations in Paragraph 31.

    32.    Deny.

    33.    Deny.

    34.    Admit.

    35.    Deny, including the footnote.

    36.    Deny.

    37.    The United States admits the MC20A Platform withstood the waves associated with other hurricanes that passed nearby the Platform prior to 2004. For the remaining allegations in Paragraph 37, the United States lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this Paragraph and therefore they are denied.

    38.    Admit.

    39.    Deny, including the footnote.

    40.    Admit.

    41.    Deny.

    42.    The United States admits that the waves generated by Hurricane Ivan were measured by several instruments installed in the northern Gulf of Mexico on offshore platforms, buoys, and the seafloor, including the U.S. Naval Research Laboratory ("NRL") Slope to Shelf and Exchange Dynamics field sensor. The United States further admits the tallest waves measured in the Gulf of Mexico during Hurricane Ivan reached 91 feet. The United States denies all other allegations in Paragraph 42.

43.     This Paragraph contains Taylor Energy's characterization of an unidentified scientific study on the location of Hurricane Ivan's largest waves in the Gulf of Mexico. The scientific study speaks for itself and is the best evidence of its contents.

44.     The United States admits to the first two sentences in Paragraph 44. The last sentence in Paragraph 44 contains Taylor Energy's interpretation of scientific evidence in the Administrative Record. The scientific studies that are part of the Administrative Record speak for themselves and are the best evidence of their contents.

45.     The United States admits that the pressure force that a wave exerts on seafloor sediments is a function of the wave's height and period and the water depth. All other allegations or characterizations in Paragraph 45 are denied.

46.     Deny.

47.     Admit.

48.     Deny.

49.     Admit.

50.     The United States admits to the first sentence in Paragraph 50 in that scientists have developed models that can be used to "hindcast" the parameters of hurricane waves at a specific location in the northern Gulf of Mexico. The remaining allegations in Paragraph 50 are Taylor Energy's interpretation of an unidentified scientific study. That study speaks for itself and is the best evidence of its contents.

51.     Paragraph 51 contains Taylor Energy's interpretation of certain scientific studies submitted to the NPFC. The scientific studies in the Administrative Record speak for themselves and are the best evidence of their contents.

52.     The United States admits the first sentence of Paragraph 52.   The remaining allegations of Paragraph 52 consist of Taylor Energy's interpretation of certain scientific studies submitted to the NPFC. The scientific studies speak for themselves and are the best evidence of their contents.

53.     The United States denies the first sentence of Paragraph 53. To the extent that Paragraph 53 characterizes reports submitted to the NPFC, no response is required. The reports in the Administrative Record speaks for themselves and are the best evidence of its contents. All other allegations in the second, third, and fourth sentences are denied.

54.     Deny.

55.     Deny.

56.     Deny.

57.     Deny.

58.     Deny.

59.     Deny.

60.     The United States admits the first and second sentences of Paragraph 60. All other allegations in Paragraph 60 are denied.

61.     The United States admits the second sentence of Paragraph 61. All other allegations in Paragraph 61 are denied.

62.     To the extent that Paragraph 62 characterizes the scientific studies submitted to the NPFC, no response is required. The studies in the Administrative Record speak for themselves and are the best evidence of their contents. All other allegations in Paragraph 62 are denied.

63.     The United States admits the fifth sentence of Paragraph 63 in that oil and natural gas continue to discharge into the Gulf of Mexico from Taylor Energy's MC-20 facility. The remaining allegations in Paragraph 63 characterize scientific evidence submitted to the NPFC. That evidence speaks for itself and is the best evidence for its contents.

64.     Admit.

65.     Admit.

66.     The United States admits, on September 17, 2004, Taylor Energy notified the National Response Center of the oil discharge from the MC-20 facility. All other allegations are denied.

67.     Admit.

68.     Deny.

69.     The United States denies the allegations in Paragraph 69 to the extent they are outside the scope of and not reflected in the Administrative Record.

70.     Deny.

71.     Deny.

72.     Deny.

73.     The United States admits the first two sentences in Paragraph 73. The United States denies the remaining allegations of Paragraph 73.

74.     The United States admits Taylor Energy incurred some removal costs. The United States denies the remaining allegations in Paragraph 74.

75.     The United States admits that Taylor Energy, between 2005 and 2007, attempted to excavate seafloor sediments to reach the buried well conductors. The United States denies the remaining allegations in Paragraph 75.

76.     The United States denies that Taylor Energy successfully sealed each of the nine wells. The remaining allegations in Paragraph 76 consist of Taylor Energy's characterization of its actions, to which no response is required.

77.     The United States admits that oil continues to flow into the Gulf from the MC-20 facility. The United States denies the remaining allegations in Paragraph 77.

78.     The United States admits that Taylor Energy removed the Platform deck. The United States denies the remaining allegations in Paragraph 78.

79.     Deny.

80.     The United States admits that Taylor Energy has response equipment on standby which it is required to do as the Responsible Party of an active pollution site. The remaining allegations in Paragraph 80 characterize Coast Guard Administrative Order 12-001, which speaks for itself and is the best evidence of its contents. To the extent that the allegations in Paragraph 80 are inconsistent with that Order, those allegations are denied.

81.     The United States admits that because oil pollution continues to be present at or around the MC-20 facility, Taylor Energy, as the responsible party, must follow the Incident Action Plan for the response which historically has required regular overflights o monitor the pollution present. The United States denies all other allegations of Paragraph 81.

82.     Deny.

83.     The United States is without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 83, and therefore denies the allegations.

84.     Deny.

85.     The United States admits that Taylor Energy submitted a claim to the NPFC but avers that the claim was received on November 16, 2018. The remaining allegations of

Paragraph 85 characterize that claim, which speaks for itself and is the best evidence of its contents.

