# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

TAYLOR ENERGY COMPANY LLC,  )
  Plaintiff,       )
vs.            ) **CIVIL ACTION NO.: 20-01086 (JDB)**
             )
UNITED STATES OF AMERICA,   )
ACTING BY AND THROUGH THE  )
UNITED STATES COAST GUARD  )
NATIONAL POLLUTION FUNDS CENTER,)
  Defendant.       )
             )
_____)

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF TAYLOR ENERGY'S MOTION TO DISMISS COUNTERCLAIMS

CARL D. ROSENBLUM, T.A.
ALIDA C. HAINKEL
LAUREN C. MASTIO
TAYLOR K. WIMBERLY
Jones Walker LLP
201 St. Charles Avenue, 49th Floor
New Orleans, Louisiana 70170-5100
Telephone: (504) 582-8000
Facsimile: (504) 589-8296
E-mail: crosenblum@joneswalker.com

And

PAUL A. DEBOLT
Venable LLP
600 Massachusetts Avenue, NW
Washington, D.C. 20001
Telephone:  (202) 344-4000
Email: PADebolt@Venable.com

*Attorneys for Taylor Energy Company LLC,*
*Plaintiff/Counterclaim Defendant*

## TABLE OF CONTENTS

INTRODUCTION........................................................................................................... 1

FACTUAL BACKGROUND ........................................................................................ 2

I.      TAYLOR ENERGY AND THE COAST GUARD COOPERATED CLOSELY
        FOR MORE THAN TEN YEARS. ................................................................... 2

II.     BECAUSE OF POLITICAL PRESSURE, THE COAST GUARD SUDDENLY
        STOPPED COOPERATING WITH TAYLOR ENERGY AND BEGAN
        CONCEALING INFORMATION.................................................................... 3

III.    THE GOVERNMENT DID NOT PRESENT THE BILLS FOR REMOVAL
        COSTS TO TAYLOR ENERGY UNTIL AFTER THEY WERE SUBMITTED TO
        AND PAID BY THE OSLTF. ........................................................................ 5

IV.     THE UNITED STATES' JUNE 2, 2020 DEMAND LETTER......................... 7

V.      THE LITIGATION BETWEEN TAYLOR ENERGY AND THE COAST
        GUARD. ...................................................................................................... 8

        A.      The LA *Luttrell* Litigation. ............................................................8

        B.      The Louisiana Action........................................................................9

        C.      The AOG Litigation and Counterclaims.........................................10

LAW AND ARGUMENT............................................................................................ 12

I.      APPLICABLE RULE 12(B) STANDARDS................................................... 12

        A.      Rule 12(b)(1)...................................................................................12

        B.      Rule 12(b)(3)...................................................................................12

        C.      Rule 12(b)(6)...................................................................................13

II.     THE COUNTERCLAIMS MUST BE DISMISSED PURSUANT TO RULE
        12(B)(3) AND 28 U.S.C. § 1406 BECAUSE THE LOUISIANA ACTION WAS
        "FIRST FILED." ......................................................................................... 14

        A.      The Louisiana Action is the "First Filed" Action. ..............................16

        B.      The Louisiana Action is Directly Related to Two Actions Filed Years Ago
                That Are Currently Pending in the EDLA (the LA *Luttrell* Litigation). ..............18

C.      The Louisiana Action and the Counterclaims Raise Both Factual and Legal
        Issues Distinct From the AOG Litigation. ...........................................................21

III.    THE COUNTERCLAIMS MUST BE DISMISSED PURSUANT TO RULE
        12(B)(3) BECAUSE VENUE IS NOT PROPER IN THIS COURT. .............................. 22

IV.     ALTERNATIVELY, THE COUNTERCLAIMS MUST BE DISMISSED
        PURSUANT TO RULE 12(B)(3) BASED ON PRINCIPLES OF *FORUM NON
        CONVENIENS* ............................................................................................... 23

V.      THE COUNTERCLAIMS MUST BE DISMISSED PURSUANT TO RULE
        12(B)(1) BECAUSE THEY ARE PREMATURE AND NOT RIPE FOR
        ADJUDICATION. .............................................................................................. 26

VI.     THE COUNTERCLAIMS MUST BE DISMISSED PURSUANT TO RULE
        12(B)(1) AND/OR RULE 12(B)(6) FOR FAILURE TO COMPLY WITH THE
        "PRESENTMENT" REQUIREMENT OF 33 U.S.C. § 2713 ......................................... 28

VII.    THE COUNTERCLAIMS SEEKING "ALL REMOVAL COSTS . . . AND
        INTEREST" AND A DECLARATORY JUDGMENT ON LIABILITY FOR
        REMOVAL COSTS OR DAMAGES MUST BE DISMISSED PURSUANT TO
        RULES 12(B)(1) AND 12(B)(6) BECAUSE THEY ARE SPECULATIVE,
        PREMATURE AND NOT RIPE FOR ADJUDICATION BY THIS COURT. ............. 33

VIII.   THE COUNTERCLAIMS MUST BE DISMISSED PURSUANT TO RULE
        12(B)(1) AND RULE 12(B)(6) PURSUANT TO THE DOCTRINE OF PRIMARY
        JURISDICTION AND FOR FAILURE TO EXHAUST ADMINISTRATIVE
        REMEDIES.......................................................................................................... 34

        A.      The Detailed Regulatory Procedure Governing Natural Resources Damages
                and the Ongoing and Incomplete NRDA Process..................................................35

        B.      The Natural Resources Damages Claims are Premature and Not Ripe. ................36

        C.      The Counterclaims are Subject to the Doctrine of Primary Jurisdiction. .............37

        D.      The Government has Not Exhausted the Administrative Process or
                Administrative Remedies.........................................................................................39

IX.     THE COUNTERCLAIMS SEEKING PENALTIES MUST BE DISMISSED
        PURSUANT TO RULE 12(B)(6) FOR FAILURE STATE A CLAIM.......................... 41

CONCLUSION ..................................................................................................... 44

Plaintiff/Counterclaim-Defendant, Taylor Energy Company LLC ("Taylor Energy"), respectfully submits this Memorandum in support of its Motion to Dismiss the claims asserted by Counterclaim-Plaintiff, the United States of America, "at the request of and on behalf of the United States Coast Guard" ("Coast Guard") (hereinafter referred to as the "United States").[1] For the reasons discussed herein, dismissal is warranted pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(3), and 12(b)(6). Accordingly, the United States' Counterclaims (the "Counterclaims") should be dismissed in their entirety.

## INTRODUCTION

As discussed herein, various *independent* grounds exist for the dismissal of the Counterclaims. Accordingly, the Counterclaims should be dismissed in their entirety pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(3), and 12(b)(6). The Counterclaims are a mirror image of an earlier filed action pending in the United States District Court for the Eastern District of Louisiana ("EDLA") (defined below as the "Louisiana Action") – the district where Taylor Energy is located, where *all* activities at issue occurred, and where related and threshold litigation (defined below as the "LA *Luttrell* Litigation") has been pending for twenty months. As such, dismissal is proper under the "first filed" doctrine. Additionally, venue is not proper in this Court under OPA's mandatory venue provision, 33 U.S.C. § 2717(b), because the discharge and alleged injury and damages in this matter occurred in the EDLA and Taylor Energy, the defendant to the Counterclaims, resides in the EDLA. Alternatively, dismissal is warranted under Rule 12(b)(3) and 28 U.S.C. § 1406(a) based on principles of *forum non conveniens*. The Counterclaims are also premature and not ripe for adjudication, warranting dismissal pursuant to Rule 12(b)(1), because

---

[1] Taylor Energy notes that its main demand was filed against the National Pollution Funds Center ("NPFC"), a unit of the Coast Guard. But the Counterclaims were filed by the United States on behalf of the Coast Guard, apparently not the NPFC.

they *presume* the validity of the Admin. Order, the Notice, and activities and alleged costs flowing therefrom - all of which are the subject of the LA *Luttrell* Litigation.

Additionally, the Government's failure to satisfy the "mandatory condition precedent" and "statutory prerequisite" of "presentment" requires dismissal of the Counterclaims pursuant to Rules 12(b)(1) and 12(b)(6) relating to the $43 million claim for reimbursement of amounts paid by the Oil Spill Liability Trust Fund without being first presented to Taylor Energy as the Responsible Party. Moreover, the claims for "all removal costs . . . and interest," irrespective of the circumstances and amounts, and for a declaratory judgment on liability for removal costs or damages must be dismissed because they are speculative, premature and not ripe for adjudication.

Furthermore, both the doctrine of primary jurisdiction and the failure to exhaust administrative remedies require dismissal of the Counterclaims relating to natural resources damages pursuant to Rules 12(b)(1) and 12(b)(6) because the detailed regulatory process governing natural resources damages is ongoing and in its early stages. Finally, the Counterclaims, which are *completely devoid* of any specific facts or allegations relating to the timing or quantity of alleged discharge or any "gross negligence or willful misconduct" by Taylor Energy, fail to state a claim for penalties.

For these various reasons, the Counterclaims should be dismissed in their entirety.

## FACTUAL BACKGROUND[2]

### I.     Taylor Energy and the Coast Guard Cooperated Closely for More than Ten Years.

In September of 2004, Hurricane Ivan traveled through the Gulf of Mexico in the direction of the central Gulf Coast. Taylor Energy was the lessee and operator of certain assets in the path

---

[2] The facts herein are based on the matter alleged in the Counterclaims, as well as other judicial matters, and the allegations contained in the public filings of such other judicial matters, including the parallel Louisiana Action (Exhibit "1") and the LA *Luttrell* Litigation (both hereinafter defined). Additionally, certain facts are based on the Declaration of William W. Pecue,

of Hurricane Ivan – namely, the MC20A Platform and a federal Outer Continental Shelf ("OCS") lease that included the MC20A Platform, wells and associated facilities (the location of which is hereinafter referred to as the "MC20 Site"). Hurricane Ivan's waves caused a massive progressive seafloor failure that toppled Taylor Energy's production platform and jacket (the "MC20 Incident").

Taylor Energy immediately notified the appropriate authorities of the loss of the platform and responded to the MC20 Incident. Taylor Energy was designated by the Coast Guard as the "Responsible Party"("RP") in accordance with the Oil Pollution Act of 1990 ("OPA"). Pursuant to the National Contingency Plan, Taylor Energy was also designated as a member of the "Unified Command," along with the Coast Guard, that was established to monitor the MC20 Site and study possible further actions to be taken in connection with the MC20 Incident. For more than a decade, the Coast Guard and Taylor Energy worked cooperatively and collaboratively under the Unified Command structure, and engaged in comprehensive collaborative scientific studies, assessments and evaluations, including coordination of *all* response efforts.

## II.    Because of Political Pressure, the Coast Guard Suddenly Stopped Cooperating With Taylor Energy and Began Concealing Information.

On October 22, 2018, the *Washington Post* published a front page article about the MC20 Incident which was largely inaccurate, one-sided, and designed for shock value. The article led with the sensationalized allegation that "300 to 700 barrels of oil per day have been spewing" into the Gulf of Mexico, which had no support in the established, comprehensive science previously accepted by both the Coast Guard and Taylor Energy.  Instead, the article was primarily based on

---

II, President of Taylor Energy ("Declaration") (Exhibit "2") and on the exhibits attached to that Declaration.

an untested, unverified, non-peer reviewed study by one individual – a theory which all now concede was essentially junk science.

In response to the article, and without any advance notice to Taylor Energy, the next day the Coast Guard issued Administrative Order No. 19-001 (the "Admin. Order"). The Admin. Order ordered, among other things, that Taylor Energy "institute a containment system to capture, contain, and remove oil" at the MC20 Site. Taylor Energy immediately sought reconsideration of the Admin. Order on October 24, 2018, and pointed out that the Coast Guard had provided Taylor Energy with no information to support the Admin. Order. Nonetheless, the Coast Guard, summarily denied Taylor Energy's request for reconsideration just one day later.

