**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**TAYLOR ENERGY COMPANY LLC,**

 **Plaintiff,**

  **v.**

**UNITED STATES OF AMERICA,**
**acting by and through the UNITED STATES**
**COAST GUARD NATIONAL POLLUTION**
**FUNDS CENTER,**

 **Defendant.**

**Civil Action No. 20-1086 (JDB)**

<u>**MEMORANDUM OPINION**</u>

 Taylor Energy Company LLC ("Taylor Energy") brought this lawsuit under the Administrative Procedure Act ("APA") seeking judicial review of the National Pollution Funds Center's ("NPFC") denial of a reimbursement claim for oil removal costs. Now before the Court is Taylor Energy's combined motion to supplement the administrative record and conduct limited discovery on the NPFC's retention and tasking of independent scientific experts. The government has agreed to complete the administrative record with a few documents that it inadvertently excluded, but otherwise opposes Taylor Energy's motion. <u>See</u> Def.'s Opp'n to Pl.'s Mot. to Complete Admin. R. or, in Alternative, to Introduce Extra-R. Evid. ("Gov't's Opp'n") [ECF No. 61] at 1–2, 5. For the following reasons, the Court will order the NPFC to complete the administrative record with three specific documents but will deny the remainder of Taylor Energy's requests.

<u>**BACKGROUND**</u>

 As of 2004, Taylor Energy owned and operated an offshore oil and gas production platform on a leased tract in the Gulf of Mexico. <u>See</u> Compl. to Vacate & Set Aside Final Agency Action

& for Other Relief ("Compl.") [ECF No. 1] ¶ 6.  Hurricane Ivan passed through the Gulf in September 2004 and, along its way, caused significant damage to Taylor Energy's oil platform, ultimately leading to the platform's collapse into the Gulf and the discharge of oil into the water and surrounding seafloor sediments.  Id.  The Coast Guard thereafter designated Taylor Energy the "Responsible Party" for the oil spill under the Oil Pollution Act of 1990 ("OPA"), meaning that Taylor would be strictly liable for clean-up costs and damages resulting from that spill, unless a specific statutory defense to liability applied.  See 33 U.S.C. § 2702; Compl. ¶¶ 7, 67.

In November 2018, Taylor Energy presented a reimbursement claim to the NPFC, invoking the "act of God" defense to liability under the OPA.  Compl. ¶¶ 7–9, 85.  Taylor Energy submitted evidence that the waves generated by Hurricane Ivan qualified as an "act of God" and caused the platform's collapse.  See id. ¶¶ 85–87.  The NPFC, however, denied Taylor Energy's claim and subsequent request for reconsideration, concluding that the MC20 platform's destruction "was not solely caused by an act of God."  Id. ¶¶ 88–89, 105, 111.  In rendering its decision, the NPFC relied on several technical reports prepared by outside subject matter experts ("SMEs"), who the NPFC had retained to address various scientific questions.  See id. ¶¶ 95, 112.

Taylor Energy filed this lawsuit in April 2020, challenging the NPFC's denial as arbitrary and capricious under the APA.  See id. ¶¶ 3, 5–18.  One of the primary allegations in Taylor Energy's complaint is that the NPFC "improperly and consciously manipulated the evaluation process," through its control of "task assignments and reliance on consultants that were unqualified and/or ill-informed" in light of the NPFC's failure to "provide said experts with relevant information."  Reply Mem. in Further Supp. of Pl.'s Objections to Admin. R., Mot. to Suppl. Admin. R. & Mot. for Discovery ("Pl.'s Reply") [ECF No. 62] at 1.  Taylor Energy thereafter moved to strike six expert reports from the administrative record on the ground that the NPFC

could not rely on "new" evidence at the reconsideration stage without giving Taylor Energy an opportunity to rebut that evidence.  See Pl.'s Mem. of P. & A. in Supp. of Mot. to Strike Select Tech. Reps. from Admin R. [ECF No. 25-1] at 5–7.  The Court denied that motion, concluding that the six reports were properly part of the administrative record because the NPFC considered them in adjudicating Taylor Energy's claim.  See Mem. Op. (Oct. 14, 2020) [ECF No. 52] at 10–13.  The Court also determined that federal regulations authorized the NPFC to obtain new evidence at the reconsideration stage and did not grant Taylor Energy a right to respond to that evidence.  See id. at 12.

In August 2020, the NPFC filed the administrative record in this case—comprising 727 documents and over 21,000 pages—and "certified [that] record as a complete accounting of all documents the NPFC relied upon for its decision."  Gov't Opp'n at 4–5; see Cert. of Admin. R. [ECF No. 41-1].  The NPFC subsequently acknowledged that it had "inadvertently omitted" a few specific documents from the administrative record and agreed to supplement the record accordingly.  See Pl.'s Mem. of P. & A. in Supp. of Objections to Admin. R., Mot. to Suppl. Admin. R. & Mot. for Discovery ("Pl.'s Br.") [ECF No. 58-2] at 12; Gov't Opp'n at 5.  But the NPFC declined Taylor Energy's requests to add various other materials.  See Pl.'s Br. at 12; Gov't Opp'n at 6.  Taylor Energy then filed the instant motion to supplement the record with a book on the history of natural disasters and four categories of documents: (1) all task orders issued by the NPFC to its SMEs relating to Taylor Energy's claim and reconsideration request; (2) all documentation and correspondence regarding those task orders; (3) all documents exchanged and correspondence between the NPFC and its SMEs; and (4) all draft technical reports provided to the NPFC.  See Pl.'s Br. at 19, 22, 23, 26.  At the same time, Taylor Energy also sought leave "to conduct limited discovery regarding the irregular and particularly curious circumstances relating

3

to the various tasks and SMEs." Id. at 32.  The motion has been fully briefed and is now ripe for the Court's consideration.

