# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **TAYLOR ENERGY COMPANY LLC,** | ) | |
| **Plaintiff,** | ) | |
| **vs.** | ) | **CIVIL ACTION NO.: 20-01086 (JDB)** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| **ACTING BY AND THROUGH THE** | ) | |
| **UNITED STATES COAST GUARD** | ) | |
| **NATIONAL POLLUTION FUNDS CENTER,** | ) | |
| **Defendant.** | ) | |
| | ) | |
| | ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF TAYLOR ENERGY'S MOTION FOR SUMMARY JUDGMENT

CARL D. ROSENBLUM, T.A.
ALIDA C. HAINKEL
LAUREN C. MASTIO
TAYLOR K. WIMBERLY
Jones Walker LLP
201 St. Charles Avenue, 49th Floor
New Orleans, Louisiana 70170-5100
Telephone: (504) 582-8000
Facsimile: (504) 589-8296
E-mail: crosenblum@joneswalker.com

And

PAUL A. DEBOLT
Venable LLP
600 Massachusetts Avenue, NW
Washington, D.C. 20001
Telephone:  (202) 344-4000
Email: PADebolt@Venable.com

***Attorneys for Taylor Energy Company LLC,
Plaintiff***

# TABLE OF CONTENTS

**Page**

STATEMENT OF THE CASE...................................................................................................1

RELEVANT BACKGROUND ...............................................................................................5

I.      THE MC20A PLATFORM .......................................................................................5

II.     THE MC20 INCIDENT...........................................................................................10

III.    THE NPFC'S DENIAL OF TAYLOR ENERGY'S ACT OF GOD CLAIM..................13

LAW AND ARGUMENT ......................................................................................................17

I.      STANDARD OF REVIEW ......................................................................................17

II.     THE NPFC ERRED AS A MATTER OF LAW WHEN IT FAILED TO APPLY
        THE UNAMBIGUOUS LANGUAGE OF THE "ACT OF GOD" DEFINITION
        IN OPA .....................................................................................................................20

III.    THE METHODOLOGIES, FINDINGS AND CONCLUSIONS OF THE NPFC
        WERE ARBITRARY, CAPRICIOUS, AN ABUSE OF DISCRETION AND
        OTHERWISE NOT IN ACCORDANCE WITH THE LAW ...........................................32

IV.     TAYLOR ENERGY IS ENTITLED TO REIMBURSEMENT OF THE
        UNCOMPENSATED REMOVAL COSTS IT HAS INCURRED UNDER THE
        CLEAR LANGUAGE OF OPA ..................................................................................51

V.      THIS COURT HAS THE AUTHORITY AND SHOULD HOLD THAT TAYLOR
        ENERGY IS ENTITLED TO THE PROTECTIONS OF THE ACT OF GOD
        DEFENSE AND GRANT THE MONETARY RELIEF REQUESTED ..........................54

Plaintiff, Taylor Energy Company LLC ("Taylor Energy"), respectfully submits this Memorandum of Points and Authorities in support of its Motion for Summary Judgment ("Motion"). For the reasons discussed herein, the administrative record and the applicable legal principles fully support the granting of Taylor Energy's Motion. This Court should therefore vacate and set aside the final agency action of the United States Coast Guard National Pollution Funds Center ("NPFC"), hold that Taylor Energy is entitled to the protections and remedies afforded by the act of God defense, and order that Taylor Energy's Claim be paid forthwith.

## STATEMENT OF THE CASE

This matter seeks judicial review under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, of the NPFC's denial of Taylor Energy's Claim invoking the act of God defense to its liability under the Oil Pollution Act of 1990 ("OPA"), 33 U.S.C. § 2701 *et seq.,* for the costs of responding to an oil discharge in the Gulf of Mexico.

In 2004, Taylor Energy was the lessee of an offshore oil and gas lease in the Gulf of Mexico, issued by the United States Department of the Interior pursuant to the Outer Continental Shelf Lands Act, 43 U.S.C. § 1301, *et seq.*, concerning an offshore lease tract known as "Mississippi Canyon 20" ("MC20"). It was also the owner and operator of an offshore, fixed steel frame oil and gas production platform situated within MC20 (the "MC20A Platform") (the site of which is sometimes referred to herein as the "MC20 Site"). An oil discharge was caused by the destruction of the MC20A Platform during Hurricane Ivan in September 2004. The extraordinarily powerful waves generated by Ivan caused a massive progressive seafloor failure upslope of the MC20A Platform that migrated downslope to the site of the MC20A Platform destroying the platform's foundation deep beneath the seafloor, causing it to topple and rupture several of its oil wells. The destruction of the oil wells resulted in the discharge of oil into the Gulf of Mexico and the seafloor sediments. The foregoing is collectively referred to herein as the "MC20 Incident."

1

As the lessee of MC20, Taylor Energy was the "Responsible Party" ("RP") for any discharges of oil from the MC20A Platform under OPA. 33 U.S.C. § 2701(32). Under OPA, an RP for an oil pollution incident is typically strictly liable for resulting Removal Costs and Damages. 33 U.S.C. § 2702. However, OPA expressly provides the RP with specific statutory defenses to liability, including the act of God defense. 33 U.S.C. § 2703(a).

Taylor Energy filed a claim[1] with the NPFC seeking reimbursement from the Oil Spill Liability Trust Fund ("OSLTF" or the "Fund") of Removal Costs it has paid to respond to the oil discharge.[2] 33 U.S.C. §§ 2708(b) & 2713(b)(1)(B). The NPFC denied Taylor Energy's Claim, as well as its Reconsideration Request.[3] This administrative action constituted "final agency action"

---

[1] The Act of God Claim of Taylor Energy dated November 15, 2018 (the "Claim") is in the administrative record at CGAOGAR_0002276-2401 with the exhibits thereto at CGAOGAR_0002569-15642. The Request for Reconsideration of Taylor Energy dated July 12, 2019 (the "Reconsideration Request") is in the administrative record at CGAOGAR_0000062-110 with the exhibits thereto at CGAOGAR_0000354-2186, CGAOGAR_0000164-174, and CGAOGAR_0021053-21402. Taylor Energy herein occasionally refers to the Claim and the Reconsideration Request, collectively, as its Claim.

[2] In its Claim, Taylor Energy sought reimbursement from the OSLTF of the Removal Costs it had paid as of August 31, 2017. The Fund is financed through a tax on the oil industry, *see* 33 U.S.C. § 2701(11); 26 U.S.C. § 9509, thereby "internaliz[ing] the cost of oil spills within the petroleum industry." *Great Am. Ins. Co., v, United States,* 55 F. Supp. 3d 1053, 1064 (N.D. Ill. 2014). The OSLTF is thus an industry-funded vehicle for spreading the cost of an oil pollution response to the broader petroleum industry when a responsible party has a statutory defense to, or is entitled to limit, liability under OPA. In effect, it is an industry-funded insurance policy designed to protect responsible companies from acts outside their control. In connection with its response efforts, Taylor Energy incurred $353,881,719 in Removal Costs as of August 31, 2017. The Liability Limits Report that the NPFC's FAQ webpage directs visitors to, predicted that the end of year balance for 2020 was expected to be near $7 billion. Available at https://www.uscg.mil/Portals/0/NPFC/docs/PDFs/Reports/2020-02-25-Oil-Pollution-Act-Liability-Limits-in-2019.pdf?ver=2020-02-25-133009-910.

[3] The NPFC's initial denial dated May 14, 2019 (the "Claim Determination") is in the administrative record at CGAOGAR_0002187-2228. The denial of Taylor Energy's Reconsideration Request dated October 10, 2019 (the "Reconsideration Denial") is in the administrative record at CGAOGAR_0000001-29. The denial of Taylor Energy's Claim refers to

under OPA (*see* 33 C.F.R. § 136.115(d)), reviewable by this Court under the APA. Based upon the administrative record and applicable legal principles, in denying Taylor Energy's Claim, the NPFC violated the APA. As demonstrated herein, the NPFC's denial was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law for a variety of independent reasons, each of which individually justify the granting of this Motion in Taylor Energy's favor.

First, the NPFC based its denial of Taylor Energy's Claim on the application of a novel, overly restrictive interpretation of the statutory definition of "act of God" of the agency's own creation, which was never adopted by Congress and runs counter to the language Congress actually enacted in OPA. The NPFC ignored the plain language of the statutory definition of an act of God, inserted its own additional requirements that Taylor Energy must prove to meet its burden of proof, and relied upon purported legislative history of other statutes and clearly distinguishable jurisprudence to impose a heightened standard, contrary to the unambiguous statutory text.

Additionally, the NPFC's denial of Taylor Energy's Claim "offered an explanation for its decision that runs counter to the evidence before the agency." *See Motor Veh. Mfrs. Ass'n v. State Farm Ins.*, 463 U.S. 29, 43 (1983); *Water Quality Ins. Syndicate v. United States*, 225 F. Supp. 3d 41, 63 (D.D.C. 2016). The NPFC's denial was replete with blatant errors, faulty logic, and inconsistencies; relied upon insufficient evidence; was speculative; misinterpreted and misconstrued information; relied upon incorrect assumptions; used incorrect methodologies or reasoning; and outright ignored contrary evidence in the administrative record.

Taylor Energy provided the NPFC with an extensive record of evidence to support its claim for reimbursement, yet the NPFC failed to even consider much of that evidence. Despite requiring

---

the final agency action which is the Reconsideration Denial, which adopts and incorporates the Claim Determination. *See* CGAOGAR_0000002.

the assistance of numerous subject matter experts ("SMEs") because the agency itself lacked the requisite technical knowledge to adjudicate the Claim, the NPFC did not even provide its SMEs with the relevant data or expert reports submitted by Taylor Energy. Rather the NPFC then cherry-picked evidence from its own SMEs to support its pre-determined outcome, while ignoring extensive contradictory technical evidence.

Furthermore, certain of the explanations provided by the NPFC were a blatant attempt to justify the NPFC's pre-determined outcome; they were not supported by the record and/or were flatly erroneous. Simply by way of example, as documented in the administrative record by both Taylor Energy's experts and the NPFC's experts, the extraordinarily powerful waves generated during Ivan caused a massive progressive seafloor failure upslope of the MC20A Platform that migrated downslope to the site of the MC20A Platform destroying the platform's foundation deep beneath the seafloor, causing it to topple and rupture several of its oil wells. The failure planes associated with the seafloor failure were approximately 100 feet *below* the seafloor surface, and the deep-seated movements of the sediments against the platform foundation pilings caused them to fail and break at a depth greater than 100 feet below the pre-Ivan seafloor. This geological event is very different than a mud overflow (*i.e.,* a mudflow or typical mudslide) that would flow sediments *over* the seafloor at the platform site. The NPFC's classification of the failure mechanism as a mudflow or mudslide, as opposed to a massive progressive seafloor failure, is simply incorrect. The two are completely different geological events. The fact that mudflow or mudslides are common in the vicinity of MC20 has no bearing on whether the wave induced seafloor failure approximately *100 feet below the seafloor surface* was exceptional and unanticipated. And, more importantly, the surveys that the NPFC contends Taylor Energy should

have performed are irrelevant to the massive progressive seafloor failure that toppled the MC20A Platform.

By way of further example, the NPFC's reliance upon a current-day wave prediction model that was *actually informed by Ivan's wave statistics* and additional information that was not known at the relevant times, to suggest that Ivan's waves somehow could have been anticipated back in 1983 and were not exceptional, is wholly improper.

As demonstrated below, the NPFC's denial not only departs from the clear statutory language of OPA, it also stands in stark contrast to the comprehensive technical data, analysis and conclusions of the preeminent experts in their respective fields.

## RELEVANT BACKGROUND[4]

### I.     The MC20A Platform

The MC20A Platform was designed, constructed, and installed by Sohio Petroleum Company ("Sohio"), the original lessee of MC20, during the 1983-1984 timeframe in 480 feet of water, approximately 10 miles southeast of the coast of Louisiana. CGAOGAR_0003254. When the MC20A Platform was designed, constructed, and installed, American Petroleum Institute ("API") industry design standards and government regulations required that it be built to withstand the environmental loads that a "100-year storm" would impart on the platform. CGAOGAR_0002317 (citing CGAOGAR_0003895; CGAOGAR_0005377). The API 100-year storm design standards for offshore structures was adopted as the industry design standard across the offshore industry, and was also incorporated by reference into Department of the Interior

---

[4] The administrative record contains a detailed discussion of the facts relating to the Claim (CGAOGAR_0002276-2401; CGAOGAR_0003249-3310; CGAOGAR_0000062-110) as well as extensive documentation underlying and supporting such facts, and Taylor Energy adopts such facts as if set forth fully herein. The relevant background section is abbreviated and only intended to provide the select background that is most pertinent to the legal review addressed herein.

regulations governing offshore structures.[5] It remains the industry design standard used by industry and government regulators today. *See* 30 C.F.R. §250.901.

In order to design a platform capable of withstanding a 100-year storm, Sohio retained Dr. Joseph Suhayda, an expert in the fields of oceanography and meteorology[6] to provide it with the environmental loads, such as maximum wind speed, wave height and period, wave bottom pressures, and currents that a 100-year storm would be expected to generate at the MC20A Platform site. The study performed by Dr. Suhayda for Sohio was comprehensive and based on the best available technical and scientific data available for the northern Gulf of Mexico at that time. The details of the work performed by Dr. Suhayda are set forth in the Claim (CGAOGAR_0002317-2320) as well as in the reports of Dr. Suhayda (CGAOGAR_0005364-5499; CGAOGAR_0000358-379). Ultimately, Dr. Suhayda provided Sohio with the following parameters for a 100-year storm design wave:

| | Significant Wave Height (ft.) | Maximum Wave Height (ft.) | Maximum Wave Period (sec.) | Wave Bottom Pressure at 482 feet (pds./ sq. ft.) |
|---|---|---|---|---|
| 100-year design storm wave (1983) | 40 | 69.6 | 14 | 249 |

*See* CGAOGAR_0005373, § 1 (Table 1), § 3.3. Sohio provided that met-ocean (meteorology and oceanography) information to structural engineers and geotechnical engineers, who used it to structurally design the platform so that it was capable of withstanding the environmental loads consistent with the 1983 API design standard.

---

[5] API Recommended Practice (RP) 2A, 13th edition, Planning, Designing, and Constructing Fixed Offshore Platforms was the applicable standard in 1983.