86.     The United States admits that Taylor Energy submitted expert reports to the NPFC.  The remaining allegations in Paragraph 86 consist of (a) Taylor Energy's characterization of those reports, which speak for themselves and are the best evidence of their contents and (b) legal conclusions, to which no response is required.

87.     Deny.

88.     The United States admits that the NPFC issued its determination on May 14, 2019. The remaining allegations of Paragraph 88 are Taylor Energy's characterizations of that determination, which speaks for itself and is the best evidence of its contents. To the extent the allegations in Paragraph 88 are inconsistent with the determination, those allegations are denied.

89.     Deny.

90.     Deny.

91.      This Paragraph contains Taylor Energy's characterization of the April 2019 report written by Navy Capt. James Pettigrew (Ret.), to which no response is required. The report speaks for itself and is the best evidence of its contents.

92.     This Paragraph contains Taylor Energy's characterization of the April 2019 report written by Navy Capt. James Pettigrew (Ret.), to which no response is required. The report speaks for itself and is the best evidence of its contents.

93.     The United States admits that Taylor Energy requested, and it provided, the resume of Capt. Pettigrew. All other allegations of Paragraph 93 are denied.

94.     The allegations in Paragraph 94 consist of Taylor Energy's characterization of the NPFC's denial of Taylor's act of God claim, which speaks for itself and is the best evidence of

its contents.  To the extent that Paragraph 94 characterizes the scientific studies submitted to the NPFC, the studies in the Administrative Record speak for themselves and are the best evidence of their contents.

95.    Deny.

96.    Deny.

97.    Deny.

98.    Deny.

99.    The allegations in Paragraph 99 consist of Taylor Energy's characterization of the NPFC's denial of Taylor's act of God claim, which speaks for itself and is the best evidence of its contents.

100.    Deny, including the footnote.

101.    The first sentence in Paragraph 101 is Taylor's Energy's characterization of the NPFC's denial of Taylor's act of God claim, to which no response is required.  The remaining allegations in Paragraph 101 are legal conclusions to which no response is required.

102.    The United States admits the NPFC voluntarily provided Taylor Energy voluminous documents that supported the NPFC's decision, including the documents referenced in Paragraph 102, and two additional documents pursuant to a FOIA request submitted by Taylor Energy to the NPFC. Otherwise, the allegations of Paragraph 102 are denied.

103.    The United States admits the NPFC voluntarily produced voluminous documents to Taylor Energy that supported the NPFC's decision and two additional documents pursuant to a FOIA request. Otherwise, the allegations of Paragraph 103 are denied.

104.    The United States admits that, after voluntarily producing voluminous documents to Taylor Energy, it located two additional documents that it produced in response to Taylor's FOIA request. Otherwise, the United States denies the allegations of Paragraph 104.

105.    Admit.

106.    Deny.

107.    The allegations in Paragraph 107 consist of Taylor's Energy's characterization of Captain Pettigrew's report, which speaks for itself and is the best evidence of its contents.

108.    Paragraph 108 characterizes the reports submitted to the NPFC, which speak for themselves and are the best evidence of their contents.

109.    Deny.

110.    Deny.

111.    The United States admits that it timely issued a denial to Taylor Energy's Request for Reconsideration on October 10, 2019. The remaining allegations in Paragraph 111 characterize the Reconsideration Denial, which speaks for itself and is the best evidence of its contents. To the extent the allegations in Paragraph 111 are inconsistent with the Reconsideration Denial, those allegations are denied.

112.    The allegations in Paragraph 112 characterize the NPFC's Reconsideration Denial, which speaks for itself and is the best evidence of its contents. To the extent the allegations in Paragraph 112 are inconsistent with the Denial, those allegations are denied.

113.    The United States admits that NPFC hired outside independent experts to assist it with evaluating Taylor Energy's claims. All other allegations of this Paragraph are denied.

114.    Deny.

115.    The allegations in Paragraph 115 are Taylor Energy's characterization of the NPFC's Reconsideration Denial, which speaks for itself and is the best evidence of its contents. To the extent the allegations in Paragraph 115 are inconsistent with the Reconsideration Denial, those allegations are denied. The third sentence of Paragraph 115 also contains a legal conclusion, to which no response is required.

116.    Deny.

117.    Deny.

118.    This Paragraph provides Taylor Energy's characterization of several judicial decisions to which no response is required. The legal decisions speak for themselves and are the best evidence of their legal findings and conclusions.

119.    Deny

120.    Deny.

121.    Deny.

122.    Deny.

## COUNT I
## PROCEDURAL DUE PROCESS OF LAW & APA

123.    The United States incorporates by reference, as if fully set forth herein, its responses to Paragraphs 1 – 122.

124–139.    The United States denies Paragraphs 124 – 139, including all subparts and footnotes.

## COUNT II
## DENIAL OF NPFC VIOLATED OPA or THE APA

140.    The United States incorporates by reference, as if fully set forth herein, Paragraphs 1 – 139.

141–173.    The United States denies Paragraphs 141 – 173, including all subparts and footnotes.

## COUNT III
## DENIAL NPFC ERRED IN DENYING TAYLOR ENERGY'S CLAIM

174.    The United States incorporates by reference, as if fully set forth herein, Paragraphs 1 – 173.

175–178.    The United States denies Paragraphs 175 – 178, including all subparts.

## COUNT IV
## DECLARATORY JUDGMENT

179.    The United States incorporates by reference, as if fully set forth herein, Paragraphs 1 – 178.

180.    The United States denies Paragraph 180, including all subparts.

181.    Taylor Energy's seven WHERFORE paragraphs following Paragraph 180, subpart B, contain Taylor Energy's prayer for relief, and as such no response is required. To the extent a response is required, the United States denies Taylor Energy is entitled the relief demanded.