The Admin. Order also ordered Taylor Energy to attend a Unified Command meeting on November 6-9, 2018, where both the Coast Guard and Taylor Energy were to evaluate and select a containment and recovery system from six to eight competing proposals. But the Coast Guard declined to provide any information about the bidding contractors, or their proposed containment and recovery systems, to Taylor Energy. On November 9, 2018, the Coast Guard advised Taylor Energy that it had unilaterally selected a third party contractor Couvillion Group LLC ("Couvillion") as the contractor under the Admin. Order. On November 13, 2018, the Coast Guard informed Taylor Energy that it would have 48 hours to execute a "take it or leave it" contract with Couvillion, in which Couvillion insisted on onerous contract terms. Taylor Energy and Couvillion were unable to agree upon a commercially reasonable contract by the short deadline dictated by the Coast Guard.

The next day, on November 16, 2018, the Coast Guard took the almost unprecedented action of issuing a Notice of Federal Assumption ("Notice") in which the Coast Guard stated that it was partially assuming response actions pertaining to the MC20 Site. The Coast Guard then

accepted Couvillion's proposal which estimated that the "cost to design, fabricate and install the Rapid Response Containment, Capture and Recovery system" would be just over $3 million (which included a 30% contingency for "unknown" events) and that the scope of work could be completed within several weeks.  Exhibit "2-A" at 10.

Even though the Coast Guard was requiring Taylor Energy to "respond to recoverable oil at the site," the Coast Guard continued to keep Taylor Energy in the dark about work at the MC20 Site, despite Taylor Energy's repeated requests for information. For example, the Coast Guard sent a very cryptic letter on May 16, 2019, notifying Taylor Energy that Couvillion had installed its containment system. Taylor Energy responded with a plea for information in a May 24, 2019 letter, emphasizing again that it "has been provided virtually no data or information concerning the Coast Guard's selection of Couvillion, the deployment of the system at MC20, or the performance of the system to date." Exhibit "2-B" at 1. Taylor Energy requested basic information about the "design and installation of the containment system," "[d]etails and specifications of Couvillion's work," "[p]lanned or proposed additional activities for the MC20 Site," and "[t]imelines and plans of presently contemplated additional activities at MC20," among other items of information. *Id*. The Coast Guard ignored this and other requests for information about Couvillion's and the Coast Guard's activities at the MC20 Site.

III.    **The Government did Not Present the Bills for Removal Costs to Taylor Energy Until After they were Submitted To and Paid By the OSLTF.**

In addition to withholding information about Couvillion's and the Coast Guard's containment related activities that began in November of 2018, the NPFC delayed over eight months before presenting a bill to Taylor Energy for these alleged response activities. Taylor

Energy has received two bills from the NPFC, each of which were just two pages long and provided only five lines of detail. Exhibit "2" ¶¶11-12; Exhibits "2-C" and "2-D."[3]

The first bill dated July 10, 2019 was in the shocking amount of $27,132,834.30, and it showed that Couvillion's alleged expenses alone had so far totaled over $26 million. Exhibit "2-C" at 3-4. That was almost nine times the $3 million Couvillion originally proposed that was accepted by the Coast Guard. *See* Exhibit "2-A" at 10. Importantly, Taylor Energy first received indications of the magnitude of Couvillion's work almost nine months late. The second bill was dated March 13, 2020 and was for $15,673,417.77. Exhibit "2-D" at 4. Couvillion's alleged expenses in that bill were almost $11 million. *Id.*[4]

Instead of presenting each bill to Taylor Energy as the RP, as OPA requires, the Coast Guard submitted the bills to the Oil Spill Liability Trust Fund ("OSLTF") for payment and the OSLTF funded Couvillion's work. *See, e.g.*, Exhibit "2-E" at 2 (the "Coast Guard costs" and "contractor costs" were "paid by the Oil Spill Liability Trust Fund" and the Coast Guard wants Taylor Energy "to reimburse the OSLTF"); Exhibit "2-F" (the Coast Guard "contracted the Couvillion Group, using the Oil Spill Liability Trust Fund (OSLTF) to design, build and install a

---

[3] Taylor Energy has not paid either of these bills. Exhibit "2," ¶13. The bills both recognize that Taylor Energy is not obligated to pay them until the Coast Guard provides "an accounting," which the Coast Guard has not yet provided. Exhibit "2-C" at 6; Exhibit "2-D" at 6. The Coast Guard has supplied partial backup for parts of the bills, but has been unwilling to supply backup for key time periods (for example, the Coast Guard has not provided Couvillion's billings covering work during late December 2018 through late April 2019, which is when the largest group of expenses were apparently incurred since that is the time period covering the fabrication and installation of the containment system). And, there is no evidence that Couvillion has actually been paid.

[4] The vast majority of the amounts in the two bills were attributable to work allegedly performed by Couvillion. Each bill showed a total for expenses applicable to the "CG Contract," which was an apparent reference to the Coast Guard's contract with Couvillion. Exhibit "2," ¶14. In the first bill, Couvillion's charges were $26,286,067.77, and in the second bill, they were $10,971,184.27. Exhibit "2-C" at 4; Exhibit "2-D" at 4.

rapid response containment system . . ."). Indeed, the Counterclaims admit that "[t]he Coast Guard accessed the Oil Spill Liability Trust fund to fund [Couvillion's] work." Rec. Doc. 19, Counterclaims ¶ 56. It further provides that the $43,269,064.68 is "owed to the Fund," *id.* at ¶ 64, and referenced "costs incurred by the Fund." *Id.* at ¶ 75. Notably, the NPFC administers the OSLTF. 40 C.F.R. § 300.5.

## IV.    The United States' June 2, 2020 Demand Letter.

On June 2, 2020, the Coast Guard sent a Demand Letter – entitled a "Pre-filing Notice of Claims" – to Taylor Energy's counsel. Exhibit "2," ¶16; Exhibit "2-G." The Demand Letter stated that the Coast Guard "is prepared to file claims" against Taylor Energy "related to the [alleged] ongoing discharge of oil from the area leased and involving the oil and gas production facility owned and operated by Taylor Energy in the Gulf of Mexico." Exhibit "2-G" at 1.

In addition, the Demand Letter stated that the Coast Guard "will seek" in litigation:

- The recovery of approximately ***$43 million in removal costs paid by the Oil Spill Liability Trust Fund (the "Fund"),*** administered by the Coast Guard's National Pollution Funds Center, in response to the oil discharge from Taylor Energy's oil production facility in the MC-20 Block of the Mississippi Canyon area of the Gulf of Mexico, from Taylor Energy as a responsible party under Section 1002(a) of the Oil Pollution Act ("OPA"), 33 U.S.C. § 2702(a), and as an owner or operator of an Outer Continental Shelf facility under OPA Section 1004(c)(3), 33 U.S.C. § 2704(c)(3);

- A declaratory judgment, under the Declaratory Judgment Act, 28 U.S.C. § 2201(a), the OPA, 33 U.S.C. §§ 2702(a), 2704(c)(3), 2705, and 2717(f)(2), and the Clean Water Act ("CWA"), 33 U.S.C. § 1321(f)(4) & (5), against Taylor Energy for all removal costs and damages, including natural resource damages, to be incurred in this action and in any subsequent action or actions; and

- Civil penalties, under Section 311(b)(7) of the CWA, 33 U.S.C. § 1321(b)(7), against Taylor Energy of up to $48,192 per day of violation or $2,100 per barrel of oil that has been discharged; or at least $192,768 per day or up to $5,783 per barrel of oil that

> has been discharged, to the extent that the discharge of oil was
> the result of gross negligence or willful misconduct by Taylor
> Energy.

Exhibit "2-G" at 1-2 (emphasis added). As is evident from the emphasized language, the Coast Guard confirmed again in its Demand Letter that the $43 million in removal costs were in fact paid by the OSLTF *before* any "presentment" to Taylor Energy.

## V.     The Litigation Between Taylor Energy and the Coast Guard.

### A.     The LA *Luttrell* Litigation.[5]

On December 20, 2018, Taylor Energy filed a "Complaint to Vacate Administrative Order and For Other Relief" against Captain Kristi M. Luttrell, in her Official Capacity as Federal On-Scene Coordinator for the MC20 Unified Command, and the Coast Guard in the United States District Court for the Eastern District of Louisiana. Rec. Doc. 1, Civil Action No. 18-14046 (E.D. La.). In that action, for almost twenty months, Taylor Energy has been challenging the issuance of the Admin. Order and Notice discussed above relating to the Coast Guard's decision to undertake containment and other activities at the MC20 Site, including its retention of Couvillion. In the Complaint, Taylor Energy seeks vacateur of the Admin. Order, the Notice, and all actions taken in implementing them. *E.g., id.* at p. 52 (Taylor Energy seeks an order "[v]acating and holding unlawful and setting aside Admin. Order No. 19-001, dated October 23, 2018, and all actions, findings, and conclusions made pursuant thereto, including the Notice of Federal Assumption dated November 16, 2018," and "declaratory relief vacating and declaring the Admin. Order . . . , the selection of Couvillion Group, LLC, [and] the Notice of Federal Assumption . . . to be unlawful . . . .").

---

[5] As noted below, the two consolidated actions discussed in this section are referred to as "*Luttrell*" or the "LA *Luttrell* Litigation."

In a related lawsuit, also filed on December 20, 2018 in the United States District Court for the Eastern District of Louisiana, which was consolidated with the preceding action, Taylor Energy filed a "Complaint for Declaratory Judgment and Other Relief" against Couvillion. Rec. Doc. 1, Civil Action No. 18-14051 (E.D. La.). As referenced above, Couvillion is the contractor unilaterally hired by the Coast Guard to undertake the containment and other associated work at the MC20 Site allegedly under the auspices of the challenged Admin. Order and the Notice. In this action, again pending for almost twenty months, Taylor Energy seeks: 1) a declaratory judgment that Couvillion does not have the authority to conduct any activities at the MC20 Site and 2) damages arising from Couvillion's activities.

This consolidated litigation (Civil Action No. 18-14046, c/w 18-14051) currently pending in the Eastern District of Louisiana ("EDLA") is referred to herein as "*Luttrell*" or the "LA *Luttrell* Litigation." The issues in the LA *Luttrell* Litigation substantially overlap with the issues raised in the Demand Letter. As the docket in the LA *Luttrell* Litigation shows, the parties have undertaken substantial activity in the litigation over the past twenty months, including discovery of both the Coast Guard and Couvillion. And, notably, a Rule 30(b)(6) deposition of the Coast Guard has been ordered by the Court. It is expected to be held within the next month. A trial date is currently set for December 7, 2020.  Rec. Doc. 286, Civil Action No. 18-14046, c/w 18-14051 (E.D. La.).

**B.      The Louisiana Action.**

In response to the Demand Letter, on June 15, 2020, Taylor Energy filed a Complaint for Declaratory Judgment against the United States of America, acting by and through the United States Coast Guard and the United States Coast Guard National Pollution Funds Center in the United States District Court for the Eastern District of Louisiana. Rec. Doc. 1, Civil Action No. 20-01720 (E.D. La.), attached hereto as Exhibit "1" (the Louisiana Action"). As stated in that Complaint, "Taylor Energy seeks a declaratory judgment in connection with the issues raised in

the Coast Guard's counsel's June 2, 2020 letter," including that "Taylor Energy pay 'approximately $43 million in removal costs.'" Exhibit "1" at ¶ 1. Furthermore, Taylor Energy explained that it was filing the Louisiana Action in the EDLA because "the demand seeks to hold Taylor Energy responsible for the very activity that Taylor Energy is challenging" in the LA *Luttrell* Litigation. *Id.* at ¶ 5. "Indeed, the vast majority of the $43 million sought in the Demand Letter is attributable to work undertaken by Couvillion and its subcontractors, allegedly under the authority of the legally invalid Admin. Order." *Id.* Defendants' responsive pleadings in the Louisiana Action are due in mid-August.