## LEGAL STANDARD

Typically, a court's review of agency action under the APA is limited to the full administrative record that was before the agency at the time of its decision.  Cmty. for Creative Non–Violence v. Lujan, 908 F.2d 992, 998 (D.C. Cir. 1990); see also SEC v. Chenery Corp., 318 U.S. 80, 87–88 (1943).  "The full administrative record consists of 'all documents and materials that the agency directly or indirectly considered' in making its decision."  Oceana, Inc. v. Ross, 454 F. Supp. 3d 62, 68 (D.D.C. 2020) (quoting Maritel, Inc. v. Collins, 422 F. Supp. 2d 188, 196 (D.D.C. 2006)).  "[A]n agency is entitled to a strong presumption of regularity, that it properly designated the administrative record."  Pac. Shores Subdivision, Cal. Water Dist. v. U.S. Army Corps of Eng'rs, 448 F. Supp. 2d 1, 5 (D.D.C. 2006) (citing Maritel, 422 F. Supp. 2d at 197).

That said, an "agency may not skew the record by excluding unfavorable information," Blue Ocean Inst. v. Gutierrez, 503 F. Supp. 2d 366, 369 (D.D.C. 2007) (citing Fund for Animals v. Williams, 391 F. Supp. 2d 191, 197 (D.D.C. 2005)), and it may not omit information simply because "it did not 'rely' on the excluded information in its final decision," Maritel, 422 F. Supp. 2d at 196 (citing Ad Hoc Metals Coal. v. Whitman, 227 F. Supp. 2d 134, 139 (D.D.C. 2002)).  Instead, "a complete administrative record should include all materials that 'might have influenced the agency's decision.'"  Amfac Resorts, L.L.C. v. U.S. Dep't of Interior, 143 F. Supp. 2d 7, 12 (D.D.C. 2001) (quoting Bethlehem Steel v. EPA, 638 F.2d 994, 1000 (7th Cir. 1980)).  And "if the agency decisionmaker based his decision on the work and recommendations of subordinates, those materials should be included as well."  Id. (citing Bar MK Ranches v. Yuetter, 994 F.2d 735, 739 (10th Cir. 1993)).  However, documents that are predecisional and deliberative may be excluded

from the record pursuant to the deliberative process privilege.  <u>Am. Petroleum Tankers Parent, LLC v. United States</u>, 952 F. Supp. 2d 252, 265–66 (D.D.C. 2016).

A plaintiff in an APA case may move to supplement the administrative record in two different ways.  First, the plaintiff may seek to "complete" the record with "evidence that was allegedly before the agency but nevertheless excluded from the administrative record."  <u>Oceana, Inc. v. Ross</u>, 290 F. Supp. 3d 73, 78 (D.D.C. 2018) (citation omitted).  However, to overcome the strong presumption of regularity, a plaintiff "must present 'non-speculative, concrete evidence . . . that the specific documents allegedly missing from the administrative record were directly or indirectly considered by the actual decision makers."  <u>Oceana, Inc. v. Pritzker</u>, 217 F. Supp. 3d 310, 316 (D.D.C. 2016) (quoting <u>Dist. Hosp. Partners, L.P. v. Sebelius</u>, 971 F. Supp. 2d 15, 20 (D.D.C. 2013)).  This means that the plaintiff must describe the omitted materials "with sufficient specificity, as opposed to merely proffering broad categories of documents and data that are 'likely' to exist as a result of other documents that are included in the administrative record."  <u>Id.</u> at 316–17 (quoting <u>Dist. Hosp.</u>, 971 F. Supp. 2d at 20–21).

Second, the plaintiff may seek to introduce "extra-record evidence"—meaning "'evidence that was not initially before the agency' but that the plaintiff 'believes should nonetheless be included in the administrative record."  <u>Oceana</u>, 290 F. Supp. 3d at 77 (quoting <u>Univ. of Colo. Health at Mem'l Hosp. v. Burwell</u>, 151 F. Supp. 3d 1, 13 (D.D.C. 2015)).  To do so, the plaintiff must "demonstrate unusual circumstances justifying a departure from the general rule."  <u>Id.</u> (quoting <u>City of Dania Beach v. FAA</u>, 628 F.3d 581, 590 (D.C. Cir. 2010)).  Only three circumstances qualify: "(1) if the agency 'deliberately or negligently excluded documents that may have been adverse to its decision,' (2) if background information [is] needed 'to determine whether the agency considered all the relevant factors,' or (3) if the 'agency failed to explain administrative

action so as to frustrate judicial review.'" <u>City of Dania Beach</u>, 628 F.3d at 590 (quoting <u>Am. Wildlands v. Kempthorne</u>, 530 F.3d 991, 1002 (D.C. Cir. 2008)).  The first circumstance requires "evidence of bad faith on the part of the agency."  <u>See Oceana</u>, 290 F. Supp. 3d at 85 (citing <u>Dist. Hosp. Partners, L.P. v. Burwell</u>, 786 F.3d 46, 54 (D.C. Cir. 2015)).

Because judicial review under the APA is confined to the administrative record, "[d]iscovery is generally unavailable."  <u>Stand Up for Cal.! v. U.S. Dep't of Interior</u>, 315 F. Supp. 3d 289, 293 (D.D.C. 2018) (citing <u>Air Transp. Ass'n of Am., Inc. v. Nat'l Mediation Bd.</u>, 663 F.3d 476, 487 (D.C. Cir. 2011)).  Hence, a court may only permit discovery upon "a strong showing of bad faith or improper motive" or "in the rare case in which the record is so bare as to frustrate effective judicial review."  <u>Am. Petroleum</u>, 952 F. Supp. 2d at 271 (quoting <u>Cmty. for Creative Non–Violence</u>, 908 F.2d at 998).