[6] *See* CGAOGAR_0002317 (discussing the extensive professional experience and qualifications of Dr. Suhayda, including in connection with the effects of storm waves on soft bottom sediments and particularly as it relates to oceanographic design data for projects in the Gulf of Mexico). Over three decades later, Taylor Energy retained the same Dr. Suhayda in support of its Claim.

Notably, additional criteria that Sohio's consultants evaluated was the effect that hurricane waves would have on the seafloor sediments at the proposed platform site, and in the area upslope of the platform. Sohio hired Woodward-Clyde Oceaneering ("Woodward-Clyde") to conduct a geotechnical study of the MC20 area. *See* CGAOGAR_0005877-5879. In order to assess the potential for mass sediment movements, Woodward-Clyde[7] performed geologic and geophysical studies to determine whether seafloor instability features existed in the vicinity of the proposed MC20A Platform site. Among other things, Woodward-Clyde provided a specific evaluation of projected mud flow activity at the recommended platform site, which would predict the most likely mud flow direction and depth, the rate of deposition of new material, and the anticipated forces which would be applied against the structure by mud flows associated with both normal creep and storm waves. The details of the extensive work performed by Woodward-Clyde and others is set forth in the Claim (CGAOGAR_0002313-2322) as well as in the reports of Jim Hooper (CGAOGAR_0003873-4006; CGAOGAR_0001588-1598). *See also* CGAOGAR_0005880-6088; CGAOGAR_0006089-6170; CGAOGAR_0006171-6290.

After proper geotechnical analysis, Woodward-Clyde concluded that the bottom sediments at and upslope of the platform site were strong enough to withstand the bottom pressure forces that waves associated with a 100-year storm would impart on them. CGAOGAR_0002320 (citing CGAOGAR_0003906-3908 and CGAOGAR_0005947-5949). However, they determined that

---

[7] Jim Hooper, Woodward-Clyde's Chief Geotechnical Engineer, was the lead Woodward-Clyde engineer assigned to the project. *See* CGAOGAR_0005880-6088; CGAOGAR_0006089-6170; CGAOGAR_0006171-6290. Mr. Hooper had extensive experience conducting geotechnical analyses of Mississippi Delta platform sites, and had served as the project manager for numerous structures installed in the mudslide areas of the delta. *See* CGAOGAR_0003878; CGAOGAR_0003902; CGAOGAR_0003956-3965. In addition, Woodward-Clyde engaged experts in the fields of geomorphology, geology, and oceanography to assist in its evaluation of the MC20 seafloor. CGAOGAR_0003902-3903. Again, over three decades later, Taylor Energy retained the same Jim Hooper in support of its Claim.

such waves might cause sediments upslope of the platform site on the seafloor bottom (not 100 feet below) to fail and descend down across the platform site as a mud *overflow or overrun* event that would flow sediments *over* the seafloor at the platform site. *See* CGAOGAR_0005891. They determined that a maximum likely mudflow could be 35 feet thick and might drag an additional 10 feet of bottom sediments along with it as it proceeded downslope. CGAOGAR_0002320 (citing CGAOGAR_0003908; CGAOGAR_0005948-5949, CGAOGAR_0005954). They recommended that Sohio design the platform such that it would be capable of withstanding a 45-foot thick mudflow impacting the platform's foundation piles. CGAOGAR_0003908; CGAOGAR_0005951-5964. Woodward-Clyde also recommended that Sohio perform periodic surveys of the seafloor in the area around and upslope of the MC20 Site. CGAOGAR_0003909; CGAOGAR_0005894. The stated purpose of such surveys was to detect the buildup of significant amounts of sediments on top of the seafloor upslope of the platform that might move downslope during a hurricane as a large mudflow (*i.e.,* a shallow type of mudslide at or near the seafloor) and topple the platform. *See id.* The Department of the Interior added a stipulation requiring Sohio to perform such surveys every two years, or after a major hurricane passed through the area. None of this has any relation to a massive progressive seafloor failure approximately 100 feet *below* the seafloor.

To address the concern relating to potential mudflow, the platform's design included features such as an over-strengthened steel frame platform jacket, which was designed to withstand a mudflow much thicker than the 45 foot 100-year design event mudflow.[8] *See*

---

[8] First, a 38-foot high window above the seafloor was created with no framing between the platform legs in order to reduce the drag on the structure from a mudflow overriding the seafloor. Second, the jacket legs were extended 30 feet below the seafloor in order to increase the lateral capacity of the piles. Third, a stronger steel was used for the upper 127 feet of the steel pipe piles extending below the seafloor. All eight structural piles of the MC20A Platform were made of

CGAOGAR_0005505-5506;  CGAOGAR_0000183-184;  CGAOGAR_0002321-2322.  Sohio's proposed platform design, together with Woodward-Clyde's report was provided to Minerals Management Services ("MMS") of the Department of the Interior. *See* CGAOGAR_0006291-6371. MMS then submitted the design to CBS Engineering, a third-party engineering expert for an independent review of the platform design. CGAOGAR_0005504-5506; CGAOGAR_0005516-5674 (final design verification report provided by CBS Engineering). Every significant action taken by Sohio, and later by Taylor Energy, related to the MC20A Platform and its wells was overseen and approved by the then MMS. *See* CGAOGAR_0002322-2323; CGAOGAR_0003255-3256. At bottom, the MC20A Platform met or exceeded all applicable industry standards, complied with all applicable government regulations, was approved by all relevant governmental agencies when it was installed, and remained in full compliance with such standards and regulations until it was toppled some twenty years later in September 2004 by the effects of Hurricane Ivan's waves and the consequential massive progressive seafloor failure upslope of MC20.[9] *See* CGAOGAR_0005500-5515.

---

ASTM A-572 Grade 50 ksi steel with 72" outside diameter and a wall thickness varying from 1.5" to 3.0" along the pile length. The four interior piles had a penetration into the soil of 431' and the four corner piles had a penetration into the soil of 507'. Conventional eight-pile platforms installed in water depths similar to the MC20A Platform would have less robust piles, likely with a 48" or 60" outside diameter and a wall thickness of ¾" to 2" with penetrations up to 350' depending on the soil strength at the particular offshore platform site. Ultimately, the MC20A Platform was designed to withstand a mudflow that could have been as high as 55 or 56 feet above the mudline. However, despite these "state of the art" precautions that were intended to provide added resistance against failure in the event of a mudflow or mudslide, the failure mechanism that toppled the MC20A Platform was something else. It was not a mudflow or mudslide but rather a massive progressive seafloor failure upslope of the MC20A Platform approximately 100 feet *below* the seafloor that migrated downslope and ultimately ***undercut*** the pile design features and sheared the platform foundation piles deep beneath the seafloor.

[9] In fact, less than one year prior to the MC20 Incident, Taylor Energy was awarded a MMS Safety Award for Excellence ("SAFE"). CGAOGAR_0002323; CGAOGAR_0003311.

## II.     The MC20 Incident

As Hurricane Ivan approached, Taylor Energy exercised the utmost care to secure the site and there were no additional measures that Taylor Energy could have taken that would have prevented or avoided the force of this natural phenomenon. *See generally* CGAOGAR_0002325-2327. The extraordinarily powerful waves generated during Ivan caused a massive progressive seafloor failure upslope of the MC20A Platform that migrated downslope to the site of the MC20A Platform destroying the platform's foundation deep beneath the seafloor, causing it to topple and rupture several of its oil wells.[10] The destruction of the oil wells resulted in the discharge of oil into the Gulf of Mexico and the seafloor sediments. CGAOGAR_0003257, ¶ 13.

Because none of the measuring devices that measured Ivan's waves were located in the area in which the storm would have generated its most extreme waves, scientists extrapolated Ivan's maximum wave heights from recorded wave measurements. CGAOGAR_0002329. They concluded that the inferred maximum wave height for Ivan was a staggering 131 feet.[11] *Id.* (citing CGAOGAR_0005391 (internal citation omitted)). Ivan also generated waves with exceptionally long periods. A wave's period is the time, in seconds, between successive wave crests passing over a stationary point. The longest measured spectral peak wave period for Ivan was 19 seconds prior to the data recording devices discontinuing the measurement capture and transmission, which

---

[10] *See* CGAOGAR_0006309-6321 (providing a detailed explanation of the failure mechanism).

[11] This was almost *twice* the maximum wave height from the applicable API design standard. By comparison, the maximum inferred wave height of Hurricane Camille's waves was 85 feet. CGAOGAR_0002329.

failure occurred prior to the peak of the storm and thus did not capture the most extreme waves. CGAOGAR_0002330 (citing CGAOGAR_0005392).[12]

The magnitude of the pressure force that a wave exerts on seafloor sediments is a function of the wave's height and period, and the water depth. The higher a wave is, the greater the pressure it will exert on the sediments. Likewise, the longer the wave period is, the greater the pressure it will exert on the sediments. Water depth is a significant factor in determining the magnitude of the pressure force that a wave exerts on the seafloor, with less force on bottom sediments in deeper water. Prior to Hurricane Ivan, it was generally accepted within the offshore industry, and among academics and government regulators, that the pressure forces imparted by hurricane waves on bottom sediments were inconsequential in waters deeper than 400 feet. CGAOGAR_0002289 (citing CGAOGAR_0003332, 3339, 3464-3465); *see also* CGAOGAR_0020285 (acknowledging "the industry belief that significant bottom pressures could not be exerted below 400 feet"). This is a particularly important fact because the MC20A Platform was situated in approximately 480 feet of water and therefore, it was wholly unanticipated that any wave pressure would have an effect 480 feet below the surface. *See id.*; CGAOGAR_0003254, ¶ 7.

A preeminent oceanographic expert retained by Taylor Energy prepared a hindcast of Ivan's waves at the MC20 Site since no direct measurements were available at the MC20 Site. CGAOGAR_0002330 (citing CGAOGAR_0005409). The maximum hindcast wave height at MC20 was between 64–79 feet, which was similar to the 69.6 feet maximum wave height of the 100-year storm wave predicted in 1983 by Sohio's consultants. CGAOGAR_0002331 (citing CGAOGAR_0005410-5411). However, the periods of the hindcasted waves at the MC20 Site

---

[12] This was *5 seconds longer* than the maximum wave period from the applicable API design standard.

during Ivan were substantially longer than the wave period parameters predicted for a 100-year storm wave in 1983 by Sohio's consultants. CGAOGAR_0002331 (citing CGAOGAR_0005411-5412). The "spectral peak wave period" hindcast for MC20 during Ivan equaled or exceeded 16 seconds for more than 12 hours before the peak of Hurricane Ivan. *Id.* This "spectral peak wave period" was 4 seconds longer than the predicted spectral peak wave period length of 12 seconds predicted for the 100-year storm wave in 1983. In fact, many of the individual hindcasted waves at MC20 during Ivan had periods exceeding 20 seconds, and the longest hindcasted wave period was 22.75 seconds. CGAOGAR_0002332 (citing CGAOGAR_0005413 and CGAOGAR_0005416-5417). The hindcast waves at the MC20 Site during Ivan would have exerted a maximum bottom pressure between 373 and 572 psf (an *average* of 473 psf of maximum bottom pressure), significantly higher than the 249 psf pressures the 100-year storm design wave would have exerted. CGAOGAR_0002333-2334 (internal citations omitted); CGAOGAR_0005409-5410; *see also* CGAOGAR_0005413-5418.[13]

The extraordinary bottom pressures exerted by Hurricane Ivan's waves caused a massive progressive seafloor failure upslope of the MC20A Platform (specifically, 2,500 feet to the northwest of the MC20A Platform) that migrated across the MC20 seafloor, ending several thousand feet downslope of the original platform site. CGAOGAR_0002285-2286; CGAOGAR_0006309-6321;   CGAOGAR_0006325;   CGAOGAR_0000408;   *see   also* CGAOGAR_0003917-3954. The platform collapsed as the result of the wave induced massive progressive seafloor failure. *Id.*; CGAOGAR_0005505-5507. Again, not by a separate geological

---

[13] During the worst one-hour of sea states in the hindcast, there was a single wave causing bottom pressures large enough to initiate the seafloor failure in 400 feet of water (*i.e.,* at the top of the slope where the failure originated), and no waves large enough to cause a failure in 482 feet of water. *See* CGAOGAR_0000410. In other words, only one wave that occurred at the peak of the storm was powerful enough to start the progressive seafloor failure.

event such as a mudflow or mudslide. Rather the failure planes associated with the seafloor failure were approximately 100 feet *below* the seafloor surface. CGAOGAR_0005506. The deep-seated movements of the sediments against the platform foundation pilings caused them to fail and break at a depth greater than 100 feet below the pre-Ivan seafloor. CGAOGAR_0005507. As of August 31, 2017, Taylor Energy had incurred $353,881,719.70 in uncompensated Removal Costs addressing the act of God event. CGAOGAR_0002569-3248.

### III.   The NPFC's Denial of Taylor Energy's Act of God Claim

####    A.   Taylor Energy's Claim

On November 15, 2018, Taylor Energy submitted a claim to the NPFC, asserting that the MC20 Incident was solely caused by an act of God, as that term is defined in OPA, and that Taylor Energy is therefore entitled to reimbursement from the OSLTF of the uncompensated Removal Costs that it had incurred as of August 31, 2017 ($353,881,719). CGAOGAR_0002276-2401. In support of the Claim, Taylor Energy submitted reports from numerous technical experts, including leading geotechnical engineers, geologists, oceanographers, and structural engineers. *See e.g.*, CGAOGAR_0006291-6372 (Gilbert and Nodine); CGAOGAR_0003873-4006 (Hooper); CGAOGAR_0005364-5499 (Suhayda); CGAOGAR_0005500-5515 (Laurendine); CGAOGAR_0008629-8761 (Fury). These experts documented that a massive progressive seafloor failure that originated upslope of the MC20A Platform caused the toppling of the MC20A Platform, and that the seafloor failure was caused by the extreme waves generated by Hurricane Ivan. The reports by the preeminent experts in their respective fields further detailed the reasons that this Incident was unanticipated, exceptional, inevitable and irresistible. The evidence Taylor Energy submitted in support of its Claim established *inter alia* that the waves during Ivan were by far the largest and longest waves ever measured in the Gulf of Mexico, or the United States, and

that the waves that caused the massive progressive seafloor failure met the express wording in the statutory definition of an act of God under OPA. CGAOGAR_0002382-2401.