## GENERAL DENIAL

182.    To the extent any allegations have not been specifically addressed in the preceding paragraphs, or to the extent a response to any of the preceding paragraphs is deemed necessary, the United States hereby denies such allegations.

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE

183.    Taylor Energy fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6).

## SECOND AFFIRMATIVE DEFENSE

184.    To the extent the matters complained of are committed to agency discretion by law the Court lacks subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1).

## THIRD AFFIRMATIVE DEFENSE

185.    This Court lacks subject matter jurisdiction over claims, under the Administrative Procedure Act, 5 U.S.C. §§ 701–706, asserted for monetary damages.

## FOURTH AFFIRMATIVE DEFENSE

186.    The Administrative Procedure Act does not authorize claims for monetary relief.

## FIFTH AFFIRMATIVE DEFENSE

187.    Taylor Energy is without statutory basis to recover interest under the Administrative Procedure Act or the Oil Pollution Act.

## SIXTH AFFIRMATIVE DEFENSE

188.    Attorney fees are not recoverable under either the Administrative Procedure Act or the Oil Pollution Act.

## UNITED STATES' COUNTERCLAIMS

While preserving all of its defenses and expressly denying that it is liable to Taylor Energy for any matter set forth in the Complaint, pursuant to the provisions of Fed. R. Civ. P. 13, the United States of America, by and through the undersigned attorneys, and at the request of and on behalf of the United States Coast Guard, asserts the following counterclaims against Taylor Energy Company, LLC ("Taylor Energy").

## NATURE OF THE ACTION

1.    This enforcement action arises from an oil spill that began on or about September 16, 2004, when Hurricane Ivan passed through the Gulf of Mexico, and an offshore oil

production platform collapsed and sank. The platform, related wells, and other equipment were owned and operated by Taylor Energy and located on a tract of land leased by Taylor Energy, approximately ten miles off the coast of Louisiana in the Outer Continental Shelf.

2.      Oil has continued to flow into the Gulf of Mexico from the related oil wells. Since April 2019, the United States Coast Guard ("Coast Guard") has been collecting and removing oil using a containment system designed and installed after the Coast Guard partially federalized the oil spill response action.

3.      The United States seeks repayment from Taylor Energy as a responsible party under Sections 1002(a) and 1005 of the Oil Pollution Act ("OPA"), 33 U.S.C. §§ 2702(a) and 2705, of over $43 million in removal costs and interest paid by the Oil Spill Liability Trust Fund (the "Fund") in response to this incident. Taylor Energy is a responsible party under OPA Section 1001(32)(C), 33 U.S.C. § 2701(32)(C), as a lessee and/or permittee of the Taylor MC-20 Facility, an offshore facility.

4.      The United States further seeks repayment pursuant to OPA Sections 1004(c)(3) and 1005, 33 U.S.C. §§ 2704(c)(3) and 2705, from Taylor Energy, as an owner or operator of an Outer Continental Shelf facility, of these same removal costs and interest paid by the Fund.

5.      The United States seeks a declaratory judgment on liability for removal costs and damages against Taylor Energy, pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201(a), and OPA Sections 1002(a), 1004(c)(3), 1005, and 1017(f)(2), 33 U.S.C. §§ 2702(a), 2704(c)(3), 2705, and 2717(f)(2), that is binding in this action and any subsequent action or actions against Taylor Energy, for all removal costs, damages, and interest in this action and in any subsequent action or actions.

6.     The United States seeks civil penalties, under Section 311(b)(7) of the Clean Water Act ("CWA"), 33 U.S.C. § 1321(b)(7), against Taylor Energy of up to $48,192 per day of violation or $1,928 per barrel of oil that has been discharged; or at least $192,768 or up to $5,783 per barrel of oil that has been discharged, to the extent that the discharge of oil was the result of gross negligence or willful misconduct by Taylor Energy.

7.     The United States seeks a declaratory judgement, pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201(a), for costs or expenses incurred by the United States in the restoration or replacement of natural resources damaged or destroyed as a result of the discharge of oil or a hazardous substance in violation of Section 311(b) of the CWA, 33 U.S.C. § 1321(b).

## I.     <u>JURISDICTION AND VENUE</u>

8.     This Court has jurisdiction over these counterclaims pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1345 (United States as plaintiff), 28 U.S.C. § 1355 (fine, penalty), 33 U.S.C. § 2717(b) (OPA), 33 U.S.C. § 1321(b)(7)(E) (CWA), and 28 U.S.C. § 1367(a) (supplemental jurisdiction).

9.      Venue in the United States District Court for the District of Columbia is proper pursuant to 28 U.S.C. § 1391(e)(1) (United States as defendant) and 33 U.S.C. § 2717(b) (OPA), as the Defendant United States resides in this district, and because Taylor Energy has availed itself of this jurisdiction by filing the above-captioned matter.

10.     Authority to bring this action is vested in the United States Department of Justice by, *inter alia*, 28 U.S.C. §§ 516 and 519.

## II.     <u>TAYLOR ENERGY</u>

11.     Taylor Energy Company, LLC is a Louisiana limited liability company with its principal place of business in New Orleans, Louisiana.

### III.   <u>STATUTORY AND REGULATORY BACKGROUND</u>

#### A.   *Responsible Party Liability for Removal Costs and Damages under the OPA*

12.     OPA Section 1002(a), 33 U.S.C. § 2702(a), provides that "each responsible party for . . . a facility from which oil is discharged, or which poses the substantial threat of a discharge of oil, into or upon the navigable waters or adjoining shorelines . . . is liable for the removal costs and damages specified in subsection (b) [33 U.S.C. § 2702(b)] that result from such incident."