Taylor Energy filed a Motion for Partial Summary Judgment in the Louisiana Action on July 17, 2020. Rec. Doc. 19, Civil Action No. 20-01720 (E.D. La.). Taylor Energy seeks dismissal of the United States' claim that Taylor Energy owes approximately $43 million in removal costs. As set forth in that motion, Taylor Energy is not responsible for these costs inasmuch as the United States failed to comply with the mandatory presentment requirement in the OPA. *See* 33 U.S.C. § 2713. Defendants have yet to respond. Instead, Defendants filed a Motion to Transfer Venue on July 21, 2020, invoking an unrecognizable and legally improper construction of the "first-filed rule" to claim that the AOG Litigation is the "first filed" action, and completely ignoring the LA *Luttrell* Litigation. Rec. Doc. 20, Civil Action No. 20-01720 (E.D. La.). Taylor Energy opposed this motion on July 28, 2020. *Id.*, Rec. Doc. 21. It is set for submission to the court on August 5, 2020.  Rec. Doc. 20-5.

C.     **The AOG Litigation and Counterclaims.**

Taylor Energy filed a judicial action for review of final agency action in this Court under the Administrative Procedures Act ("APA") (5 U.S.C. § 701, *et seq.*) against the NPFC on April 27, 2020 ( the "AOG Litigation"). Rec. Doc. 1. The judicial review relates to one limited issue: "The action seeks judicial review of the final decision by the NPFC in which it improperly denied

Taylor Energy's Claim invoking the act of God defense to its liability under the Oil Pollution Act of 1990 ('OPA') for the costs of responding to" the MC20 Incident. *Id*. at ¶ 5. If the NPFC had properly recognized the act of God defense, then Taylor Energy would have been entitled to reimbursement from the OSLTF of the approximately $353 million in removal costs it actually paid as of August 2017. *Id*. at ¶ 83. Because this is an administrative review governed by APA standards, Taylor Energy contends that the NPFC acted in an "arbitrary and capricious" manner in rejecting Taylor Energy's act of God statutory defense. *Id*. at ¶ 22. The primary issue is whether Taylor Energy is entitled to the protections of this statutory defense. This issue is separate and distinct and is independent of the issues raised in the LA *Luttrell* Litigation and the Louisiana Action.

Despite having nothing to do with the factual or legal issues raised in the AOG Litigation,[6] and despite the previously filed Louisiana Action and LA *Luttrell* Litigation, on July 10, 2020, the Coast Guard filed its Counterclaims. Rec. Doc. 19. Although the Counterclaims are essentially a mirror image of the Louisiana Action, the United States inexplicably failed to disclose the existence of the Louisiana Action.[7] Pursuant to Rule 12(b) of the Federal Rules of Civil Procedure, Taylor Energy now moves to dismiss the Counterclaims for the following independent reasons.

---

[6] Indeed, the AOG Litigation does not raise or relate to the subject matter of the LA *Luttrell* Litigation, the Admin. Order, the Notice, Couvillion's retention and work, or the Demand Letter.

[7] The Counterclaims also fail to mention the Demand Letter or the LA *Luttrell* Litigation.

## LAW AND ARGUMENT

### I.      Applicable Rule 12(b) Standards.

#### A.      Rule 12(b)(1).

Jurisdiction is a threshold issue, and a court must satisfy itself that it has subject matter jurisdiction to hear and decide a case before proceeding to the merits. *See Grand Lodge of Fraternal Order of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13 (D.D.C. 2001). Under Rule 12(b)(1), the party seeking to invoke the jurisdiction of a federal court (the United States here) bears the burden of establishing that the court has jurisdiction by a preponderance of the evidence. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992); *US Ecology, Inc. v. U.S. Dep't of Interior*, 231 F.3d 20, 24 (D.C. Cir. 2000) (citing *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 103-04 (1998); *Fontaine v. Bank of Am., N.A.*, 43 F. Supp. 3d 1 (D.D.C. 2014). In examining jurisdictional facts, a court may consider all relevant evidence, including material outside the pleadings. *See Land v. Dollar*, 330 U.S. 731, 735 (1947); *KVOS, Inc. v. Associated Press*, 299 U.S. 269, 279 (1936); *Jerome Stevens Pharmaceuticals, Inc. v. FDA*, 402 F.3d 1249, 1253-54 (D.C. Cir. 2005). As discussed below, there are various independent bases under which the Counterclaims should be dismissed pursuant to Rule 12(b)(1).

#### B.      Rule 12(b)(3).

A party may move to dismiss an action based on improper venue pursuant to Rule 12(b)(3). In considering a Rule 12(b)(3) motion, the court accepts the plaintiff's well-pled factual allegations regarding venue as true, draws all reasonable inferences from those allegations in the plaintiff's favor, and resolves any factual conflicts in the plaintiff's favor. *Mikkilineni v. Pa.*, No. 02-1205, 2003 U.S. Dist. LEXIS 13669, *22 (D.D.C. Aug. 5, 2003) (citing *2215 Fifth St. Assocs. v. U-Haul Int'l, Inc.*, 148 F. Supp. 2d 50, 54 (D.D.C. 2001)). The court, however, need not accept the plaintiff's legal conclusions as true. *Id.*  In addition, the court may examine facts outside of the

complaint to determine whether venue is proper. *Id.* (citing 5A FED. PRAC. & PROC. CIV. 2d § 1352). Moreover, the party seeking to assert a new claim (the United States here) bears the burden of alleging facts that demonstrate that venue is proper for that particular claim in this Court. *See Hunter v. Johanns*, 517 F. Supp. 2d 340, 343 (D.D.C. 2007) ("[T]he plaintiff . . . bears the burden of establishing that venue is proper.") (citations omitted). Here, the United States has not and cannot meet its burden to establish that venue for Counterclaims is proper in this Court. Accordingly, the Counterclaims should be dismissed under Rule 12(b)(3).

C.     **Rule 12(b)(6).**

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a court may dismiss a complaint, or any part thereof, for failure to state a claim upon which relief may be granted. *Jones v. Lieber*, 606 F. Supp. 2d 53, 56 (D.D.C. 2009). A motion to dismiss under Rule 12(b)(6) questions whether the complaint contains sufficient facts "to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). The court must accept all well-pleaded factual allegations of the complaint as true, but "conclusory allegations or legal conclusions masquerading as factual conclusions" are not considered. *Beavers v. Metro. Life Ins. Co.*, 566 F.3d 436, 439 (5th Cir. 2009) (citation omitted); *Mikkilineni*, 2003 U.S. Dist. LEXIS 13669, *12-13 (citing *Kowal v. MCI Communications Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994) ("The court need not accept as true legal conclusions cast as factual allegations."). When the complaint's allegations could not raise a claim of entitlement to relief, the claim should be dismissed, as "this basic deficiency should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007) (citation omitted). Here, the Counterclaims are devoid of any specific factual allegations entitling it to the relief requested. Rather, it is merely a generic recitation of the law.

Accordingly, Taylor Energy's Motion to Dismiss should be granted on multiple independent grounds.

## II.   The Counterclaims Must be Dismissed Pursuant to Rule 12(b)(3) and 28 U.S.C. § 1406 Because the Louisiana Action was "First Filed."

The Counterclaims must be dismissed for improper venue pursuant to Rule 12(b)(3) and 28 U.S.C. § 1406 because the claims are duplicative of a previously filed action pending in Louisiana. Therefore, the "first-filed" rule precludes the United States from prosecuting the later filed Counterclaims in this forum. "Federal Rule of Civil Procedure 12(b)(3) instructs the court to dismiss or transfer a case if venue is improper or inconvenient in the plaintiff's chosen forum." *Neubrech v. Am. Nat'l Red Cross*, Civil Action No. 04-0995 (RMU), 2005 U.S. Dist. LEXIS 3587, *4-5 (D.D.C. Mar. 2, 2005) (internal citations omitted). Furthermore, 28 U.S.C. § 1406(a) provides that "[t]he district court of a district in which is filed a case laying venue in the wrong division or district ***shall*** dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." (Emphasis added).

Here, it is undisputed that Taylor Energy filed the Louisiana Action in the EDLA – Taylor Energy's chosen venue where Taylor Energy is located and ***all*** activities at issue occurred – ***before*** the United States asserted its Counterclaims against Taylor Energy. Therefore, venue is improper here as to those later claims under the "first-filed" rule. *See Wash. Metro. Area Transit Auth. v. Ragonese*, 617 F.2d 828, 830 (D.C. Cir. 1980); *Furniture Brands Int'l, Inc. v. U.S. Int'l Trade Comm'n,* 804 F. Supp. 2d 1, 3-4 (D.D.C. 2011) (Bates, J.).

This Court should be guided by the well established D.C. Circuit precedent as set forth in *Wash. Metro. Area Transit Auth. v. Ragonese*:

> For more than [seven] decades the rule in this circuit has been that "[w]here two cases between the same parties on the same cause of action are commenced in two different Federal courts, the one which is commenced first is to be allowed to proceed to its conclusion first . . . ." *Speed Products Co. v. Tinnerman*, 83

> U.S.App.D.C. 243, 245, 171 F.2d 727, 729 (D.C. Cir. 1948), quoted in *Food Fair Stores, Inc. v. Square Deal Market Co.*, 88 U.S.App.D.C. 176, 177, 187 F.2d 219, 220 (D.C.Cir.1951). See *Continental Grain v. Barge FBL-585*, 364 U.S. 19, 26, 80 S. Ct. 1470, 4 L. Ed. 2d 1540 (1960). Considerations of comity and orderly administration of justice dictate that two courts of equal authority should not hear the same case simultaneously. *Hilton Hotels Corp. v. Weaver*, 117 U.S.App.D.C. 83, 83, 325 F.2d 1010, 1010 (D.C. Cir.1963) (per curiam), cert. denied, 376 U.S. 951, 84 S. Ct. 968, 11 L. Ed. 2d 971 (1964).

617 F.2d at 830; *see also Nat'l Family Planning & Reprod. Health Ass'n v. Sullivan*, 1992 U.S. Dist. LEXIS 15217, *5 (D.D.C. 1992) ("This principle of judicial comity is derived from the policies favoring the conservation of judicial resources as well as providing for the comprehensive disposition of litigation before the federal courts.").

When deciding whether to dismiss a case on the grounds that it is a parallel action, courts may also evaluate various equitable considerations. *Furniture Brands Int'l, Inc.,* 804 F. Supp. 2d at 6-7. In addition to the important consideration of which action is older, courts may consider the entire basket of equitable principles that can weigh in favor of one forum over another. *Id.* at 4-5. Such equitable considerations include: "(1) whether all parties are present in both cases, (2) the location of the witnesses, and (3) the stage of the respective proceedings." *Id.* at 6-7 (citation omitted).