## <u>ANALYSIS</u>

Taylor Energy seeks to add a book on the history of natural disasters and four broad categories of documents to the administrative record: (1) all task orders issued by the NPFC to its SMEs relating to Taylor Energy's claim and reconsideration request; (2) all documents and correspondence involving those task orders; (3) all documents exchanged and correspondence between the NPFC and its SMEs; and (4) all draft technical reports provided to the NPFC.  <u>See</u> Pl.'s Br. at 19, 22, 23, 26.  Taylor Energy argues that these documents are necessary to "complete" the administrative record because the NPFC considered them, <u>see id.</u> at 18, and, in the alternative, that the documents should be introduced as extra-record evidence given the NPFC's "documented efforts to repeatedly <u>conceal</u> information" and "take action in furtherance of its pre-determined outcome," <u>see id.</u> at 30–32.  Taylor Energy also seeks leave "to conduct limited discovery regarding the irregular and particularly curious circumstances relating to the various tasks and

SMEs," including leave to depose the NPFC's Claim Manager and various SMEs.  Id. at 32, 34. The Court evaluates each request in turn.[1]

## I.    **Motion to Complete the Administrative Record**

### A.  Presumption of Regularity

Throughout its brief, Taylor Energy repeatedly suggests that the NPFC's compilation of the administrative record has been so irregular that the presumption of regularity should not apply at all.  See, e.g., Pl.'s Br. at 10 n.17, 11, 18–19, 20, 25 n.52, 33.  The Court sees no evidence to support these allegations and will briefly address a few of Taylor Energy's recurrent arguments before delving into its specific document requests.

Taylor Energy characterizes the NPFC's consideration of six "new" expert reports at the reconsideration stage as evidence of the NPFC's "conscious and bad faith manipulation of the Administrative Record."  See id. at 10.  The Court already rejected Taylor Energy's attempt to strike these reports from the record, concluding that Taylor Energy's argument was "untenable" because the applicable federal regulations did "not limit the scope of information that the NPFC can consider when adjudicating a reconsideration request" and did not grant Taylor Energy a right to rebut new information at the reconsideration stage.  See Mem. Op. (Oct. 14, 2012) at 12. Although Taylor Energy disclaims any attempt to "re-urge the same legal position" now, it nonetheless argues that the NPFC's consideration of these six reports and "scheme" to deny Taylor Energy a chance to rebut them "provid[e] evidence of irregularities."  See Pl.'s Br. at 10 & n.17. However, because the regulations permitted the NPFC to obtain and rely on these reports, as the

---

[1] Taylor Energy also requests a court order with respect to certain documents that the NPFC has acknowledged were "inadvertently omitted" from the administrative record and thus should be added to it.  See Pl.'s Br. at 17–18.  The Court expects that the NPFC will complete the administrative record with these materials based on its express agreement to do so, see Gov't's Opp'n at 6 n.3, and therefore the Court need not enter an order to this effect at this time.  See, e.g., Stand Up for Cal.!, 315 F. Supp. 3d at 294.

Court has already found, these actions appear entirely regular.

Taylor Energy also questions why "without a deadline" the NPFC issued its Claim Determination before receiving these "new" reports given that the reports had already been commissioned at that time.  Id. at 8.  But the premise of this argument is false because the NPFC did have a six-month deadline to resolve Taylor Energy's initial claim.  See 33 C.F.R. § 136.115(c).  Indeed, the NPFC issued its Claim Determination 179 days after Taylor Energy's claim submission, i.e., one day shy of the deadline, see Gov't's Opp'n at 16, and thus the timing of that decision does not evince a "scheme" to manipulate the administrative record.

Another target of Taylor Energy's frustration is the NPFC's response to its Freedom of Information Act ("FOIA") request.  See Pl.'s Br. at 10–11.  After the NPFC's initial denial, "Taylor Energy requested that the NPFC provide 'all materials reviewed and considered by the NPFC' in connection with its Claim Determination."  Id. at 10.  The NPFC gave Taylor Energy copies of the documents cited in its Claim Determination but proceeded to process the remainder of the request under FOIA.  Id.  Although Taylor Energy insinuates that it was reprehensible for the NPFC to do this, id., the NPFC had no obligation, at that stage of proceedings, to provide Taylor Energy with "all materials reviewed and considered" in connection with the Claim Determination.  Rather, in accordance with the APA and the controlling regulations, the NPFC was only required to provide "a brief statement of the grounds for denial."  5 U.S.C. § 555(e); see also 33 C.F.R. § 136.115(c) ("A claimant will be notified in writing sent by certified or registered mail whenever a claim against the Fund is denied.").  Hence, the NPFC did not act nefariously in processing Taylor Energy's document request under FOIA because NPFC had no other duty to produce the requested materials at that time.

Taylor Energy also charges that although the NPFC said that the FOIA review process

would take "longer than anticipated" "due to the voluminous nature of [Taylor Energy's] request," see Ex. E, Pl.'s Mot. [ECF No. 58-7] at 1, the NPFC ultimately produced just two documents, see Ex. H, Pl.'s Mot. [ECF No. 58-10] at 1.  Taylor Energy therefore suggests that the NPFC not only withheld materials under FOIA but also purposefully delayed its FOIA production until after the deadline had passed for Taylor Energy to submit its reconsideration request.  See Pl.'s Br. at 11. To the extent that Taylor Energy was unsatisfied with the NPFC's FOIA decision, the proper course of action was to administratively appeal that decision and then seek judicial review.  See 5 U.S.C. §§ 522(a)(6)(A)(i), (a)(4)(B).  But Taylor Energy took no such steps, and this Court will not construe the NPFC's unchallenged FOIA response as evidence of a plot to conceal documents when Taylor Energy did not even see fit to challenge that response.

Finally, Taylor Energy repeatedly accuses the NPFC of "purposefully exclud[ing] information unfavorable to its position" from the administrative record.  See Pl.'s Br. at 31; see also, e.g., id. at 2, 11 n.26, 18, 34.  These allegations are conclusory and unfounded.  Not only does Taylor Energy fail to identify any purposeful efforts by the NPFC to conceal evidence, but it also does not point to a single piece of unfavorable information that was omitted.