### B.     The NPFC's Claim Determination

On May 14, 2019, the NPFC issued its Claim Determination, denying the Claim. In reaching its determination that the MC20 Incident was not solely caused by an act of God, the NPFC disregarded the explicit definition of "act of God" in OPA and erroneously relied on a heightened standard which included a definition of the term "act of God" that the agency fabricated for use in this case and which was inconsistent with the definition of "act of God" that Congress enacted in OPA. The Claim Determination also failed to address much of the technical evidence submitted by Taylor Energy that is present in the administrative record. In many instances, the NPFC reached conclusions that were contradicted by the evidence submitted by Taylor Energy, without offering evidence supporting the NPFC's conclusions, and without even addressing the comprehensive evidence submitted by Taylor Energy. In support of its conclusion that the MC20A Platform was not toppled by an act of God, the Claim Determination cited and relied extensively (and almost exclusively) upon only one April 2019 report prepared for it by Capt. James Pettigrew (United States Navy, retired). CGAOGAR_0002187-2228; CGAOGAR_0020030-20061. Surprisingly, Capt. Pettigrew was provided with only limited, select information/data and essentially tasked to dissect discrete issues. CGAOGAR_0000071-73. His findings on which the NPFC relied were well beyond his knowledge or expertise and were speculative, unfounded, and in many cases demonstrably incorrect. *Id.* It is apparent that, from the outset, the denial of Taylor Energy's Claim was a predetermined outcome sought by the NPFC and the adjudication process was undertaken in furtherance of its end-motivated result.

### C.      Taylor Energy's Reconsideration Request

On July 12, 2019, pursuant to 33 C.F.R. 136.115(d), Taylor Energy timely submitted a request to the NPFC, formally asking that it reconsider its Claim Determination. CGAOGAR_0000062-110. In support of its Reconsideration Request, Taylor Energy submitted rebuttal reports to the one April 2019 Pettigrew report. These technical experts had decades of experience in the fields of geotechnical engineering and oceanography, including relevant experience assessing the impacts of hurricane waves on seafloor sediments in the offshore Mississippi River Delta Region of the Gulf of Mexico. CGAOGAR_0000358-379 (Suhayda); CGAOGAR_0000380-406 (Ward); CGAOGAR_0000164-174 (Hooper); CGAOGAR_0000407-526 (Gilbert and Nodine). Indeed, a number of the technical experts were the same experts that Sohio had used in designing the MC20A Platform in the early 1980s. The Claim and Reconsideration Request established beyond question, *inter alia*, that the Incident was unanticipated, exceptional, inevitable and irresistible, and was the sole cause of the discharge.

### D.      The NPFC's Reconsideration Denial

On October 10, 2019, the NPFC issued its denial of Taylor Energy's Reconsideration Request. CGAOGAR_0000001-29. The Reconsideration Denial incorporated, wholesale, the May 14, 2019 Claim Determination, but it was also based on several new opinions and conclusions. Specifically, the Reconsideration Denial relied upon two "new" reports from Capt. Pettigrew (*see* CGAOGAR_0020062-20091; CGAOGAR_0020277-20301), and "new" reports from four other consultants:  (1)  ABSG  (CGAOGAR_0020183-20243);  (2)  DEA  (CGAOGAR_0020244-

20276);[14] (3) GZA (CGAOGAR_0020305-20622); and (4) NGI (CGAOGAR_0020092-20182).[15]

As was the case with the initial April 2019 Pettigrew report, the new reports from these SMEs

demonstrate that much of the evidence submitted with Taylor Energy's Claim and Reconsideration

Request, was either not shared with or was ignored by the NPFC's experts. Likewise, the NPFC

misunderstood, misinterpreted and/or misconstrued information, cherry-picked those expert

findings that it believed to support its pre-determined outcome, and ignored other relevant findings

and conclusions offered by Taylor Energy's technical experts and supported by the evidence in the

administrative record. The Claim Determination and Reconsideration Denial were replete with

blatant errors, faulty logic, inconsistencies, relied upon insufficient evidence, were speculative,

relied upon incorrect assumptions, used incorrect methodologies or reasoning, and outright ignored

contrary evidence submitted by Taylor Energy.

Taylor Energy now seeks this Court's review on summary judgment of the NPFC's denial

of Taylor Energy's Claim for the reasons set forth in its Complaint and as discussed below.

---

[14] Despite being commissioned, the DEA Report was never relied upon by the NPFC in connection with its Reconsideration Denial. *See generally* CGAOGAR_0000001-29.

[15] In Count 1 of its Complaint, Taylor Energy alleged that the NPFC committed process error that violated the Due Process Clause, the agency's own regulations, and the APA. ECF 1, ¶¶ 113, 123-139. In its Complaint (*id.* at ¶ 139), and separately by motion, Taylor Energy moved to strike six technical reports from the administrative record on the grounds that the failure to disclose the existence/identities and opinions until the Reconsideration Denial in furtherance of its pre-determined outcome violated the relevant regulations and the Due Process Clause. ECF 25-1 at 7, 9-10, 17-19. This Court denied the Motion. *See* ECF 52 at 11. While Taylor Energy continues to maintain that its due process rights were violated (*see also* ECF 58-2), given the Court's ruling on the motion to strike, Taylor Energy will not restate its arguments here, but respectfully incorporates such arguments herein by reference and preserves the issue for appeal. *Capitol Sprinkler Inspection, Inc. v. Guest Servs.,* 630 F.3d 217, 226 (D.C. Cir. 2011) (an interlocutory order merges into a final judgment and is reviewable upon appeal from final judgment).

# LAW AND ARGUMENT

## I.    Standard of Review

"Summary judgment is the proper mechanism for deciding, as a matter of law, whether an agency action is supported by the administrative record and consistent with the APA standard of review." *Blue Ocean Inst. v. Gutierrez*, 585 F. Supp. 2d 36, 41 (D.D.C. 2008). "[T]he summary judgment standard of Rule 56(a) does not apply when motions for summary judgment are sought in agency review cases." *AARP v. United States EEOC*, 267 F. Supp. 3d 14, 26 (D.D.C. 2017) (citing *Fulbright v. McHugh*, 67 F. Supp. 3d 81, 89 (D.D.C. 2014) (citation omitted)).

Under the APA, a reviewing court must set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706. Courts must consider "whether the agency acted within the scope of its legal authority, whether the agency has explained its decision, whether the facts on which the agency purports to have relied have some basis in the record, and whether the agency considered the relevant factors." *Fund for Animals v. Babbitt*, 903 F. Supp. 96, 105 (D.D.C. 1995) (citing *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378, 109 S. Ct. 1851, 104 L. Ed. 2d 377 (1989)). Courts look to whether the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Great Am. Ins. Co.*, 55 F. Supp. 3d at 1058 (citing *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43). This standard requires "at the very least" the NPFC to "examine the relevant data and articulate a satisfactory explanation for its action." *Id.*; *Water Quality Ins. Syndicate*, 225 F. Supp. 3d at 63 (citations omitted). "'[C]onclusory statements will not do; an agency's statement must be one of *reasoning*.'" *Water Quality Ins. Syndicate*, 225 F. Supp. 3d at 63 (quoting *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014)).

"Moreover, when review of an agency's action is 'bound up with a record-based factual conclusion,' the reviewing court must determine whether that conclusion "is supported by substantial evidence."' *Id.* (quoting *Dickinson v. Zurko*, 527 U.S. 150, 164, 119 S. Ct. 1816, 144 L. Ed. 2d 143 (1999)). "Assessment of whether substantial evidence supports the agency's factual findings is based on consideration of the record 'as a whole.'" *Id.* at 64 (quoting *Defs. of Wildlife*, 815 F.3d at 9*).* "Notably, 'an agency's refusal to consider evidence bearing on the issue before it constitutes arbitrary agency action within the meaning of § 706,' as does ignoring 'evidence contradicting its position.'" *Id.* (quoting *Butte Cty., Cal. v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010). Furthermore, the Court cannot adequately discharge its duty to engage in a substantial inquiry by just taking the agency's word that it "considered all relevant matters." *Asarco, Inc. v. EPA*, 616 F.2d 1153, 1160 (9th Cir. 1980). Under these applicable standards, the NPFC's action is in error.

Congress expressly defined "act of God" in OPA and the NPFC has not adopted any regulations interpreting the act of God defense. 33 U.S.C. § 2701(1). Moreover, adjudicating an act of God defense is not a technical matter over which the NPFC has more expertise than the Court. While the standard of review under the arbitrary and capricious standard is highly deferential, *see Water Quality Ins. Syndicate*, 225 F. Supp. 3d at 40, "[a] court does not defer to an administrative construction of a statute when there are 'compelling indications that it is wrong.'" *Great Am. Ins.*, 55 F. Supp. 3d at 1058 (citations omitted); *see also Guindon v. Pritzker*, 31 F. Supp. 3d 169, 186 (D.D.C. 2014) ("This deferential standard cannot permit courts [] merely to rubber stamp agency actions, nor be used to shield the agency's decision from undergoing a thorough, probing, in-depth review." (internal quotation marks and citation omitted)); *Otay Mesa Prop., L.P. v. U.S. Dep't of Interior*, 646 F.3d 914, 916 (D.C. Cir. 2011) ("Substantial evidence is

a deferential standard. But deference is not abdication."); *Huff v. Vilsack*, 195 F. Supp. 3d 343, 352 (D.D.C. 2016) (noting that, even under the deferential standard of review, "courts retain a role, and an important one, in ensuring that agencies have engaged in reasoned decisionmaking, which means the court *must* ensure that the decision was based on a consideration of the relevant factors and determine whether there has been a clear error of judgment" (internal quotation marks, brackets, and citation omitted)). Indeed, "'[d]eference does not mean acquiescence.'" *Water Quality Ins. Syndicate*, 225 F. Supp. 3d at 64 (quoting *Presley v. Etowah Cty. Comm'n*, 502 U.S. 491, 508 (1992)). Additionally, the D.C. Circuit has not hesitated to reject agency determinations under the APA's substantial evidence standard when an agency ignores factual matters or fails to respond adequately to meritorious arguments raised in opposition to the agency's action. *Id.* (collecting cases).

As discussed below, under the applicable legal standards for this Court's review, the NPFC's denial of Taylor Energy's Claim must be set aside because the NPFC's decision:

(1) improperly applied a heightened standard expressly contrary to the plain language of the definition of "act of God" prescribed by Congress in OPA; and

(2) the methodology, findings and conclusions of the NPFC were arbitrary, capricious, an abuse of discretion and otherwise not in accordance with the law for various distinct and independent reasons, including, but not limited to, the NPFC's (i) re-casting and/or misconstruing of what the actual "act of God" event and failure mechanism were; (ii) cherry-picking of information, data and expert findings, and ignoring relevant evidence in the administrative record provided by Taylor Energy in support of its Claim; and (iii) retroactive application of a standard and data points that were not known at the relevant times (i.e., in 1983 or at the time of the Incident), and were actually informed by Hurricane Ivan's amazing wave statistics.

## II.     The NPFC Erred as a Matter of Law When it Failed to Apply the Unambiguous Language of the "act of God" Definition in OPA

### A.     The Oil Pollution Act

Congress passed OPA in 1990 in response to the Exxon Valdez oil spill in Prince William Sound, Alaska. CGAOGAR_0002202 (citing *Oil Pollution Act of 1990*, Pub. L. No, 101-380, 104 Stat. 484 (codified as 33 U.S.C. §§ 2701-2761)). OPA established a strict liability scheme for oil spill removal costs and related damages. 33 U.S.C. § 2101 *et seq*. However, OPA sets forth specific exceptions or defenses to liability. 33 U.S.C. § 2103(a). Specifically, "[a] responsible party is not liable for removal costs or damages under section 1002 [33 U.S.C. § 2702] if the responsible party establishes, by a preponderance of the evidence, that the discharge or substantial threat of a discharge of oil and the resulting damages or removal costs were caused solely by . . . act of God." 33 U.S.C. § 2703(a)(1).[16] An "act of God" is defined in OPA to mean "an unanticipated, grave natural disaster or other natural phenomenon of an exceptional, inevitable and irresistible character, the effects of which could not have been prevented or avoided by the exercise of due care or foresight." 33 U.S.C. § 2701(1). Ultimately, in OPA, Congress determined that the

---

[16] The NPFC did *not* rely upon any of the limitations on a complete defense set forth in 33 U.S.C. § 2703(c) in denying Taylor Energy's Claim. As part of its Claim Determination, the NPFC did *not* find that Taylor Energy had failed to provide all reasonable cooperation and assistance requested by the Coast Guard in responding to the MC20 Incident. *See* CGAOGAR_0002225 ("For the purposes of adjudicating this claim, the NPFC has assumed, without deciding, that Taylor was compliant with the provisions of 33 U.S.C. § 2703(c)"). The NPFC also did *not* find that Taylor Energy failed without sufficient cause to comply with the Coast Guard's administrative orders relating to the response to the MC20 Incident. However, the NPFC intimated that it could have denied the Claim on those grounds. Therefore, out of an abundance of caution, Taylor Energy set forth a detailed account of its cooperation over the years and evidence in support thereof in its Reconsideration Request. *See* CGAOGAR_0000087-109. The NPFC did *not* base its Reconsideration Denial on 33 U.S.C. § 2703(c), or otherwise address any alleged lack of cooperation or failure to comply with an order issued without sufficient cause, on behalf of Taylor Energy. Thus, that issue need not be considered by this Court in ruling on this Motion. In any event, Taylor Energy's many years of cooperation is well documented in the administrative record.

industry-funded OSLTF should be used to pay for removal costs when a discharge is caused solely by an "act of God."[17]

B.   **The NPFC's Application of a Heightened Standard Contrary to the Plain Language of the Definition of "act of God" Prescribed by Congress in OPA was Legal Error**

The NPFC applied a definition of "act of God" that is not found in OPA and violates the express terms of that statute. Specifically, the NPFC ignored the clear and unambiguous statutory language, and read-in additional, more restrictive terms. Additionally, without finding that OPA's act of God definition was ambiguous, let alone genuinely ambiguous, the NPFC's reliance on the purported legislative history of *other* environmental statutes, cases decided under them, and its view of the overall purpose of OPA was likewise arbitrary and capricious, an abuse of discretion and otherwise not in accordance with the law.

i.   **The NPFC Failed to Apply the Plain Language of the Statutory Definition of "act of God" and Inserted its Own Additional Requirements**

When a statute contains an explicit definition, as OPA does here, administrative agencies and courts must follow that definition. *See Stenberg v. Carhart*, 530 U.S. 914, 942 (2000). Moreover, "the possibility of deference [to the Agency's interpretation] can arise only if a regulation is genuinely ambiguous...[a]nd before concluding that a rule is genuinely ambiguous, a court must exhaust all the 'traditional tools' of construction." *Kisor v. Wilkie*, 139 S. Ct. 2400,

---

[17] Congress, through OPA's statutory defenses, recognized that it is not fair, and creates negative incentives, to impose strict liability on an RP when the sole cause of a discharge is beyond the control of the RP. Indeed, allocating costs in this manner, through the OSLTF, serves various public policy goals and provides many positive benefits to the Nation. *See* CGAOGAR_0002372-2375. With over $7 Billion estimated to be in the Fund, this situation presents the rare set of circumstances exactly contemplated by Congress for a statutory defense to strict liability.