13.     "Facility" means "any structure, group of structures, equipment, or device (other than a vessel) which is used for one or more of the following purposes: exploring for, drilling for, producing, storing, handling, transferring, processing, or transporting oil . . . ." 33 U.S.C. § 2701(9).

14.     OPA Section 1001(32)(C), 33 U.S.C. § 2701(32)(C), defines "responsible party" to include, "[i]n the case of an offshore facility . . . the lessee or permittee of the area in which the facility is located . . . [.]"

15.     OPA Section 1001(30), 33 U.S.C. § 2701(30), defines "remove" and "removal" to mean "containment and removal of oil or a hazardous substance from water and shorelines or the taking of other actions as may be necessary to minimize or mitigate damage to the public health or welfare, including, but not limited to, fish, shellfish, wildlife, and public and private property, shorelines, and beaches[.]"

16.     OPA Section 1001(31), 33 U.S.C. § 2701(31), defines "removal costs" to mean "the costs of removal that are incurred after a discharge of oil has occurred or, in any case in which there is a substantial threat of a discharge of oil, the costs to prevent, minimize, or mitigate oil pollution from such an incident[.]"

17.     OPA Section 1002(b)(1)(A), 33 U.S.C. § 2702(b)(1)(A), provides that the "removal costs" referred to in Section 1002(a) of OPA, 33 U.S.C. § 2702(a), include "all removal costs incurred by the United States . . . under subsection (c), (d), (e), or (l) of Section 1321 of this title [Section 311 of the Clean Water Act, 33 U.S.C. § 1321]."

18.     Pursuant to OPA Section 1017(f)(2), 33 U.S.C. § 2717(f)(2), in any action for recovery of removal costs referred to in OPA Section 1002(b)(1), 33 U.S.C. § 2702(b)(1), "the court shall enter a declaratory judgment on liability for removal costs or damages that will be binding on any subsequent action or actions to recover further removal costs or damages."

19.     OPA Section 1002(b)(2), 33 U.S.C. § 2702(b)(2), provides that the "damages" referred to in OPA Section 1002(a), 33 U.S.C. § 2702(a), include damages for injury to, destruction of, or loss of use of, natural resources; damages for loss of subsistence use of natural resources; damages for injury to real or personal property, loss of profits and earning capacity; and damages equal to the net loss of taxes, royalties, rents, fees, or net profit shares.

20.     OPA Section 1001(20), 33 U.S.C. § 2701(20), provides that "'natural resources' includes land, fish, wildlife, biota, air, water, ground water, drinking water supplies, and other such resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by the United States (including the resources of the exclusive economic zone), any State or local government or Indian tribe, or any foreign government."

21.     OPA Section 1005, 33 U.S.C. § 2705, provides that each responsible party is liable to the United States for interest on the removal costs, and such interest begins to accrue on the 30th day following the date on which the claim is presented to the responsible party.

### B.  Outer Continental Shelf Facility Owner/Operator Liability for United States Removal Costs under the OPA

22.     OPA Section 1004(c)(3), 33 U.S.C. § 2704(c)(3), provides, "Notwithstanding the limitations established under subsection (a) of this section [33 U.S.C. § 2704(a)] and the defenses of section 2703 of this title, all removal costs incurred by the United States Government or any State or local official or agency in connection with a discharge or substantial threat of a discharge of oil from any Outer Continental Shelf facility or a vessel carrying oil as cargo from such a facility shall be borne by the owner or operator of such facility or vessel."

23.     OPA Section 1001(25), 33 U.S.C. § 2701(25), defines "Outer Continental Shelf facility" to mean "an offshore facility which is located, in whole or in part, on the Outer Continental Shelf and is or was used for one or more of the following purposes: exploring for, drilling for, producing, storing, handling, transferring, processing, or transporting oil produced from the Outer Continental Shelf [.]"

### C.  Liability for Penalties and Restoration Costs under CWA

24.     Section 311(b) of the CWA, 33 U.S.C. § 1321(b), prohibits the discharge of oil or hazardous substances into or upon the navigable waters of the United States or adjoining shorelines in such quantities as the President determines may be harmful to the public health or welfare or environment of the United States.

25.     Pursuant to Section 311(b)(4) of the CWA, 33 U.S.C. § 132l(b)(4), the United States Environmental Protection Agency ("EPA"), acting through its delegated authority under Executive Order No. 11,735, 38 Fed. Reg. 21,243 (Aug. 7, 1973), has determined by regulation that discharges of oil in such quantities as may be harmful to the public health or welfare or environment of the United States include discharges of oil that "(a) Violate applicable water quality standards; or (b) Cause a film or sheen upon or discoloration of the surface of the water

or adjoining shorelines or cause a sludge or emulsion to be deposited beneath the surface of the water or upon adjoining shorelines." 40 C.F.R. § 110.3.

26.      CWA Section 311(b)(7)(A), 33 U.S.C. § 1321(b)(7)(A), provides that any person who is the owner, operator, or person in charge of an offshore facility from which oil is discharged in violation of Section 311(b)(3) of the CWA shall be subject to a civil penalty.

27.      Pursuant to CWA Section 311(b)(7)(A), 33 U.S.C. § 1321(b)(7)(A), and EPA's 2020 Civil Monetary Penalty Inflation Adjustment Rule, 85 Fed. Reg. 1751 (Jan. 13, 2020), each violation of Section 311(b)(3) of the CWA occurring after December 6, 2013, through November 2, 2015, is subject to a civil penalty of up to $37,500 per day of violation or up to $2,100 per barrel of oil discharged, and each violation of Section 311(b)(3) of the CWA occurring after November 2, 2015, is subject to a civil penalty of up to $48,192 per day or up to $1,928 per barrel of oil discharged. 40 C.F.R. § 19.4.