Courts routinely dismiss actions based upon the existence of earlier-filed litigation involving the same issues. *Ragonese,* 617 F.2d at 831 (affirming dismissal of WMATA's enforcement action as "this circuit's 'first-to-file' rule mandated" because enforcement would be premature prior to the contract's interpretation and the process of interpretation had already commenced in a court of equal authority); *Bergh v. Washington*, 535 F.2d 505, 506-507 (9th Cir. 1976) (affirming dismissal of action concerning fishing regulations because of earlier-filed suit regarding validity of same regulations at issue); *Pacesetter Systems, Inc. v. Medtronic, Inc.*, 678 F.2d 93, 95 (9th Cir. 1982) (affirming dismissal of second-filed action regarding patent

infringement that raised identical issues as earlier-filed suit over patent); *Furniture Brands Int'l, Inc.,* 804 F. Supp. 2d 1 (granting motion to dismiss pursuant to the first-to-file rule in deference to the earlier action); *Poku v. FDIC*, 752 F. Supp. 2d 23 (D.D.C. 2010) (granting motion to dismiss because case was duplicative of case pending in another federal district court) (Bates, J.); *United Transp. Union v. National Mediation Bd.*, 1993 U.S. Dist. LEXIS 20910 (D.D.C. June 8, 1993) (granting motion to dismiss); *Action for Childrens Television v. FCC*, 827 F. Supp. 4, 15-16 (D.D.C. 1993) (granting FCC's motion to dismiss Evergreen as a plaintiff because its challenge to the indecency forfeiture at issue in a previously pending case are closely related to the constitutional claim in the later filed litigation); *see also Jordan v. Quander*, 2012 U.S. Dist. LEXIS 111473 (D.D.C. Aug. 9, 2012) (granting motion to dismiss) (Bates, J.). Here, the existence of the previously filed Louisiana Action (*i.e.,* the first filed action) that addresses all claims asserted in the Counterclaims, and the totality of the circumstances (including, but not limited to, the pending LA *Luttrell* Litigation, and the fact that venue is not proper in this Court), require the dismissal of the later filed Counterclaims.

### A.     The Louisiana Action is the "First Filed" Action.

It is well established that great deference is afforded to the venue selected by a plaintiff. *Wilderness Soc'y v. Babbitt*, 104 F. Supp. 2d 10, 12 (D.D.C. 2000) ("Absent specific facts that would cause a district court to question plaintiffs' choice of forum, plaintiffs' choice is afforded substantial deference."); *Shapiro, Lifschitz & Schram, P.C. v. R.E. Hazard, Jr. Ltd. Pshp.*, 24 F. Supp. 2d 66, 70 (D.D.C. 1998) ("Plaintiff's choice of forum is due substantial deference."). Here, Taylor Energy exercised its right to file suit against the United States in the EDLA, the venue where the MC20 Site is located, the venue where the costs identified in the Demand Letter were allegedly incurred, the venue where Taylor Energy is located, and the venue of its previously filed litigation involving related and threshold issues. Specifically, Taylor Energy filed its Louisiana

Action against the Coast Guard and the NPFC on June 15, 2020. *See* Exhibit "1." Nearly a month later, on July 10, 2020, the "United States of America . . . on behalf of the United States Coast Guard"[8] filed the Counterclaims. Rec. Doc. 19. These two actions are mirror images of one another. *Cf.* Exhibit "1" with Rec. Doc. 19. They involve identical factual and legal issues (*i.e.,* whether the United States is entitled to recover approximately $43 million in removal costs and is entitled to a declaratory judgment for past and future removal costs, damages and civil penalties), and the parties are likewise the same (*i.e.,* Taylor Energy and the Coast Guard).[9]

Although the Counterclaims curiously do not reference the June 2, 2020, Demand Letter, the claims alleged are virtually identical to the claims set forth in the Demand Letter. *Compare* Exhibit "2-G" with Rec. Doc. 19, Counterclaims ¶¶ 3-7 (both seeking approximately $43 million in removal costs and claiming entitlement to a declaratory judgment for past and future removal costs, damages and civil penalties). As set forth in its Complaint in the Louisiana Action, that litigation "arises out of the Demand Letter that is directly related to two previously filed actions in this Court which are currently pending."[10] Exhibit "1" at ¶ 2. Indeed, Taylor Energy filed the

---

[8] *See* Rec. Doc. 19 at 15.

[9] Here, the Counterclaim Plaintiff, the "United States of America . . . on behalf of the United States Coast Guard" is "substantially the same" as the defendants in the Louisiana Action, the United States of America, acting by and through the United States Coast Guard, and the United States Coast Guard National Pollution Funds Center, which is a unit of the Coast Guard. *See UtahAmerican Energy, Inc. v. Dep't of Labor*, 685 F. 3d 1118, 1124-25 (D.C. Cir. 2012) (concluding that parallel litigation on the same subject in two different courts was not appropriate where the defendant in one case (the Mine Safety and Health Administration) was a component of the defendant in the other (the Department of Labor)); *Carter v. Dir.*, 2019 U.S. App. LEXIS 28764, *2 (D.D.C. Sept. 23, 2019) (per curium) (finding that two officers of the U.S. Marshals Service and the U.S. Marshals Service in the first filed case are "substantially the same" as the Director of the U.S. Marshals Service in the later filed case).

[10] The Counterclaims remarkably fail to even mention the Louisiana Action or the LA *Luttrell* Litigation. And, surprisingly, the United States did not see fit to even notify this Court of

Louisiana Action as a direct result of the Demand Letter. And, Taylor Energy filed suit in the EDLA due to the two previously filed actions in the EDLA which are currently pending (the LA *Luttrell* Litigation).

In addition to the pure timing of the filing of these parallel cases, equitable considerations mandate dismissal of the Counterclaims in favor of the Louisiana Action: (1) all parties are present in both cases; (2) the key witnesses are located in the EDLA – *i.e.,* Taylor Energy (including its President, William Pecue, and its CFO, Dina Bracci Riviere), and Coast Guard New Orleans Sector that contracted with Couvillion under the challenged Admin. Order and Notice; and (3) while the Louisiana Action is in its early stages, the related previously filed LA *Luttrell* Litigation has been pending for approximately 20 months, discovery is ongoing and trial is set for December 2020.[11] *See Furniture Brands Int'l, Inc.,* 804 F. Supp. 2d at 6-7. There can be no question that the Louisiana Action was the first-filed case, and the later filed Counterclaims should be dismissed in favor of Taylor Energy's chosen forum. *See Ragonese,* 617 F.2d at 831.

### B. The Louisiana Action is Directly Related to Two Actions Filed Years Ago That Are Currently Pending in the EDLA (the LA *Luttrell* Litigation).

The LA *Luttrell* Litigation is not just related to "Taylor Energy's liability" as "the responsible party" in the Louisiana Action; the issues are inextricably intertwined and the outcome of the LA *Luttrell* Litigation directly controls the outcome of Louisiana Action and the parallel later filed Counterclaims. Indeed, the issues in the LA *Luttrell* Litigation involve threshold, dispositive issues that must be decided *before* the Louisiana Action (or the parallel Counterclaims)

---

the existence of those cases despite the requirement of Local Rule 40.5(b) ("[P]arties shall notify the Clerk of the existence of related cases….").

[11] *See* Section IV, *infra.*

could be fully resolved – for example, the legal validity of the Admin. Order, the Notice, and Couvillion's activities as the Coast Guard's contractor.

The relationship between LA *Luttrell* Litigation and the Louisiana Action are outlined in the opening paragraphs of the Complaint in the Louisiana Action:

2.

This Complaint arises out of the [Coast Guard's] Demand Letter that is directly related to two previously filed actions [the LA *Luttrell* Litigation] in this Court which are currently pending.

* * *

5.

The present Complaint is related to and arises out of [*Luttrell*] inasmuch as the Demand Letter seeks to hold Taylor Energy responsible for the very activities that Taylor Energy is challenging in [*Luttrell*]. Indeed, the vast majority of the $43 million sought in the Demand Letter is attributable to work undertaken by Couvillion and its subcontractors, allegedly under the authority of the legally invalid Admin. Order.

Exhibit "1" at ¶¶ 2, 5; *see also id*. at ¶ 30(a) ("Inasmuch as the $43 million sought in the Demand Letter is tied directly to the Admin. Order and Couvillion's alleged work and billings, the issues raised in the Coast Guard's Demand Letter cannot be addressed without first resolving the subject matter asserted in the [LA *Luttrell* Litigation] already pending in this district"); *id*. at ¶ 40(a) (Taylor Energy seeks a declaratory judgment that it "is not liable for any removal costs, penalties or damages because the Admin. Order and Couvillion's activities, which form the basis for the billings, are invalid and improper as a matter of law, all as set forth in [*Luttrell*] pending in this district"). In other words, the Louisiana Action is inseparable from and dependent upon resolution of the issues raised in *Luttrell*.[12]

---

[12] The United States erroneously relies upon the AOG Litigation as the alleged first filed action as the basis for its effort to have the Louisiana Action transferred here. But this is just a

Significantly, Taylor Energy filed a Notice of Collateral Proceeding in the Louisiana Action on June 16, 2020, pointing out that the Louisiana Action "is directly related to" *Luttrell*. Rec. Doc. 6, Civil Action No. 20-01720 (E.D. La.). Accordingly, the Louisiana Action was transferred to the same Section for handling on June 30, 2020. *Id.* at Rec. Doc. 9. Defendants never objected to Taylor Energy's Notice of Collateral Proceeding or explained how it is inaccurate.

The Louisiana Action (and likewise the later filed Counterclaims) cannot be decided on its own or independent of resolution of the threshold claims raised in the LA *Luttrell* Litigation.[13] Rather, the issues that are before the EDLA are inextricably intertwined with and determinative of the issues that are the subject of the Counterclaims.[14] As such, the Counterclaims should be dismissed in favor of the parallel first-filed Louisiana Action.[15]

---

further procedural ploy in forum shopping. Indeed, it is transparent *attempt* to take advantage of the more liberal "substantially overlap" standard of the Fifth Circuit. *See also En Fuego Tobacco Shop LLC v. United States FDA*, 356 F. Supp. 3d 1, 8-9 (D.D.C. 2019) (declining to re-engage in an independent or additional first-filed analysis following the Fifth Circuit's decision to transfer a case to the District of Columbia). There is absolutely *no* overlap between the AOG Litigation and the Counterclaims, much less are the claims "parallel" or even "substantially related." And, incredibly, the United States completely ignores the existence and relevance of the long-pending LA *Luttrell* Litigation.

[13] Likewise, the parallel Counterclaims are inseparable from *Luttrell* for the same reasons. Moreover, as a predicate to its claims, the Counterclaims necessarily address Admin. Order 19-001, the validity of which is the subject of the LA *Luttrell* Litigation. *See* Rec. Doc. 19 ¶ 52; *see also id.* ¶¶ 53 – 56 (reciting facts that are directly at issue in the LA *Luttrell* Litigation). Specifically, the LA *Luttrell* Litigation also challenges the Admin. Order ***and*** "all actions taken thereunder," *see e.g.,* Exhibit "1" at ¶ 90, which includes the $43 million sought in the Counterclaims as well as other future removal costs and damages.

[14] Indeed, many of the factual allegations recited in the Counterclaims are directly at issue in the LA Luttrell Litigation. *See e.g.,* Rec. 19, Counterclaim ¶¶ 52-56.

[15] Taylor Energy seeks dismissal as opposed to merely transfer of the Counterclaims. The Louisiana Action and the Counterclaims address the very same issues and are virtually duplicative and dismissal is warranted under various other independent grounds. And, courts routinely exercise their discretion to dismiss as opposed to transfer cases.

### C. The Louisiana Action and the Counterclaims Raise Both Factual and Legal Issues Distinct From the AOG Litigation.

The AOG Litigation addresses just one issue – whether Taylor Energy should be reimbursed for its removal costs paid through August 31, 2017 due to recognition of the "act of God" defense.[16] There is no other issue. It is a review of final agency action under the APA, and thus subject to the burdens and standards of review unique to that statute. Resolution of the distinct issue raised in the AOG Litigation is not dependent on resolution of any other litigation and does not raise or relate to the Louisiana Action, the LA *Luttrell* Litigation, the Admin. Order, the Notice, or the Demand Letter.