In sum, then, the Court does not find that Taylor Energy has rebutted the presumption of regularity with respect to the entire administrative record.  Hence, the Court will proceed to analyze Taylor Energy's arguments that certain types of documents were considered but withheld. However, because the burden is on Taylor Energy to describe the omitted materials "with sufficient specificity," the Court will focus only on Taylor Energy's more particularized requests for documents within each category.  See Oceana, 217 F. Supp. 3d at 316 (quoting Dist. Hosp., 971 F. Supp. 2d at 20–21).[2]

---

[2] Taylor Energy also characterizes the Department of Justice's involvement in reviewing Taylor Energy's claim as irregular.  Pl.'s Br. at 25 n.52.  But Taylor Energy does not tie this alleged irregularity to the NPFC's

### B.  Ted Steinberg's Book

The Court turns first to Taylor Energy's request to add Ted Steinberg's book, <u>Acts of God: The Unnatural History of Natural Disaster in America</u> (2000), to the administrative record.  <u>See</u> Pl.'s Br. at 17–18.  The NPFC offers a "see generally" citation in its Claim Determination to the book, noting parenthetically that the book "discuss[es] how decision-makers in the United States have literally paved the way for greater loss of life and property from floods, earthquakes, hurricanes, etc."  Ex. A, Pl.'s Mot. ("Claim Determination") [ECF No 58-3] at 34 n.189.  This citation is intended to support the NPFC's proposition that "[i]t is nearly inconceivable that a facility that deals with oil or hazardous substances in the [Gulf] region will succeed by arguing that it was unaware of the strong possibility of a tropical storm or a hurricane disrupting or disabling operations."  <u>Id.</u> at 34.  And this proposition appears within a lengthy analysis of why— based on "the terms of [Taylor Energy's] lease," the "voluminous research describing the instability of the area of MC-20," and the loss of another platform in the Gulf in 1969—Taylor Energy "foresaw or should have foreseen" that its platform could collapse.  <u>See id.</u>  The NPFC has agreed that the book "can be cited and discussed for the point that the NPFC cited it for," but has declined to "make it a separate entry on the AR index," because it was only "footnoted for a minor, non-substantive point."  <u>See</u> Ex. I, Pl.'s Mot. [ECF No. 58-11] at 1, 3.  Taylor Energy does not dispute that the point is minor and non-substantive, but argues that the entire book must be added to the record because it "is clearly a material that was considered, relied upon and even cited by the NPFC."  Pl.'s Br. at 17–18.

A single broad citation to this book, however, does not "clearly" show that the NPFC

---

compilation of the administrative record.  In any event, the government has represented to the Court that "[t]he Department of Justice had no involvement in the NPFC's adjudication of Taylor Energy's AOG claim."  Gov't's Opp'n at 19.

directly or indirectly considered the entire book or even a subset of its contents.  Indeed, the parenthetical that the NPFC uses to describe the book seems to draw its phrasing from the publisher's description of the book.  See Acts of God, the Unnatural History of Natural Disaster in America, Oxford University Press, https://global.oup.com/academic/product/acts-of-god-9780195309683?cc=us&lang=en&# (last visited Feb. 15, 2021) (Steinberg "reveals how the decisions of business leaders and government officials have paved the way for the greater losses of life and property" from natural disasters in the United States.) (emphasis added).

Courts in this District have routinely recognized that "the mere mention of a document in the agency's decision or the record does not always mean, ipso facto, that the agency considered the document."  Oceana, 290 F. Supp. 3d at 79 (citing Franks v. Salazar, 751 F. Supp. 2d 62, 69 (D.D.C. 2010) ("[N]either the materials' purported relevance nor plaintiffs' references to [the materials] during the permitting process constitute concrete evidence that [defendant] considered the materials, either directly or indirectly.")); see also WildEarth Guardians v. Salazar, 670 F. Supp. 2d 1, 6 (D.D.C. 2009) ("[T]he Court is not persuaded that a singular reference to [a document] in the background section of the 90-day finding is, by itself, sufficient to support supplementation of the record.").  The citation here appears only to parrot the publisher's description.  And Taylor Energy does not identify any part or chapter of the book that the NPFC considered in light of its "see generally" citation.  Thus, absent further specificity, the Court does not find that this single citation for a non-substantive point necessitates the entire book's inclusion in the record.

### C.  NPFC Task Orders Regarding Taylor Energy's Claims

Next, Taylor Energy seeks to complete the administrative record with "[a]ll Task Orders issued by the NPFC relating to Taylor Energy's Claim and/or Reconsideration Request."  Pl.'s Br.

at 19.  These task orders contain "the NPFC's instructions" to its SMEs regarding what questions to address in their reports.  <u>See</u> Gov't's Opp'n at 4–5.  According to Taylor Energy, the record presently contains the "original Task Order 1 as well as an amended Task Order 1," Task Order 2, the "original Task Order 3 as well as an amended Task Order 3," a revised Task Order 11, and Task Order 14.  <u>See</u> Pl.'s Br. at 19–20.  From Taylor's perspective, then, "Task Orders 4, 5, 6, 7, 8, 9, 12, and 13," as well as "the original version of Task Order 11" are conspicuously absent.  <u>Id.</u> at 20.  And because "the tasks and the scope of the tasks was [sic] before and considered by the NPFC," Taylor Energy asserts that these "missing" orders should be added to the record.  <u>See id.</u>

The NPFC offers a logical explanation for why many of these Task Orders are not missing at all.  During the NPFC's adjudication of Taylor Energy's claim, the Coast Guard's contractor renumbered the task orders, such that "[t]he orders that had been referred to as Task Orders 1, 2, and 3, became referred to as Task Orders 8, 9, and 10."  Gov't's Opp'n at 10.  The NPFC affirms that "[d]espite the new names, the task orders remained the same."  <u>Id.</u>  The NPFC's Reconsideration Denial explains this, too.  <u>See</u> Ex. C, Pl.'s Mot. ("Reconsideration Denial") [ECF No. 58-5] at 4 n.14 ("In follow up correspondence with CG contracting, this task order was renamed from task order 1 to task order 8."); <u>id.</u> at 4 n.17 ("In follow up correspondence with CG contracting, this task order was changed from task order 2 to task order 9.").  Hence, the NPFC has satisfied the Court that Tasks Orders 8 and 9 are already part of the administrative record.  <u>See</u> Admin. R. Index ("AR Index") [ECF 41-2] at 46–47 (listing doc. 711 (Task Order 8) and doc. 695 (Task Order 9)).