2414-15 (2019). Because Congress defined the term "act of God" in OPA, the NPFC was required to apply the term using the definition that Congress gave it.

To that end, the definition of "grave," when used as an adjective is "considerable," "great," "significantly serious" or "likely to produce great harm or danger." https://www.merriam-webster.com/dictionary/grave. "Exceptional" means "superior," "rare" or "deviating from the norm." https://www.merriam-webster.com/dictionary/exceptional. "Irresistible" means "impossible to resist". https://www.merriam-webstercom/dictionary/irresistible. "Inevitable" means "certain," "inescapable" or "unavoidable." https://www.merriam-webster.com/dictionary/inevitable. "Unanticipated" means "unexpected" or "unforeseen." https://www.merriam-webster.com/dictionary/unanticipated. None of these elements include within their definitions a requirement that the natural phenomenon be "unprecedented" or that it be "one of the most grave" natural phenomenon of all time, as the NPFC erroneously concluded. Rather than rely upon the plain meaning of these terms, the NPFC resorted to purported legislative history to justify its imposition of an overly-restrictive standard that is inconsistent with Congress' statutory definition, and imposed additional elements. Doing so is clear error under the APA.

The NPFC undisputedly failed to apply the plain meaning of the "act of God" definition as set forth in the statute. Instead, it applied an overly restrictive definition of its own creation and impermissibly inserted elements into the statutory definition of "act of God." For example, according to the NPFC, Taylor Energy must prove that the waves at MC20 during Ivan were "***one of the most grave***, exceptional, inevitable and irresistible [natural phenomena] ***of all time***." CGAOGAR_0002212 (emphasis added); *see also* CGAOGAR_0002189. The NPFC also stated that the event must not only be "***unprecedented***," an unauthorized extra-statutory definition in and of itself, but it must be more than "unprecedented." *See e.g.,* CGAOGAR_0002209 (emphasis

added) ("[T]he weather event must not simply be...unprecedented....")[18]; *see also* CGAOGAR_0002210 (relying on an alleged absence of "***freak conditions*** unexplainable by present hind cast methods or physical understanding of hurricane winds and waves" (emphasis added)); CGAOGAR_0002217 (same). None of these terms are found in the statutory definition of "act of God" nor do they equate with the plain meaning of the words in the statutory definition. Rather, they impose a heightened standard that is inconsistent with the plain language of Congress' statutory definition.

The NPFC's reliance on an unauthorized extra-statutory definition and its decision to impose additional requirements of its own creation not found in the text of the statute as enacted by Congress was unlawful, arbitrary and capricious, an abuse of discretion, and a *per se* ground for this Court's overturning the NPFC's decision. *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43; *Water Quality Ins. Syndicate*, 225 F. Supp. 3d at 63 ("'An agency acts arbitrarily or capriciously if it has relied on factors Congress did not intend it to consider….'" (quoting *Defs. of Wildlife,* 815 F.3d at 9)). For this reason alone, Taylor Energy's Motion should be granted.

ii.   **The NPFC Improperly Relied Upon Purported Legislative History to Support its Overly-Restrictive Application of the Term "act of God" as Defined by Congress in OPA**

Contrary to the NPFC's contention that "Congress has...provided thorough detailed legislative history what it meant by the term and how narrowly it should be applied" (CGAOGAR_0002204) (and putting aside that it is improper to refer to legislative history when there is no ambiguity), the NPFC does not cite any legislative history in connection with OPA. The purported legislative history of a different law, the Comprehensive Environmental Response,

---

[18] *See also* CGAOGAR_0000074 (addressing the meaning of "exceptional" and "unanticipated" and why these terms cannot possibly be construed to mean "unprecedented").

Compensation and Liability Act ("CERCLA"), relied upon by the NPFC (*see* CGAOGAR_0002208) was actually a 1986 House Committee report written six years after the definition of "act of God" was adopted by Congress and cannot be considered evidence of Congress' intent when it adopted the definition in 1980 in connection with CERCLA. *See* CGAOGAR_0000066 (citation omitted). Notwithstanding the foregoing, that purported legislative history does not support the overly restrictive application of the "act of God" definition under OPA applied by the NPFC; it merely recognizes that the defense

> is similar to, but more limited in scope than, the traditional "act of God" defense. It has three elements: the natural phenomenon must be exceptional, inevitable, and irresistible. Proof of all three elements is required for successful assertion of the deference. The "act of God" defense is more nebulous, and many occurrences asserted as "acts of God" would not qualify as "exceptional natural phenomenon." For example, a major hurricane may be an "act of God," but in an area (and at a time) where a hurricane should not be unexpected, it would not qualify as a "phenomenon of exceptional character."

H.R. Rep. No. 99-253 (IV), at 71, reprinted in 1986 U.S.C.C.A.N. 3068, 3101.

Additionally, the NPFC misstated the words of the statute as it relates to the ability to prevent or avoid the effects "by the exercise of due care or foresight." Specifically, the NPFC replaced the word "or" for the word "and" (CGAOGAR_0000014), then proceeded to conclude, without any support, that "[t]his portion of the statute creates an especially high hurdle for a discharger to prove entitlement to the 'act of God' defense." *Id.* Relying on a footnote in a single case interpreting an unrelated defense concerning an "act or omission of a third party" and legislative history in connection with the Federal Water Protection Control Act "FWPCA" (a/k/a Clean Water Act "CWA") that admittedly do not even address the terms at issue (*i.e.,* the exercise of due care or foresight), the NPFC essentially reads out the "or" and states that "courts have typically focused upon the foreseeability of the event rather than the due care of the discharger." *Id.* There is no basis for this interpretation by the administrative agency. Again, the NPFC

misapplied the clear, unambiguous statutory language and applied an overly narrow definition of "act of God" that is inconsistent with the plain language of OPA. The NPFC's reliance on the purported legislative history was error.

   iii.  **The NPFC's Reliance on Jurisprudence was Misplaced and does Not Support its Overly-Restrictive Application of the Term "act of God" as Defined by Congress in OPA**

   Likewise, the cases relied upon by the NPFC are not proper precedent and are clearly distinguishable. *Apex Oil v. United States*, 208 F. Supp. 2d 642 (E.D. La. 2002) is the only OPA decision addressing the act of God defense in any detail.[19] In *Apex*, the plaintiff filed suit appealing the denial of its claim for reimbursement of oil spill clean-up costs under OPA. *Id*. at 644. The oil company was towing barges, some of which were laden with slurry oil, up the Mississippi River toward their final destination in Chicago, knowing (1) the flood stage condition of the river, (2) that strong fast currents were precipitating damage to navigational aids, (3) that effects were migrating down river, and (4) after being duly advised that caution should be exercised in light of the considerably perilous conditions. *Id.* at 656-57. The tug and barge collided with a bridge abutment, which resulted in an oil spill. *Id.* at 645. Apex argued that the flood and exceptionally strong and unpredictable currents solely caused the oil spill and was an act of God. *Id.*

   The NPFC concluded that human influence (*i.e.*, Apex's decision to continue to navigate despite knowing the flood stage condition of the river) partly caused the incident and that the flood was not the sole cause. *Id.* The reasoning for the NPFC's decision was that because the Captain

---

[19] In *United States v. J.R. Nelson Vessel*, 1 F.Supp. 2d 172 (E.D. N.Y. 1998), defendants left a vessel in the care and custody of a marina. During a storm the vessel broke open and partially submerged, leaked oil. The United States sued under OPA for clean-up costs. The defendant maintained the third party was liable and made much to do about the storm. In a footnote, the court rejected the act of God defense because the defendant made no effort to establish that the storm was of such a magnitude to meet OPA's definition. *Id.* at 176, n. 2. Consequently, *J.R. Nelson Vessel* has no relevance here.

"was aware that the current on the river was strong and that the water was high, it appeared he took a knowledgeable risk in proceeding, which led to the unfortunate event." *Id*. Apex sought the District Court's review of the NPFC's decision denying its claim for reimbursement of recovery costs and cleanup expenses. *Id.* at 648. The court, in determining whether the act of God was the sole cause of the collision and resulting spill, compared the facts of the *Apex* case to the facts in *Sabine Towing & Transportation Co., Inc. v. United States,* 666 F.2d 561 (Ct. Cl. 1981), a case under the CWA. *Id.* at 657. There, the court rejected the plaintiff's characterization of a freshet condition as an act of God, reiterating that an act of God must result solely from a grave natural disaster, and must be unanticipated. *Id*. The *Apex* court explained that if freshet conditions in *Sabine* did not constitute an act of God within the meaning of the CWA, then surely "a swift unpredictable current on the Mississippi River at or about the time of heavy rains which caused the Mississippi River to rise to flood stage can not constitute an act of God within the meaning of the OPA." *Id.* at 657. The court attributed the most apparent cause of the release to the "underpowered Apex tug" and the tug captain's choice to negotiate the bridge with this tug in spite of the intensifying current. *Id.* Therefore, the court concluded that the act of God was not the sole cause of the oil spill. *Id.* at 658.

What is learned (unsurprisingly) from *Apex* is that a swift current during flood conditions is not an unanticipated, exceptional or inevitable natural phenomenon. Moreover, the current was not the sole cause of the discharge. The captain was aware of the current and made the conscious decision to proceed, with an "underpowered Apex tug" moving upstream with seven barges-three filled with slurry oil. The facts in *Apex* are a far cry from the facts presented by Taylor Energy.

There is no evidence in the administrative record, that on the day that Hurricane Ivan hit, Taylor Energy could have done anything to prevent the toppling of its fixed platform - there was

no human error. Moreover, the evidence is indisputable that the waves during Ivan were truly unanticipated, exceptional, inevitable and irresistible and the effect of this natural phenomenon could not have been prevented or avoided by the exercise of due care. What happened at MC20 simply cannot be compared to the known strong currents on the Mississippi River that, along with the captain's conscious decision, caused the unfortunate event in *Apex*. *Apex* is the *only* case that addresses an "act of God" under OPA and it is clearly distinguishable.

The remainder of the cases relied upon by the NPFC for its overly-restrictive application of the "act of God" defense are in the context of the CWA (a/k/a FWPCA) and CERCLA and are likewise clearly distinguishable.[20] A review of the jurisprudence addressing an act of God defense under these statutes reveals three overriding themes that preclude an act of God defense: (1) as in *Apex*, where vessels knowingly proceed in forecasted hazardous weather conditions or fail to take adequate precautions in forecasted weather conditions, the defense does not apply; (2) natural phenomena that are not truly exceptional do not qualify as acts of God; and (3) where human error

---

[20] CWA's definition of an act of God is "an act occasioned by an unanticipated grave natural disaster." 33 U.S.C. § 1321(a)(12). CERCLA's definition of an act of God is identical to the definition found in OPA. 42 U.S.C. § 9601(1) ("unanticipated grave natural disaster or other natural phenomenon of an exceptional, inevitable, and irresistible character, the effects of which could not have been prevented or avoided by the exercise of due care or foresight."). Although the definitions of act of God in the three federal environmental statutes are substantially similar, they were adopted under different pretexts. Importantly, under the CWA and CERCLA, the public is responsible for clean-up costs when an act of God defense is successful. Accordingly, CWA and CERCLA exceptions to liability are strictly construed because "it is the clear congressional intent that 'cases where the public pays for cleanup [are] the exception, not the rule.'" *Liberian Poplar Transports, Inc. v. U.S.*, 26 Cl. Ct. 223, 225 (1992) (citation omitted)). In marked contrast, under OPA, the oil and gas industry funds the OSLTF. Its purpose is to protect an innocent RP when, for example, an act of God is the sole cause of the oil pollution incident. The Fund is financed through a tax on the oil industry, 33 U.S.C. § 2701(11); 56 U.S.C. § 9509, and designed to protect RPs from acts outside their control. Again, the unique circumstances presented here is exactly what Congress contemplated for a statutory defense to strict liability.

plays a role in the discharge, the act of God is not the sole cause precluding the defense. None of these themes exist here.

Courts have denied act of God defenses in cases where there was adequate notice of an extreme weather condition, and the party failed to take reasonable care to avoid the foreseeable effects of the weather. *United States v. M/V Santa Clara I*, 887 F. Supp. 825 (D. S.C. 1995) (vessel from which hazardous materials were discharged during storm not entitled to assert act of God defense under CERCLA where storm was forecast when vessel departed port), *Sabine Towing & Transportation Co., Inc.* 666 F.2d 561 (vessel owner who knowingly sent tug up Hudson River during spring flooding not entitled to assert act of God defense under the CWA (a/k/a FWPCA)), and *Liberian Poplar Transports, Inc.*, 26 Cl. Ct. 223 (vessel that broke free of berth during thunderstorm not entitled to act of God defense where thunderstorm was well forecasted and crew of vessel could have taken precautions).