28.      Pursuant to CWA Section 311(b)(7)(D), 33 U.S.C. § 1321(b)(7)(D), and EPA's 2020 Civil Monetary Penalty Inflation Adjustment Rule, 85 Fed. Reg. 1751 (Jan. 13, 2020), where the violation of Section 311(b)(3) of the CWA is the result of gross negligence or willful misconduct, the owner, operator, or person in charge is subject to a civil penalty of at least $150,000 or $5,300 per barrel for violations that occurred after December 6, 2013 through November 2, 2015, and at least $192,768 or up to $5,783 per barrel for violations that occurred after November 2, 2015. 40 C.F.R. § 19.4.

29.      Pursuant to CWA Sections 311(f)(4) and (5), 33 U.S.C. § 1321(f)(4) and (5), the owner or operator of a vessel or onshore or offshore facility is liable for costs or expenses incurred by the United States in the restoration or replacement of natural resources damaged or

destroyed as a result of the discharge of oil or a hazardous substance in violation of Section
311(b) of the CWA, 33 U.S.C. § 1321(b).

## IV.    FACTUAL ALLEGATIONS

### A. History of the MC-20 Facility

30.    In 1981, Sohio Petroleum Corporation ("Sohio") purchased an oil and gas lease,
OCS-G 04935, located on the Outer Continental Shelf in the Gulf of Mexico. The OCS-G 04935
Lease granted Sohio the exclusive right and privilege to drill for, develop, and produce oil and
gas resources in the submerged lands known as Block 20 of the Mississippi Canyon, referred to
herein as the "MC-20 Block."

31.    Lease OCS-G 04935 identified portions of the MC-20 Block that were subject to
mass movements of sediment and required Sohio to conduct site-specific surveys and mapping to
determine the potential for unstable bottom conditions.

32.    Sohio hired Woodward-Clyde Oceaneering ("Woodward") to perform geologic
studies of the MC-20 Block to determine the characteristics of seafloor instability features of the
region and to gauge the potential for mass sediment movements within the MC-20 Block.

33.    After concluding its study, Woodward proposed a site for the construction of an
oil production platform within the MC-20 Block immediately downslope of an area with large
mudflow deposits from the Mississippi River.

34.    In an effort to monitor mass soil movements upslope of the proposed site,
Woodward recommended a program of periodic geophysical surveys around and upslope from
the platform site utilizing the same geophysical tools and following the same track lines as used
in the 1982 survey for the purpose of monitoring seafloor instabilities and sediment
accumulations.

35.     Woodward also recommended biennial geophysical surveys and surveys following any major storms of the mudflow channels and depositional lobes above the proposed site to monitor seafloor instabilities.

36.     On August 8, 1983, Sohio submitted its Initial Plan for the Development and Production of Lease OCS-G 04935 to the Department of Interior Mineral Management Service ("MMS") for review.

37.     MMS approved Sohio's plan for the construction of the oil production platform, the drilling of wells A1 – A28, and oil pipelines that served as tie-in points with other platforms within the Gulf for the transport of oil.

38.     MMS approval was granted pursuant to 30 C.F.R. § 250.34 with the stipulation that geophysical surveys be conducted prior to platform installation and every two years thereafter. In addition, geophysical surveys were required to be conducted after any major storms in the area.

39.     In August 1984, Sohio completed construction of the oil production platform with 28 well slots. The platform is referred to hereafter as the "MC20A Platform" or the "Platform."

40.     Sohio drilled 18 wells (A-1 through A-18) to develop and produce oil and gas. All of those wells were completed, except A-5 and A-15, which were plugged, and temporarily abandoned.

41.     BP Exploration and Oil, Inc. acquired Sohio in 1987 and operated the MC20A Platform and oil well field until it sold the Platform, connecting oil wells, and the OCS-G 04935 Lease to Taylor Energy in 1994.

42.     Taylor Energy continued the operation of the MC20A Platform and drilled ten additional wells (A-19 through A-28) in 2000. The Platform, the related wells, and all related

equipment, all located within the MC-20 Block, are collectively referred to herein as the "MC-20 Facility" or the "Facility."

43.     From 1994 to 2004, Taylor Energy failed to conduct geophysical surveys of the MC-20 Block every two years and after major storms, as recommended by Woodward and required by MMS as part of Lease OCS-G 04935, except for a 2001 survey of Block 21 of the Mississippi Canyon that Taylor Energy alleges also partially surveyed the MC-20 Block.

### B.  The MC-20 Oil Discharge

44.     Taylor Energy continued to operate and produce oil and gas from the MC-20 Facility until the Platform was toppled and oil production was halted when Hurricane Ivan passed through the Gulf of Mexico in September 2004.

45.     On or about September 16, 2004, the Platform sank and the MC-20 Facility began discharging oil into the Gulf of Mexico (the "MC-20 Oil Discharge").

46.     In 2008, a Unified Command was established to, *inter alia*, oversee and coordinate all response and mitigation efforts related to the MC-20 Oil Discharge. The Unified Command included the Coast Guard as the Federal On-Scene Coordinator ("FOSC"), MMS (now the Bureau of Safety and Environmental Enforcement, or "BSEE"), the Bureau of Ocean Energy Management ("BOEM"), and Taylor Energy.