Just like the matters raised in the later filed Counterclaims, the Louisiana Action is a direct response to the Demand Letter in which the Coast Guard is seeking $43 million in removal costs, and other remedies, such as damages and penalties.  Exhibit "1" at ¶ 1. The Louisiana Action is also directly tied to the LA *Luttrell* Litigation because the Demand Letter, on which the Louisiana Action is based, "seeks to hold Taylor Energy responsible for the very activities that Taylor Energy is challenging" in the earlier filed LA *Luttrell* Litigation. *Id.* at ¶ 5; *see also id.* at ¶ 30(a) ("the issues raised in the Coast Guard's Demand Letter cannot be addressed without first resolving the subject matter" in the LA *Luttrell* Litigation). And the Louisiana Action's relationship to the Admin. Order and Couvillion's work are stressed throughout the Complaint in the Louisiana Action.[17] Moreover, unlike the AOG Litigation, the Louisiana Action is an ordinary action, not a judicial review of final agency action.

---

[16] Indeed, AOG Litigation relates to amounts already paid by Taylor Energy, while the parallel Louisiana Action and the Counterclaims address billings that Taylor Energy has not paid. The amounts at issue in the parallel actions are not at issue in the AOG Litigation, but are directly at issue in *Luttrell*.

[17] *See, e.g.,* Exhibit "1" at ¶5 ("Indeed, the vast majority of the $43 million sought in the Demand Letter is attributable to work undertaken by Couvillion and its subcontractors, allegedly

Finally, a review of all cases wherein a party sought review of the NPFC's determination regarding a statutory defense to liability under OPA did not reveal *any* cases where an enforcement action was brought as a counterclaim. Therefore, the Counterclaims are not typical, highlights that the AOG Litigation and the Counterclaims involve separate issues, and is particularly improper in light of Taylor Energy's earlier filed Louisiana Action and the LA *Luttrell* Litigation. At bottom, the existence of the previously filed Louisiana Action and the totality of the circumstances mandate dismissal of the later filed Counterclaims pursuant to Rule 12(b)(3) and 28 U.S.C. § 1406.

**III.    The Counterclaims Must be Dismissed Pursuant to Rule 12(b)(3) Because Venue is Not Proper in this Court.**

In addition to dismissal based upon the first-filed doctrine, Rule 12(b)(3) and 28 U.S.C. § 1406(a) provide an additional, independent basis for the dismissal. Here, the United States has not and cannot satisfy its burden that venue is proper in this Court for the matters asserted against Taylor Energy in the Counterclaims. *See Hunter*, 517 F. Supp.2d 340; *Modaressi*, 441 F. Supp.2d at 53.

OPA's venue provision states, "[v]enue shall lie in any district in which the discharge or injury or damages occurred, or in which the defendant resides, may be found, has its principal office, or has appointed an agent for service of process." 33 U.S.C. § 2717(b). "The mandatory text of OPA's venue provision – that "[v]enue **shall** lie," 33 U.S.C. § 2717(b) (emphasis added) – indicates Congress's intent that § 2717(b) serve as the exclusive source of venue for OPA claims." *Water Quality Ins. Syndicate v. Nat'l Pollution Funds Ctr.*, 2020 U.S. Dist. LEXIS 13333, *13

---

under the authority of the legally invalid Admin. Order."); *id*. at ¶ 30(a) ("As noted above, two consolidated actions are already pending in this district relating to the validity of the Admin. Order and the MC20 activities undertaken by Couvillion on behalf of the Coast Guard"); *id*. at ¶ 40(a) ("the $43 million sought in the Demand Letter is tied directly to the Admin. Order and Couvillion's alleged work and billings").

(S.D.N.Y. Jan. 27, 2020). As such, the venue provision Congress explicitly established for controversies arising from OPA cannot be circumvented by relying on more general venue provisions. *See, i.e., Nat'l Educ. Training Grp., Inc. v. Resolution Tr. Corp.*, 794 F. Supp. 838, 840 (N.D. Ill. 1992) (holding the specific venue provision of the National Bank Act of 1864 "trumps" the general venue provision of 5 U.S.C. § 703); *Burns, Nordeman & Co. v. Am. Nat. Bank & Tr. Co.*, 394 F.2d 300, 303 (2d Cir. 1968). Yet that is exactly what the Government posits in its venue allegation. *See* Rec. Doc. 19, Counterclaims ¶ 9.[18]

Here, venue in the District of Columbia is improper under § 2717(b). The discharge and alleged injury and damages in this matter occurred in the EDLA, not the District of Columbia. *See* Rec. Doc. 19, Counterclaims ¶ 45. Indeed, the gravamen of the matters asserted in the Counterclaims all are from actions taken (the Admin. Order, Notice, Couvillion's retention and activities) and costs incurred in Louisiana and at the MC20 Site in the Gulf of Mexico. Moreover, Taylor Energy, the defendant to the Counterclaims, resides in the EDLA, not the District of Columbia, and Taylor Energy has absolutely no presence in the District of Columbia. *See id.* at ¶ 11; Exhibit "2," ¶ 2.  Accordingly, venue in this Court is improper. This Court should dismiss the Counterclaims in accordance with Rule 12(b)(3).

## IV.     Alternatively, the Counterclaims Must be Dismissed Pursuant to Rule 12(b)(3) Based on Principles of *Forum Non Conveniens*

In addition, principles of *forum non conveniens* preclude venue here. The doctrine of *forum non conveniens* is based on the inconvenience of the chosen venue and a court has discretion to dismiss even if jurisdiction and venue are otherwise proper. *American Dredging Co. v. Miller*, 510

---

[18] Because the issues asserted in the AOG Litigation are distinct from the matters raised in the Counterclaims, Taylor Energy's choice to file the AOG Litigation here is irrelevant to whether venue is proper when Taylor Energy is sought to be made a defendant.

U.S. 443, 448-49 (1994) (factors relevant to *forum non conveniens*); *see* 28 U.S.C. § 1404. The Court should exercise its discretion to dismiss the Counterclaims on the grounds of *forum non conveniens* because "considerations of convenience, efficiency, and justice" overwhelmingly favor the EDLA as the proper forum. *Koster v. Lumbermens Mut. Cas. Co.*, 330 U.S. 518, 528 (1947).

In considering whether to grant a motion to dismiss for *forum non conveniens*, a court first determines whether the proposed alternative forum is adequate. *Irwin v. World Wildlife Fund, Inc.*, 448 F. Supp. 2d 29, 32 (D.D.C. 2006) (citations omitted). As long as the alternative forum provides some potential avenue for redress, that forum generally will be considered adequate. *See* James M. Moore et al., Moore's Federal Practice-Civil §111.74 (2017). If the alternative forum is adequate, the court then balances the private interests of the litigants and the interests of the public. *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 254-61 (1981); *El-Fadl v. Central Bank of Jordan*, 75 F.3d 668, 677-78 (D.C. Cir. 1996), *rev'd on other grounds*, *Samantar v. Yousuf*, 560 U.S. 305 (2010). The public interest factors in a *forum non conveniens* inquiry include: "local interest in having localized controversies decided at home; the possibility of holding the trial in a forum at home with the law that must govern the case, rather than having a court in some other forum untangle problems in conflict of laws, and in law foreign to itself; and avoiding the imposition of jury duty on people of a community [that] has no relation to the litigation and other administrative difficulties that flow from foreign litigation congesting local courts." *MBI Grp., Inc. v. Credit Foncier du Cameroun*, 616 F.3d 568, 576 (D.C. Cir. 2010) (quotations and alteration omitted). Indeed, a court's balancing of public interest factors alone is sufficient to affirm its decision to dismiss for *forum non conveniens*. *See Jackson v. Am. Univ. in Cairo*, 52 F. App'x 518, 518 (D.C. Cir. 2002).

It is well-settled that a court can dismiss a case on *forum non conveniens* grounds if either the private factors or the public factors warrant dismissal. *See id.* ("Piper . . . indicates that either private interest factors or public interest factors may be cause for dismissal.") (citing *Piper Aircraft*, 454 U.S. at 242–44). The private factors include the "ease of access to sources of proof; availability of compulsory process for attendance of unwilling witnesses, and the cost of obtaining attendance of willing, witnesses; . . . and all other practical problems that make trial of a case easy, expeditious and inexpensive." *MBI Grp., Inc.*, 616 F.3d at 576 (citing *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 518 (1947)).

Here, clearly an alternative and more appropriate forum already exists – the Eastern District of Louisiana where the MC20 Site is located and Taylor Energy resides. Moreover, the public and private factors overwhelmingly support dismissal in favor of the EDLA. As discussed above, the LA *Luttrell* Litigation is inextricably intertwined with the factual and legal issues raised by the Counterclaims, and the Counterclaims cannot be determined without those initial matters being determined first. The LA *Luttrell* Litigation has been pending for years,[19] and will continue to proceed in the EDLA to resolution. To proceed in a new venue is contrary to the goals of judicial efficiency.[20] Additionally, the documents and other evidence (*e.g.,* the MC20 Site, the containment system that is the subject of certain costs claimed in the Counterclaims, and any other physical equipment or facilities for which the United States claims Taylor Energy is responsible) are almost

---

[19] The parties have undertaken substantial activity in the litigation over the past year and a half, including thousands upon thousands of pages of filings with exhibits and discovery of both the Coast Guard and Couvillion.

[20] In contrast to the matters raised in the Counterclaims that are dependent upon resolution of issues already pending in Louisiana, the AOG Litigation involves **completely** distinct facts (*i.e.,* facts related to the administrative process and scientific/technical information concerning the "act of God" event), which are based on the review of the Administrative Record.

exclusively located within the EDLA. Similarly, the key witnesses are located in the EDLA.[21] Indeed, (i) the MC20 Site is located within the EDLA; (ii) the Coast Guard Sector New Orleans responsible for the MC20 Incident, the issuance of the Admin. Order, the Notice, and Couvillion's retention and performance is located within the EDLA; (iii) other relevant officials participating in the response are located within the EDLA; (iv) the Unified Command meetings all took place in the EDLA; and (v) Taylor Energy's office is located in the EDLA. Taylor Energy does not have *any* presence in the District of Columbia. Exhibit "2," ¶ 2.  For these reasons, principles of *forum non conveniens* strongly weigh in favor of dismissing the Counterclaims under Rule 12(b)(3).

## V.    The Counterclaims Must be Dismissed Pursuant to Rule 12(b)(1) Because They Are Premature and Not Ripe for Adjudication.

The Counterclaims are premature and not ripe for adjudication because they **presume** the validity of the Admin. Order, the Notice, and activities and alleged costs flowing therefrom - all of which are the subject of the LA *Luttrell* Litigation. Dismissal is therefore warranted under Rule 12(b)(1) because this Court lacks subject matter jurisdiction.

"At the most elemental level, the constitutional minimum for the exercise of [this Court's] jurisdiction is a dispute presenting a justiciable 'case or controversy.'" *Wyoming Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43 (D.C. Cir. 1999) (citations omitted). To be a case or controversy for Article III jurisdictional purposes, the litigation must be "constitutionally and prudentially ripe." *Wyoming Outdoor Council*, 165 F.3d at 48 (quoting *Louisiana Envtl. Action Network v.*

---

[21] To the extent that any Coast Guard witnesses are located in Washington, D.C., they are likely to be witnesses on ministerial issues (such as when bills were received and paid, by way of example). But the key witnesses – the witnesses with actual, on-site knowledge about the day-to-day work at the MC20 Site which are the subject of the Counterclaims – are undoubtedly based in New Orleans. Indeed, most are the same Coast Guard personnel who are involved in the activities at issue in the LA *Luttrell* Litigation. Finally, the activities that are addressed in the Counterclaims all concern conduct in Louisiana.