The NPFC further clarifies that the task orders ultimately renumbered as 1 through 7 by the Coast Guard contractor were excluded from the administrative record because they "are completely unrelated to Taylor Energy's Claim."  Gov't's Opp'n at 10 n.6.  Taylor Energy disputes

this explanation, citing an email indicating that Task Orders 1 through 7 address assignments like "Oil Sample Analysis" or "Oil Spill Analysis," which might plausibly relate to Taylor Energy's claim.  Pl.'s Reply at 4.  But the mission of the NPFC is to administer the OPA and provide "[p]rompt funding for federal pollution response and restoration of natural resources injured by oil spills."  NPFC's Mission & Vision, U.S. Coast Guard, https://www.uscg.mil/Mariners/National-Pollution-Funds-Center/About-NPFC/Vision_Mission/ (last visited Feb. 15, 2021).  Therefore, because projects like "Oil Sample Analysis" or "Oil Spill Analysis" could relate to any claim before the NPFC, there is no basis to question the NPFC's representations that those projects were unrelated to Taylor Energy's claim.  Furthermore, that same email reveals that Task Orders 1 through 7 were completed before Taylor Energy submitted its claim to the NPFC, which further substantiates the NPFC's account.  See Ex. A, Gov't's Opp'n [ECF 61-1] at 1.  Taylor Energy also offers no evidence that Task Orders 12 and 13 were ever considered by the NPFC.  These orders are not cited in the NPFC's Claim Determination or Reconsideration Denial, and the Court has no reason to suspect that they relate to Taylor Energy's claim.  Thus, the Court will deny Taylor Energy's request to complete the administrative record with Task Orders 4, 5, 6, 7, 12, and 13.

That leaves Taylor Energy's request for the original version of Task Order 11.  Taylor Energy points to an email in the administrative record attaching a "revised" version of the Order; this email was sent by William Dodson—the NPFC Claim Manager assigned to Taylor Energy's claim—to, inter alia, Russell Proctor—the supervisor who ultimately signed off on the Claim Determination and Reconsideration Denial.  Ex. K, Pl.'s Mot. [ECF No. 58-13].  In the body of the email, Mr. Dodson states that he "added a significant amount of tasking to the revised task order" and "doubled the amount of hours" of associated work.  See id.  Although the NPFC's Reconsideration Denial cites only the revised version of Task Order 11, see Reconsideration

Denial at 7 n.28; Ex. K, Pl.'s Mot., Taylor Energy contends that the original version should be added to the record as well, see Pl.'s Br. at 20.

NPFC does not address the original version of Task Order 11 in its opposition brief.  But the NPFC has already included the original versions of the other subsequently amended Task Orders—namely, Task Orders 1 and 3 (renumbered as 8 and 10)—in the administrative record. See AR Index, docs. 705, 707–13.  The Court does not agree with Taylor Energy that an agency's inclusion of one kind of document in the administrative record dictates the inclusion of all other documents in the same category for "consistency" purposes.  See Pl.'s Reply at 5 n.5.  Nonetheless, that the NPFC has already included all other relevant Task Orders in the administrative record in both original and amended form implies that the NPFC considered both versions of its Task Orders when adjudicating Taylor Energy's claim.  Furthermore, Mr. Dodson's email to his superiors also suggests that the original Task Order 11 might have influenced the NPFC's decision-making because the NPFC made substantial changes to it.  See Ex. K, Pl.'s Mot.  Thus, the Court finds that Taylor Energy has presented reasonable, non-speculative grounds to believe that the NPFC considered the original Task Order 11, and will grant Taylor Energy's request to add this document to the record.

### D.  Documents and Correspondence Regarding Task Orders

Taylor Energy also seeks all "documents and correspondence regarding the Task Orders." See Pl.'s Br. at 22.  As part of this broad request, Taylor Energy first discusses the NPFC's statement in the Reconsideration Denial that certain Task Orders were renumbered "in follow-up correspondence with [Coast Guard] contracting."   Id.  Taylor Energy then argues that the administrative record is deficient because neither "[t]his cited 'follow-up' correspondence" nor "other correspondence or documentation relating to these changes to the Task Orders" is contained

therein.  Id.  But, as the Court has already explained above, the mere mention of a document in the agency's decision does not necessarily mean the agency considered the document.  See Oceana, 290 F. Supp. 3d at 79; see also Franks, 751 F. Supp. 2d at 69; WildEarth Guardians, 670 F. Supp. 2d at 6.  And the administrative record need not include "every scrap of paper" in the agency's file.  See Conservation Force v. Salazar, 2012 WL 11947683, at *5 (D.D.C. Feb. 6, 2012) (quoting TOMAC v. Norton, 193 F. Supp. 2d 182, 195 (D.D.C. 2002)).  Taylor Energy presents no evidence that the NPFC considered the renumbering issue or any correspondence on this subject in adjudicating Taylor Energy's claim, and hence the Court will deny this request.

Taylor Energy also contends that the administrative record lacks any "documentation related to the substantive amendments made to certain of the Task Orders" and that "whatever the NPFC considered that prompted the changes" should be added to the administrative record.  See Pl.'s Br. at 22–23.  For starters, any materials reflecting the NPFC's "internal deliberations" about how to amend its Task Orders were properly excluded from the record as privileged.  See Blue Ocean Inst., 503 F. Supp. 2d at 369 (stating that agency "may exclude materials that reflect internal deliberations"); see also Ohio Valley Env't Coal. v. Whitman, 2003 WL 43377, at *6 (S.D. W. Va. Jan. 6, 2003) (denying request to include "internal reports, memoranda, and e-mails created by [agency] staff for use of other [agency] staff" because such additions would improperly "inject internal [agency] deliberations" into the administrative record).