Notably, each involved a vessel that remained in an area in which the peril was forecasted without taking adequate precautions, or sailed into an area in which the peril was known to exist. They are distinguishable from the situation presented here because the MC20A Platform was not mobile. Taylor Energy could not have moved the platform, taken any reasonable precautions to prevent the MC20 seafloor from collapsing, or prevented the platform from toppling when the seafloor collapsed. There are *no* cases that discuss the "act of God" defense under any statute (OPA, CWA or CERCLA) in the context of a *fixed platform*. Moreover, while Hurricane Ivan may have been forecasted, the magnitude of the waves and the resultant massive progressive seafloor failure certainly were not "forecasted" much less even anticipatable. Indeed, a natural phenomenon that last occurred somewhere between the end of the last ice age and the beginning of the Roman Empire must surely qualify as exceptional and unanticipated under OPA, or nothing ever will. *See*

CGAOGAR_0002389. If the NPFC's decision is not set aside, it will result in the judicial elimination of the act of God defense established by Congress in OPA.

Another group of cases relied upon by the NPFC have denied act of God defenses where the natural phenomenon was not severe or exceptional enough to qualify as an act of God, and the party's negligence played a role in the loss. *United States v. Barrier Indus.*, 991 F. Supp. 678, 679 (S.D.N.Y. 1998) (cold spell that caused bursting of pipes did not qualify as act of God under CERCLA); *Kyoei Kaiun Kaisha, Ltd. v. M/V Bering Trader*, 795 F. Supp. 1054, 1055, n.2 (W.D. Wash. 1991) (strong winds that drove ship aground not unusual for Aleutian Islands in winter and thus not act of God and vessel crew's negligence in handling mooring lines contributed to loss); *United States v. Stringfellow*, 661 F. Supp. 1053, 1061 (C.D. Cal. 1987) (heavy rains were not the kind of "exceptional" natural phenomenon to which the CERCLA act of God defense applies. "The rains were foreseeable based on normal climatic conditions and any harm caused by the rain could have been prevented through design of proper drainage channels."); *United States v. Alcan Aluminum Corp.*, 892 F. Supp. 648, 657-58 (M.D. Pa. 1995) (act of God defense did not apply because heavy rainfall is not the kind of exceptional phenomenon to which the act of God defense applies and discharge was the result of the defendant's decision to illegally dump hazardous waste into an abandoned mine). These cases are also easily distinguishable from Taylor Energy's Claim. The extraordinary waves are a classic example of an act of God,[21] and there is no evidence that

---

[21] In *Pioneer Natural Resources v. Diamond Offshore Co.*, 638 F. Supp. 2d 665, 672 (E.D. La. 2009), the court found that Hurricane Ivan generated waves that exceeded the 100-year storm conditions and that the owners of a rig "could not have foreseen that it would generate the aforesaid extreme conditions." Notably, it was clear error for the NPFC to completely disregard *Pioneer* as the court's findings are relevant to the issue of whether Hurricane Ivan's waves were anticipatable. *See* CGAOGAR_0000070. Moreover, here it was not just the waves that render this an act of God as that term is defined in OPA, but the natural phenomenon as a whole – *i.e.,* the waves (combined height, periods, and pressures exerted) and the resultant massive progressive seafloor failure that migrated downslope – presents an even more compelling case.

Taylor Energy did anything to contribute to the discharge that resulted from the collapse of the MC20A Platform, or that it could have done anything to prevent the regional seafloor failure from destroying the platform.

Tellingly, in each of the cases on which NPFC relies, experts were not required because it is common knowledge that extremely cold weather causes pipes to burst from which hazardous substances can escape (*Barrier Industries*); containers on a vessel may topple overboard during a heavy storm (*M/V Santa Clara*); heavy rainfall may cause flooding and the release of hazardous substances where there has been illegal dumping (*Alcon Aluminum*); and a vessel may strike debris (*Sabine Towing*) or a bridge during a spring flood (*Apex*). What caused the release of the hazardous substance in each case was highly predictable and a matter of common knowledge. As a result, the natural phenomena were simply not so unanticipated, exceptional, inevitable and irresistible to qualify for an act of God defense.

In contrast, the facts in this case present an issue of first impression because of the truly extraordinary natural phenomenon that occurred – waves that were unrivaled in combined height and period, exerting such extraordinary pressure on the seafloor bottom hundreds of feet down so as to trigger a massive progressive seafloor failure commencing upslope and migrating down and across the platform site. Again, this situation is exactly what the statutory defense of act of God was enacted by Congress for.

There is no question that the technical evidence offered by Taylor Energy proved by a preponderance of the evidence that an extraordinary natural phenomenon toppled the MC20A Platform, and caused the release of oil. The NPFC does not deny that an extraordinary natural

phenomenon occurred[22] and it quite clearly could not deny Taylor Energy's claim based on common knowledge or even its own specialized knowledge. Rather, in a premeditated scheme to debunk Taylor Energy's act of God defense, the NPFC hired a bevy of experts—not to challenge the act of God itself—but to provide support for its pre-determined decision to deny Taylor Energy reimbursement from the OSLTF.[23] Such action by the administrative agency cannot withstand judicial scrutiny.

As the act of God jurisprudence shows, Taylor Energy recognized that it is rare that an act of God defense will be successful. But when Congress enacted OPA, it recognized that acts of God do occur, and under some circumstances unanticipated natural phenomena will be exceptional, inevitable and irresistible in character, the effects of which could not have been prevented or avoided by the exercise of due care or foresight. Neither the plain language of the statute nor any other precedent has imposed such a restrictive application of "act of God" as the NPFC did here. As the administrative record in this case reflects, the wave conditions that resulted in the upslope massive progressive seafloor failure were clearly an "unanticipated grave natural disaster or other natural phenomenon of an exceptional, inevitable and irresistible character" within the plain meaning of those words and the "act of God" definition expressly set forth in OPA. In sum, the clear unambiguous statutory text should govern. Had the NPFC applied the statutory definition as written, it would have had to grant the Claim.

And, even if the NPFC were to resort to the purported legislative history of other statutes (which is particularly improper in light of the clear, unambiguous statutory language), such

---

[22] *See also* CGAOGAR_0000013 (not even acknowledging the term "other natural phenomenon" despite the disjunctive term "or" in the OPA definition).

[23] As discussed below, there are various additional aspects of this effort that render the NPFC's denial arbitrary, capricious, an abuse of discretion and otherwise not in accordance with the law.

purported legislative history likewise does not support the overly restrictive application of the act of God definition applied by the NPFC. Similarly, the jurisprudence cited by the NPFC does not support the overly restrictive application of the act of God definition used by the NPFC. Indeed, the definition of act of God imposed by the NPFC was not only overly restrictive; the NPFC impermissibly added elements to the act of God defense, beyond those which are statutorily prescribed. Taylor Energy's Motion should be granted, and the NPFC's denial of Taylor Energy's Claim should be vacated.

## III.   The Methodologies, Findings and Conclusions of the NPFC were Arbitrary, Capricious, an Abuse of Discretion and Otherwise not in Accordance with the Law

The methodologies used and the findings and conclusions of the NPFC were arbitrary, capricious, an abuse of discretion and otherwise not in accordance with the law for various distinct reasons. While Taylor Energy's Complaint identifies various ways in which the NPFC's decision was arbitrary, capricious, an abuse of discretion and otherwise not in accordance with the law, this Motion focuses on addressing some of the most glaring issues.[24]

Notably, the NPFC's process in connection with the adjudication of Taylor Energy's Claim was driven by its predetermined outcome to justify its denial. This is evidenced by the NPFC's (i) attempt to re-cast the natural phenomenon at issue; (ii) retention of SMEs to refute specific issues that support Taylor Energy's Claim;[25] (iii) cherry-picking of information to provide its SMEs, and relatedly its failure to provide its experts with all of the relevant facts and data; (iv) cherry-picking of findings by its SMEs, and relatedly its ignoring of data and findings that do not support its

---

[24] The purpose of this Motion is not to dissect the entirety of the NPFC's Claim Determination and Reconsideration Denial and the expert opinions on which it relied to identify every technical inaccuracy (and indeed, there were many, *see e.g.,* ECF 1 at ¶¶ 156; 157), but rather to address the overarching issues that render its action arbitrary and capricious within the meaning of the APA.

[25] This is further bolstered by the issues addressed in ECF 25-1 and 58-2.

denial; and (v) the fact that the NPFC offered an explanation for its decision that runs counter to the evidence before the agency, and was based on faulty logic and incorrect methodology and reasoning. These errors permeate all aspects of the NPFC's denial. They render the NPFC's conclusions with respect to each individual element arbitrary, capricious, an abuse of discretion and otherwise not in accordance with the law.[26] As demonstrated by Taylor Energy and as the administrative record establishes, the MC20 Incident constitutes an "act of God" within the plain, unambiguous meaning of that statutory term.

### A.    In Addition to Applying an Improper, Heightened Standard, the NPFC Misconstrues What the Actual "act of God" and Failure Mechanism Were

#### i.    Taylor Energy does not contend that Hurricane Ivan was the act of God

The NPFC concludes, based on the alleged legislative history of CERCLA, that "Congress believed that the majority of hurricanes should not fall within the domain of the statutory defense." CGAOGAR_0002208. It then proceeds to compare the frequency of named storms in the Atlantic Ocean, Caribbean Sea and/or the Gulf of Mexico to the frequency of a flow rate in *Sabine Towing & Transp. Co.*, where the flow rate on the day of the incident was equaled or exceeded on twenty-five percent of all days that year. CGAOGAR_0002208-2209 ("Similarly, there were 87 days in 2018 where a named storm was in the Atlantic Ocean, Caribbean Sea and/or the Gulf of Mexico, which is roughly also one-quarter of the time."). Even assuming that the purported legislative history of CERCLA is applicable or otherwise provides guidance, Taylor Energy does not contend that the meteorological parameters of Hurricane Ivan (*i.e.,* the storm) were the "act of God." In fact, Taylor Energy acknowledges that the occurrence of hurricanes in the Gulf of Mexico "is not

---

[26] *See also,* ECF 1 at ¶¶ 156 and 157 (setting forth various instances of speculation, faulty logic, and inaccuracies relating to each specific element), which is expressly incorporated herein as if set forth *in extenso*.

an unusual occurrence" and "is not an unanticipated event." CGAOGAR_0000074; *see also*

CGAOGAR_0000082 ("[T]he fact that hurricanes occur every year in this region is not the issue

...[Taylor Energy] does not dispute that hurricanes are an anticipated occurrence in the Gulf of

Mexico."); CGAOGAR_0002327 ("The general meteorological characteristics of the storm were

not exceptional for a Category 4 or 5 hurricane."). Thus, whether Hurricane Ivan was an "act of

God" misses the mark.

The NPFC repeats this threshold error throughout its Claim Determination and its

Reconsideration Denial. [27] The NPFC's logic ignores the fact that an anticipated or foreseeable

natural disaster or natural phenomena, like a hurricane, can have unknown and unanticipated

characteristics that support the assertion of an act of God defense—here extraordinary waves (and

more particularly the combination of the height of the waves, the long periods and the extreme

downward pressures on seafloor sediments at a water depth of more than 480 feet) that caused the

---

[27] *See e.g.*, CGAOGAR_0002212 ("The legislative history of both CERCLA and the CWA are clear that if the storm was foreseeable, predicted, or not unusual at the time and place it occurred, the defense should not apply"); CGAOGAR_0002213 (CERCLA's legislative history also addresses the idea of a hurricane being unanticipated…."); CGAOGAR_0002220 ("It is nearly inconceivable that a facility that deals with oil or hazardous substances in the region will succeed by arguing that it was unaware of the strong possibility of a tropical storm or a hurricane disrupting or disabling operations" (citation omitted)); *see generally* CGAOGAR_0002213-2214 (discussing the frequency of hurricanes in the Atlantic and Gulf Regions). And, the NPFC's decision is based on this incorrect premise. CGAOGAR_0002212 ("Ivan . . . was nowhere near one of the most severe, grave nor exceptional hurricanes of all time."); CGAOGAR_0000016 ("Hurricane Ivan was not a rare event . . . ."); CGAOGAR_0000024 (stating that "[t]he Gulf of Mexico itself is highly conducive to the generation of major hurricanes" and discussing the recurrence interval of storms); CGAOGAR_0000025 ("Taylor either was aware, or should have been aware, of the propensity for hurricanes within the Gulf of Mexico and the unstable sedimentation conditions within the Mississippi Canyon."); CGAOGAR_0000027 (extrapolating from the general premise that hurricanes in the Gulf of Mexico are not acts of God under OPA and stating that "at a minimum, there was a chain of causation from the hurricane itself, to winds, to waves, to a failure of the subseafloor"). This error in and of itself renders the NPFC's reliance upon *Sabine Towing*, *Apex*, *Kyoei Kaiun Kaisha*, *M/V Santa Clara I*, and *Liberian Poplar Transports* irrelevant. Likewise, all of those cases are easily distinguishable as discussed *supra*.

seafloor to fail, toppling the MC20A Platform. There is no evidence that the typical characteristics of a hurricane—winds, heavy rain and flooding—toppled the fixed platform. In fact, to the contrary, the undisputed evidence is that these forces did not cause the platform to topple.

Similarly, the NPFC based its denial on an opinion that "[while] Ivan generated the highest waves ever measured or hind cast in the Gulf of Mexico…[it] does not appear to have generated any *freak* conditions unexplainable by present hind cast methods or physical understanding of hurricane winds and waves. Hence, the extreme waves generated by Ivan do not appear to be an unexpected event." CGAOGAR_0002210 (quoting Cooper (CGAOGAR_0019890)) (emphasis added)[28]; CGAOGAR_0002217 (again relying on this same finding); CGAOGAR_0000017 (same). But, again, while Ivan did generate the tallest waves ever measured or hindcast, the combined height and length of the waves created pressures on the seafloor that were more than *twice* those that the 100-year design storm wave would have produced, and had a return interval exceeding 2,000 years. CGAOGAR_0000075.[29] It was this natural phenomenon as a whole (the combination of the height of the waves, the long periods and the extreme downward pressures on

---

[28] It is relevant to note for other purposes Cooper's reference to "present" (*i.e.,* post-Ivan) hindcast models as well as the fact that Cooper did not specifically address waves at MC20. The NPFC also cherry-picked from Cooper. *Compare e.g.,* CGAOGAR_0000016-17 to CGAOGAR_0019890 (NPFC disputing Dr. Suhayda's claim that the recurrence interval of Hurricane Ivan waves exceeded 2,000 years despite (and completely ignoring) Cooper's finding that "Ivan appears to have generated roughly 2,500-year conditions at the site of the highest hindcast," but just 3 sentences later relying on Cooper for a different proposition).