47.     On September 23, 2008, the U.S. Coast Guard FOSC issued Administrative Order (Admin Order) 006-08, which required Taylor Energy to address the ongoing discharge of oil from the MC-20 Facility by, *inter alia*, deploying an open water skimmer to mitigate the continuous discharge at the Facility until such time that pollution domes were installed; conducting overflights twice daily to monitor the discharge from the Facility; providing the

Coast Guard the results of the overflights; and installing pollution domes to mitigate the continuous discharge no later than November 1, 2008.

48. In May 2009, Taylor Energy deployed a subsea oil recovery system at the MC-20 Facility.

49. From 2009 to 2012, Taylor Energy's subsea containment system deteriorated and oil continued to discharge from the MC-20 Facility.

50. On June 25, 2012, the FOSC issued Admin Order 12-001, which required, *inter alia*, that Taylor Energy begin the design and planning for a new pollution dome system suitable for the environmental conditions at the MC-20 Block and submit a written plan that showed a projected timeline for fabrication and installation to the Unified Command no later than September 1, 2012.

51. On November 26, 2012, the FOSC amended Admin Order 12-001 to allow Taylor Energy to make repairs to its containment domes as an interim step in meeting the requirements of Admin Order 12-001. Taylor Energy was given until January 30, 2013 to identify two companies that could design a new pollution dome system or make recommendations for the proper repair to its current system.

52. On October 23, 2018, the Coast Guard issued Admin Order 19-001 to Taylor Energy, ordering it, *inter alia*, to institute a new containment system to capture, contain, and remove oil discharged from the MC-20 Facility.

53. In November 2018, Taylor Energy presented three new containment domes to the Unified Command as a proposal to contain the ongoing MC-20 Oil Discharge and as a replacement for its failed subsea containment system.

54.     The Unified Command rejected Taylor Energy's proposal because it concluded,

*inter alia*, that the proposed domes would result in increased bottom disturbances; have limited

storage capacity; require a vessel to remain on-site for continuous processing and offloading; not

be big enough to cover the affected area; and require several hose connections that would

introduce potential multiple failure points.

55.     On November 16, 2018, the Coast Guard issued a Notice of Federal Assumption

and assumed authority for containing the MC-20 Oil Discharge.

56.     In December 2018, the Coast Guard commenced operations to contain the MC-20

Oil Discharge working with a third party contractor to construct a new containment system to

collect the oil. The Coast Guard accessed the Oil Spill Liability Trust Fund to fund this work.

57.     The Fund has incurred $43,269,064.68 in removal costs and interest related to the

Taylor MC-20 Oil Discharge as of March 13, 2020.

58.     As a result of the oil discharge and substantial threat of oil discharge from the

MC-20 Facility, the United States has expended and will expend removal costs within the

meaning of the OPA, 33 U.S.C. § 2702(b).

59.     The Taylor MC-20 Oil Discharge resulted in a discharge of oil "in such quantities

as may be harmful," within the meaning of the CWA, 33 U.S.C. § 1321(b)(3).

60.     The amount of damages and the extent of injuries sustained by the United States

as a result of the Taylor MC-20 Oil Discharge is not yet fully known.

### C.  The Coast Guard's Removal Costs and Demands for Payment

61.     On July 11, 2017, Coast Guard, on behalf of the Fund, sent Taylor Energy a

written request for reimbursement of removal costs incurred by the United States in the amount

of $176,991.94, of which Taylor Energy subsequently paid $4,291.46, leaving an unpaid balance of $172,700.48.

62.     On July 10, 2019, the Coast Guard, on behalf of the Fund, sent Taylor Energy an additional written request for reimbursement of removal costs incurred by the United States in the amount of $27,132,834.30.

63.     On March 13, 2020, the Coast Guard, on behalf of the Fund, sent Taylor Energy a written request for reimbursement of removal costs incurred by the United States in the amount of $15,673,417.77.  This March 2020 invoice included a summary of all unpaid costs from the July 2017 and 2019 invoices, and as well as incurred interest as of that date for a total amount owed to the Fund of $43,269,064.68.

64.     Taylor Energy has not paid the Coast Guard the $43,269,064.68, owed to the Fund in removal costs and interest, incurred by the United States in connection with the Taylor MC-20 Oil Discharge.

## V.     LEGAL CONTENTIONS SUPPORTING CLAIMS FOR RELIEF

65.     Taylor Energy is a "person" within the meaning of OPA Section 1001(27), 33 U.S.C. § 2701(27) and CWA Section 311(a)(7), 33 U.S.C. § 1321(a)(7).

66.     The MC-20 Facility is a "facility" within the meaning of OPA Section 1001(9), 33 U.S.C. § 2701(9).

67.     The MC-20 Facility is an "offshore facility" within the meaning of OPA Section 1001(22), 33 U.S.C. § 2701(22) and CWA Section 311(a)(11), 33 U.S.C. § 1321(a)(11).

68.     The MC-20 Facility is an "Outer Continental Shelf Facility" within the meaning of OPA Section 1001(25), 33 U.S.C. § 2701(25).

69.     At all times material herein, Taylor Energy was the "owner or operator" of the MC-20 Facility within the meaning of OPA Section 1001(26)(A)(ii), 33 U.S.C. § 2701(26)(A)(ii) and CWA Section 311(a)(6), 33 U.S.C. § 1321(a)(6).

70.     At all times material herein, Taylor Energy was a "lessee" or "permittee," within the meaning of OPA Sections 1001(16) or (28), 33 U.S.C. § 2701(16) or (28), of the MC-20 Block.