*Browner*, 87 F.3d 1379, 1384 (D.C. Cir. 1996)). "Just as the constitutional standing requirement for Article III jurisdiction bars disputes not involving injury-in-fact, the ripeness requirement excludes cases not involving present injury." *Wyoming Outdoor Council*, 165 F.3d at 48; *see also National Treasury Employees Union v. United States*, 101 F.3d 1423, 1427 (D.C. Cir. 1996). "A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Pfizer Inc. v. Shalala*, 182 F.3d 975 (D.C. Cir. 1999) (quoting *Texas v. United States,* 523 U.S. 296, 300 (1998)). As such, if a case is predicated upon the resolution of pending litigation that involves whether the alleged injury actually exists in the first place, as here, it is not judicially ripe for adjudication. *See also In re BofI Holding S'holder Litig.*, No. 3:15-cv-02722-GPC-KSC, 2018 U.S. Dist. LEXIS 96155 (S.D. Cal. June 7, 2018) (finding that a significant portion of a shareholder derivative complaint was unripe because breach of fiduciary duty claims were contingent in that they depended upon the outcome of pending securities fraud and whistleblower litigation); *Penn-America Ins. Co. v. Mapp*, 461 F. Supp. 2d 442, 458 (E.D. Va. 2006) (holding that it is premature to rule on plaintiff's duty to indemnify while the underlying action remains pending).

Here, as discussed in detail in Section II, *supra,* the matters alleged in the Counterclaims cannot be decided on their own or independent of the LA *Luttrell* Litigation.[22] Rather, the issues that are before the EDLA in the LA *Luttrell* Litigation are inextricably intertwined with and a ***precursor*** to the issues that are the subject of the Counterclaims. And, until those threshold issues are ruled upon (including the exhaustion of all appeal rights), the Counterclaims are wildly

---

[22] *See* note 13, *supra*.

premature and is not ripe for adjudication by this Court. Indeed, there is no injury if the Admin. Order, the Notice, and Couvillion's retention are held invalid.

It bears repeating that the Counterclaims seek to hold Taylor Energy responsible for the very activities that Taylor Energy is challenging in the LA *Luttrell* Litigation. Specifically, the United States is seeking $43 million in removal costs, and other remedies, such as damages and penalties. Exhibit "1" at ¶ 1. The vast majority of the $43 million sought apparently is attributable to activities undertaken by Couvillion and its subcontractors and suppliers, allegedly under the authority of the legally invalid Admin. Order, Notice and contract. *See* Exhibit "2," ¶ 14; Exhibit "2-C" at 4; Exhibit "2-D" at 4. Likewise, future removal costs as sought in the Counterclaims will also undoubtedly fall into this same category. The United States cannot simply ignore the legal predicate for its claims (*i.e.,* the legal validity of its actions and the actions of contractors which are the subject of the LA *Luttrell* Litigation) as it has attempted to do.   Accordingly, the Counterclaims should be dismissed under Rule 12(b)(1) to the extent it seeks adjudication of premature and unripe claims.

## VI.   The Counterclaims Must be Dismissed Pursuant to Rule 12(b)(1) and/or Rule 12(b)(6) for Failure to Comply with the "Presentment" Requirement of 33 U.S.C. § 2713.[23]

As a "***mandatory condition precedent***" to filing suit and a ***statutory prerequisite*** to recovery of any removal costs from a Responsible Party, OPA requires that a claimant, here the Government, present removal cost claims to the Responsible Party ***before*** it "present[s] the claim[s] to the [Oil Spill Liability Trust Fund]" ("OSLTF") for payment. 33 U.S.C. § 2713(a) and

---

[23] Taylor Energy has already filed a Motion for Partial Summary Judgment in the Louisiana Action on this very issue. *See* Rec. Doc. 19, Civil Action No. 20-01720 (E.D. La.). However, in light of Taylor Energy's responsive pleading deadline to the Counterclaims, and out of an abundance of caution, Taylor Energy raises presentment here as a jurisdictional bar, mandatory condition precedent, and a statutory prerequisite, barring recovery.

(c). Here, the United States has failed to meet this "mandatory condition precedent" and therefore fails to state a claim for reimbursement of the $43 million in the Counterclaims.[24] Additionally, any claims for removal costs or damages against Taylor Energy for uncertain future amounts allegedly due are premature and speculative, and, by definition, could not satisfy the "mandatory condition precedent" of presentment.[25] The claims for reimbursement of the $43 million and any unknown future claims that have not yet been presented to Taylor Energy must be dismissed.

Although OPA contains detailed provisions controlling the liability of a "responsible party" for removal costs (33 U.S.C. § 2701, *et seq*.; 33 U.S.C. § 2702), it expressly requires, with certain exceptions not applicable here, that "***all*** claims for removal costs or damages ***shall be presented first to the responsible party*.**" *Id.* § 2713(a) (emphasis added). ***Thereafter,*** if the claim is not resolved to the claimant's satisfaction within 90 days or the responsible party denies all liability, only then may the claimant "elect to commence an action in court against the responsible party . . . or to present the claim to the [Oil Spill Liability Trust] Fund." *Id.* at § 2713(c). Notably, the Government acknowledges this "presentment" requirement in OPA, but then ignores this statutory predicate. *See* Rec. Doc. 19, Counterclaims ¶ 21.

OPA's presentment requirement is no mere formality. Just the opposite – it creates a jurisdictional defect that mandates denial of a claim if the claimant failed to comply. *Boca Ciega*

---

[24] *See* Rec. Doc. 19, Counterclaims ¶¶ 3 and 4.

[25] *See id.* at ¶ 5. Taylor Energy raises this point out of an abundance of caution. While Taylor Energy does not read the First, Second or Third Counterclaims as seeking a declaration that any and all future ***amounts*** must unequivocally be paid by Taylor Energy, to the extent that the United States is seeking such an advisory ruling, such claims can easily be dismissed. Not only have they not been "presented," but they are speculative, premature, and unripe, as discussed in more detail in Section VII, *infra*.

*Hotel, Inc. v. Bouchard Transp. Co.*, 51 F.3d 235, 240 (11th Cir. 1995) (holding "that the clear text of § 2713 creates a mandatory condition precedent barring all OPA claims unless and until a claimant has presented her claim" in accordance with the statute); *Marathon Pipe Line Co. v. LaRoche Indus. Inc*., 944 F. Supp. 476, 477 (E.D. La. 1996) ("§ 2713's presentation requirement is jurisdictional and mandates dismissal when that provision is applicable and not complied with by the claimant."); *Johnson v. Colonial Pipeline Co*., 830 F. Supp. 309, 311 (E.D. Va. 1993) (dismissing the plaintiffs' OPA claims because the plaintiffs' failure to satisfy the presentment requirement constituted a "jurisdictional defect"); *Gabarick v. Laurin Mar (America) Inc.*, 2009 U.S. Dist. LEXIS 20974, *14-20 (E.D. La. Jan 12, 2009) (granting barge owner's motion to dismiss, holding that it lacked subject matter jurisdiction over the OPA claims because § 2713's "mandatory condition precedent" to filing suit - the statutory notice/presentment requirements - were not met); *Abundiz v. Explorer Pipeline Co*., Nos. 3:03-cv-0508-H, 3:03-cv-0787-H, Memorandum Opinion and Order, at *2 (N.D. Tex. Nov. 25, 2003) (granting a motion to dismiss "on the merits" because the "plaintiffs had failed to meet the presentation requirement under OPA" and thus lacked subject matter jurisdiction to entertain such claims). The principal purpose of the mandatory presentment requirement is to encourage the resolution of claims arising from an oil spill without involving the courts. *Boca Ciega Hotel, Inc.*, 51 F.3d at 238-39 (OPA seeks "to encourage settlement and avoid litigation"); *Gabarick*, 2009 U.S. Dist. LEXIS 20974 (E.D. La. Jan. 12, 2009) (declining to interpret OPA to "nullify the very administrative process" created by the statute); *Johnson*, 830 F. Supp. at 310 ("The purpose of the claim presentation procedure is to promote settlement and avoid litigation.").

The Government undeniably failed to comply with the OPA presentment requirement in connection with the $43 million, and it appears to have done so intentionally. As noted above, the

Coast Guard, mostly through its contractor Couvillion, started incurring massive expenditures purportedly relating to removal costs in November of 2018. However, instead of presenting those bills to Taylor Energy as the Responsible Party for input, review and, if proper, payment, the Coast Guard automatically submitted the bills to the OSLTF for payment. *See generally,* Exhibit "2," ¶¶ 11-16. Indeed, the Counterclaims admit skipping this "presentment" requirement. The Government states that "[t]he Coast Guard accessed the Oil Spill Liability Trust fund to fund [Couvillion's] work." Rec. Doc. 19, Counterclaims ¶ 56. It further provides that the $43,269,064.68 is "owed to the Fund," *id.* at ¶ 64, and referenced "costs incurred by the Fund." *Id.* at ¶ 75.  Only many months after the bills were submitted to the OSLTF, and were actually paid by the OSLTF, did the United States then send the two bills to Taylor Energy. *See generally,* Exhibit "2," ¶¶ 11-16. By the time Taylor Energy received the first request for reimbursement (July 2019), the Government had apparently already incurred and paid more than $28 million on Couvillion's $3 million accepted proposal. The failure to satisfy the "mandatory condition precedent" of presentment to Taylor Energy prior to presenting the claim to the OSLTF for payment requires dismissal of the Counterclaims relating to the $43 million.

Moreover, the fact that the OSLTF has already paid the claim means that there is no way for the Coast Guard to cure this fatal flaw. Because the bills were submitted to the OSLTF for payment and actually funded by the OSLTF *before* Taylor Energy had any opportunity for input, review or objection, any presentment to Taylor Energy now would be meaningless. The United States cannot "put the genie back in the bottle." Indeed, the United States' actions here are severely prejudicial to Taylor Energy. Beginning in November of 2018 when the Coast Guard selected Couvillion as the contractor, Taylor Energy continually asked for information relating to Couvillion's work. It did so in order to perform its obligations and exercise its rights as the

Responsible Party. But Taylor Energy was met with silence and/or concealment by both the Government and Couvillion. Taylor Energy only knew – or thought it knew – that Couvillion's work would be in the range of $3 million and performed in a matter of only a few weeks. *See* Exhibit "2-A" at 10. Unknown to Taylor Energy, Couvillion was generating excessive bills in the tens of millions.[26] The $27 million bill showed that Couvillion had run up expenses of over $26 million, almost ten times its represented estimate of $3 million. *See* Exhibit "2-C." If the Coast Guard had shared information with Taylor Energy timely, Taylor Energy would have had a meaningful opportunity for input and review. Taylor Energy was consciously deprived of that opportunity and right forever.

"[S]trict adherence to the procedural requirements specified by the legislature is the best guarantee of evenhanded administration of the law." *Hallstrom v. Tillamook County*, 493 U.S. 20, 31 (1989). The United States must comply with the law, not just the parts of the law that are convenient for it. *See, e.g., Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1909 (2020) (citation omitted). Allowing the Government to cut corners and skip the presentment stage would not only be contrary to the plain statutory language and jurisprudence, but it would establish a harmful precedent, and place Taylor Energy and other Responsible Parties in serious jeopardy when dealing with overzealous or heavy-handed governmental officials. Accordingly, the Counterclaims relating to the $43 million should be dismissed for failure to satisfy the "presentment" requirement.

---

[26] Couvillion submitted its first invoice to the Coast Guard on December 3, 2018 – nearly seven months before Taylor Energy received the first request from the Coast Guard for "reimbursement" – and they appear to have sent bills thereafter every two weeks or so. Exhibit "2," ¶ 17.