Furthermore, Taylor Energy's speculation that other documents discussing tasking changes must exist does not overcome the presumption of regularity.  See Blue Ocean Inst., 503 F. Supp. 2d at 371 ("Under the most traditional understanding of how a party meets its burden of proof, [plaintiff] is reduced to theorizing that the documents may exist, which fails to overcome the presumption that the record is complete."); see also Stand Up for Cal.!, 315 F. Supp. 3d at 296

(rejecting as speculative plaintiffs' claim that "other documents (e.g., agendas, notes, minutes)" must have been "created relating to [certain] conference calls"); City of Duluth v. Jewell, 968 F. Supp. 2d 281, 292 (D.D.C. 2013) (denying request where plaintiff "reason[ed] that because there [were] certain documents in the administrative record, it follow[ed] that there must have been discussions and analyses of the issues raised by those documents") (quotation omitted).

Lastly, Taylor Energy argues that, although the administrative record contains an email attaching "updated IGCE's" for Task Orders 1, 2 and 3 and "a copy of the PR fully funding these Task Orders," the record is "missing the original IGCEs and the IGCEs and PR(s) for other Task Orders." See Pl.'s Br. at 23; Ex. L, Pl.'s Mot. [ECF No. 58-14] at 1. Taylor Energy does not explain the meaning or relevance of these documents, but the Court understands this as a request for all Independent Government Cost Estimates ("IGCEs") and Purchase Requests ("PRs") associated with Taylor Energy's claim. An IGCE is the "Government's estimate of costs that a contractor/recipient may incur in performing services and/or providing supplies to achieve the Government's objectives." USAID, Independent Government Cost Estimate Guide and Template (Apr. 2, 2013), https://cic.gsa.gov/documents/USAID-Guide-on-IGCE.pdf. A PR appears to authorize funding a Task Order. See Ex. L, Pl.'s Mot. at 1. Neither the Claim Determination nor the Reconsideration Denial cite any IGCEs or PRs, let alone the specific ones that Taylor Energy alleges are missing. That a few IGCEs or PRs were attached—as part of a larger zip file containing other documents—to one email in the administrative record does not suffice to prove that NPFC considered all IGCEs and PRs. Thus, because Taylor Energy again fails to offer any concrete evidence that these materials were considered, the Court will deny this request.

### E.  Documents and Correspondence Regarding SMEs

Next, Taylor Energy moves to complete the record with all "communications or documents

exchanged between the NPFC and [its] SMEs." See Pl.'s Br. at 24.  Taylor Energy notes that "[o]f particular relevance are documents and communications relating to the selection/retention of the SMEs, their qualifications, and the information and documents that the NPFC consciously chose to provide to the SMEs,"[3] as well as "communications regarding draft opinions/conclusions and revisions to" the SMEs' reports.  Id.  at 24, 26–27.  And Taylor Energy asserts that these written materials must exist due to "evidence of the NPFC providing the SMEs with information and documents, conferences between the NPFC and the SMEs, changes in tasking, and the SME's revisions to their Technical Reports based on comments of the NPFC."  Id. at 24.

This request suffers from the same defects as the previous request.  Any "internal deliberations" regarding the SMEs—such as the NPFC's internal assessment of what types of experts it needed to hire or discussions about what documents to provide to the SMEs, see Pl.'s Br. at 26—are privileged.  See Blue Ocean Inst., 503 F. Supp. 2d at 369.  Conversely, instructions or substantive feedback given by the NPFC to its SMEs likely should be part of the record if any such written correspondence was exchanged and considered by the NPFC; but Taylor Energy offers no proof to that there was any.  For example, Taylor Energy states that the record should reflect "those [issues] that [the NPFC] may have instructed its SMEs not to pursue because they would have been contrary to the NPFC's predetermined position."  Pl.'s Br. at 25.  Taylor Energy also notes that "correspondence regarding . . . how to present/style a particular issue is especially relevant."  Id. at 26.  These types of documents would undoubtedly bolster Taylor Energy's case, but its arguments that the NPFC has improperly withheld these materials fall flat because there is no evidence that they exist.  See Conservation Force, 2012 WL 11947683, at *4 (declining to

---

[3] Taylor Energy also singles out "materials relating the changes in tasking and all opinions of the SMEs." Pl.'s Br. at 24.  The Court has already addressed the former category of documents and will address the SMEs' opinions in the following section in connection with Taylor Energy's related request for all draft technical reports.

complete record with unspecified missing "emails regarding meetings, drafts, revisions, and sign-off"); City of Duluth, 968 F. Supp. 2d at 292 (rejecting request to complete the record where plaintiff's "request assumes that this information exists in written form, or even exists at all").[4]

Furthermore, the Court is not convinced that the administrative record is entirely "devoid" of all documents regarding the SMEs. See Pl.'s Reply at 6. The certified index provided to the Court does include some documents relating to SME qualifications, see, e.g., AR Index, doc. 727 ("James Pettigrew Resume"), and the NPFC Reconsideration Denial delineates which documents the NPFC provided to each SME, see, e.g., Reconsideration Denial at 5 n.19 ("The documents provided to NGI in support of this task order included . . . ."). The Task Orders, as discussed above, communicate which topics the SMEs were instructed to address, Gov't's Opp'n at 4–5, and "the expert reports include detailed descriptions of the tasks they respond to," id. at 12; see also, e.g., Ex. B, Gov't's Opp'n [ECF No. 61-2] at 3, 4. Thus, the fact that the NPFC did not consider email correspondence with the SMEs—to the extent such correspondence even took place[5]—does not seem abnormal given that the NPFC relied on several, more formal documents at its disposal. Moreover, Taylor Energy may believe that the NPFC should have considered other SMEs' qualifications, transmitted additional documents to its SMEs, or more clearly instructed its SMEs on their assigned tasks, but those beliefs are not a basis for completing the administrative record.