[29] Cooper states that the waves generated by Ivan had a return interval of 3,000 years (CGAOGAR_0019887; CGAOGAR_0019890), while Panchang and Lee estimated that Ivan's waves had return intervals exceeding 10,000 years (CGAOGAR_0020856). The NPFC relied on these authors' statements that their models could predict waves at other locations (not at MC20) with characteristics similar to Ivan after the fact, but dismissed their statements, based on the same models, that Ivan's waves had return intervals in the thousands of years, which is a completely separate issue (*e.g.,* cherry-picking only the statements that support the NPFC's denial, and disregarding the statements that support the Claim). *See* CGAOGAR_0000077.

seafloor sediments resulting in a massive progressive seafloor failure that toppled the MC20A Platform) - not the wind or wave heights themselves - that make this not just an "unexpected event" but one that was clearly exceptional and unanticipated. Yet, even in its Reconsideration Denial, the NPFC (and its expert, GZA), continues to focus on the wave height alone. *See e.g.,* CGAOGAR_0000016-17. This is arbitrary and capricious within the meaning of the APA.

ii.     **The MC20A Platform was not toppled by a mudflow or mudslide**

The NPFC also relies upon its finding that the area was prone to mudslides (*see e.g.,* CGAOGAR_0002213; CGAOGAR_0002219-2220; CGAOGAR_0002222) and relatedly Taylor Energy's alleged failure to conduct certain surveys (*see e.g.,* CGAOGAR_0002218) in denying Taylor Energy's Claim. However, the MC20A Platform was ***not*** toppled by a mudslide or mudflow overrunning the platform site, but rather a massive progressive seafloor failure approximately 100 feet below the seafloor, or "sub seafloor". *See* CGAOGAR_006309-6321 (analyzing the failure mechanism and explaining the "wave-induced failure of the seafloor" as distinct from other possible failure mechanisms such as a mudflow overrunning the platform site); CGAOGAR_006325 ("[A] mudflow overrunning the platform site…[is] not likely because [it is] inconsistent with the available evidence.").

The NPFC recognized in its Claim Determination that Taylor Energy asserted "that a massive seafloor failure" toppled its platform (*see* CGAOGAR_0002193), yet proceeds to re-cast the event in an effort to fit its narrative that the MC20A Platform was constructed in an area of known mudslides hence the disaster was not unanticipated and the failure to conduct certain surveys intended to monitor sediment accumulations "could have contributed to" the discharge. *See e.g.,* CGAOGAR_0000027. Indeed, this was in spite of evidence in the Claim that the event was an "entire slope failure, rather than a typical mudslide, (*i.e.,* a very extreme event)" – a

distinction completely ignored by the NPFC. COGAOGAR_0002389-2390 (quoting COGAOGAR_0014832).[30]

As explained in the Reconsideration Request, "the NPFC is confusing a mudflow with a seafloor failure. As was discussed in the reports of Jim Hooper and Robert Gilbert, Mary Nodine and Stephen Wright, the two phenomenon are different...Moreover, the MC20A platform was not knocked over by a mudflow...[; it] was toppled by a seafloor failure. A slope failure is a different geohazard than a mudslide." CGAOGAR_0000082; *see also* CGAOGAR_006309-6325;[31] CGAOGAR_0001590 ("In my January 8, 2018 report, I concluded that the MC20A platform was not toppled by such a mudflow"); *Id.* ("In general 'mudslide' forces against a jacket structure are much smaller than those that would be imposed by the type of landslide failures that occurred during Hurricane Ivan."); *Id.* ("Delta front mudflows are a very different phenomenon, compared to a sub-seafloor type of landslide failure."); CGAOGAR_0003881 ("The seafloor failure was materially different than a mudslide.").

In its Reconsideration Denial, the NPFC ignores this important distinction discussed in detail in Taylor Energy's Reconsideration Request.[32] Incredibly, this is so even despite its own

---

[30] Notably, the experts at the 2005 Hurricane Readiness an Recovery Conference, which was convened in part by the MMS (*see* COGAOGAR_0014812), attributed the MC20A Platform incident to a slope failure, not a mudslide and concluded that since slope failures are extreme events, there was no need to modify other existing platforms in the same mudslide regions of the Gulf of Mexico. *See* COGAOGAR_0002390; *see also* COGAOGAR_0014832.

[31] It is also significant that the seafloor failure first occurred near the top of the slope 2,500 feet to the northwest of the platform site, then with additional wave loading, progressed down the slope and across the platform location, *see* CGAOGAR_006309, because the wave mobilized sediments in shallower waters and caused them to flow downslope into deeper water as opposed to the wave imparting significant pressures on the seafloor in those deeper waters.

[32] The NPFC's only reference to the distinct nature of these geological events is actually an acknowledgement and then a baseless, end-motivated justification that is superficial at best:

expert – NGI , which was specifically tasked with reviewing this issue – agreeing as to the failure mechanism (*i.e.,* mechanism 1) and actually finding that an overrunning mudslide was not likely as the "60 ft mudslide overrun needed for mechanism 2 does not agree with the present seafloor level at the original platform location." CGAOGAR_0020120-20121. And, its other expert, GZA stating that "the consensus appears to be that failure of the oil platform was the result of a progressive stability failure" and that "[g]eophysical data showed shearing to a depth of 100 to 150 feet below the pre-hurricane seafloor...." CGAOGAR_0020340; *see also* CGAOGAR_0020528-20565. These are only some examples of cherry-picking by the NPFC. *See Water Quality Ins. Syndicate* 225 F. Supp. 3d at 69.

Accordingly, the fact that mudflow or mudslides are common in the vicinity of MC20 has no relevance to whether the wave induced seafloor failure was exceptional and unanticipated. *See* CGAOGAR_0000407-468. Similarly, Taylor Energy's failure to conduct certain surveys intended

---

The difference between a mudflow and a seafloor failure are certainly academically and technically important. However, the operational fact is that they are both dynamic movements of the ocean bottom, in this area with a history of subaqueous sediment instabilities (repetitiveness intended), that have caused the loss of offshore platforms. Enabling alignment of this knowledge across the whole design process should have been ensured.

CGAOGAR_0000020 (citing CGAOGAR_0020283-20284). This conclusory statement is in direct conflict with the expert opinions contained within the administrative record as detailed herein and lacks any basis whatsoever. The NPFC cites to Pettigrew for this proposition; however, as the record reflects and Pettigrew seemingly concedes when he attempts to back-step and re-frame certain comments in other contexts (*i.e.,* a non-geotechnical context) (*see e.g.,* CGAOGAR_0020285 ("My statement was in relation to the industry belief that significant bottom pressures could not be exerted below 400 feet, but that in 1969, three platforms were lost in 325 feet of water and that belief should be re-examined. It was never meant to imply that there is no significant difference in the pressure that a wave would exert on the seafloor at these difference depths"), Pettigrew lacks any expertise in geotechnical matters. *See* CGAOGAR_0020712-20714. And, Pettigrew does not cite to any authority whatsoever for his bold and superficial statement that a mudflow and seafloor failure are both "dynamic movements of the ocean bottom", or otherwise elaborate as to how or why that may be significant here. CGAOGAR_0020283-20284.

to detect the buildup of sediments upslope of the platform that could result in a mudflow or

mudslide is irrelevant to whether the massive progressive seafloor failure was foreseeable,

constituted a failure of due care or was the cause of the discharge.[33] *Id.*; CGAOGAR_0000408

("Periodic surveys that could have detected an advancing mudflow would not have provided

warning that the platform would be toppled by a failure of the sea floor in Hurricane Ivan waves.").

Indeed, had such surveys been conducted in an effort to identify the potential for a mudflow or

mudslide, they would not have shown the existence of conditions that would be relevant to the risk

that a massive progressive seafloor failure might occur well beneath the seafloor surface. *See also

id.* ("Hurricane Ivan caused disturbance of the sediment below the sea floor to a depth of more

than 100 feet over a distance of 4,500 feet upslope from the platform to 3,000 feet downslope from

---

[33] Notwithstanding that Taylor Energy's failure to conduct certain surveys is irrelevant to the geological event that was the actual failure mechanism, the administrative record reflects that there were no significant accumulations of sediments or any significant sediment movement around or upslope of the MC20A Platform. In fact, a 2001 survey detected a *decrease* in the elevations of the mudlobe crests located upslope of the MC20A Platform of up to 30 feet, meaning that the risk of a large mudflow originating on those mudlobe crests during a hurricane had *decreased* since the platform was erected in 1984 and no major hurricanes passed through the MC20 area after the 2001 survey that would have caused a significant amount of sediment to accumulate upslope of the platform). CGAOGAR_0000085-87 (citing CGAOGAR_0000113-134; CGAOGAR_0000164-174; CGAOGAR_0000183-244). Despite the detailed discussion of the existing surveys, isopatch surveys commissioned by Taylor Energy and the expert opinions of leading experts set forth in the Reconsideration Request, the NPFC completely ignores this, which was arbitrary and capricious. *See* CGAOGAR_0000027; *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43; *Water Quality Ins. Syndicate*, 225 F. Supp. 3d at 64 ("Notably, 'an agency's refusal to consider evidence bearing on the issue before it constitutes arbitrary agency action within the meaning of § 706,' as does ignoring 'evidence contradicting its position.' *Butte Cty.*, 613 F.3d at 194."); *id.* at 68 ("The D.C. Circuit has not hesitated to reject agency determinations under APA's substantial evidence standard when an agency ignores factual matters or fails to respond adequately to meritorious arguments raised in opposition to the agency's action."). It merely reiterates its superficial argument that Taylor Energy failed to conduct geophysical surveys, finding that "the failure to conduct these surveys *could have* contributed to the collapse of the MC-20A platform" (CGAOGAR_0000027 (emphasis added), without anything more (no citations, no discussion, etc.). In short, the NPFC's reliance on the lack of surveys as a basis for its denial is not only arbitrary and capricious, it is a red herring.

the platform, moved a 90-foot high mud lobe nose nearly 4,000 feet from upslope of the platform to downslope from the platform, and caused changes of 30 to 50 feet in the elevation of the sea floor in the vicinity of Mississippi Canyon 20," which is "dramatically different."). Those surveys, therefore, would have had no probative value in determining whether there was a risk that the event that actually toppled the MC20A Platform (*i.e.,* massive progressive seafloor failure) could occur. *Id.*

Notably, the NPFC never found that the fact that Taylor Energy did not engage in periodic geophysical surveys actually *caused* the platform to topple. Rather, it merely found that "the failure to conduct these surveys ***could have contributed*** to the collapse of the MC-20A platform." CGAOGAR_0000027 (emphasis added).[34] Moreover, the finding that "the failure to conduct the surveys *could have contributed* to the collapse of the MC-20A platform" is erroneous because it ignores that the failure mechanism was not a mudflow or mudslide. *See also* CGAOGAR_0000407-468. Simply stated, the absence of surveys that have no relation to the complete failure of the seafloor that actually occurred is too tenuous to say that such contributed to, *much less caused*, the discharge. Indeed, it is erroneous to conclude that Taylor Energy has failed to establish by a preponderance of the evidence that the natural phenomena at issue was not the sole cause of the act of God.

At bottom, in addition to applying an improper, heightened standard, the NPFC misconstrues what the actual "act of God" event is, among other things, in an effort to "move the ball" to support its predetermined outcome. For this independent reason, its denial was arbitrary, capricious, an abuse of discretion and otherwise not in accordance with the law.

---

[34] Indeed, this is a far cry from the "fault of man" in the cases addressed by the NPFC. *See* CGAOGAR_0002221-0002222.

**B.      The NPFC and its Outside Technical Experts Entirely Failed to Consider Taylor Energy's Evidence on Important Aspects**

"[A] court must be sure that the agency 'has ***examine[d] the relevant data*** and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" *AARP*, 267 F. Supp. 3d at 26 (quoting *U.S. Chamber of Commerce v. SEC*, 412 F.3d 133, 140, 366 U.S. App. D.C. 351 (D.C. Cir. 2005) (alterations in original) (emphasis added) (internal quotation marks omitted) (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43)). "Notably, 'an agency's refusal to consider evidence bearing on the issue before it constitutes arbitrary agency action within the meaning of § 706,' as does ignoring 'evidence contradicting its position.'" *Water Quality Ins. Syndicate* 225 F. Supp. 3d at 64 (quoting *Butte Cty.,* 613 F.3d at 194.). In *Water Quality Ins. Syndicate,* this Court stated:

> The D.C. Circuit has not hesitated to reject agency determinations under APA's substantial evidence standard when an agency ignores factual matters or fails to respond adequately to meritorious arguments raised in opposition to the agency's action. *See, e.g., Nat'l Ass'n of Clean Water Agencies v. EPA,* 734 F.3d 1115, 1136-38 (D.C. Cir. 2013) (rejecting agency rule under APA substantial evidence standard where group challenging rule presented credible evidence contrary to agency findings and agency offered only "mere assertion" that rule accounted for contrary evidence in reply); *Butte Cty.,* 613 F.3d at 194 (rejecting agency finding under APA substantial evidence standard where agency failed to "articulate a satisfactory explanation" and agency "ignore[d] evidence contradicting its position" (internal quotation marks and citations omitted)); *Dillmon,* 588 F.3d at 1091 (rejecting agency decision as unsupported by substantial evidence where agency failed to offer "compelling reason for refusing to believe [the plaintiff]" and overturning previous factfinder's credibility determination); *Safe Extensions, Inc.,* 509 F.3d at 605 (rejecting agency decision where "the FAA has provided absolutely no evidence to back it up" since "[a]s we have said many times before, '[a]n agency's unsupported assertion does not amount to substantial evidence.'" (*quoting Algonquin Gas Transmission Co. v. FERC,* 948 F.2d 1305, 1313 (D.C. Cir. 1991))).

225 F. Supp. 3d at 68. In overturning the NPFC decision, this Court further relied on the fact that the NPFC decision "ignores critical context provided in the Coast Guard investigative record and amounts to cherry-picking of evidence that, when considered as a whole, raises significant doubt about the ultimate conclusion reached" and "[t]he NPFC is not free to ignore, without explanation,

the record evidence and factual findings highlighted by Coast Guard investigators, who have close familiarity with the environmental and operating conditions and the actual events under review…." *Id.* at 69.