71.     Taylor Energy is a "responsible party" within the meaning of OPA Section 1001(32)(C), 33 U.S.C. § 2701(32)(C).

72.     The discharge of oil into the Gulf of Mexico was a "discharge" of "oil" into "navigable waters" as those terms are defined in OPA Section 1001(7), 33 U.S.C. § 2701(7) and CWA Section 311(a)(2), 33 U.S.C. § 1321(a)(2) ("discharge"); OPA Section 1001(23), 33 U.S.C. § 2701(23) and CWA Section 311(a)(1), 33 U.S.C. § 1321(a)(1) ("oil"); and OPA Section 1001(21), 33 U.S.C. § 2701(21) ("navigable waters").

73.     The Coast Guard undertook "removal" actions within the meaning of OPA Section 1001(30), 33 U.S.C. § 2701(30).

74.     The toppling of the MC20A Platform, resulting in the ongoing Taylor MC-20 Oil Discharge from the MC-20 Facility, is an "incident" within the meaning of OPA Section 1001(14), 33 U.S.C. § 2701(14).

75.     The costs incurred by the Fund for the Coast Guard's removal action conducted in response to the release of oil from the MC-20 Facility were "removal costs" within the meaning of OPA Sections 1001(31) and 1002(b)(1), 33 U.S.C. §§ 2701(31) and 2702(b)(1).

76.     The United States may sustain "damages," within the meaning of OPA Section 1002(b)(2), 33 U.S.C. § 2702(b)(2), for, inter alia, injuries to, destruction of, loss of, or loss of

use of natural resources, damages for injury to real or personal property, loss of profits and earning capacity, loss of subsistence use, and net loss of taxes, royalties, rents, fees, and net profit shares due to the injury to, destruction of, and loss of real property, personal property, and natural resources.

77.     The United States may incur costs or expenses in the restoration or replacement of natural resources damaged or destroyed as a result of the discharge of oil or a hazardous substance in violation of Section 311(b) of the CWA, 33 U.S.C. § 1321(b).

## VI.     FIRST COUNTERCLAIM:
### REMOVAL COSTS UNDER OPA SECTION 1002(a), 33 U.S.C. § 2702(a)

78.     The United States incorporates by reference, as if fully set forth herein, Paragraphs 1 –77 of these Counterclaims.

79.     As a lessee and/or permittee of the MC-20 Block at the time of the MC-20 Oil Discharge, Taylor Energy is liable to the United States under OPA Sections 1002(a) and 1005, 33 U.S.C. §§ 2702(a) and 2705, for all removal costs resulting from the MC-20 Oil Discharge and interest on the amount paid in satisfaction of the claim.

## VII.     SECOND COUNTERCLAIM:
### REMOVAL COSTS UNDER OPA SECTION 1004(c)(3), 33 U.S.C. § 2704(c)(3)

80.     The United States incorporates by reference, as if fully set forth herein, Paragraphs 1 –77 of these Counterclaims.

81.     As an owner and/or operator of the MC-20 Facility, an Outer Continental Shelf facility from which oil was discharged, Taylor Energy is liable to the United States under OPA Sections 1004(c)(3) and 1005, 33 U.S.C. §§ 2704(c)(3) and 2705, for all removal costs incurred by the United States in connection with the discharge or substantial threat of discharge from the MC-20 Facility and interest on the amount paid in satisfaction of the claim.

## VIII.   THIRD COUNTERCLAIM:
## DECLARATORY JUDGMENT THAT TAYLOR ENERGY IS LIABLE FOR
## REMOVAL COSTS AND DAMAGES

82.     The United States incorporates by reference, as if fully set forth herein,

Paragraphs 1 –77 of these Counterclaims.

83.     As a result of Lease OCS-G 04935 and the various agreements alleged herein,

Taylor Energy became and remains a "responsible party" for the MC-20 Facility, an "offshore

facility" within the meaning of the OPA, 33 U.S.C. § 2701 *et seq.*

84.     At all times material herein, Taylor Energy was the owner or operator of the MC-

20 Facility and has been and remains a "responsible party" for an "offshore facility" within the

meaning of the OPA, 33 U.S.C. § 2701 *et seq.*

85.     The United States may sustain "damages," as that term is defined in 33 U.S.C.

§ 2702(b)(2), for, *inter alia*, injuries to, destruction of, loss of, or loss of use of natural resources,

damages for injury to real or personal property, loss of profits and earning capacity, loss of

subsistence use, and net loss of taxes, royalties, rents, fees, and net profit shares due to the injury

to, destruction of, and loss of real property, personal property, and natural resources.

86.     An actual controversy exists between the United States and Taylor Energy.

87.     Pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, and the OPA,

33 U.S.C. §§ 2702(a), 2704(c)(3), 2705, and 2717(f), the United States is entitled to, and hereby

seeks, a declaratory judgment, that is binding in this action and any subsequent action or actions

against Taylor Energy that Taylor Energy is liable for removal costs and damages in this action

and in any such subsequent action or actions.

## IX.     FOURTH COUNTERCLAIM:
## CIVIL PENALTIES UNDER CWA SECTION 311(b), 33 U.S.C. § 1321(b)

88.     The United States incorporates by reference, as if fully set forth herein, Paragraphs 1 –77 of these Counterclaims.

89.     As the owner, operator, or person in charge of the MC-20 Facility, an offshore facility from which oil was discharged, Taylor Energy is liable for a civil penalty of up to $37,500 per day of violation or up to $2,100 per barrel of oil discharged for each violation of Section 311(b)(3) of the CWA that occurred after December 6, 2013, through November 2, 2015 and up to $48,192 per day or up to $1,928 per barrel of oil discharged for each violation of Section 311(b)(3) of the CWA that occurred after November 2, 2015, pursuant to CWA Section 311(b)(7), 33 U.S.C. § 1321(b)(7), and 40 C.F.R. § 19.4.