**VII.    The Counterclaims Seeking "all removal costs . . . and interest" and a Declaratory Judgment on Liability for Removal Costs or Damages Must be Dismissed Pursuant to Rules 12(b)(1) and 12(b)(6) Because They are Speculative, Premature and Not Ripe for Adjudication by this Court.**

The Claims for "all removal costs . . . and interest," irrespective of the circumstances and amounts, and for a declaratory judgment on liability for removal costs or damages must be dismissed because they are speculative, premature and not ripe for adjudication. *See* Rec. Doc. 19, First Counterclaim, Second Counterclaim, and Third Counterclaim. Indeed, ruling on such unknown matters – for instance, what removal costs or damages may actually be (*i.e.,* the sums certain), whether such removal costs or damages were properly incurred or valid, and whether such amounts are accurate and do not contain billing errors – at this time would be improper and grossly unfair.

In addition to the blatant unfairness of a court adjudicating such unknowns, the statutory regime precludes the Court from such a determination at this time. The plain language of 33 U.S.C. §2717(f)(2), upon which the United States relies for its Third Counterclaim, provides as follows:

> An action for recovery of removal costs referred to in section 2702(b)(1) of this title must be commenced within 3 years after completion of the removal action. In any such action described in this subsection, the court shall enter a declaratory judgment on liability for removal costs or damages that will be binding on any subsequent action or actions to recover further removal costs or damages. Except as otherwise provided in this paragraph, an action may be commenced under this subchapter for recovery of removal costs at any time after such costs have been incurred.

Because the United States is statutorily barred from bringing an "action for recovery of removal costs" (as discussed in Section VI), seeking a declaratory judgment, at best, is premature. Because the Government fails to state a claim with respect to "such action," a "declaratory judgment on liability for removal costs or damage is likewise improper." Accordingly, with the dismissal of the $43 million claim, this Court must also dismiss the declaratory judgment claim.

Furthermore, any declaratory judgment on *liability* (at the appropriate time), does not relieve the Government from (a) complying with the mandatory condition precedent of presenting future claims (*see* 33 U. S. C. §2713);[27] and (b) only being permitted to commence an action "after such costs have been incurred" (*see* 33 U. S. C. §2717(f)(2)). Indeed, these two requirements go hand in hand.

Pursuant to 33 U.S.C. § 2701(3) "'claim' means a request, made in writing for a ***sum certain***, for compensation for damages or removal costs resulting from an incident." (Emphasis added). And, a sum certain is not known until such costs have been incurred. Moreover, "the statutory language envisions that a claimant will bring a series of claims over the course of conducting removal actions, rather than one lump claim at the end." *In re Oil Spill*, 2011 U.S. Dist. LEXIS 131069, *41, n.28 (Nov. 14, 2011) (citing 33 U. S. C. §2717(f)(2)). Therefore, any Counterclaims relating to unknown or future removal costs are speculative, premature and not ripe for adjudication. The United States' First, Second and Third Counterclaims must be dismissed pursuant to Rules 12(b)(1) and 12(b)(6).

## VIII.   The Counterclaims Must be Dismissed Pursuant to Rule 12(b)(1) and Rule 12(b)(6) Pursuant to the Doctrine of Primary Jurisdiction and for Failure to Exhaust Administrative Remedies.

Pursuant to Rules 12(b)(1) and 12(b)(6), Taylor Energy moves to dismiss the claims relating to natural resources damages (Third Counterclaim and Fifth Counterclaim). Such claims are premature and are not ripe for adjudication. Their subject matter falls within the agency's (*i.e.,*

---

[27] Although the United States acknowledges it is bound by the presentment requirement, *see* Rec. Doc. 19, Counterclaims ¶ 21, it has not, and cannot, present a "claim" for a "sum certain" in connection with any of the future removal costs or damages. Nor have the events occurred that would otherwise allow the United States to file a judicial action (*i.e.,* a denial of all liability by the Responsible Party or the passage of 90 days since the Demand Letter). Curiously, the Counterclaims do not even mention the Demand Letter.

the Coast Guard's) primary jurisdiction, and the detailed administrative process expressly set forth in the regulations, which is incomplete and ongoing. Consequently, this Court should dismiss these claims as the United States has failed to state a claim upon which relief can be granted. Both the doctrine of primary jurisdiction and failure to exhaust administrative remedies require dismissal.

A.   **The Detailed Regulatory Procedure Governing Natural Resources Damages and the Ongoing and Incomplete NRDA Process.**

OPA and its regulations establish an elaborate natural resources damages assessment process for the evaluation and restoration of natural resources that have been contaminated by the discharge, or threatened discharge, of oil. 33 U.S.C. § 2701 *et seq*. Pursuant to 33 U.S.C. § 2706(c), the Federal Trustees, which are comprised of Federal officials acting on behalf of the public as trustees for natural resources, must assess the natural resources damages that may result from an oil spill. The NRDA regulations outline the procedure for such an assessment.  15 C.F.R. § 990.10 *et seq*. (the "NRDA Process"). Specifically, the NRDA regulations – at issue in this case – dictate the process for collecting, compiling, and analyzing information to assess the extent of any injury to a natural resource and to determine appropriate restoration and compensation for such injuries. These regulations attempt to simplify the process for assessing natural resources damages by providing a three-step procedure: (1) the Pre-assessment Phase; (2) the Restoration Planning Phase, and (3) the Restoration Implementation Phase. *See id.* However, each phase has its own procedural nuances and requirements that dictate the required process/procedure. *See id.; see e.g.,* 15 C.F.R. § 990.44 (requiring a Notice of Intent to Conduct Restoration Planning); 15 C.F.R. § 990.45 (requiring that Federal Trustees open and maintain an administrative record in a manner consistent with the Administrative Procedure Act for the Restoration Planning Phase); 15 C.F.R. § 990.61 (requiring that Federal Trustees open and maintain an administrative record for the Restoration Implementation Phase).

Upon development of a Final Restoration Plan, the Federal Trustees must present a written demand to the responsible parties. *See* 15 C.F.R. § 990.62. The responsible parties must respond within ninety (90) calendar days in writing by paying or providing binding assurance they will reimburse trustees' assessment costs and implement the plan or pay assessment costs and the trustees' estimate of the costs of implementation. If the responsible parties do not agree to the demand within ninety (90) calendar days after trustees present the demand, the trustees may either file a judicial action for damages or present the uncompensated claim for damages to the OSLTF, as provided in section 1012(a)(4) of OPA (33 U.S.C. 2712(a)(4)) or seek an appropriation from the OSLTF as provided in section 1012(a)(2) of OPA (33 U.S.C. 2712(a)(2)). *See* 15 C.F.R. § 990.64. Therefore, under the express requirements of the NRDA regulations, judicial action for damages is *only* appropriate *after* the administrative process has run its course and certain prerequisites have been satisfied. Here, because the Government seeks to "circumvent" this agency process, judicial action is at best premature and not ripe for adjudication.

B.     **The Natural Resources Damages Claims are Premature and Not Ripe.**

This Court should dismiss these claims as premature and not ripe since the NRDA Process is ongoing, in its early stages, and completion is necessary to assess any damages. Courts regularly dismiss claims pursuant to Rule 12(b)(1) where judicial intervention would be premature and such claims are not ripe. *See e.g., St. Croix Chippewa Indians of Wis. v. Kempthorne*, 2008 U.S. Dist. LEXIS 76103, *24-25 (D.C. Cir. Sept. 30, 2008). The ripeness doctrine is intended to "prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967). "In examining whether a claim is ripe for review, the Court must consider: '(1) whether delayed review

would cause hardship to the plaintiff []; (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3) whether the [C]ourt [] would benefit from further factual development of the issues presented.'" *Kempthorne*, 2008 U.S. Dist. LEXIS *24-25 (quoting *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 733 (1998)). All of these elements exist here.

It is beyond dispute that the NRDA Process for the MC20 Incident is ongoing and incomplete.  In fact, this NRDA process has been pending for over four years since late 2015, yet it is only in the Pre-Assessment Phase. Indeed, Taylor Energy has requested that NOAA[28] include it in the process on numerous occasions, yet NOAA has consistently refused, representing that the NRDA Process remains in the Pre-Assessment Phase. Exhibit "2," ¶ 18.

Applying all three factors here, the Counterclaims for natural resources damages are clearly not ripe for judicial review. First, delayed review would not cause hardship; the United States simply needs to wait for the administrative process (which it controls) to run its course. Second, judicial intervention would be manifestly inappropriate at this time - well before the agency has completed the NRDA. Third, this Court will certainly benefit from further factual development, specifically the determination regarding the existence of natural resources damages, the impacts of same, and any restoration plan. Accordingly, the Counterclaims relating to natural resources damages are premature and not ripe for adjudication.

### C.    The Counterclaims are Subject to the Doctrine of Primary Jurisdiction.

Dismissal of the United States' claims concerning natural resources damages is also proper pursuant to the doctrine of primary jurisdiction. Courts routinely dismiss or stay claims under the

---

[28] The NRDA Process is being administered by the National Oceanic and Atmospheric Administration ("NOAA"), which is a unit of the Coast Guard.

doctrine of "primary jurisdiction." *Montgomery Environmental Coalition v. Washington Suburban Sanitary Commission*, 607 F.2d 378, 383 (D.C. Cir. 1979) (affirming district court's decision to dismiss pursuant to primary jurisdiction); *see Total Telecommunications Services, Inc. v. AT&T*, 919 F. Supp. 472 (D.D.C. 1996) (dismissal is appropriate when "no useful purpose would ensure by the retention of jurisdiction"). The doctrine permits a court to "refer" actions to an administrative agency when the core questions raised in a lawsuit "require[] the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body." *United States v. Western Pacific R.R. Co.*, 352 U.S. 59, 64 (1956). The purpose of the doctrine, courts have emphasized, is to utilize "the advantages of allowing an agency to apply its expert judgment" including weighing "the policy judgments needed to implement an agency's mandate." *Allnet Commc'n Serv., Inc. v. Nat'l Exch. Carrier Ass'n, Inc.*, 965 F.2d 1118, 1120 (D.C. Cir. 1992). Although "[n]o fixed formula exists for applying the doctrine of primary jurisdiction," the Supreme Court has noted that it is particularly fitting for cases "requiring the exercise of administrative discretion." *Western Pacific R.R. Co.*, 352 U.S. at 64. "It is sufficient that an administrative agency's decision will ultimately be a material aid in resolving the pending litigation to invoke the doctrine of primary jurisdiction." *Nat'l Marketing Consultants, Inc. v. Blue Cross and Blue Shield Assoc.*, No. 87 C 7161, 1987 U.S. Dist. LEXIS 10840 (N.D. Ill. Nov. 19, 1987) (citing *Ricci v. Chicago Mercantile Exchange*, 409 U.S. 289, 305 (1973)).

The issues presented here (*i.e.,* natural resources damages that the United States *"may"* sustain)[29] fall squarely within the scope and purposes of the primary jurisdiction doctrine. If this Court allows such claims to proceed, it would be tasked with substituting its judgment with that of

---

[29] Rec. Doc. 19, Counterclaims ¶¶ 76, 77, and 85.

the very agency that created these rules and regulates conduct under them. As such, all claims for natural resources damages should be dismissed under the doctrine of primary jurisdiction.