---

[4] Taylor Energy also focuses on a footnote in the Reconsideration Denial listing documents that David Evans and Associates ("DEA"), one of the SMEs, received from the National Oceanic and Atmospheric Administration ("NOAA"). See Reconsideration Denial at 7 n.30. When Taylor Energy reached out to NPFC counsel about those documents, NPFC counsel explained that the NPFC did not consider them but "knew that NOAA had this information and told DEA it could be obtained from NOAA." See Ex. I, Pl.'s Br. at 2. Based on this email, Taylor Energy now questions why "there are no such communications between DEA and the NPFC regarding this issue." See Pl.'s Br. at 25. Not only does Taylor Energy merely "assume[] that this information exists in written form," see City of Duluth, 968 F. Supp. 2d at 292, but it also does not explain the relevance of any communications addressing this issue.

[5] As Taylor Energy points out, the NPFC did not contract directly with the SMEs. Rather, the NPFC contracted with Potomac Wave Consulting, Inc. ("Potomac Wave"), and Potomac Wave subcontracted with the various SMEs. See Pl.'s Br. at 7 n.4. Therefore, the extent of direct communication (written or otherwise) between the SMEs and the NPFC is not clear.

See Conservation Force, 2012 WL 11947683, at *5 ("While the issue of what the [agency] should have considered in reaching its decision may ultimately bear on whether the agency action at issue was arbitrary and capricious, that is an argument to be addressed in a motion on the merits, not a discovery motion."). Thus, the Court finds that Taylor Energy has failed to rebut the presumption of regularity with respect to this sweeping request.

### F.   Draft Technical Reports by SMEs

Finally, Taylor Energy seeks to complete the administrative record with draft versions of the SMEs' technical reports and any other preliminary opinions that the SMEs conveyed to the NPFC.  See Pl.'s Br. at 26.  At the outset, the government notes that "documents that are pre-decisional or deliberative, such as draft reports, are generally not part of the administrative record." See Gov't's Opp'n at 13.  But rather than elaborate on this privilege argument, the government only explains why the specific draft technical reports that Taylor Energy references were not considered by the NPFC.  See id.

The Court is not sure that all draft technical reports sent from the SMEs to the NPFC necessarily fall within the scope of the deliberative process privilege, such that they should—by definition—be excluded from the administrative record.  See Am. Petroleum, 952 F. Supp. 2d at 265 ("[M]aterials protected by the deliberative process privilege are not part of the Administrative Record.").  To fall within the scope of the deliberative process privilege, a document must be both predecisional and deliberative.  See Oceana, 290 F. Supp. 3d at 83 (citing In re Sealed Case, 121 F.3d 729, 737 (D.C. Cir. 1997)).  "A document is predecisional 'if it was generated before the adoption of an agency policy' and it is deliberative 'if it reflects the give-and-take of the consultative process.'"  Id. (quoting Am. Petroleum, 952 F. Supp. 2d at 265).  The rationale for excluding these deliberative process documents from the administrative record is two-fold.  First,

the documents are irrelevant to arbitrary and capricious review because "[t]he actual subjective motivation of agency decisionmakers is immaterial as a matter of law—unless there is a showing of bad faith or improper behavior." Nat'l Ass'n of Chain Drug Stores v. HHS, 631 F. Supp. 2d 23, 27 (D.D.C. 2009) (quoting In re Subpoena Duces Tecum Served on Off. of Comptroller of Currency, 156 F.3d 1279, 1279 (D.C. Cir. 1998)).  Second, "protecting internal, deliberative materials helps 'enhance the quality of agency decisions by protecting open and frank discussion among those who make them within the Government.'"  Oceana, 290 F. Supp. 3d at 83 (quoting Oceana, 217 F. Supp. 3d at 319).

Draft documents prepared by an agency often fall naturally within the scope of the privilege.  See id. at 83–84 (excluding "preliminary draft of an agency decision" and "feedback from agency staff" on that draft from administrative record as privileged).  But the draft technical reports at issue here were prepared by outside SMEs hired "to conduct independent reviews and analyses" and "provid[e] impartial and unbiased opinions" regarding various scientific questions at issue.  See Reconsideration Denial 3–4.  Therefore, although the SMEs' draft reports are predecisional, the government does not explain why these reports—which are not internal to the agency and do not express the agency decisionmakers' subjective opinions—are deliberative.  Cf. Styrene Info. & Rsch. Ctr. v. Sebelius, 851 F. Supp. 2d 57, 64–65 (D.D.C. 2012) (completing record with expert panel subgroup draft reports because such reports were identified as integral to the expert panel's report to the agency, upon which the agency relied); Ad Hoc Metals Coal., 227 F. Supp. 2d at 139 (completing record with transcript of workshop comments from outside experts where agency acknowledged reviewing transcript); see also, e.g., Ctr. for Biological Diversity v. Zinke, 2018 WL 8805325, at *4 (D. Alaska Nov. 16, 2018) ("[W]hen an agency obtains and considers materials from outside of that agency. . . the deliberative process privilege does not

apply.") (emphasis added); <u>Maritel</u>, 422 F. Supp. 2d at 196 (noting that an "agency generally may exclude material that reflects internal deliberations" such as "deliberative <u>intra-agency</u> records") (emphasis added).

The Court need not resolve this question here, however, because the government previously informed Taylor Energy that any "draft reports" by SMEs were included in the administrative record "to the extent they were relied upon or considered." Ex. I, Pl.'s Mot. at 3. Despite the government's passing reference to the deliberative process privilege in its opposition brief, <u>see</u> Gov't's Opp'n at 13, the Court does not understand the government to have actually withheld any SME draft reports as privileged. Therefore, the Court will analyze only whether the specific drafts that Taylor Energy seeks to include were, in fact, considered by the NPFC.