So too here. Despite the NPFC's boilerplate statement that it "thoroughly reviewed all documentation submitted with the Claim, analyzed the applicable law and regulation, and concluded that Taylor Energy had failed to demonstrate an entitlement to an act of God defense," *see* CGAOGAR_0002189 (citing 33 U.S.C. § 2703(a)); CGAOGAR_0000002, the administrative record establishes that this clearly was not the case. The NPFC, and the experts upon which it relied, failed to consider extensive relevant information and data offered by Taylor Energy.

While agency action is generally presumed valid, especially where the agency's technical determination is made on matters which the agency lays claim to special expertise, *Water Quality Ins. Syndicate,* 225 F. Supp. 3d at 62, here, such deference is not owed the NPFC because it admittedly did not have the expertise to refute the evidence presented by Taylor Energy. The NPFC itself has no "special expertise" on the technical issues presented here. Instead, it went *outside* the agency and hired experts to give support to its pre-ordained conclusion to deny the Claim. Indeed, the NPFC relied heavily (and essentially exclusively) on the opinions of its various outside SMEs,[35] yet it failed to even provide its experts with much of the data and opinions set forth in the Claim, Reconsideration Request, or the expert reports or other evidence submitted therewith.[36]

---

[35] *See also e.g.,* CGAOGAR_0020278 ("NPFC requires contractor support to review the information provided by Taylor toward Mr. Pettigrew....").

[36] Significant issues were simply ignored or dismissed by the NPFC in its own, unexplained discretion, despite its need to depend on the outside expertise of specialized consultants in this very area. Stated differently, while the NPFC had to rely upon SMEs in this area, it charged its SMEs with precisely what it wanted to justify its pre-determined outcome.

Specifically, when rendering his initial opinion, Pettigrew was not provided with a copy of the Claim or the evidence in support thereof. *See generally* CGAOGAR_0020030-20061; *see also* CGAOGAR_0020280 (discussing his first report and conceding "I was not asked to review the 1983 report of Woodward-Clyde Oceaneering. I was not asked to review Mr. Hooper's report."). In connection with his subsequent reports, it appears that Pettigrew still was not provided with a copy of the Claim or its voluminous evidentiary support (with the exception of a few select items that he was specifically asked to comment on). *See generally* CGAOGAR_0020062-20091; CGAOGAR_0020277-20301. Pettigrew was asked to respond to specific matters addressed by Mr. Ward and Mr. Hooper; however, Pettigrew has no experience in the areas addressed by Mr. Ward (structural engineering) or Mr. Hooper (geotechnical engineering). CGAOGAR_0020278-20379. As reflected in the administrative record, Pettigrew's expertise is limited to meteorological and oceanographic (METOC) matters. *See id.*; CGAOGAR_0020712-20714.[37]

Further, NGI was neither provided with a copy of the Claim nor the Reconsideration Request (including the voluminous evidence submitted with those documents). *See* CGAOGAR_0020099; CGAOGAR_0000005, n. 19. It was asked to review nine (9) documents provided to it, one of which it did not review – Dr. Suhayda's February 5, 2018 report – because it was admittedly a topic beyond its expertise. CGAOGAR_0020099. None of these nine

---

[37] While the Federal Rules of Evidence do not apply to federal administrative agencies, the spirit of *Daubert* does because "'junk science' has no more place in administrative proceedings than in judicial ones." *Niam v. Ashcroft*, 354 F.3d 652, 660 (7th Cir. 2004); *Lobsters, Inc. v. Evans*, 346 F. Supp. 2d 340 (D. Mass. 2004); *see also Donahue v. Barnhart*, 279 F.3d 4421. 446 (7th Cir. 2002) ("[T]he idea that experts should use reliable methods does not depend on Rule 702 alone, and it plays a role in the administrative process because every decision must be supported by substantial evidence. Evidence is not "substantial" if vital testimony has been conjured out of whole cloth."); *U.S. Steel Mining Co. v. Director, Office of Worker's Compensation Programs, U.S. Department of Labor,* 187 F.3d 384, 389 (4th Cir. 1999) (recognizing the importance "that final agency decisions will be based on evidence of requisite quality and quantity").

documents included highly relevant information and data such as Hooper's reports or any of the post-2006 Fugro reports, which addressed the precise issues addressed by NGI. *Id.*[38]

Similarly, ABS was neither provided with a copy of the Claim nor the Reconsideration Request (including the voluminous evidence submitted with those documents). *See* CGAOGAR_0020243; CGAOGAR_0000005, n. 21. And, the select few documents with which it was provided did not even include the information and data particularly relevant to the subject of its report such as the reports of Hawk Technical Support, LLC (Laurendine) (CGAOGAR_0005500-5515) or FuryConsult, LLC (Fury) (CGAOGAR_0008629-8761). *Id.*

Likewise, GZA was neither provided with a copy of the Claim nor the Reconsideration Request (including the voluminous evidence submitted with those documents). *See* CGAOGAR_0020314 (stating it was asked to "[r]eview the February 5, 2018 report prepared by Dr. Suhayda and associated references...."); CGAOGAR_0000006, n. 26.

And, finally, despite having tasked DEA with certain work, the DEA report was not even relied upon by the NPFC. *See* CGAOGAR_0000007. In short, the NPFC essentially cherry-picked what information and facts to provide its outside subject matter experts, and significant technical and scientific information offered by Taylor Energy was not provided.[39] *See Boquet Oyster House,*

---

[38] This is despite relying on the Fugro reports from 2005 and 2006. Specifically, the NPFC provided these early reports by Fugro to NGI, GZA and ABS (*see* CGAOGAR_0000005-6, n. 19, 21 & 26) but did not provide NGI with Hooper's 2018 report, which relied on numerous additional surveys that Fugro performed using far more advanced and reliable technology, that provided much better data to assess what happened at MC20 during Ivan. Hooper discussed all of Fugro's subsequent surveys and attached images from the later surveys to his 2018 report. Yet the NPFC did not send Hooper's 2018 report to its experts. Instead, it sent reports from 2005–2007 containing opinions that were revised based on the later surveys. This is another example of the NPFC engaging in cherry-picking.

[39] NGI, GZA, ABS and DEA were all contracted and tasked before Taylor Energy submitted its Reconsideration Request (*see* ECF 58-2 at 9-10 (citations omitted)), which is presumably why their opinions *do not even consider* matters addressed in the Reconsideration Request; however, their reports were used to support the Reconsideration Denial. First, the fact that there are many

*Inc. v. United States*, No. 09-3537, 2011 U.S. Dist. LEXIS 126295 (E.D. La. Oct. 31, 2011)

(providing that an agency cannot "arbitrarily reject[] a claimant's expert without justification;"

rather, the agency must explain why it finds an expert's report to be unpersuasive); *see also Motor*

*Vehicle Mfrs. Ass'n*, 463 U.S. at 43; *Water Quality Ins. Syndicate*, 225 F. Supp. 3d at 64 ("Notably,

'an agency's refusal to consider evidence bearing on the issue before it constitutes arbitrary agency

action within the meaning of § 706,' as does ignoring 'evidence contradicting its position.' *Butte*

*Cty.,* 613 F.3d at 194."); *id.* at 68 ("The D.C. Circuit has not hesitated to reject agency

determinations under APA's substantial evidence standard when an agency ignores factual matters

or fails to respond adequately to meritorious arguments raised in opposition to the agency's

action.").

  Not only did the NPFC's experts fail to consider or examine relevant data, but the NPFC

likewise cherry-picked findings and conclusions of its experts while ignoring those that did not

support its predetermined outcome. Additionally, the NPFC failed to address relevant information

and data. Simply by way of example (in addition to other examples that are interspersed throughout

this Motion), the NPFC improperly disregarded the U.S. Naval Research Laboratory (NRL) Slope

to   Shelf   and   Exchange   Dynamics   field   sensor's   readings.   CGAOGAR0002210;

CGAOGAR0002216; *see also* CGAOGAR_0005389-5391. The waves generated by Hurricane

Ivan were measured by several instruments installed in the northern Gulf of Mexico on offshore

---

expert issues that are not even addressed in the Reconsideration Denial is arbitrary and capricious
in and of itself. Second, there is no reason that additional information could not have been provided
by the NPFC to its SMEs. Additionally, many of the errors contained within the Claim
Determination, Reconsideration Denial and the underlying SMEs' reports are likely a function of
the NPFC's failure to provide its SMEs with all relevant evidence. Simply by way of example, if
the SMEs had been provided with a copy of Jim Hooper's report, they would have understood that
Hooper performed geotechnical work that Pettigrew incorrectly attributed to Dr. Suhayda's scope
of work that Dr. Suhayda was accused of having not performed. CGAOGAR_0003873-4006.

platforms, buoys, and the seafloor. CGAOGAR_0005389-5391. This includes the NRL readings which are critical to the scientific record of this case and strongly contradict the NPFC's findings. *Id.* Yet, the NPFC improperly disregarded these readings, and sought to read those measurements out of the administrative record. *See* CGAOGAR0002210; CGAOGAR0002216. This was despite the fact that its own expert, GZA used data from the NRL sensors to verify its hindcast of Ivan's waves. *See* CGAOGAR_0020322. Under the controlling legal principles, the fact that relevant information and data was *completely ignored* by the NPFC and its experts and/or was dismissed without any explanation was arbitrary, capricious, an abuse of discretion and otherwise not in accordance with the law, particularly in light of the NPFC's need to rely upon outside experts because it lacked the special expertise. *Great Am. Ins. Co.*, 55 F. Supp. 3d at 1058.

C.   **The Retroactive Application of Post-Ivan Wave Models as Opposed to Adjudicating Taylor Energy's Claim Based on the Standards in Effect at the Relevant Times Was Arbitrary, Capricious, an Abuse of Discretion and Otherwise Not in Accordance With the Law**

The NPFC's reliance upon *new, recent* wave models, which were informed by Hurricane Ivan itself, as opposed to the design wave based on the standard in place in 1983 (*i.e.,* the API 100-year standard) was arbitrary and capricious, an abuse of discretion and otherwise not in accordance with the law. It also amounts to a violation of Taylor Energy's due process rights. Indeed, the post-Ivan wave standards and the models relied upon by the NPFC were adjusted upward to account for the magnitude of Hurricane Ivan's exceptional and unanticipated waves; therefore, the NPFC's logic in this regard was faulty and improper as a matter of law. CGAOGAR_0005407-5408.

In 1976, the API formally adopted the 100-year storm design wave as part of its RP2A design standards for offshore structures in the Gulf of Mexico. *See* CGAOGAR_0002305-2306 (citing CGAOGAR_0003895). The 100-year design storm wave standard reflects industry custom that a platform should be designed to withstand the worst expected wave conditions likely to occur

at the platform's location in a 100-year time frame. CGAOGAR_0002306 (citing CGAOGAR_0003895; CGAOGAR_0005504). The API 100-year storm design standards for offshore structures was adopted as the industry design standard across the offshore industry, and was also incorporated by reference into Department of the Interior regulations governing offshore structures.[40] It remains the industry design standard used by industry and government regulators today. *See* 30 C.F.R. §250.901; CGAOGAR_0002306 (citing CGAOGAR_0003895; CGAOGAR_0005504); *see also Pioneer Natural Resources v. Diamond Offshore Co.*, 638 F. Supp. 2d at 677-678.[41]

As a result of the exceptional and unprecedented characteristics of the waves associated with Ivan, the API design standards for oceanographic environmental data for the Gulf of Mexico were significantly increased *after* Ivan. CGAOGAR_0002330 (citing CGAOGAR_0005407). The 100-year individual maximum wave height was increased from 70.5 feet (21.5 m) to 91.5 feet (27.9 m) for the MC20 area. *Id.* (citing CGAOGAR_0005408) The new 100-year significant wave height was increased from 39.9 feet to 51.8 feet (15.8 m) and the spectral peak wave period was increased from 14.3 seconds to 15.4 seconds. *Id.* Even with these increases, the current API

---

[40] API Recommended Practice (RP) 2A, 13th edition, Planning, Designing, and Constructing Fixed Offshore Platforms was the applicable standard in 1983. MMS and its independent consultants, relying upon the then applicable API 100-year storm design standards, reviewed and approved the design, construction, and installation of the MC20A Platform. CGAOGAR_0002290; CGAOGAR_0002321-2322 (internal citations omitted).

[41] Despite the NPFC's complete disregard of *Pioneer*, the *Pioneer* court's reliance on API standards for the design of rig mooring systems to determine whether the rig's owner had taken reasonable precautions to guard against the effects of the storm is relevant to the issue of whether Sohio took reasonable precautions to guard against the effects of a hurricane when it designed and built the MC20A Platform in accordance with the 1983 API standards to withstand the effects of reasonably anticipatable storms. *See* CGAOGAR_0000070-71.

recommended design standards do not reach the magnitude of the wave heights and periods generated by Ivan. *Id.* This demonstrates that the MC20 Incident was truly exceptional.

The NPFC apparently recognized the importance of using 1983 metocean standards, *see* CGAOGAR_0020034 (tasking for Pettigrew instructing that he use "1983 metocean standards"), yet later abandoned that approach when it realized it did not support its desired outcome. The NPFC and its outside expert, GZA improperly relied upon "***post-Ivan wave statistics*** for the Gulf of Mexico" in an effort to justify its finding that the waves "were not unpredictable nor exceptional." CGAOGAR_0000016 (emphasis added). Relatedly, the NPFC failed to recognize that Hurricane Ivan produced the largest and longest waves ever measured, forecast or hindcast in the Gulf of Mexico, and that as a result of the waves measured during Hurricane Ivan, the API 100-year design wave height was increased significantly from 72 feet to 91 feet in a 2007 revision of the API standards. CGAOGAR_0000077. Such retroactive application is *per se* arbitrary and capricious.

Additionally, the NPFC's criticisms of Dr. Suhayda's 100-year design storm wave is misguided and inaccurate. *See* CGAOGAR_0000078 (citing CGAOGAR_0000358-526). The design storm wave provided by Dr. Suhayda to Sohio in 1983 was derived from the "wave of record" *at the time*, which was a wave measured during Hurricane Camille at a platform on South Pass 72. *Id.* (citing CGAOGAR_0000371-372; CGAOGAR_0000391). Thus, the criticism that Dr. Suhayda's 1983 design wave for MC20 did not take into account this "worst case" scenario is simply incorrect. But, more importantly, there is no design standard called the "worst case" or "most dangerous" scenario as the NPFC created. CGAOGAR_0000079 (citing CGAOGAR_0000363-364; CGAOGAR_0000400); therefore, the NPFC's position that Sohio should have used a non-existent standard is also *per se* arbitrary and capricious.