90.     As the owner, operator, or person in charge of the MC-20 Facility, an offshore facility from which oil was discharged, Taylor Energy is liable for a civil penalty of at least $150,000 per day of violation or $5,300 per barrel of oil discharged for each violation of Section 311(b)(3) of the CWA that occurred after December 6, 2013 through November 2, 2015, and at least $192,768 or up to $5,783 per barrel for violations that occurred after November 2, 2015, to the extent that the violation is the result of gross negligence or willful misconduct, pursuant to CWA Section 311(b)(7), 33 U.S.C. § 1321(b)(7), and 40 C.F.R. § 19.4.

## X.     FIFTH COUNTERCLAIM:
## DECLARATORY JUDGMENT THAT TAYLOR ENERGY IS LIABLE FOR
## RESTORATION COSTS INCURRED BY THE UNITED STATES

91.     The United States incorporates by reference, as if fully set forth herein, Paragraphs 1 –77 of these Counterclaims.

92.     At all times material herein, Taylor Energy was the owner or operator of the MC-20 Facility, an offshore facility from which oil was discharged.

93.     The United States may incur costs or expenses in the restoration or replacement of natural resources damaged or destroyed as a result of the discharge of oil from the MC-20 Facility.

94.     An actual controversy exists between the United States and Taylor Energy.

95.     In the alternative to the third counterclaim with respect to natural resource damages, pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, the United States is entitled to, and hereby seeks, a declaratory judgment, that is binding in this action and any subsequent action or actions against Taylor Energy that Taylor Energy is liable under CWA Sections 311(f)(4) and (5), 33 U.S.C. §§ 1321(f)(4) and (5) for costs or expenses incurred by the United States in the restoration or replacement of natural resources damaged or destroyed as a result of the discharge of oil from the MC-20 Facility.

**REQUEST FOR RELIEF**

WHEREFORE, the United States respectfully requests that this Court:

A.     Dismiss Taylor Energy's Complaint with prejudice and costs;

B.     Award the United States $43,269,064.68 in removal costs and accrued interest, plus all other removal costs and interest incurred by the United States through the date of judgment;

C.     Enter a declaratory judgment that Taylor Energy is liable under OPA Sections 1002(a) and 1005, 33 U.S.C. §§ 2702(a) and 2705, for all removal costs and damages resulting from the Taylor MC-20A Oil Discharge, which will be binding on this action and on any subsequent action or actions to recover removal costs or damages;

D.     Enter a declaratory judgment that Taylor Energy is liable under OPA Sections 1004(c)(3) and 1005, 33 U.S.C. §§ 2704(c)(3) and 2705, for all removal costs and interest

incurred by the United States in connection with the discharge or substantial threat of discharge of oil form the MC-20 Facility, which will be binding on this action and on any subsequent action or actions to recover removal costs and interest;

   E.  Assess a civil penalty against Taylor Energy in an amount to be determined by the Court;

   F.  Enter a declaratory judgment that Taylor Energy is liable under CWA Sections 311(f)(4) and (5), 33 U.S.C. § 1321(f)(4) and (5), for costs or expenses incurred by the United States in the restoration or replacement of natural resources damaged or destroyed as a result of the discharge of oil from the MC-20 Facility;

   G. Award the United States its costs of this action; and

   H. Grant such other relief as the Court deems just and proper.

         Respectfully submitted,

         FOR THE UNITED STATES OF AMERICA:

         JEFFREY BOSSERT CLARK
         Assistant Attorney General
         Environment and Natural Resources Division
         United States Department of Justice


         */s/ Mark L. Walters*
         MARK L. WALTERS
         U.S. Department of Justice
         Environmental & Natural Resources
         Division
         Environmental Defense Section
         P.O. Box 7611
         Washington, DC 20044
         Phone: (202) 616-9190
         Fax: (202) 514-8865
         mark.walters@usdoj.gov

/s/ *R. Shea Diaz*

R. SHEA DIAZ
Trial Attorney (D.C. Bar # 1500278)
RICHARD GLADSTEIN
Senior Counsel (D.C. Bar # 362404)
SCOTT CERNICH
Senior Counsel (D.C. Bar # 479851)
MARK C. ELMER
Senior Counsel (D.C. Bar # 453066)
SAMANTHA RICCI
Trial Attorney (Cal. 324517)
Environmental Enforcement Section
Environment and Natural Resources Division
United States Department of Justice
Washington, D.C.
Tel: (202) 514-3211 | Fax: (202) 616-6584
rebecca.diaz@usdoj.gov


MICHAEL R. SHERWIN
Acting United States Attorney

DANIEL F. VAN HORN, D.C. BAR #924092
Chief, Civil Division



/s/ *Doris Coles-Huff*

DORIS COLES-HUFF, D.C. Bar # 461437
Assistant United States Attorney
U.S. Attorney's Office for the District of Columbia
Civil Division
555 4th Street, N.W.
Washington, D.C.  20530
Telephone: (202) 252-2557
doris.coles@usdoj.gov


OF COUNSEL:

SCOTT C. HERMAN
Attorney Advisor
National Pollution Funds Center, US Coast Guard
2703 Martin Luther King Jr. Avenue SE
Washington, DC 20593

PATRICIA KINGCADE
Attorney Advisor
National Pollution Funds Center, US Coast Guard
2703 Martin Luther King Jr. Avenue SE
Washington, DC 20593

HEATHER S. KENNEALY
Attorney Advisor
U.S. Coast Guard Headquarters
Office of Claims and Litigation (CG-LCL)
2703 Martin Luther King Jr. Avenue, SE, Stop 7213
Washington, DC 20593-7213