### D. The Government has Not Exhausted the Administrative Process or Administrative Remedies.

Moreover, the United States has not fully exhausted the administrative process and its attendant remedies. Nor has Taylor Energy had the opportunity to fully exhaust any potential administrative remedies with respect to the NRDA. "Motions to dismiss for failure to exhaust administrative remedies are . . . appropriately analyzed under Rule 12(b)(6)." *See Winston v. Clough*, 712 F. Supp. 2d 1, 6 (D.D.C. 2010) (citation omitted). These exhaustion requirements are not jurisdictional, but rather are "similar to a statute of limitations." *Colbert v. Potter*, 471 F.3d 158, 167 (D.C. Cir. 2006). Therefore, they are properly raised in a Rule 12(b)(6) motion to dismiss. *See Rosier v. Holder*, 833 F.Supp.2d 1, 5 (D.D.C. 2011) (citing *Artis v. Bernanke*, 630 F.3d 1031, 1034 n.4 (D.C. Cir. 2011)).

In *Randolph-Sheppard Vendors of Am. v. Weinberger*, the United States Court of Appeals for the District of Columbia recognized:

> It is a "long settled rule of judicial administration that ***no one*** is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted." *Myers, supra*, 303 U.S. at 50-51 (footnote omitted); *see McKart, supra*, 395 U.S. at 193. Moreover, the policy of exhaustion "is particularly viable where an established scheme of decision making might be undermined by permitting circumvention of administrative procedures." *Wallace v. Lynn*, 165 U.S. App. D.C. 363, 507 F.2d 1186, 1190 (D.C. Cir. 1974).

795 F.2d 90, 104 (D. C. Cir. 1986) (emphasis added). Here, the regulations establish a detailed process and hierarchy that would be undermined by permitting this action to proceed now. *See id.* Moreover, the express language of the regulations dictate when the United States can file a judicial action for natural resources damages. And, it is not until ***after*** the agency has undertaken an

assessment, developed a final restoration plan, and presented the claim to the responsible party (among other things) – *none* of which have yet occurred. *See* 15 C.F.R. § 990.64.

Further, the United States fails to allege any facts in its Counterclaims sufficient to state a claim related to natural resources damage. It has not even alleged that it has undertaken, much less completed, the NRDA Process. Nor has it alleged sufficient facts to establish that natural resources were in fact damaged as a result of the MC20 Incident. And, the United States has not alleged any facts that it has incurred costs or expenses in the restoration or replacement of natural resources damages or destroyed as a result of the discharge of oil of a hazardous substance in violation of Section 311(b) of the CWA, 33 U.S.C. § 1321 (b). Again, such claims are speculative and premature.

The Counterclaims only allege that "[t]he United States *may* sustain [natural resources] 'damages,'" and "*may* incur costs or expenses in the restoration or replacement of natural resources damaged or destroyed as a result of the discharge of oil or a hazardous substance. . . ." Rec. Doc. 19, Counterclaims ¶¶ 76, 77, and 85 (emphasis added). These non-specific, speculative, and conclusory allegations are *completely* insufficient to state a claim. *Twombly,* 550 U.S. at 556 ("A formulaic recitation of the elements of a cause of action will not do."); *Beavers,* 566 F.3d at 439 ("[C]onclusory allegations or legal conclusions masquerading as factual conclusions" are not considered); *Mikkilineni*, 2003 U.S. Dist. LEXIS 13669, *12-13 (citing *Kowal*, 16 F.3d at 1276 (D.C. Cir. 1994) ("The court need not accept as true legal conclusions cast as factual allegations."). And, they certainly do not establish that the required administrative process has run its course and that the applicable administrative remedies have been exhausted.

To the contrary, although the MC20 Incident occurred nearly 16 years ago, Taylor Energy is not aware of *any* natural resources damage or monetary amounts incurred by the United States

related to actual natural resources damages. A Final Restoration Plan has not even been developed much less has a written demand been presented to Taylor Energy. *See* 15 C.F.R. § 990.62.[30] It is only after this (and other procedural requirements that have not yet been met) that the United States may file a judicial action for damages. *See* 15 C.F.R. § 990.64.

Because there can be no dispute that the NRDA Process is not complete, any judicial action seeking recovery of alleged natural resources damages is premature. This Court should dismiss the Counterclaims seeking natural resources damages pursuant to Rules 12(b)(1) and 12(b)(6) because they are premature and not ripe for adjudication. Both the doctrine of primary jurisdiction and the failure to exhaust administrative remedies compel such a result.

## IX.    The Counterclaims Seeking Penalties Must be Dismissed Pursuant to Rule 12(b)(6) for Failure State a Claim.

When considering a Rule 12(b)(6) motion, courts look to Rule 8(a) to determine whether particular claims and causes of action have been adequately pled in the complaint. *See Hill v. Smoot*, 308 F. Supp. 3d 14, 18 (D.D.C. 2018); *Bradley v. NCAA*, 249 F. Supp. 3d 149, 157 (D.D.C. 2017). Pursuant to Rule 8(a), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a); *see also Twombly*, 550 U.S. at 555 (citation omitted). Although "[t]he pleading standard Rule 8 announces does not require detailed factual allegations, . . . it demands more than an unadorned, the defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (citations omitted). Stated differently, a plaintiff must allege "more than labels and conclusions" to survive a Rule 12(b)(6) motion. *Twombly*, 550 U.S. at 555. The plaintiff must come forward with well-pleaded facts that permit the court to infer

---

[30] *See* discussion in Section IV, *supra*, regarding presentment as a mandatory condition precedent to judicial action, which is equally applicable in the context of presentment under *See* 15 C.F.R. § 990.62, and incorporated by reference as if fully set forth herein.

more than the mere possibility of misconduct. *Iqbal*, 556 U.S. at 678; *see also Bryant v. Taylor*, 244 F. Supp. 3d 209, 212 (D.D.C. 2017) ("This test is context-specific, but the key inquiry is whether the alleged facts permit the court to infer more than the mere possibility of misconduct.") (citations omitted) (internal quotations omitted)). It follows that "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679.

Rule 8(a) "contemplate[s] the statement of circumstances, occurrences, and events in support of the claim presented" and does not authorize a "bare averment that he wants relief and is entitled to it." *Twombly*, 550 U.S. at 555 & n.3. Here, the Counterclaims for penalties under Section 311(b)(7) of the Clean Water Act ("CWA"), 33 U.S.C. § 1321(b)(7) is simply that – a "bare averment that [it] wants [penalties] and is entitled to [them]." *See id.*

In its Counterclaims, the United States alleges that Taylor Energy is liable for a civil penalty of up to $37,500 per day of violation or up to $2,100 per barrel of oil discharged for each violation of Section 311(b)(3) of the CWA that occurred after December 6, 2013, through November 2, 2015 and up to $48,192 per day or up to $1,928 per barrel of oil discharged for each violation of Section 311(b)(3) of the CWA that occurred after November 2, 2015, pursuant to CWA Section 311(b)(7), 33 U.S.C. § 1321(b)(7), and 40 C.F.R. § 19.4.  *See* Rec. Doc. 19, Counterclaims ¶ 89). It is true that "[a]ny person who is the owner, operator, or person in charge of any vessel, onshore facility, or offshore facility from which oil or a hazardous substance is discharged in violation of paragraph (3), shall be subject to a civil penalty in an amount up to $25,000 per day of violation or an amount up to $1,000 per barrel of oil or unit of reportable quantity of hazardous substances discharged." 33 U.S.C. § 1321(b)(7)(A). The United States,

however, does not set forth any specific facts related to the timing of the discharge,[31] the quantity of the discharge, or circumstances surrounding the discharge.[32]

Moreover, it fails to give any specificity to the factors that courts consider when deciding whether to even award a claim for civil penalties. *See* 33 U.S.C. § 1321(b)(8). These factors, which are specifically outlined in the statute, include "seriousness of the violation or violations, the economic benefit to the violator, if any, resulting from the violation, the degree of culpability involved, any other penalty for the same incident, any extent, and degree of success of any efforts of the violator to minimize or mitigate the effects of the discharge, the economic impact of the penalty on the violator, and any other matters as justice may require." *See id.* Although the judicial award of civil penalties is highly discretionary, the Counterclaims are so bare that the court has no basis for which to even exercise its discretion to assess any purported penalties. *Tull v. United States*, 481 U.S. 412, 427 (1987). As such, the United States' claim for penalties should be dismissed outright since it is completely devoid of any specificity.

Additionally, the Counterclaims seek penalties against Taylor Energy of up to $150,000 per day of violation or $5,300 per barrel of oil discharged for each violation of Section 311(b)(3) of the CWA that occurred after December 6, 2013 through November 2, 2015, and at least $192,768 or up to $5,783 per barrel for violations that occurred after November 2, 2015, to the extent that the violation is the result of gross negligence or willful misconduct, pursuant to CWA

---

[31] To the extent that the United States does plead with additional specificity as required by *Twombly* and *Iqbal*, any claim for penalties is nevertheless beyond the applicable statute of limitations. Taylor Energy expressly reserves all rights in this regard.

[32] Taylor Energy expressly reserves all defenses related to the Government's express instructions to Taylor Energy ***not*** to engage in any further decommissioning activity following Taylor Energy's successful completion of numerous interventions wells and other decommissioning activities, as the risks would outweigh any benefits, and be illegal under 43 U.S.C. § 1332(6) and 30 C.F.R. § 250.1703(g).

Section 311(b)(7), 33 U.S.C. § 1321(b)(7), and 40 C.F.R. § 19.4. As recited in the Counterclaims, civil penalties can be increased pursuant to Section 311(b)(7)(D), 33 U.S.C. § 1321(b)(7)(D), **only** if the violation results from "***gross negligence or willful misconduct***." The Counterclaims, however, are devoid of ***any*** facts to support this theory of enhanced liability, and therefore it fails to state a claim for increased penalties.

Instead of pleading any facts in support of its burden, the United States simply repeats the standard for determining if increased penalties are recoverable. Rec. Doc. 19, Counterclaims ¶ 90. Indeed, the Counterclaims are ***completely devoid*** of any specific facts or allegations contending that ***Taylor Energy*** acted with "gross negligence or willful misconduct." A complaint (here, the Counterclaims) cannot survive a motion to dismiss with only "a formulaic recitation of the elements." *Twombly,* 550 U.S. at 555. Because that is all the United States provides, its claim for increased penalties must be dismissed under Rule 12(b)(6).

## CONCLUSION

Various ***independent*** grounds exist for the dismissal of the Counterclaims against Taylor Energy asserted in this Court. Accordingly, the Counterclaims should be dismissed in their entirety.

DATED this 31st day of July, 2020.

Respectfully submitted,

*/s/ Carl D. Rosenblum*
CARL D. ROSENBLUM, T.A. (LA #02083)
(Admitted *Pro Hac Vice*)
ALIDA C. HAINKEL (LA #24114)
(Admitted *Pro Hac Vice*)
LAUREN C. MASTIO (LA #33077)
(Admitted *Pro Hac Vice*)
TAYLOR K. WIMBERLY (LA #38942)
(Admitted *Pro Hac Vice*)
Jones Walker LLP
201 St. Charles Avenue, 49th Floor
New Orleans, Louisiana 70170-5100
Telephone: (504) 582-8000
Facsimile: (504) 589-8296
E-mail: crosenblum@joneswalker.com

And

*/s/ Paul A. Debolt*
PAUL A. DEBOLT (DC Bar No. 450904)
Venable LLP
600 Massachusetts Avenue, NW
Washington, D.C. 20001
Telephone:  (202) 344-4000
Email: PADebolt@Venable.com

***Attorneys for Taylor Energy Company LLC,
Plaintiff/Counterclaim Defendant***

## CERTIFICATE OF SERVICE

I certify that on this 31st day of July, 2020, a true and correct copy of the foregoing pleading

was filed electronically with the Clerk of Court of the District of Columbia by using the CM/ECF

system, which provides notice of filing to all counsel of record by electronic means.

*s/ Carl D. Rosenblum*
CARL D. ROSENBLUM