Taylor Energy first references a June 2019 draft report by DEA. Pl.'s Br. at 27. Taylor Energy argues that the NPFC received, considered, and revised that report, and therefore it should be part of the administrative record. <u>See id.</u> Taylor Energy also attaches a privilege log from another case, which references an email transmitting the DEA draft report to the NPFC's contractor, Potomac Wave, and indicates that several revisions were subsequently made to the draft.[6] <u>See id.</u>; Ex. N, Pl.'s Mot. [ECF No. 58-16]. The government disclaims any consideration of this draft, <u>see</u> Pl.'s Br. at 13, but curiously the same privilege log contains a related entry in which the government represents that "part of" the same draft was circulated "inter-agency for review and comment." <u>See</u> Ex. N, Pl.'s Mot. Thus, in light of the fact that the June 2019 draft report by DEA was given to the NPFC for feedback and changes were subsequently made, the Court finds that Taylor Energy has provided reasonable, non-speculative grounds to believe that

---

[6] The privilege log also shows the government did not withhold this draft report in the other litigation under the deliberative process privilege. Ex. N, Pl.'s Mot. Rather, the draft was withheld under an unspecified "other" form of privilege. <u>Id.</u>

the NPFC considered this draft and will order the NPFC to add it to the administrative record.  See
Styrene Info. & Rsch. Ctr., 851 F. Supp. 2d at 64 (completing administrative record with draft
technical reports where the "scientific information and advice" in the reports was "substantively
considered" and factored into the final report).  Nonetheless, the Court will not require the NPFC
to add all "other versions" of the report because there is no evidence that the NPFC considered
other interim drafts.  See Pl.'s Br. at 27.

Taylor Energy next seeks to add a June 2019 draft report by GZA Environmental, Inc.
("GZA").  See id.  The administrative record contains the complete version of the final report, AR
Index, doc. 686, but only the "Conclusions" section of the June 2019 draft and excerpts of some
appendices to the draft, see id., docs. 685, 687–692; Gov't's Opp'n at 14 n.10.  Taylor Energy
emphasizes that the "Conclusions" sections in the draft and final versions differ, see Ex. O, Pl.'s
Mot. [ECF No. 58-17], though the relevance of the changes is not immediately clear.  See Pl.'s Br.
at 27.  The government does not deny that it received a copy of the entire draft report from GZA,
but responds that "the fact that the NPFC considered certain draft appendices in reaching its
decision does not ipso facto mean that the NPFC considered the entire draft report."  Gov't's Opp'n
at 14.  While that might be true as a generality, here the NPFC did not consider only "certain draft
appendices"; the NPFC considered the draft's "Conclusions" section, too.  See AR Index, doc.
685.  The Court is not aware of—and the government does not cite—any precedent authorizing an
agency to cherry-pick excerpts of a single document for inclusion in the administrative record
absent a claim of privilege.  Thus, the Court will order the NPFC to add to the record the entire
June 2019 GZA draft report.

## II.   **Motion to Introduce Extra-Record Evidence**

Taylor Energy argues that, to the extent that the Court denies its motion to complete the

administrative record, the "foregoing documents or categories of documents" should instead be added as extra-record evidence. See Pl.'s Br. at 30. Taylor Energy contends that the D.C. Circuit's "unusual circumstances" requirement has been met because "the NPFC purposefully excluded information unfavorable to its position" and "the record is so bare that it prevents effective judicial review." See id. at 31; see also City of Dania Beach, 628 F.3d at 590 (explaining that "unusual circumstances" justify introducing extra-record evidence "if the agency deliberately or negligently excluded documents that may have been adverse to its decision" or "if the agency failed to explain administrative action so as to frustrate judicial review").

The present administrative record contains 21,000 pages of material, including the NPFC's 42-page Claim Determination, 29-page Reconsideration Denial, and all documents cited therein. See Cert. of Admin. R.; Gov't Opp'n at 4. Taylor Energy offers no support for its assertion that this record is "so bare" as to impede judicial review, see Pl.'s Br. at 31, and the Court sees no merit to this point. Instead, Taylor Energy merely reiterates its broad allegations that the NPFC has "repeatedly conceal[ed] information from Taylor Energy and take[n] action in furtherance of [NPFC's] pre-determined outcome." See id. at 31–32. But, as the Court has explained above, those accusations are unsupported, and there is no evidence that the NPFC has acted in bad faith. See Deripaska v. Mnuchin, 2020 WL 7828783, at *3 (D.D.C. Dec. 29, 2020) (concluding that plaintiff's "requests for supplementation d[id] not come close to establishing that [agency] acted in bad faith" where plaintiff "conclusorily [sic] allege[d] that [agency] deliberately or negligently omitted documents from the record"). Thus, because no "unusual circumstances" justify introducing extra-record evidence here, the Court will deny Taylor Energy's motion in this respect.

### III.   Motion for Discovery

Lastly, Taylor Energy requests leave to conduct "limited discovery into the end-motivated

process employed by the NPFC." Pl.'s Br. at 34. Specifically, Taylor Energy wants "to inquire into the retention of the SMEs (including the timing of such retention, the process for selecting the SMEs and their experience/qualifications), the tasking (including changes in the tasking and scope), the selective information provided to or relied upon by the SMEs, and the opinions of the SMEs (including what may have influenced their opinions or any changes thereto)." Id. As part of this "limited" request, Taylor Energy seeks to depose Mr. Dodson and various SMEs. Id.

The threshold for allowing discovery in an APA case overlaps substantially with the standard for introducing extra-record evidence. Namely, a court may only grant discovery upon "a strong showing of bad faith or improper motive" or "in the rare case in which the record is so bare as to frustrate effective judicial review." Am. Petroleum, 952 F. Supp. 2d at 271 (quoting Cmty. for Creative Non–Violence, 908 F.2d at 998). Taylor Energy has failed to make either showing, as explained above, and therefore the Court will deny its motion for discovery.

## CONCLUSION

For the foregoing reasons, the Court will order the NPFC to complete the administrative record with the following documents: (1) the original version of Task Order 11; (2) the June 2019 draft report by DEA; and (3) the June 2019 draft report by GZA. However, the Court will deny the remainder of Taylor Energy's requests to complete the administrative record, to introduce extra-record evidence, and to conduct discovery. A separate Order will issue on this date.

/s/
JOHN D. BATES
United States District Judge

Dated: February 15, 2021