The NPFC's reliance on a standard that was developed and implemented as a direct result of the very MC20 Incident is an erroneous application of the law. *See also Sea-Land Serv., Inc. v. Dep't of Transp.*, 137 F.3d 640, 646 (D.C. Cir. 1998) ("An agency action, however permissible as an exercise of discretion, cannot be sustained 'where it is based not on the agency's own judgment but on an erroneous view of the law.'" (citation omitted)); *Mamiye Bros. v. Barver S.S. Lines, Inc.*, 360 F.2d 774, 780 (2d Cir. 1966) ("[I]t is necessary to resist the strong human temptation to review action by looking backward with the wisdom born of the event." (internal quotations omitted)). The retroactive application of a standard that was not even in existence at the time of the MC20 Incident in 2004 (much less at the time that the Facility was constructed in 1983), and was actually developed as a result of the very act of God event at issue, is not only arbitrary and capricious, but it implicates significant due process concerns.

The law is well established that the adoption of a new standard without timely notice fails to comport with the Due Process Clause. In *Landgraf v. Usi Film Prods.*, the court noted that retroactivity is disfavored and found that the "Due Process Clause [] protects the interests in fair notice and repose that may be compromised by retroactive legislation; a justification sufficient to validate a statute's prospective application under the Clause may not suffice to warrant its retroactive application." 511 U.S. 244, 266-67 (1994) (internal quotations omitted). Moreover, in *Celtronix Telemetry, Inc. v. FCC*, the court stated that "a retroactive rule forbidden...is one which 'alter[s] the *past* legal consequences of past actions.'" 272 F.3d 585, 588, 348 U.S. App. D.C. 183 (D.C. Cir. 2001) (quoting *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 219, 109 S. Ct. 468, 102 L. Ed. 2d 493 (1988) (Scalia, J. concurring)) (alterations in original). In *Parker v. Time Warner Entertainment Co.*, the court found that the retroactive application of a new and expansive standard, which was neither contemplated nor foreshadowed by prior authority,

implicated significant due process concerns. 331 F.3d 13, 22 (2d Cir. 2003). This is exactly what the NPFC improperly did here.

Undersigned counsel was not able to locate a single administrative decision or case wherein a *new* (post-event) standard was retroactively applied to determine whether an event was exceptional, unanticipated, or otherwise could have been prevented or avoided by the exercise of due care or foresight. To the contrary, in other contexts, where the appropriate standard has been addressed, courts have applied the standard in place at the time of design/construction. For instance, courts have found that the appropriate standard to apply in a products liability case is the one that was in place at the time of manufacture/design. *See, e.g., Graves ex rel. W.A.G. v. Toyota Motor Corp.*, No. 2:09cv169KS-MTP, 2012 U.S. Dist. LEXIS 1623 (S.D. Miss. Jan. 5, 2012) ("[T]he relevant focus in a products liability case is on the condition of the product and/or the conduct of the manufacturer at the time of the product's manufacture or sale…Toyota cannot be held to…any ratings system…that was not in place at the time the subject vehicle was manufactured.").

In short, no expert at the time that the MC20A Platform was designed, constructed and installed in 1983-84 anticipated waves of this magnitude or the resultant massive progressive seafloor failure. Waves of this magnitude have never been measured in the Gulf of Mexico (or anywhere in the United States), and even experts post-Ivan could not re-create waves of such magnitude without inputting Hurricane Ivan's unique meteorological data into their models (and even those models did not accurately predict the worst of Ivan's waves). *See* CGAOGAR_0000076-77 (citing CGAOGAR_0000368-370).

Moreover, contrary to the NPFC's apparent approach in adjudicating Taylor Energy's Claim and its ultimate conclusion, the act of God defense does not require every conceivable

precaution be taken but simply requires the "exercise of due care." And, the standard of due care must be drawn from established standards, not new standards conceived or informed *after* the act of God occurrence to deny a valid act of God defense. At bottom, the API standards in effect at the time that the MC20A Platform was designed, constructed and installed – 1983/1984 – are the relevant standards. Revisions to those standards *after* 1984 are *irrelevant* to Taylor Energy's invocation of the act of God defense. This improper reliance by the NPFC justifies the granting of this Motion.

**IV.    Taylor Energy is Entitled to Reimbursement of the Uncompensated Removal Costs it has Incurred Under the Clear Language of OPA**

Because no waves of the height or period of those generated by Ivan had been measured previously, Ivan's waves were exceptional and unanticipated. Furthermore, with the most experienced experts in their respective fields conducting numerous studies,[42] waves and resultant bottom pressures *nowhere near* those generated during Ivan were predicted[43] or anticipated. *See* CGAOGAR_0005392-5402. And, even after the fact, no expert could even re-create waves of such magnitude without inputting Hurricane Ivan's unique meteorological data into their models, and even those models did not accurately predict the worst of Ivan's waves.[44] *See*

---

[42] *See* CGAOGAR_0005377-5386; CGAOGAR_0003902-3903; CGAOGAR_0005880-6290. It should also be noted that the resulting seafloor failure was in turn unanticipatable. No one did or could have predicted not only the extreme waves, but also the massive progressive seafloor failure. *See also* CGAOGAR_0000408 ("The sea floor failure at Mississippi Canyon during Hurricane Ivan caused changes at and below the sea flop that are dramatically different than anything that occurred at the platform in the decades before or after the hurricane."). Again, while it was recognized that the area was prone to mudslides, the seafloor failure hundreds of feet below the sea surface was a completely distinct geotechnical phenomenon. *Id.*; CGAOGAR_0001590.

[43] However, it should be noted that neither "exceptional" nor "unanticipated" mean "unpredictable." *See* Section II.B.i., *supra.*

[44] It is also important to note that none of the studies/articles (Cooper (2005), Cox(2005), Panchang and Li (2006) or Forristall (2007), all relied upon by Pettigrew) address the waves that were hindcast *for MC20*. Rather, "the comments in these articles about Hurricane Ivan's waves are

CGAOGAR_0000076-77 (citing CGAOGAR_0000368-370). The very fact that this has turned into a nit-picking battle of experts (which is flawed in and of itself as discussed herein and in more detail in Taylor Energy's Reconsideration Request) only bolsters that these waves were unanticipatable at the time (in 1983 and even in 2004). Indeed, the waves were well beyond anything that had been predicted or could have been predicted using the best science and technology available. And, in fact, the standard – the API's 100-year storm design wave – was changed *as a result* of the unprecedented waves during Ivan. CGAOGAR_0000077; *see also* CGAOGAR_0000367 ("Had the models accurately estimated the magnitude of the waves produced by Hurricane Ivan before 2004, the characteristics of the 100-year storm design wave would have been increased before 2007."). Certainly, this qualifies as exceptional and unanticipated.

In its pre-determined desire to conclude that this natural phenomenon was not inevitable and irresistible, the NPFC resorts to criticizing Dr. Suhayda's work back in 1983. But, such attack is based on a fundamental misunderstanding and mischaracterization of the issues and the work actually performed by Dr. Suhayda for Sohio. Again, it was not the waves that toppled the platform; rather the failure mechanism was the wave-induced failure of the seafloor. Indeed, "the platform was designed to resist a total wave load that was about two times greater than the maximum wave load in Hurricane Ivan," and "the platform was designed appropriately to withstand the design mudflow or overrunning mudslide loading event."[45] CGAOGAR_0006297. Indeed, the MC20A Platform was *over-strengthened*, and MMS (and its independent expert)

---

limited to the wave data from the specific distinct locations discussed in each report." CGAOGAR_0000367.

[45] The NPFC ignores this distinction.

reviewed, oversaw and approved the MC20A Platform and all activities related thereto. *See* CGAOGAR_0006293; CGAOGAR_0006297; CGAOGAR_0002322-2323; CGAOGAR_0003255-3256. Moreover, as discussed in Taylor Energy's Claim and Reconsideration Request (but ignored by the NPFC), the MMS deemed the MC20A Platform safe. *See* CGAOGAR_0002321-2323. The MC20A Platform was fixed; it could not move or otherwise resist what occurred. *See also* CGAOGAR_0005507 ("As discussed in the Fury Consult report, the forces exerted against the piles by such a deep-seated seafloor failure would cause them to fail. This wave-induced sediment failure had not been envisioned at MC20A by the original design of the Design CVA third party expert vetted and approved by the MMS's Offshore Structural Engineering staff."). In short, the plain meaning of irresistible and inevitable in the statutory definition are satisfied.

Furthermore, the effects of Ivan's waves could not have been prevented by the exercise of due care or foresight. The design and construction of the MC20A Platform met or exceeded all applicable industry standards, and preeminent experts in their respective fields engaged in elaborate studies and analyses in connection therewith.[46] The NPFC again resorted to criticizing Dr. Suhayda's work back in 1983, which was based on the same fundamental misunderstanding of the work performed by Dr. Suhayda and the improper retroactive application of a post-Ivan standard that was actually informed by and the result of Ivan's extreme and unprecedented waves. Finally, the MC20 Incident (*i.e.,* the natural phenomenon of Ivan's waves and the associated massive progressive seafloor failure) was the sole cause of discharge. There simply was no human

---

[46] To the extent that the NPFC criticizes the work of Dr. Suhayda and/or Sohio's design and construction of the MC20A Platform, that implicates a separate defense under 33 U.S.C. § 2703(a) not at issue here. *See* CGAOGAR_0002282 at n. 4.

error or other intervening cause as was the case in the distinguishable jurisprudence relied upon by the NPFC.

Simply put, if this natural phenomenon does not constitute an "act of God," it is hard to conceive of anything that ever would. That is certainly not what Congress intended by its express inclusion of delineated exceptions to strict liability.

**V.    This Court has the Authority and Should Hold that Taylor Energy is Entitled to the Protections of the Act of God Defense and Grant the Monetary Relief Requested**

In an APA case, the district court has authority to vacate the agency's action or provide other relief. Therefore, such relief is not just limited to remanding the case back to the administrative agency. *NAACP v. Trump*, 298 F. Supp. 3d 209, 245 (D.D.C. 2018) ("'[U]nsupported agency action normally warrants vacatur.'"). As this Court has recognized, "judges of the D.C. Circuit have noted, remand without vacatur sometimes invites agency indifference." *Id*. Further, while money damages are not recoverable under the APA, certain types of monetary relief, like that requested by Taylor Energy, are recoverable and within the scope of the APA. *See Bowen v. Massachusetts*, 487 U.S. 879, 895 (1988); *Holly Sugar Corp. v. Veneman*, 355 F. Supp. 2d 181, 197 (D.D.C. 2005) (finding that plaintiffs' requested monetary relief sought reimbursement, and therefore under *Bowen* it was not a claim to recover money damages).

Here, Taylor Energy is seeking reimbursement - from the Fund established by Congress and funded by the oil industry - for the Removal Costs it has incurred in responding to the discharge resulting from the "act of God" event. The NPFC's suggestion that Removal Costs that may also be categorized as well decommissioning costs are not recoverable by a Responsible Party under 33 U.S.C. § 2708 can be easily disposed of as legally incorrect. The plain language of the statute expressly provides for the recovery of any costs that fall within OPA's definition of Removal Costs. *See* 33 U.S.C. § 2703; 33 U.S.C. § 2701(31). There is no exclusion in that definition or

elsewhere in the statute for costs that may also be categorized as well decommissioning costs. It was thus arbitrary and capricious, an abuse of discretion and otherwise not in accordance with the law for the NPFC to deny reimbursement of the Removal Costs incurred by Taylor Energy on such grounds. For the reasons set forth herein, the administrative record supports Taylor Energy's entitlement to the protections of the act of God defense and the requested monetary relief.[47]

## CONCLUSION

For the foregoing reasons, Taylor Energy's Motion for Summary Judgment should be granted. This Court should vacate and set aside the NPFC's denial of Taylor Energy's Claim, find that Taylor Energy is entitled to the protections and remedies afforded by the act of God defense, and award Taylor Energy its uncompensated Removal Costs, as of August 31, 2017, in the amount of $353,881,719. Or, alternatively, this Court should remand this matter to the NPFC, directing that the NPFC recognize Taylor Energy's act of God defense, and ordering that it adjudicate the amount of Removal Costs that Taylor Energy is entitled to be reimbursed from the OSLTF.

Respectfully submitted,

/s/ Carl D. Rosenblum
CARL D. ROSENBLUM, T.A. (LA #02083)
(Admitted *Pro Hac Vice*)
ALIDA C. HAINKEL (LA #24114)
(Admitted *Pro Hac Vice*)
LAUREN C. MASTIO (LA #33077)
(Admitted *Pro Hac Vice*)
TAYLOR K. WIMBERLY (LA #38942)
(Admitted *Pro Hac Vice*)
Jones Walker LLP
201 St. Charles Avenue, 49th Floor

---

[47] The record contains the Declaration of Dina Bracci Riviere with Exhibits 1-31, which details the uncompensated Removal Costs incurred by Taylor Energy as of August 31, 2017 in the amount of $353,881,719, CGAOGAR_0002569-3248, enabling the Court to award that amount to Taylor Energy with additional amounts to be calculated and presented for reimbursement consistent with the Court's finding that Taylor Energy is entitled to the protections of the act of God defense under OPA.

New Orleans, Louisiana 70170-5100
Telephone: (504) 582-8000
Facsimile: (504) 589-8296
E-mail: crosenblum@joneswalker.com

And

PAUL A. DEBOLT (DC Bar No. 450904)
Venable LLP
600 Massachusetts Avenue, NW
Washington, D.C. 20001
Telephone:  (202) 344-4000
Email: PADebolt@Venable.com

***Attorneys for Taylor Energy Company LLC,
Plaintiff***

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this 8th day of March, 2021, a true and correct copy of the foregoing

pleading was filed electronically with the Clerk of Court of the District of Columbia by using the

CM/ECF system, which provides notice of filing to all counsel of record by electronic means.

*/s/ Carl D. Rosenblum*
CARL D. ROSENBLUM