## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **TAYLOR ENERGY COMPANY, LLC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No.:  20-1086-JDB** |
| | ) | |
| **v.** | ) | |
| | ) | |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## DEFENDANT'S COMBINED OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND CROSS MOTION FOR SUMMARY JUDGMENT

ELLIOT HIGGINS
MARK L. WALTERS
U.S. Department of Justice
Environmental & Natural Resources
Division
Environmental Defense Section
P.O. Box 7611
Washington, DC 20044
Phone: (202) 598-0240
Fax: (202) 514-8865
elliot.higgins@usdoj.gov
mark.walters@usdoj.gov

OF COUNSEL:

SCOTT C. HERMAN
Attorney Advisor
National Pollution Funds Center, US Coast Guard
2703 Martin Luther King Jr. Avenue SE
Washington, DC 20593

HEATHER S. KENNEALY
Attorney Advisor
U.S. Coast Guard Headquarters
Office of Claims and Litigation (CG-LCL)
2703 Martin Luther King Jr. Avenue, SE, Stop 7213

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ...................................................................................................................1

BACKGROUND ....................................................................................................................3

    I.     Legal Background ...............................................................................................3

         A.  The Oil Pollution Act of 1990 ...............................................................3

             1.  Compensation Framework ...........................................................4

             2.  Liability and the "Act of God" Defense .....................................5

         B.  *Apex Oil Co., Inc v. United States* ........................................................5

    II.    Factual Background ............................................................................................6

    III.   Procedural Background.......................................................................................8

STANDARD OF REVIEW ....................................................................................................9

ARGUMENT .......................................................................................................................12

    I.     The NPFC's Interpretation of the OPA Act of God Defense Was in Accordance
         With Law .........................................................................................................12

         A.  The NPFC's Interpretation of the OPA Act of God Defense Was Sound .............12

             1.  The NPFC Correctly Rejected Taylor Energy's Common Law
                 Incorporation Theory ..................................................................12

             2.  The NPFC Correctly Articulated the OPA Act of God Standard ...................14

         B.  The NPFC's Statutory Interpretation Is Entitled to Deference .............................16

         C.  Taylor Energy's Arguments that the NPFC Misconstrued the Statute Fail...........20

             1.  The NPFC Did Not "Add Elements" to the OPA Act of God Defense...........20

             2.  The NPFC's Reliance on Legislative History Was Appropriate ....................21

             3.  The NPFC Correctly Interpreted the Case Law................................................24

    II.    The NPFC's Application of the Law to the Facts Was Not Arbitrary and
         Capricious .......................................................................................................26

A. The NPFC Examined the Relevant Data, Made Factual Findings Supported by Substantial Evidence, and Articulated a Satisfactory Explanation for Its Action ........................................................................................................26

   1. Taylor Energy Contended that the Hurricane Ivan Waves Were an Act Of God ...........................................................................................26

   2. The NPFC Considered Taylor Energy's Evidence and the Opinions of Independent Experts ...............................................................................27

   3. The NPFC Determined Taylor Energy Failed to Prove the MC-20 Oil Discharge Was Caused by an Act of God ..........................................30

B. Taylor Energy's Arguments that the NPFC's Methodology, Findings, and Conclusions Were Arbitrary and Capricious Fail .....................................31

   1. The NPFC Did Not Err by Considering Hurricane Ivan in Its Adjudication of Taylor Energy's Claim .........................................31

   2. Taylor Energy Should be Judicially Estopped from Arguing that the NPFC Erred by Referring to the Failure Mechanism as a Mudslide ..............33

   3. The NPFC Correctly Determined that Taylor Energy's Failure to Conduct Seafloor Surveys "Could Have Contributed" to the Platform's Destruction ........................................................................................35

   4. The NPFC Considered All Relevant Data and Provided the Independent Experts with Appropriate Instructions and Information ...................36

   5. The NPFC Did Not Err by Considering Post-1983 Data in Its Determination of Whether the Hurricane Ivan Waves Were an Act of God ................................................................................................41

III. Plaintiff's Requested Relief Exceeds the Scope of the APA's Limited Review ........................................................................................................43

CONCLUSION ....................................................................................................44

Defendant the United States of America, acting by and through the United States Coast Guard National Pollution Funds Center ("NPFC") moves for summary judgment and responds as follows to Plaintiff Taylor Energy Company, LLC ("Taylor Energy's") motion for summary judgment.

## INTRODUCTION

Operating an offshore oil platform near the Mississippi River Delta is a risky venture. Much of the seafloor is inherently unstable, consisting of weak sediments supplied by river channels.  AR 20309.[1]  Even a small change in prevailing conditions can trigger a mudflow.  AR 2220.  To make matters worse, the presence of the Loop Current and warm-core eddies provide deep reservoirs of very warm water relative to the rest of the Gulf, making the Delta region highly conducive to generating major hurricanes.  AR 20309.  Indeed, severe tropical storms affect the area most seasons.  *See* AR 20088.

Despite these known risks, Taylor Energy made a business decision in 1994 to buy an oil platform near the Mississippi River Delta.  AR 20859.  The seafloor was so unstable at the platform location that the lease required Taylor Energy to regularly perform high resolution surveys to monitor seafloor instabilities and sediment accumulations—a requirement that Taylor Energy ignored.  AR 2191–92.

In 2004, a Hurricane Ivan-induced mudslide toppled Taylor Energy's oil platform, and oil gushed into the Gulf of Mexico.  AR 2192.  Taylor Energy is the undisputed "responsible party" under the Oil Pollution Act of 1990 (OPA).  *See* AR 352.  OPA requires responsible parties to

---

[1] "AR" is an abbreviation for Administrative Record.  "AR 20309" is an abbreviation for "CGAOGAR_0020309."

1

pay for cleanup efforts, and Taylor Energy allegedly incurred over $350 million in removal costs.

Now Taylor Energy wants this money back.  Taylor Energy submitted a claim to the NPFC, insisting that "an act of God" caused the oil discharge and arguing that it is entitled to recoup all of its removal costs.  Compl. to Vacate & Set Aside Final Agency Action & for Other Relief [ECF No. 1] ¶¶ 7–9.  Under OPA's act of God defense, a responsible party must prove by the preponderance of the evidence that the oil discharge was *solely* caused by an "unanticipated grave natural disaster or other natural phenomenon of an exceptional, inevitable, and irresistible character the effects of which could not have been prevented or avoided by the exercise of due care or foresight."  33 U.S.C. § 2701(1).

The NPFC rejected Taylor Energy's claim.  The NPFC recognized that though Hurricane Ivan was a powerful weather event, it was a hurricane in a place frequented by hurricanes, and was thus not an "exceptional" natural phenomenon as required by the statute.  AR 2210. Furthermore, the inherently unstable condition of the area's seafloor sediments—including massive ongoing mudflows—was well known and thus the mudslide that toppled the platform could not be considered "unanticipated."  AR 28.  Indeed, the NPFC determined that Taylor Energy's failure to conduct the mandated seafloor surveys prior to the incident could have contributed to the platform's destruction, so Taylor Energy did not prove the hurricane conditions were the "sole cause" of the discharge.  AR 27.

Taylor Energy now seeks judicial review, claiming that the NPFC's decision was arbitrary and capricious under the Administrative Procedure Act, 5 U.S.C. § 701.  Taylor Energy insists that the NPFC used an improperly heightened act of God standard and manipulated the

claims process in "a premeditated scheme to debunk Taylor Energy's act of God defense."  Pl.'s Mem. of P. & A. in Supp. Of Mot. for Summ. J. ("Pl.'s. Br.") [ECF No. 69-2] at 6, 33.

Taylor Energy's arguments fail.  The NPFC's reading of the OPA act of God defense—based on the text, OPA's object and policy, legislative history, and case law—was a textbook example of reasoned statutory interpretation and is in accordance with law.  The NPFC's approach was informed by the only court to have construed the OPA act of God defense, *see Apex Oil Co., Inc. v. United States*, 208 F. Supp. 2d 642, 654 (E.D. La. 2002) (concluding that the OPA act of God defense is "uniformly and *singularly* limited"), and is entitled to deference.  As to Taylor Energy's attacks on the NPFC's process, the Court has already considered and rejected similar arguments.  Mem. Op. (Oct. 14, 2020) [ECF No. 52] at 10–13 (rejecting Taylor Energy's claims that the NPFC impermissibly considered expert reports in its Determination on Reconsideration); Mem. Op. (Feb. 15, 2021) [ECF No. 65] at 9 (rejecting as "conclusory and unfounded" Taylor Energy's accusations that the NPFC "purposefully excluded information unfavorable to its position" (quoting Pl.'s Mem. of P. & A. in Supp. of Objections to Admin. R., Mot. to Suppl. Admin. R. & Mot. for Discovery [ECF No. 58-2] at 31)).  Taylor Energy's latest arguments are more of the same.  As the decision documents show, the NPFC examined the relevant data and articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made.

In short, the NPFC's decision was not arbitrary, capricious, or an abuse of discretion.

## BACKGROUND

**I.   Legal Background**

**A.   The Oil Pollution Act of 1990**

Congress passed the Oil Pollution Act of 1990, 33 U.S.C. § 2701 *et seq.,* in response to the Exxon Valdez oil spill. [2] *Water Quality Ins. Syndicate v. United States,* 522 F. Supp. 2d 220, 226 (D.D.C. 2007).  The statute was intended "to streamline federal law so as to provide quick and efficient cleanup of oil spills, compensate victims of such spills, and internalize the costs of spills within the petroleum industry." *Bean Dredging, LLC v. United States*, 773 F. Supp. 2d 63, 68 (D.D.C. 2011) (quoting *Rice v. Harken Expl. Co.*, 250 F.3d 264, 266 (5th Cir. 2001)).  To accomplish these goals, OPA establishes (1) an administrative adjudication process by which the United States pays compensation for damages or removal costs under prescribed conditions and (2) a strict liability scheme for oil spill removal costs and related damages.  33 U.S.C. § 2701, *et seq*.

### 1.  Compensation Framework

The NPFC is the Coast Guard command responsible for administering the Oil Spill Liability Trust Fund ("the Fund") and adjudicating claims against it.  *See* 33 U.S.C. §§ 2701–2720.  The Fund is available for various uses, including the payment of removal costs incurred by the United States, costs associated with natural resource damages, administrative costs, and claims for uncompensated removal costs.[3]  33 U.S.C. § 2712; *see also* 33 U.S.C. § 2752.  When

_____

[2] In passing the new law, Congress explicitly recognized that the existing federal and state laws provided inadequate cleanup and damage remedies, required large taxpayer subsidies for costly cleanup activities, and presented substantial barriers to victims' recoveries such as legal defenses, corporate forms, and burdens of proof that unfairly favored those responsible for the spills.  *See* S. Rep. No. 101-94, (1989); 1990 U.S.C.C.A.N. 722.  Congress also recognized that, pre-OPA, the costs of cleanup and damage from spills were not high enough to encourage greater industry efforts to prevent spills and develop effective techniques to contain spills that did in fact occur.  *Id.*

[3] In light of the Fund's various uses, Taylor Energy's characterization of the Fund as an "industry-funded insurance policy designed to protect responsible companies from acts outside their control" is misleading and incorrect.  Pl.'s Br. at 4 n.2.  The Fund does not provide

determining whether the Fund should grant a request for compensation, the NPFC follows an informal adjudication process controlled by 33 U.S.C. § 2713, 33 C.F.R. Part 136, and 5 U.S.C. § 555.

### 2. Liability and the "Act of God" Defense

OPA established a strict liability scheme for parties responsible for vessels and facilities that discharge oil into or upon the navigable waters and adjoining shorelines of the United States. 33 U.S.C. § 2702(a); *see In re Settoon Towing Co.*, 859 F.3d 340, 344 (5th Cir. 2017). A "responsible party" is liable under § 2702(a) for removal costs and damages arising from such an incident. 33 U.S.C. § 2702(a). Under 33 U.S.C. § 2708, a "responsible party" may assert a claim for removal costs or damages in very limited circumstances.

One such circumstance is an "act of God." 33 U.S.C. § 2703(a)(1). A "responsible party" is not liable under § 2702 for removal costs or damages if the "responsible party" establishes by a preponderance of the evidence that the discharge of oil and resulting damages or removal costs were caused *solely* by an "act of God." *Id.* An "act of God" means an "unanticipated grave natural disaster or other natural phenomenon of an exceptional, inevitable, and irresistible character the effects of which could not have been prevented or avoided by the exercise of due care or foresight." 33 U.S.C. § 2701(1).

### B.   *Apex Oil Co., Inc. v. United States*

---

pollution insurance to Taylor Energy or any other entity liable under OPA. *See Gatlin Oil Co. v. United States*, 169 F.3d 207, 213 (4th Cir. 1999) ("With respect to the Oil Pollution Act, the government does not issue any policies, nor does it assume any risk on behalf of claimants. The Act provides limited compensation when the party responsible for an oil spill is unavailable. It does not function as a private insurance company."). Additionally, Taylor Energy's characterization of the Fund as "industry-funded" does not tell the full story. The Fund has been financed by several sources, including taxes on the petroleum industry; interest earned on principal from the United States Treasury investments; and cost recoveries, fines and civil penalties collected from responsible parties. 26 U.S.C. § 9509(b).

Only one court has construed OPA's act of God defense: *Apex Oil Co., Inc. v. United States*, 208 F. Supp. 2d 642, 654 (E.D. La. 2002). In *Apex Oil*, the court held that the OPA act of God defense was "uniformly and *singularly* limited." *Id.* (emphasis in original). Whereas the common law act of God defense could be invoked when a natural disaster or natural phenomenon caused destruction, the OPA act of God defense required a "*grave* natural disaster" or another "*exceptional*" natural phenomenon. *Id.* at 652 (citing 33 U.S.C. 2701(1)) (emphasis added). Thus, the court concluded that the OPA definition is "much more limited in scope than the traditional common law 'act of God' defense." *Id.* at 652–53. The court found that legislative history from the identical CERCLA[4] act of God definition confirmed this reading:

> The [common law] 'act of God' defense is more nebulous, and many occurrences asserted as 'acts of God' would not qualify as 'exceptional natural phenomenon.' For example, a major hurricane may be an 'act of God,' but in an area (and at a time) where a hurricane should not be unexpected, it would not qualify as a 'phenomenon of exceptional character.'

*Id.* at 653 (alteration added) (quoting H.R. Rep. No. 99–253(IV), 1986 U.S.C.C.A.N. 3068, 3100).

The court's determination that the OPA act of God defense was "*singularly* limited" relied on two further bases. First, the court opined that OPA's "object and policy," which is to internalize costs within the oil industry and to expand the liability of the discharger, suggests a narrow interpretation. *Id.* at 651–54. Second, the Court observed that in cases involving the

---

[4] Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9607 *et seq*; *see* 42 U.S.C. § 9601(1) ("The term 'act of God' means an unanticipated grave natural disaster or other natural phenomenon of an exceptional, inevitable, and irresistible character, the effects of which could not have been prevented or avoided by the exercise of due care or foresight.")

identical CERCLA act of God definition and the similar Clean Water Act (CWA) act of God definition[5] no polluter had *ever* successfully raised the defense.  *Id.* at 656.

## II.   Factual Background

In 1980, the Department of the Interior (DOI) proposed to sell oil and gas leases on tracts of land in the outer continental shelf near the Mississippi River Delta.  AR 2189; *see also* AR 4576–808 (1980 DOI EIS).  Several of the tracts "were subject to geohazardous conditions specific to seafloor instability caused by unconsolidated sediments, slumping, shallow faulting or gaseous sediments."  AR 2189–90.  One such tract was 66-110—the eventual home of the platform at issue in this case—located in Mississippi Canyon Block 20 (MC-20) of the Gulf of Mexico.  AR 2190.  DOI's 1980 environmental impact statement recognized that mudflow may occur in the canyon and that sediment may be moving down slope.  AR 2190.

On October 20, 1981, Sohio Petroleum Corporation purchased a lease on tract 66-110. AR 2190; *see also* AR 4809–5050 (1981 DOI EIS).  That lease identified portions of the tract that were subject to mass movements of sediment and required Sohio to conduct site-specific surveys and mapping to determine the potential for unstable bottom conditions.  AR 2190.  Sohio hired Woodward-Clyde Oceaneering to perform geologic studies and geotechnical analysis of the Mississippi Canyon seafloor.  AR 2190; *see also* AR 5880–6088 (Woodward Report).  In turn, Woodward hired Dr. Joseph Suhayda to define a 100-year storm design wave which sought to forecast the worst expected wave conditions likely to occur at the platform's location in a 100-year time frame.  *See* AR 2190.  Woodward accepted Dr. Suhayda's findings, completed its

_____

[5] 33 U.S.C. § 1321(a)(12) ("'[A]ct of God' means an act occasioned by an unanticipated grave natural disaster[.]").

survey, and proposed a site for the construction of a platform within the MC-20, about 10 miles southeast of South Pass of the Mississippi River.  AR 2191.

Woodward's analysis explained that the proposed site exhibited large mass soil movements and that the seafloor had been built up from several mudflow episodes.  AR 2191. Woodward also described the proposed site as being immediately downslope of a large mudflow terminal deposit and described the mudflows within the deposit as being triggered by large waves and by other factors which were, in some instances, poorly understood.  AR 2191.  To monitor seafloor instabilities and mass soil movements upslope of the proposed site, Woodward recommended geophysical surveys biennially and following any major storms.  AR 2191; *see also* AR 18470 (Woodward recommendation).

In 1983, Sohio submitted a plan to develop the lease to the U.S. Minerals Management Service (MMS).  AR 2191.  The MMS approved Sohio's plan with the stipulation that high resolution seafloor surveys be conducted just prior to platform installation, every two years thereafter, and after any major storms in the area.  AR 2191; *see* AR 6377 (MMS approval with stipulation).  In 1984-85, Sohio built the offshore oil platform that was ultimately purchased by Taylor Energy in 1994.  AR 2191.  Taylor Energy used the platform to extract oil from 1994 until 2004.  AR 2191–92.

On or about September 16, 2004, Hurricane Ivan passed through the Gulf of Mexico, causing Taylor Energy's offshore oil platform to sink and discharge oil into the Gulf.  AR 2. More specifically, the hurricane caused waves that created pressure at the seafloor, resulting in a deep mudslide that toppled the platform.  AR 5, 2192.  Taylor Energy responded, assumed responsibility for the incident, and incurred removal costs.  AR 2.

### III.   Procedural Background

On November 16, 2018, Taylor Energy presented an act of God defense claim to the NPFC for $353,881,719.70.  AR 2276–401.  On May 14, 2019, the NPFC issued a written "Determination" denying Taylor Energy's claim.  AR 2187–228; *see infra* at 13–16, 27–32.  The NPFC's regulations allow an unsuccessful claimant to seek reconsideration and to submit additional supporting evidence.  33 C.F.R. § 136.115(d).  Taylor Energy did both.  On October 10, 2019, the NPFC issued a written "Determination on Reconsideration."  AR 1–29.  Taken together, the Determination and Determination on Reconsideration constitute the NPFC's decision and reasoning in this case.

In April 2020, Taylor Energy filed this suit, seeking judicial review of the NPFC's decision under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701.  Compl. ¶¶ 3, 5–18.  Taylor Energy claimed that the NPFC violated the APA and the Due Process Clause by committing substantive and procedural errors in rejecting both the initial claim and the reconsideration claim.  *See id.* ¶¶ 123–80.  On March 8, 2021, Taylor Energy moved for summary judgment.  Pl.'s Mot. for Summ. J. [ECF No. 69].

## STANDARD OF REVIEW

In the normal course, summary judgment may be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits [or declarations] show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as matter of law."  *Air Transp. Ass'n of Am., Inc. v. Nat'l Mediation Bd.*, 719 F. Supp. 2d 26, 31–32 (D.D.C. 2010), *aff'd*, 663 F.3d 476 (D.C. Cir. 2011) (quoting Fed. R. Civ. P. 56(c)).  In a case involving review of a final agency action under the APA, 5 U.S.C. § 706, however, the standard set forth in Rule 56(c) does not apply and summary judgment instead serves as a "mechanism for deciding

whether as a matter of law the agency action is . . . consistent with the APA standard of review." *Cayuga Nation v. Bernhardt*, 374 F. Supp. 3d 1, 9 (D.D.C. 2019) (quotation omitted).

The APA authorizes a court to "set aside" agency action when it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[,]" 5 U.S.C. § 706(2)(A). Section 706(2)(A) sets out "[t]wo distinct but potentially overlapping standards of . . . review." *Fox v. Clinton*, 684 F.3d 67, 74 (D.C. Cir. 2012). First, in deciding whether an agency's interpretation of a statute that it implements is "in accordance with law," courts apply the familiar *Chevron* framework. *See Baystate Franklin Med. Ctr. v. Azar,* 950 F.3d 84, 92 (D.C. Cir. 2020) ("[I]t is under *Chevron*, not the APA arbitrary and capricious standard, that a court considers 'whether the agency's construction of the statute is faithful to its plain meaning, or, if the statute has no plain meaning, whether the agency's interpretation 'is based on a permissible construction of the statute.'" (quoting *Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–44 (1984))). Second, under "arbitrary and capricious review," the function of the district court is to determine whether "the agency 'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" *Id.* at 89 (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

The scope of review under the "arbitrary and capricious standard is 'highly deferential,'" *Am. Trucking Ass'ns, Inc. v. Fed. Motor Carrier Safety Admin.*, 724 F.3d 243, 245 (D.C. Cir. 2013) (quoting *Am. Wildlands v. Kempthorne*, 530 F.3d 991, 997 (D.C. Cir. 2008)), and "narrow," such that "a court is not to substitute its judgment for that of the agency," *Judulang v. Holder*, 565 U.S. 42, 53 (2011) (quotations omitted); *Ark Initiative v. Tidwell*, 816 F.3d 119, 127 (D.C. Cir. 2016). This "highly deferential" standard, which "presumes agency

action to be valid," *Defs. of Wildlife v. Jewell*, 815 F.3d 1, 9 (D.C. Cir. 2016) (quotations and citation omitted), "is especially applicable [to] . . . 'technical determinations on matters to which the agency lays claim to special expertise,'" *Rosebud Mining Co. v. Mine Safety & Health Admin.*, 827 F.3d 1090, 1101 (D.C. Cir. 2016) (quoting *Bldg. & Constr. Trades Dep't, AFL–CIO v. Brock,* 838 F.2d 1258, 1266 (D.C. Cir. 1988)).  The D.C. District Court has recognized that the NPFC has special expertise in its field.  *See Bean Dredging*, 773 F. Supp. 2d at 81.

"[W]hen review of an agency's action is 'bound up with a record-based factual conclusion,' the reviewing court must determine whether that conclusion 'is supported by substantial evidence.'"  *Crooks v. Mabus*, 104 F. Supp. 3d 86, 99 (D.D.C. 2015) (quoting *Dickison v. Zurko*, 527 U.S. 150, 164 (1999)).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  An agency decision "may be supported by substantial evidence even though a plausible alternative interpretation of the evidence would support a contrary view."  *Morall v. Drug Enf't Admin.*, 412 F.3d 165, 176 (D.C. Cir. 2005) (quoting *Robinson v. Nat'l Transp. Safety Bd.*, 28 F.3d 210, 215 (D.C. Cir. 1994)).  The substantial evidence standard "requires more than a scintilla, but can be satisfied by something less than a preponderance of the evidence."  *Town of Barnstable v. FAA*, 740 F.3d 681, 687 (D.C. Cir. 2014) (quoting *Fla. Gas Transmission Co. v. FERC*, 604 F.3d 636, 645 (D.C. Cir. 2010)).

Finally, in evaluating agency action under the "arbitrary or capricious" standard, the reviewing court must take "due account . . . of the rule of prejudicial error."  5 U.S.C. § 706.  Just as the burden of establishing that the agency action is arbitrary or capricious rests with the party challenging agency action, so too must that party establish that any errors were

prejudicial. *Jicarilla Apache Nation v. U.S. Dep't of Interior*, 613 F.3d 1112, 1121 (D.C. Cir. 2010) (citing *PDK Labs. Inc. v. U.S. Drug Enf't Admin.,* 362 F.3d 786, 799 (D.C. Cir. 2004)). The question of whether an error was prejudicial is necessarily contextual, and courts must proceed with a case-specific application based upon an examination of the entire record. *Jicarilla Apache Nation,* 613 F.3d at 1121. However, where the party challenging agency action fails to show that the agency's error may have affected the outcome of the proceedings below, the error is not prejudicial, and it would be senseless to vacate and remand for further proceedings. *Id.*

### ARGUMENT

I.    **The NPFC's Interpretation of the OPA Act of God Defense Was in Accordance with Law.**

In this section, the United States (A) describes how the NPFC interpreted the OPA act of God definition. The NPFC's reading of the statute—based on the text, the OPA's object and policy, legislative history, and case law—resulted in a permissible construction of the statute that is in accordance with law. Next, the United States (B) explains why that interpretation is entitled to judicial deference and (C) rebuts Taylor Energy's contention that the NPFC impermissibly heightened the act of God standard.

A.    **The NPFC's Interpretation of the OPA Act of God Defense Was Sound.**

1.    **The NPFC Correctly Rejected Taylor Energy's Common Law Incorporation Theory.**

In its claim submissions, Taylor Energy advanced a novel reading of the OPA act of God defense. Taylor Energy claimed that OPA's statutory definition is "identical" to the common

law act of God defense,[6] so common law cases bear on Taylor Energy's claim.  AR 2375–96

(citing maritime and tort law cases from the 1800s to the present).  Relying on this theory, Taylor

Energy argued that the OPA act of God defense should be construed broadly, *see* AR 2376, and

that the *Apex Oil* court's decision to the contrary was wrong, AR 2379.

The NPFC rejected Taylor Energy's "common law incorporation" theory.  AR 2200.

Starting its analysis with the text, the NPFC explained that OPA explicitly defined "act of God"

and made no reference to the common law, strongly suggesting that the statutory definition was

distinct.  *See* AR 2204–05.  Next, the NPFC explained that the act of God defense serves a

different role in the common law cases than in OPA and related environmental statutes.  In the

common law cases, the issue is whether the party is at fault and therefore liable.  AR 2205.  By

contrast, the environmental statutes featuring the defense—CERCLA, CWA, and OPA—hold

polluters liable regardless of fault.  AR 2200–05.

Finally, the NPFC considered relevant case law, all of which confirmed that Taylor

Energy's "common law incorporation" theory was wrong.  First, the NPFC observed that in

*Sabine Towing and Transportation Co.  v. United States*, the court determined it was

inappropriate to consider the common law when analyzing the CWA act of God defense.  666

F.2d 561, 564 (Ct. Cl. 1981) (citing *Milwaukee v. Illinois,* 451 U.S. 304 (1981) (holding that

federal common law is supplanted by any federal statute addressing the same question)).

Second, the NPFC observed that, in an analogous ocean pollution context, courts have held that

the CWA preempts the federal common law.  AR 2203 n.99 (citing *Middlesex Cnty. Sewerage

Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 15 (1981) (holding that CWA preempts common

---

[6] In its request for reconsideration, Taylor Energy walked back its original argument, contending
that the common law cases that use a definition of "act of God" that is materially different from
OPA's definition need not be considered.  AR 313.

law of nuisance)).   Third, the NPFC observed that while the act of God defense has been successful in common law cases, it has never been successfully invoked under a federal environmental statute.   AR 2204.   Fourth, the NPFC considered the *Apex Oil* case—which directly rejected Taylor Energy's theory—and concluded the case was well-founded.   AR 2200–21.

In sum, the NPFC concluded that the OPA act of God definition did not incorporate the common law.   Instead, the NPFC found that the OPA act of God defense is distinct from the common law, should be construed more narrowly,[7] and that that the *Apex Oil* court's statutory interpretation was sound.[8]

## 2.   The NPFC Correctly Articulated the OPA Act of God Standard.

Having rejected Taylor Energy's preliminary arguments, the NPFC proceeded to consider what a claimant asserting the OPA act of God defense must prove.   AR 11–15, 2207.   The NPFC articulated the standard as follows:

> In order to be successful under an act of God claim, Taylor must establish, by a preponderance of the evidence, that the discharge of oil and resulting damages or removal costs were caused solely by an "act of God."   The phrase "act of God" is defined by OPA as: an unanticipated grave natural disaster or other natural phenomenon of an exceptional, inevitable, and irresistible character the effects of which could not have been prevented or avoided by the exercise of due care or foresight.

AR 2200 (citations omitted).

_____

[7] Courts agree that OPA defenses are to be construed narrowly.   *Apex Oil*, 208 F. Supp. 2d at 654; *United States v. English*, No. CV00-00016ACKBMK, 2001 WL 940946, at *4 (D. Haw. Mar. 28, 2001); *see also United States v. W. of England Ship Owner's Mut. Prot. & Indem. Ass'n (Luxembourg)*, 872 F.2d 1192, 1198 (5th Cir. 1989) ("Liability exceptions under [OPA's predecessor statute] must be narrowly construed to effectuate Congress' strict liability scheme.").

[8] The NPFC Determination quoted the *Apex Oil* decision at length and essentially adopted that court's statutory construction.   *See* AR 2205–07 (quoting *Apex Oil*, 208 F. Supp. 2d at 652–54)).

The NPFC broke the defense into four general elements:

(1) An unanticipated, AR 13,
(2) grave natural disaster or other natural phenomenon,  AR 13, that was
(3) of exceptional, inevitable and irresistible character, the effects of which could not
   have been prevented or avoided by the exercise of due care or foresight, AR 14, that
   was
(4) the sole cause of the discharge, AR 2220–22.

The NPFC construed each of the four elements, analyzing the text, relevant legislative

history, and case law.  Analysis of two elements bears mentioning here.

The NPFC explained that the first element—whether the incident was "unanticipated"—

was akin to foreseeability.  AR 2212.  The NPFC observed that the legislative history of

analogous provisions in CERCLA and the CWA—which both include an "unanticipated"

prong—indicate that if a storm was foreseeable, predicted, or not unusual at the time and place it

occurred, the defense should not apply.   AR 2213.  A 1970 Congressional Report prior to

passage of the CWA is instructive:

> The term "act of God" is defined to mean an act occasioned by an *unanticipated*
> grave natural disaster. . . .  [O]nly those acts about which the owner could have had
> no foreknowledge, could have made no plans to avoid, or could not predict would
> be included.  Thus, grave natural disasters which could not be anticipated in design,
> location, or operation of the facility or vessel by reason of historic, geographic, or
> climatic circumstances or phenomena would be outside the scope of the owner's or
> operator's responsibility.

AR 2213 (quoting H.R. Rep. No. 91-940 (1970) (Conf. Rep.), *reprinted in* 1970 U.S.C.C.A.N.

2712, 2722) (emphasis added).  The NPFC determined that foreseeability was an objective

question.  AR 2215–16 (citing *Liberian Poplar Transp., Inc. v. United States*, 26 Cl. Ct. 223, 226

(Cl. Ct. 1992) ("Whether the crew did or did not actually anticipate the storm is beside the

point.").

The NPFC interpreted the third element—"exceptional, inevitable and irresistible

character, the effects of which could not have been prevented or avoided by the exercise of due

care or foresight"—to set a high bar.  Looking to the text, the NPFC noted that "Congress did not intend every 'natural disaster' or 'natural phenomenon' to be eligible for the act of God defense." AR 2208.  Rather, the claimant must prove a *grave* natural disaster or an *exceptional* natural phenomenon—which suggested that "a heightened level of severity" is required.  AR 2208. Next, the NPFC considered legislative history from an identical act of God provision in CERCLA as bearing on this element.  AR 2208 (quoting H.R. Rep. No. 99-253(IV) *reprinted in* 1986 U.S.C.C.A.N. 3068, 3100 ("[A] major hurricane may be [a common law] 'act of God,' but in an area (and at a time) where a hurricane should not be unexpected, it would not qualify as a 'phenomenon of exceptional character.'")).  As for past precedent, the NPFC observed that a claimant had *never* successfully raised an act of God defense under the environmental law statutes.  AR 2204 (citing *e.g.* Clifford J. Villa, *Is the "Act of God" Dead*, 7 Wash. J. Envtl. L. & Pol'y 320, 322 (July 2017)).  In view of the statutory text, the legislative history of similar provisions, and the claimants' uniform failure to successfully invoke the defense, the NPFC concluded that Taylor Energy had a heavy burden to prove this element.  AR 2212.

> **B.      The NPFC's Statutory Interpretation Is Entitled to Deference.**

The NPFC's interpretation of the OPA act of God defense was a permissible construction of the statute that is in accordance with law.  There is no ambiguity—the OPA act of God definition did not incorporate the common law and should be construed narrowly.  To the extent the court concludes there is any ambiguity on these issues, however, the NPFC's interpretation is entitled to *Chevron* or *Skidmore* deference.

The *Chevron* inquiry involves two steps.  At step one, courts ask "whether Congress has directly spoken to the precise question at issue."  *Chevron,* 467 U.S. at 842.  If the statutory language is unambiguous and "the intent of Congress is clear, that is the end of the matter; for

the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43.  However, "if the statute is silent or ambiguous with respect to the specific issue," the Court will proceed to step two of the *Chevron* analysis and ask whether the agency's interpretation is "permissible."  *Id.* at 843.  At this step, the interpretation is "given controlling weight unless" it is "manifestly contrary to the statute."  *Id.* at 844.  The question at this step "is not whether the [plaintiff's] proposed alternative is an acceptable policy option but whether the [agency action] reflects a reasonable interpretation of [the statute]."  *Coal. for Common Sense in Gov't Procurement v. United States,* 707 F. 3d 311, 317 (D.C. Cir. 2013).

Here, the plain language of the statute demonstrates that Congress did not intend the common law act of God defense to apply under OPA.  Instead, Congress provided an explicit statutory definition.  Taylor Energy's claim that the NPFC should have applied the common law standard thus founders on the plain language of the statute.  To the extent that the statutory language contains any ambiguity, the NPFC's narrow interpretation of the act of God defense is entirely "reasonable and consistent" with the statutory purpose and legislative history.  *GTE Serv. Corp. v. FCC,* 205 F.3d 416, 421 (D.C. Cir. 2000).  The permissibility of the NPFC's construction is confirmed by the fact that the NPFC's statutory construction is essentially an adoption of the *Apex Oil* court's construction.  While Taylor Energy may present alternative readings of the OPA defense, such claims fail in the face of the agency's carefully considered decision.  *See Serono Lab'ys, Inc. v. Shalala*, 158 F.3d 1313, 1321 (D.C. Cir. 1998) (under *Chevron* step two, "courts are bound to uphold an agency interpretation as long as it is reasonable—regardless whether there may be other reasonable, or even more reasonable, views"); *Bush–Quayle '92 Primary Comm., Inc. v. FEC,* 104 F.3d 448, 453 (D.C. Cir. 1997)

("When confronted with alternative sensible readings of an ambiguous statute the court is directed by *Chevron* to adopt the one the agency presents." (citing *Chevron,* 467 U.S. at 844)).

The NPFC's interpretation of the OPA act of God defense is entitled to *Chevron* deference because OPA authorizes the NPFC to make rules, regulations and decisions in administering OPA, and the NPFC's statutory interpretation in this case arose out of that delegation. *See Gonzales v. Oregon*, 546 U.S. 243, 255–56 (2006); *Fox v. Clinton*, 684 F.3d at 83. That the NPFC made its interpretation through informal adjudication does not preclude judicial deference. *See Barnhart v. Walton*, 535 U.S. 212, 221 (2002). In *Barnhart,* the Supreme Court explained that an agency's statutory interpretation through means less formal than "notice and comment" rulemaking can warrant *Chevron* deference depending on several factors. *Id.* at 222; *see also United States v. Mead Corp.*, 533 U.S. 218, 230–31 (2001) ("The want of [notice and comment] does not decide the case.").[9]

The same factors the Supreme Court found supported *Chevron* deference in *Barnhart* are present here. As to the initial factor—"the interstitial nature of the legal question[s]," *Barnhart*,

---

[9] The D.C. Circuit has granted *Chevron* deference to agency statutory interpretations arising from informal adjudications. *See, e.g., Menkes v. U.S. Dep't of Homeland Sec.,* 637 F.3d 319, 331 (D.C. Cir. 2011) (affording *Chevron* deference to Coast Guard decision in adjudicatory proceeding because it was "bound up with the administration of the . . . scheme of regulating"); *Mylan Labs., Inc. v. Thompson,* 389 F.3d 1272, 1280 (D.C. Cir. 2004) (according *Chevron* deference to FDA letter due to "complexity of the statutory regime under which the FDA operates, the FDA's expertise[, and] the careful craft of the scheme it devised to reconcile the various statutory provisions"). The NPFC itself has received deference to its statutory interpretations arising from informal adjudications. *See Buffalo Marine Servs. Inc. v. United States*, 663 F.3d 750, 754–57 (5th Cir. 2011) (concluding that the NPFC's statutory interpretation issued via informal adjudication is entitled to *Chevron* deference); *Gatlin Oil Co. v. United States*, 169 F.3d at 210 (same); *Am. Steamship Owners Mut. Prot. & Indem. Ass'n, Inc. v. United States*, 489 F. Supp. 3d 106 (E.D.N.Y. 2020) (same); *but cf. Water Quality Ins. Syndicate v. United States*, 225 F. Supp. 3d 41, 72 (D.D.C. 2016) (concluding no deference warranted where the NPFC offered almost no explanation or analysis for term defined in informal adjudication).

535 U.S. at 222—both questions at issue (i.e. how to construe exceptions to liability and the applicability of the common law) are important to the administration of the statute as a whole. The NPFC is uniquely well placed to resolve these interstitial questions.  As for the second factor—"the related expertise of the Agency," *id.*—the NPFC is an expert in determining which claims qualify for reimbursement and which do not.  *See Bean Dredging*, 773 F. Supp. 2d at 81. Interpreting statutory defenses falls squarely within this expertise.  As for the third factor—"the importance of the question to administration of the statute," *Barnhart*, 535 U.S. at 222— determining how to construe the defenses and whether the common law applies are questions of great importance to the administration of the statute.  In many close cases, the answer to these questions could determine which claims succeed or fail.  As to the fourth factor—"the complexity of that administration," *id.*—the administration is complex because there are many different types of claims involving extraordinarily technical factual determinations.  As to the final factor—"the careful consideration the Agency has given the question over a long period of time," *id.*—the NPFC first articulated these positions in its informal adjudication of the *Apex Oil* case—nearly 20 years ago.  *See generally* Def.'s United States' Opp'n to Pl.'s Cross Mot. for Summ. J. at 4, *Apex Oil Co. v. United States*, No. Civ.A. 01-CV-0768, 2001 WL 34784466 (E.D. La. Dec. 31, 2001) (defending agency adjudication and construing the OPA act of god claim in light of the CERCLA and CWA definitions with no reference to common law cases); *id.* at 4 ("Exceptions to liability for pollution incidents must be narrowly construed.").

Even if the court were to determine that *Chevron* deference was inapplicable to this case, the NPFC's determination deserves *Skidmore* deference.  Under *Skidmore*, an agency's statutory interpretation is "'entitled to respect' . . . to the extent it has the 'power to persuade.'"  *Gonzales*, 546 U.S. at 256 (quoting *Skidmore v. Swift & Co.,* 323 U.S. 134, 140 (1944)); *accord Cnty. of*

*Maui, Hawaii v. Hawaii Wildlife Fund*, 140 S. Ct. 1462, 1474 (2020)  ("Even [in the absence of *Chevron* deference], we often pay particular attention to an agency's views in light of the agency's expertise in a given area, its knowledge gained through practical experience, and its familiarity with the interpretive demands of administrative need.").  "The weight of such a judgment in a particular case will depend upon the thoroughness evident in [the agency's] consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control."  *Gonzales*, 546 U.S. at 268 (quoting *Skidmore,* 323 U.S. at 140).  Here, for the reasons stated in the preceding analysis, *Skidmore* deference would be appropriate.

### C.    Taylor Energy's Arguments that the NPFC Misconstrued the Statute Fail.

Taylor Energy raises three arguments against the NPFC's interpretation of the OPA act of God defense.  None are persuasive.

### 1.    The NPFC Did Not "Add Elements" to the OPA Act of God Defense.

Taylor Energy contends that the NPFC "impermissibly added elements to the act of God defense."  Pl.'s Br. at 34.  Specifically, Taylor Energy claims that the NPFC added "unprecedented" to the definition and erred by saying that Taylor Energy had to prove that the MC-20 incident was "one of the most grave, exceptional, inevitable and irresistible [natural phenomena] of all time."[10]  *Id.* at 25 (quoting AR 2212).

---

[10] In its motion, Taylor Energy also claims that the NPFC required Taylor Energy to prove "freak conditions."  Pl.'s Br. at 25.  This is false.  The NPFC merely used the term "freak conditions" to quote an expert who opined that Hurricane Ivan-induced waves were not "an unexpected event":

> "[T]he NPFC relies on the opinion proffered by Dr. Cortis Cooper and others, which states that '[while] Ivan generated the highest waves ever measured or hind cast in the Gulf of Mexico... [it] does not appear to have generated any freak conditions unexplainable by present hind cast methods or physical understanding

Taylor Energy already raised these contentions in its Request for Reconsideration, AR

307–08, and the NPFC's Determination on Reconsideration explained that no elements were

added to the definition:

> NPFC acknowledges its use of "unprecedented" in its determination but notes it only did so in response to Taylor's arguments.  Taylor uses the term "unprecedented" on 22 separate occasions in its original claim submission to describe the winds, waves, and other characteristics associated with Hurricane Ivan. In responding, the NPFC uses the term three times, and on each occasion to either quote a judicial decision or explain a case or a series of cases that preceded it.  To be clear, the NPFC did not impermissibly add any elements to the statutory defense when it adjudicated the original claim.

AR 8.  As for Taylor Energy's complaint about the NPFC saying that Taylor Energy had to

prove the event was one of the most exceptional of all time, the NPFC's statement must be read

in context.  The NPFC had explained that no claimant raising an act of God defense under the

three environmental law statutes had *ever* been successful.  *See* AR 2204.  Compared to this

uniform history of courts determining that natural disasters and other natural phenomena were

not acts of God under the environmental statutes, the NPFC was conveying that Taylor Energy

had a high bar indeed.

Though Taylor Energy hangs much of its argument on this single sentence, what matters

is the NPFC's statutory interpretation as a whole.  As described *supra* at 12–16, the NPFC

closely considered the text, statutory purpose, and the legislative history of analogous statutory

provisions, and then articulated and applied the proper legal standard in its decision documents.

Indeed, the NPFC quoted the statutory text verbatim in the decision documents 10 times.  *See*

AR 3; (stating the act of God definition verbatim) AR 8 (same); AR 11 (same); AR 11 n.56

---

of hurricane winds and waves.  Hence, the extreme waves generated by Ivan do not
appear to be an unexpected event.'"

AR 2210 (citations omitted).

(same); AR 2200 (same); AR 2204 (same); AR 2206 (same) AR 2207 (same); AR 2207–08 (same); AR 2220 (same).  In short, the NPFC neither added elements to the OPA act of God definition nor impermissibly heightened the standard.  AR 8.

### 2. The NPFC's Reliance on Legislative History Was Appropriate.

Taylor Energy argues that the NPFC was wrong to rely on legislative history from CERCLA and the CWA.[11]  Pl.'s. Br. at 25–26.  Taylor Energy says that this was inappropriate because (1) the OPA act of God definition is not ambiguous; and (2) CERCLA and CWA legislative history does not bear on an OPA provision.  *Id.*

It is true that, as discussed *supra* at 16–17, the OPA act of God definition unambiguously excludes the common law act of God definition that Taylor Energy seeks to apply.  Contrary to Taylor Energy's assertions, however, the NPFC's reliance on legislative history to interpret the statutory definition was appropriate.  The D.C. Circuit has long recognized that legislative history is critical to understanding statutory text, with or without ambiguity.  *E.g. Nat. Res. Def. Council, Inc. v. Browner*, 57 F.3d 1122, 1127 (D.C. Cir. 1995) ("Reference to statutory design and pertinent legislative history may often shed new light on congressional intent, notwithstanding statutory language that appears 'superficially clear.'"); *Planned Parenthood Fed'n of Am., Inc. v. Heckler*, 712 F.2d 650, 656–57 (D.C. Cir. 1983) ("Although we find that

_____

[11] In this section of its motion, Taylor Energy also argues that, in the OPA act of God definition, the NPFC replaced the word "or" with the word "and."  Pl.'s Br. at 26 (citing AR 14 ("An "act of God" must be of exceptional, inevitable and irresistible character, the effects of which could not have been prevented or avoided by the exercise of due care *and* foresight.") (emphasis added)).  Taylor Energy is correct about the replaced word, but this was merely a typographical error.  In the heading immediately before the error, the NPFC correctly stated the standard with the word "or."  AR 14.  Moreover, in every other recitation of the full standard, the NPFC used the correct conjunction.  *See* AR 3; (stating the act of God definition verbatim) AR 8 (same); AR 11 (same); AR 11 n.56 (same); AR 2200 (same); AR 2204 (same); AR 2206 (same) AR 2207 (same); AR 2207–08 (same); AR 2220 (same).

the 'plain meaning' of the statute is clear from its terms, we note that the legislative history is equally illuminating in this case."); *see OSG Bulk Ships, Inc. v. United States*, 921 F. Supp. 812, 819 (D.D.C. 1996), *aff'd*, 132 F.3d 808 (D.C. Cir. 1998) ("To determine whether the intent of Congress is clear and unambiguous, the Court must examine the text, the structure and the legislative history of the Act.").  Moreover, the type of legislative history that the NPFC relied upon—committee reports—is the best source of legislative history.  *Dig. Realty Tr., Inc. v. Somers*, 138 S. Ct. 767, 782–83 (2018) (Sotomayor, J., concurring) ("It is . . . no surprise that legislative staffers view committee and conference reports as the most reliable type of legislative history.").

The NPFC was well advised to consider the legislative history of both CERCLA[12] and the CWA because these statutes have identical and similar act of God definitions, respectively, and "[t]here is a presumption that Congress uses the same term consistently in different statutes." *Nat'l Treasury Employees Union v. Chertoff*, 452 F.3d 839, 857–58 (D.C. Cir. 2006); *see also Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 254 (1994).  "[P]arallel provisions give 'a strong indication' that the common term should be construed consistently under each statute."  *Nat'l Treasury Employees Union*, 452 F.3d at 858 (quoting *Indep. Fed'n of Flight Attendants v.*

---

[12] Taylor Energy says that the CERCLA legislative history that the NPFC cited "was actually a 1986 House Committee report written six years after the definition of 'act of God' was adopted by Congress and cannot be considered evidence of Congress' intent when it adopted the definition in 1980 in connection with CERCLA."  Pl.'s Br. at 26.  The D.C. Circuit has already rejected this argument.  *See State of Ohio v. U.S. Dep't of the Interior*, 880 F.2d 432, 453 n.30 (D.C. Cir. 1989).  In *State of Ohio*, the D.C. Circuit explained that Congress amended and reenacted the entire CERCLA statute in 1986, in the Superfund Amendments and Reauthorization Act (SARA), Pub. L. No. 99–499, 100 Stat. 1613 (1986).  *See State of Ohio*, 880 F.2d at 438, 453 n.30.  As such, enactment of preexisting CERCLA provisions can show "that Congress made a conscious decision not to amend the operative language."  *Id.*  To the extent that a Congressional report shows the SARA sponsors' view of the statute, "it would be misguided to dismiss that report as mere postenactment history."  *Id.*

*Zipes*, 491 U.S. 754, 758 n.2 (1989)); *see also Kooritzky v. Herman,* 178 F.3d 1315, 1319 (D.C. Cir. 1999) (explaining that similar language in different statutes is a strong indication that the language should be interpreted alike).

The common terminology is no surprise, as OPA's legislative history indicates that the Act "amended, expanded, and strengthened pre-existing statutes that addressed oil spill cleanup, liability and compensation." *Apex Oil*, 208 F. Supp. 2d at 654 (citing OPA legislative history); *see* S. Rep. No. 101–94, *reprinted in* 1990 U.S.C.C.A.N. News 722, 726 ("This bill adopts [the Section 311 of the Clean Water Act] standards for economic damages, as well as for removal costs and natural resource damages."). Indeed, courts interpreting OPA provisions universally look to interpretations of similar CWA and CERCLA provisions. *See, e.g., United States v. Bros. Enter., Inc.*, 113 F. Supp. 3d 907, 913 (E.D. Tex. 2015) (observing that "courts frequently look [to CERCLA] when interpreting OPA"); *United States v. Mizhir*, 106 F. Supp. 2d 124, 125 (D. Mass. 2000) (adopting the CWA definition of "navigable waters" to determine applicability of OPA); *Plantation Pipeline Co. v. Oil Spill Liability Trust Fund,* 1998 U.S. Dist. LEXIS 23671 at *15 (N.D. Ga. June 16, 1998) (adopting CWA definition of "waters of the United States" to determine whether spill threatened navigable waterway under OPA); *United States v. J.R. Nelson Vessel,* 1 F. Supp. 2d 172, 176 n.2 (E.D.N.Y. 1998) (OPA "Act of God" language), *aff'd*, 173 F.3d 847 (2d Cir. 1999); *Int'l Marine Carriers v. Oil Spill Liab. Trust Fund,* 903 F. Supp. 1097, 1102-03 (S.D. Tex. 1994) (looking to CERCLA to interpret third-party defense to liability in a cost-recovery action under OPA).

Finally, the propriety of the NPFC's use of legislative history from other statutes is confirmed by the only court to have construed the OPA act of God defense—which explicitly relied on the legislative history of both CERCLA and the CWA. *See Apex Oil*, 208 F. Supp. 2d

at 653–54; *see also Water Quality Ins. Syndicate*, 225 F. Supp. 3d at 74 (considering both CWA and CERCLA legislative history in the course of interpreting the OPA term "gross negligence"). Therefore, Taylor Energy's objections to the NPFC's use of legislative history are not well founded.

### 3.   The NPFC Correctly Interpreted the Case Law.

Taylor Energy boldly claims that all "the cases relied upon by the NPFC are not proper precedent and are clearly distinguishable."  Pl.'s. Br. at 27.  Taylor Energy first considers the *Apex Oil* case and, omitting any discussion of the *Apex Oil* court's statutory interpretation, says the case is distinguishable on its facts.  *Id.* at 27–28.  Next, Taylor Energy objects to the NPFC's reliance on the CWA and CERCLA act of God cases and, in any event, insists that they are factually distinguishable.  *Id.* at 29.

Taylor Energy is simply wrong that the cases are "not proper precedent."  *Apex Oil* is directly on point, and the cases featuring the identical CERCLA definition and the similar CWA definition are relevant for the reasons explained in the preceding section.[13]  Moreover, while it is true that none of the cases the NPFC relied on precisely match the facts of this case, they nonetheless exhibit general themes that support the NPFC's analysis of the MC-20 incident: (1) the act of God defense is narrow in light of the fact that no claimant has ever successfully brought it; (2) natural phenomena occurring in a region and at a time when they are known to

_____

[13] Taylor Energy acknowledges that OPA and CERCLA/CWA have "substantially similar" act of God provisions but insists that they must be construed differently because the CERCLA/CWA were "adopted under different pretexts [sic]" than OPA.  Pl.'s Br. at 29 n.20.  According to Taylor Energy, CERCLA/CWA exceptions to liability are strictly construed because the public would otherwise have to foot the bill, but OPA should be construed broadly because the Oil Spill Liability Trust Fund is "[i]n effect" an "an industry-funded insurance policy."  *Id.* at 4 n.2, 29 n.20.  As the United States explained above, however, Taylor Energy's characterizations of the Fund are misleading and incorrect.  *See* note 3, *supra*.

occur should generally not be considered "unanticipated," *see Sabine Towing*, 666 F.2d at 565; *Apex Oil*, 208 F. Supp. 2d at 656–57; and, (3) likewise, storms that were actually forecast, such that the responsible facility/vessel should have prepared itself for the event, cannot be considered "unanticipated," *see United States v. M/V Santa Clara I*, 887 F. Supp. 825, 830, 843 (D.S.C. 1995); *Kyoei Kaiun Kaisha v. M/V Bering Trader*, 795 F. Supp. 1054, 1055 (W.D. Wash. 1991).

Curiously, though Taylor Energy attacks the NPFC's consideration of CERCLA and CWA act of God cases, Taylor Energy argues that the NPFC should have considered a case from a body of law much farther afield—a common law negligence case.  In an apparent nod to its "common law incorporation" theory, Taylor Energy argues that the NPFC erred by not considering *Pioneer Natural Resources USA, Inc. v. Diamond Offshore Co.*, 638 F. Supp. 2d 665 (E.D. La. 2009).  Pl.'s. Br. at 27.  As the NPFC explained in its decision, common law cases are not relevant to the OPA act of God inquiry due to the wholly different context in which they arise.

In sum, the NPFC correctly articulated and interpreted the statute; this interpretation is entitled to deference; and Taylor Energy's arguments to the contrary are unpersuasive.

## II.   The NPFC's Application of the Law to the Facts Was Not Arbitrary and Capricious.

In this section, the United States (A) describes the NPFC's application of the law to the facts, in which the NPFC examined the relevant data, made factual findings supported by substantial evidence, and articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made.  Next, the United States (B) explains why Taylor Energy's arguments attacking the NPFC's analysis fail.  In particular: (1) the NPFC did not err by considering the frequency and intensity of Gulf hurricanes; (2) Taylor Energy should be judicially estopped from challenging the NPFC's descriptions of the failure

mechanism as "a mudslide"; (3) the NPFC did not err in concluding that Taylor Energy's failure to conduct high resolution seafloor surveys "could have contributed" to the platform's destruction; (4) the NPFC considered all relevant data; and (5) the NPFC did not err by considering post-1983 data in its decision.

A.  **The NPFC Examined the Relevant Data, Made Factual Findings Supported by Substantial Evidence, and Articulated a Satisfactory Explanation for Its Action.**

1.  **Taylor Energy Contended that the Hurricane Ivan Waves Were an Act of God.**

In its claim submissions, Taylor Energy argued the Hurricane Ivan's "unprecedented, massive waves" constituted an OPA act of God.  AR 2289, 2383.  For reference, Taylor Energy pointed to the "100-year design storm wave" created by Dr. Suhayda in the early 1980s for the MC-20 site.  *See* AR 2306, 2317–20.  The "100-year design storm wave" sought to forecast "the worst expected wave conditions likely to occur at the platform's location in a 100-year time frame."  *See* AR 2306, 2317.  The Hurricane Ivan-induced wave heights and periods were substantially beyond what Dr. Suhayda had forecast.  AR 2329–30.  Taylor Energy claimed that the wave height-period combination exerted "extraordinary" pressures on the seafloor sediments that had a return interval of over 2,000 years and caused a "seafloor failure" that toppled the MC-20 platform.  AR 2285–86.

2.  **The NPFC Considered Taylor Energy's Evidence and the Opinions of Independent Experts.**

To assess these claims, "the agency 'examine[d] the relevant data.'"  *See Baystate Franklin Med. Ctr.,* 950 F.3d at 89 (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  The NPFC primarily relied on two sources

of information.  First, the NPFC considered Taylor Energy's voluminous submissions.  AR 15.[14]

Second, the NPFC contracted with several experts in the fields of meteorology, oceanography,

geotechnical engineering, geology and hydrographic/geophysical surveys.[15]  AR 3–4.  The

NPFC tasked these experts with reviewing Taylor Energy's submitted information for accuracy

and to conduct research and analysis with the overall objective of providing impartial and

unbiased opinions on the MC-20 incident.  AR 3–4.  The experts reached four general

conclusions that refuted Taylor Energy's contention that Ivan's waves were "unprecedented" and

could not have been anticipated.

First, the experts concluded that a hurricane of Ivan's intensity is not rare within the Gulf

of Mexico.[16]  AR 16.  They estimated the recurrence interval of such a storm to be

approximately 5 to 10 years.  AR 16 (citing AR 20623–47 (GZA Report Appendix G)).

---

[14] In its Determination on Reconsideration, the NPFC noted that though it did not discuss each of
Taylor Energy's submissions in the decisional documents, such as Taylor Energy's "detailed
history of offshore oil and gas development," the NPFC reviewed and considered the material.
AR 8; *see Lorion v. U.S. Nuclear Regulatory Comm'n*, 785 F.2d 1038, 1042 (D.C. Cir. 1986)
("[T]he failure to mention certain evidence [does not mean] that it was not considered, nor does
it follow that an explanation is incomplete unless it dutifully lists all the evidence that the
[agency] examined.").

[15] The reports are as follows: April 1, 2019 Pettigrew Report, AR 20030–61;  May 15, 2019
Pettigrew Report, AR 20062–91; June 25, 2019 NGI Report, AR 20092–182; July 2019 ABSG
Report, AR 20183–243; June 2019 David Evans & Associates Report, AR 20244–76; August
2019 Pettigrew Response Comments, AR 20277–301; June 2019 GZA Conclusions, AR 20302–
04; Aug 2019 GZA Technical Report AR 20305–622; GZA Report Appendix G, AR 20623–47;
GZA Report Appendix J, AR 20648–60; GZA Report Appendix K, AR 20661–72; GZA Report
Appendix L, AR 20673–90; GZA Report Appendix N, AR 20691–98; GZA Report Appendix O,
AR 20699–711.

[16] Taylor Energy itself recognizes that Ivan was not exceptional.  Compl. ¶ 40 (referring to Ivan
as "a classical, long-lived Cape Verde hurricane"); Pl.'s Br. at 36 ("("The general meteorological
characteristics of the storm were not exceptional for a Category 4 or 5 hurricane." (quoting AR
2327)).

Second, the experts estimated that the recurrence interval for the Hurricane Ivan-induced waves was approximately 100 years (as opposed to Taylor Energy's estimate of 2,000 years). AR 16 (citing AR 20648–60 (GZA Report Appendix J)); *see also* AR 17 (citing Berek et al., 2007 for conclusion that wave heights in water depths similar to the former MC-20 platform of around 86 feet have recurrence intervals of about 100 years and wave heights similar to Hurricane Ivan's waves have recurrence intervals on the same order of magnitude of 100 years); AR 17 (citing Cooper et al., 2005 for conclusion that Hurricane Ivan-induced waves, though powerful, were explainable by present hindcast methods)).

Third, the experts concluded that Dr. Suhayda's 1983 analysis contained substantial flaws and, but for these flaws, the analysis could have forecast the Hurricane Ivan-induced conditions at the site.  AR 17–19.  The primary flaw concerned Dr. Suhayda's 100-year storm wave design.[17]  When Dr. Suhayda designed this wave, he relied on a single wave condition—a wave with a single wave height and a single wave period—and used this wave condition to compute maximum bottom pressure during the 100-year storm.  AR 17; *see* AR 20661–72 (GZA Report Appendix K).  However, this approach is inherently flawed and fails to accurately forecast the most extreme bottom pressures a site would experience.  AR 17 ("While the combination selected by Dr. Suhayda might have been a good choice to compute extreme forces on the MC-20A platform, . . . longer periods should have been selected associated with smaller wave heights in order to find the maximum bottom pressure during a given storm segment.") (citing AR

---

[17] Other substantial flaws included that Dr. Suhayda omitted any mention of the "unstable subaqueous nature of the bottom in this region," AR 19 (citing AR 20030–61 (Pettigrew Report)), and he failed to use a safety factor or otherwise account for "uncertainties" in the calculation of parameters when designing his 100-year storm wave for the MC-20 platform, *see* AR 20057.

20691–98 (GZA Report Appendix N), 20821–48 (Bea et al. 1983)).  Instead of a single wave condition, Dr. Suhayda should have considered various combinations of wave height and wave period, which would have more accurately forecast bottom pressures at the site.[18]  AR 17.

At the time Dr. Suhayda selected his design, all of the elements to make a correct design decision were available.  AR 17 (citing AR 20699–711 (GZA Appendix O), 20802–20 (Longuet-Higgins)).  As such, Taylor Energy's claim that early 1980s wave-forecasting methodology could not have anticipated the wave heights and periods produced by Hurricane Ivan's characteristics is incorrect.  Indeed, Dr. Suhayda properly forecast the wave heights and periods in 1983; he simply failed to perform the correct statistical analysis.  AR 19 (citing AR 20699–711 (GZA Appendix O)).

Fourth, the experts opined that Dr. Suhayda's report and Woodward-Clyde's design of the MC-20 platform failed to take into account Hurricane Camille—a 1969 hurricane that destroyed offshore oil platforms in the Mississippi River Delta and caused mudflows of 70-90 feet of thickness.  AR 18–19.  The occurrence of this similar storm in the same vicinity as the MC-20 platform, just 14 years prior to 1983, should have been considered.  AR 18–19 (citing AR 20821–48 (Bea report)).

### 3. The NPFC Determined Taylor Energy Failed to Prove the MC-20 Oil Discharge Was Caused by an Act of God.

Upon carefully considering Taylor Energy's evidence, as well as the evidence of the independent experts, the NPFC determined that Taylor Energy failed to prove by a

---

[18] *See also* AR 18–19 ("In addition to using a design wave spectrum in lieu of a single wave condition design wave, Dr. Suhayda should have used longer periods associated with shorter waves in the standard distribution in order to find the likely maximum bottom pressures during a given storm.").

preponderance of the evidence that the MC-20 oil discharge was caused solely by an act of God

under OPA.  AR 20.  The NPFC summarized its factual findings and conclusions as follows:

> Hurricanes are common occurrences, especially in the Gulf of Mexico.  In fact, there have been over 300 hurricane strikes in the Atlantic and Gulf coast regions since 1851.  They are certainly not unanticipated.  Hurricanes bring with them several known characteristics, including high winds, high waves, and high wave pressures.  While the intensity may vary from storm to storm, it is unquestioned that these characteristics are attendant, in one way or another, with all hurricanes.  There can be little doubt that Taylor was well-aware of the propensity and intensity of hurricanes in Gulf of Mexico.
>
> The unstable subsea conditions at MC-20 were also well-known.  Research was clear far before Taylor assumed the lease that the submerged delta apron consisted of thick, very weak sediments that are inherently unstable and vulnerable to hurricane wave-induced failure and that even a small change in prevailing conditions, such as wave input, can trigger a mudflow.  As a result, wave-induced bottom pressures accompanying large hurricanes can cause spectacular failures of the accumulated sediments.  Yet despite this research Taylor made the decision to acquire the lease.  It cannot later successfully claim that this instability was unanticipated.

AR 27–28.

The NPFC then went on to summarize the flaws identified by its experts and discussed

above, such as the flaws in Dr. Suhayda's methodology and the complete failure to account for

Hurricane Camille.  AR 28.  The NPFC then concluded that "[h]ad the proper methodology been

used, . . . Ivan's wave pressures would have fallen into the 'expected' range."  AR 28.  It further

noted that "Taylor did not comply with a mandate of the MMS to conduct geophysical surveys of

the site biennially and following major storms," and that "it is possible that the geophysical

surveys could have detected sediment instabilities in and around the MC-20A platform that could

have been rectified prior to Ivan."  AR 28–29.  Thus, Taylor's "failure to conduct these surveys

calls into question whether the incident was the sole cause of the structure's failure."  AR 29.  As

the NPFC concluded:

> Ultimately, Taylor made a decision to purchase the MC20 lease and fixtures knowing that the lease was located on a tract of land that was identified to contain geohazardous conditions and described to contain instabilities caused by

unconsolidated sediments, slumping, shallow faulting or gaseous sediments in an area of the country prone to hurricanes.  It is the determination of the NPFC that Taylor should remain liable for this decision as its act of God defense fails.

AR 29.

**B.**     **Taylor Energy's Arguments that the NPFC's Methodology, Findings and Conclusions Were Arbitrary and Capricious Fail.**

**1.  The NPFC Did Not Err by Considering Hurricane Ivan in Its Adjudication of Taylor Energy's Claim.**

Taylor Energy contends that the NPFC "misconstrue[d] . . . the actual 'act of God' event and failure mechanism" by focusing on Hurricane Ivan rather than the extraordinary waves caused by Ivan.  Pl.'s. Br. at 36 (capitalization altered).  Taylor Energy says that the NPFC should have considered the "natural phenomenon as a whole," which it defines as "the combination of the height of the waves, the long periods and the extreme downward pressures on seafloor sediments."  *Id.* at 37–38.  Curiously, Taylor Energy concludes that the hurricane itself was not part of the natural phenomenon as a whole.[19]

As a threshold matter, the NPFC did consider all the information that Taylor Energy says should have been considered (i.e. the wave height and periods and their downward pressures on the soil).  *See* AR 16–22.  More to the point, however, Taylor Energy's argument is illogical.  Hurricane Ivan was the precipitating factor in the MC-20 incident, and the NPFC was correct to consider it—including its intensity and the frequency of like storms.  The reasons Taylor Energy wishes that the NPFC had not considered hurricane frequency are apparent.  The independent

---

[19] In the past, Taylor Energy has acknowledged that Hurricane Ivan caused the destruction of its platform.  Compl. ¶ 9, *Taylor Energy Company, L.L.C. V. Underwriters at Lloyd's London*, No. 2:09cv6383, (E.D. La. Sept. 18, 2009), ECF No. 1 ("On September 15, 2004, Hurricane Ivan passed through the Gulf of Mexico . . . , causing significant damage to many offshore facilities, including MC20 and its 28 oil and/or gas wells and pipelines associated therewith.").  As explained in more detail *infra* at 33–35, the Court should estop Taylor Energy from taking inconsistent positions in the instant case.

experts and Taylor Energy itself all recognize that Ivan was not exceptional, AR 16 (citing AR

20623–47). Pl.'s. Br. at 36 ("The general meteorological characteristics of the storm were not

exceptional for a Category 4 or 5 hurricane." (quoting AR 2327)), and numerous sources suggest

that a hurricane in an area known for hurricanes cannot be an act of God under OPA, *see Apex

Oil*, 208 F. Supp. 2d at 654; H.R. Rep. No. 99–253(IV), 1986 U.S.C.C.A.N. 3068, 3100

(CERCLA legislative history); H.R. Rep. No. 91-940 (1970) (Conf. Rep.), *reprinted in* 1970

U.S.C.C.A.N. 2712, 2722 (CWA legislative history).  Here, Hurricane Ivan is just such a

hurricane, and the NPFC committed no error in considering its characteristics in adjudicating

Taylor Energy's claim.

### 2.   Taylor Energy Should Be Judicially Estopped from Arguing that the NPFC Erred by Referring to the Failure Mechanism as a Mudslide.

Taylor Energy contends that the NPFC "misconstrue[d] . . . the actual 'act of God' event

and failure mechanism" by referring to the mass sediment movement that toppled the MC-20

platform as a "mudflow or mudslide."  Pl.'s. Br. at 35, 38.  Taylor Energy protests that "the

MC20A Platform was ***not*** toppled by a mudslide or mudflow overrunning the platform site, but

rather a massive progressive seafloor failure . . . ."  *Id.* at 38 (emphasis in original).

Taylor Energy should be judicially estopped from arguing that the NPFC's

characterization of the "failure mechanism" as a "mudflow or mudslide" renders the decision

arbitrary and capricious.  For years, Taylor Energy has represented that a "mudslide" toppled the

MC-20 platform.  Even in the instant claims process, Taylor Energy's own experts regularly

refer to the failure mechanism as a mudslide, e.g. AR 6474 ("In September 2004, the MC 20

field was devastated by Hurricane Ivan, which created mudslides that toppled and displaced the

MC 20 platform."); AR 6489; AR 6519; AR 13866, and even equate "mudslide" with "slope

failure," AR 6489 ("[Ivan-induced seafloor pressure] changes in the vicinity of MC 20 initiated

33

submarine slope failures (mudslides).”), AR 13560.  But now, upon determining it is in its interest to say otherwise, Taylor Energy attempts to recast the failure mechanism as a “seafloor failure.”  Pl.’s. Br. at 6.

“Judicial estoppel ‘prevents a party from asserting a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous proceeding.’”  *Marshall v. Honeywell Tech. Sys. Inc.*, 828 F.3d 923, 928 (D.C. Cir. 2016) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001)).  “[J]udicial estoppel is an equitable doctrine invoked by a court at its discretion.”  *New Hampshire*, 532 U.S. at 750 (internal quotation marks omitted).  The Supreme Court has enumerated three non-exhaustive factors that inform the Court’s decision of whether to invoke the rule.  *Id.* at 750-51 (internal quotation marks omitted).

Here, all three factors favor judicial estoppel.  The first factor is that “a party’s later position must be clearly inconsistent with its earlier position.”  *Id.* (internal quotation marks omitted). There is no question this applies to Taylor Energy’s about-face.  For years, Taylor Energy has consistently referred to the mass sediment movement that toppled the MC-20 platform as a mudslide.  *E.g.*, Compl. ¶ 11*, Taylor Energy Company, L.L.C. v. Underwriters at Lloyd’s London*, No. 2:09cv6383, (E.D. La. Sept. 18, 2009), ECF No. 1 (“MC20 was toppled and carried downslope by the storm-initiated mudslide.”)**;** Mot. to Dismiss at 5, *Apalachicola Riverkeeper Et Al v. Taylor Energy Company*, L.L.C., No. 2:12-cv-00337 (E.D. La. April 25, 2012), ECF No. 15-1 (referring to the sediment movement as “[a] massive sea floor mudslide” and as a “[t]he mudslide”).  Now Taylor Energy claims that “the MC20A Platform was ***not*** toppled by a mudslide or mudflow overrunning the platform site, but rather a massive progressive seafloor failure . . . .”  Pl.’s Br. at 38 (emphasis in original).

The second factor is "whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled." *New Hampshire v. Maine*, 532 U.S. at 750 (internal quotation marks omitted).  In the earlier cases, the courts accepted Taylor Energy's allegation that a mudslide toppled the platform.  *See* Order at 1, *Apalachicola Riverkeeper Et Al v. Taylor Energy Company*, L.L.C., No. 2:12-cv-00337 (E.D. La. May 4, 2013), ECF No. 66 ("In September 2004, a mudslide triggered by Hurricane Ivan destroyed a number of oil wells owned by Taylor."); Order at 6*, Taylor Energy Company, L.L.C. v. Underwriters at Lloyd's London*, No. 2:09cv6383, (E.D. La. Oct. 29, 2010), ECF No. 96 ("During the course of the hurricane, the MC20 platform and its associated wells were buried due to an undersea mudslide event during the storm." (citing MMS letter attached to affidavit of William Pecue, Taylor Energy's CEO)).

The third factor is the "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *New Hampshire*, 532 U.S. at 751 (internal quotation marks omitted).  Here, Taylor Energy would derive an unfair advantage from its gamesmanship.  Taylor Energy attacks the NPFC for characterizing the event in exactly the same manner that Taylor Energy has done for years.  In view of all three factors, Taylor Energy should be estopped from taking the position that the NPFC's decision is arbitrary and capricious for describing the failure mechanism as a mudslide or mudflow.

### 3. The NPFC Correctly Determined that Taylor Energy's Failure to Conduct Seafloor Surveys "Could Have Contributed" to the Platform's Destruction.

Taylor Energy's contention that the seafloor surveys would have had "no probative value" is suspect.  *Id.* at 42.  Taylor Energy's lease required it to regularly perform "high

resolution surveys" to monitor seafloor conditions.  AR 6377.  From 1994 to 2004, Taylor

Energy conducted only one survey in the area—a 2001 survey of MC-21 that Taylor Energy

claims partially surveyed MC-20.  AR 2192.  In the three years that followed before Hurricane

Ivan, there were at least seven storms that could have contributed to significant sediment

movement upslope of the platform site or significant sediment accumulation on the mudlobe

crests in the area of the platform.  AR 5.  But since Taylor Energy did not conduct the required

high resolution seafloor surveys during this time period, there is no way of knowing the

condition of the seafloor prior to Hurricane Ivan.  Taylor Energy now seeks to benefit from this

lack of information by claiming that the surveys would not have mattered.[20]  The NPFC came to

the opposite conclusion, finding that the failure to perform seafloor surveys "could have

contributed" to the collapse of the MC-20 platform.  AR 27.  The absence of information on

what the surveys would have shown is due to Taylor Energy's failure to collect the information

as required, and Taylor Energy does not now deserve the benefit of the doubt.

─────────────────────

[20] Taylor Energy argues that the one survey it conducted during its lease, in 2001, "detected a
*decrease* in the elevations of the mudlobe crests located upslope of the MC20A Platform of up to
30 feet."  Pl.'s Br. at 41 n.33 (emphasis added).  From this, Taylor Energy infers that the risk of a
large mudslide to the MC-20 site actually decreased since the platform was built.  *Id.*  Taylor
Energy is simply incorrect.  The sources it relies on do not say there was a decrease of 30 feet, let
alone that there was a decrease in the risk of a mudslide.  *See* AR 113–134 (Suhayda report in
which he does not discuss any elevation decrease); AR 164–74 (Hooper report in which he says
there was "a small loss of elevation (a few feet)" AR 183–244 (Gilbert and Nodine report in
which they say "there was a small loss of sediment (less than 10 feet in thickness)").  Moreover,
Taylor Energy ignores the fact that there were at least seven storms that could have contributed
to significant sediment movement in the areas upslope of the MC-20 platform site or significant
sediment accumulation on the mudlobe crests in the area of the platform.  *See* AR 20062–91.
Even assuming Taylor Energy is correct that there was a "30 foot decrease" at the site in 2001, it
completely ignores the Fugro survey it commissioned and submitted with its claim showing that
"[b]athymetric changes between 2001 and 2004 show an elevation *increase* (sediment
accumulation) of about 50 ft at the MC 20 'A'-Structure."  AR 7651 (emphasis added).

Since the NPFC was correct to conclude that Taylor Energy's failure to perform high resolution seafloor surveys "could have contributed" to the collapse of the MC-20 platform, the NPFC's conclusion that Hurricane Ivan waves were not the "sole cause" of the oil discharge is well-founded.  AR 27–28.

### 4. The NPFC Considered All Relevant Data and Provided the Independent Experts with Appropriate Instructions and Information.

Taylor Energy raises four general challenges to the manner in which the NPFC and the experts considered the evidence.[21]  Pl.'s Br. at 44.  None are persuasive.

First, Taylor Energy argues that the NPFC "failed to . . . provide its experts with much of the data and opinions set forth in the Claim, Reconsideration Request, or the expert reports or other evidence submitted therewith."  *Id.* at 44.  In essence, Taylor Energy suggests that the APA required the NPFC to provide its independent experts with *all* of Taylor Energy's submissions. *See id.* at 44–46.

Taylor Energy's argument fails because the APA imposes no such requirement.  Rather, the APA requires the *agency* to fully consider relevant evidence—not experts hired by the agency.  Thus, Taylor Energy seeks to impose upon the NPFC a procedural requirement that is

---

[21] Taylor Energy also claims, without any support, that the NPFC's findings are not due any deference because the agency has no expertise and had to hire independent experts.  Pl.'s Br. at 44.  Taylor Energy is wrong.  The D.C. District Court has explicitly concluded that the "relevant data" agencies must consider can include "outside expertise."  *Alfa Int'l Seafood v. Ross*, 264 F. Supp. 3d 23, 60 (D.D.C. 2017).  Moreover, the Court has recognized that the NPFC is an expert in its field, *Bean Dredging*, 773 F. Supp. 2d at 78, and the APA mandates deference to agency fact-finding.  *See* 5 U.S.C. § 706(2)(E); *Kappos v. Hyatt*, 566 U.S. 431, 436 (2012) (affirming review of "factual findings under the APA's deferential 'substantial evidence' standard").  The APA does not condition this deference on whether an agency engages independent experts.

not statutorily mandated.[22]  *See Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council*, 435 U.S. 519 (1978) (holding that a reviewing court may not require an agency to abide by procedures not mandated by statute or established by its own regulations).  Beyond this fatal flaw, what Taylor Energy suggests is simply impractical.  Taylor Energy's original claim submission totaled 13,200 pages.  It would have been excessive for the NPFC to ask the experts to review all of this information—the vast majority of which had nothing to do with the discrete questions the experts were tasked with addressing.  Instead, the NPFC provided the experts with the information necessary to render opinions.[23]  To the extent the experts wanted to consider other information, they were welcome (and sometimes even required) to do so.  *See*, *e.g.*, AR 20799–801 (task order 9 requiring independent research).

As for the specific examples of documents that Taylor Energy says should have been given to the experts, the NPFC had valid reasons for not providing them.  For instance, the NPFC did not provide the experts with Taylor Energy's claim because this is a "persuasive" document that argues for Taylor Energy's theory.[24]  As explained above, the NPFC engaged the

_____

[22] The Court has rejected Taylor Energy's previous attempts to impose additional procedural requirements on the NPFC.  *See* Mem. Op. (Oct. 14, 2020) at 12–13.  Nonetheless, Taylor Energy attempts to re-litigate this issue in the instant motion.  *See* Pl.'s Br. at 44 n.39.

[23] The task orders list what the experts considered.  *See* AR 20921–25 (task order 8); AR 20799–801 (task order 9); AR 20933–36 (task order 10); AR 20954–59 (task order 11); AR 20960 (task order 14).

[24] As another example, the NPFC did not provide Dr. Hooper's report, AR 3873–4006, to the independent expert NGI because Dr. Hooper had personal involvement at the MC-20 site; he served as Woodward-Clyde's Chief Engineer and leader of its project team that conducted the 1983 geotechnical study of the MC-20.  AR 5880–6088 (Woodward Report).  Moreover, Dr. Hooper's report failed to provide a complete version of any post-2006 Fugro survey of the MC-20 and instead provided only a brief overview of a few surveys that would have provided insufficient detail to NGI for its review.  *See* AR 3873–4006.

independent experts "to provide the NPFC an objective analysis of the information relied upon by Taylor in its claim submission."  AR 3; *see* AR 3–4 (describing that "the overall objective" in hiring independent subject matter experts was to obtain "impartial and unbiased opinions on the information presented by Taylor in support of its claim submission").  Providing the independent experts with Taylor Energy's "persuasive" materials would have therefore defeated NPFC's purpose in hiring them.

Second, Taylor Energy says that the NPFC "hired experts to give support to its pre-ordained conclusion to deny the Claim."  Pl.'s. Br. at 44.  Taylor Energy offers no support for this proposition—because there is none.  Indeed, the Court already rejected this baseless theory in adjudicating Taylor Energy's motion to supplement the record.  *See* Mem. Op. (Feb. 15, 2021) at 7.  Nonetheless, the United States will again note that the only instructions provided to the independent experts are located in the administrative record, and the instructions self-evidently do not seek a "pre-ordained conclusion."  *See* AR 20921–25 (task order 8); AR 20799–801 (task order 9); AR 20933–36 (task order 10); AR 20954–59 (task order 11); AR 20960 (task order 14).

Third, Taylor Energy argues that the NPFC "cherry-picked findings and conclusions of its experts while ignoring those that did not support its predetermined outcome."  Pl.'s. Br. at 47. In particular, Taylor Energy suggests that the NPFC erred by "task[ing] [David Evans and Associates] with certain work, [but] the DEA report *was not even relied upon* by the NPFC."  *Id.* at 46 (emphasis added).  Taylor Energy also complains that the NPFC improperly disregarded

---

Taylor Energy also complains that the NPFC failed to provide ABS reports of Hawk Technical Support, LLC (Laurendine) (AR 5500–15) or FuryConsult, LLC (Fury) (AR 8629–761).  Pl.'s Br. at 46.  Contrary to Taylor Energy's contention, the NPFC provided the Fury report to ABS. *See* AR 20799–801 (task order 9).  As for the Laurendine report, it would have been of little utility to ABS.  Only four pages bear on ABS's tasks, and they include a scant description of the MC-20 platform design and an abbreviated conclusion.  AR 5500–15.

the U.S. Naval Research Laboratory (NRL) Slope to Shelf and Exchange Dynamics field

sensor's readings, *id.* at 47–48, and "cherry-picked" from Dr. Cortis Cooper, *id.* at 37 n.28.

Taylor Energy's contentions are without merit.  As for the David Evans Report, the

NPFC explained that it did not closely analyze the Evans report—which concerned oil coming

from the discharge site—because "it is undisputed that discharges of oil from Taylor's platform

amounted to an incident under OPA."  AR 7.  There is no error in this.  The NPFC did not, as

Taylor Energy suggests, ignore the Evans report to support a predetermined outcome.  As to the

NRL sensor readings, the NPFC both considered and discussed them.  *See* AR 2210, 2216.

Taylor Energy's expert, Dr. Suhayda, relied on the readings to determine wave recurrence

intervals up to 10,000 years.  AR 2216.  The NPFC viewed this conclusion with caution because

the NRL readings involved data sets of only 25 years and 11 years, which is rather limited for

determining a recurrence interval of 10,000 years.  AR 2216.  As to Dr. Cooper's report, AR

19887–93, the NPFC did not "cherry-pick" his findings.  The NPFC relied on his conclusion that

the Ivan waves were not "unexpected" notwithstanding the fact that some of the hindcast data on

which Cooper relied—that said the waves had a 2,500-year recurrence period—was contradicted

by the independent experts.[25]  AR 2217; *see* AR 16 (relying on independent experts' findings

that the recurrence interval for the Hurricane Ivan-induced waves was approximately 100 years).

Indeed, the fact that Dr. Cooper reached his conclusion despite the questionable, overlong

hindcast data further bolsters the NPFC's determination that the Ivan event should not be

considered "unanticipated."

---

[25] As its name suggest, "hindcasting" involves entering data from a past actual storm into a
model to see how accurately that model predicts the known actual wave conditions.

Fourth, Taylor Energy criticizes the NPFC's reliance on the expert Capt. James Pettigrew.  Pl.'s. Br. at 16, 45.  The NPFC tasked Capt. Pettigrew with responding to 11 meteorology-oceanography claims made by Dr. Suhayda within his report.  AR 20921–25. Taylor Energy claims that Capt. Pettigrew was provided with only limited information and that his findings "were well beyond his knowledge or expertise and were speculative, unfounded, and in many cases demonstrably incorrect."  Pl.'s Br. at 16.

Taylor Energy is wrong on all counts.  Capt. Pettigrew was well qualified to comment on Dr. Suhayda's report.  Capt. Pettigrew has a Bachelor of Science in Ocean Engineering from Texas A&M University, a Master of Science in Meteorology and Physical Oceanography from the Naval Postgraduate School, and a Diploma in Joint Operations Planning from the Armed Forces Staff College.  AR 20712–14.  Moreover, Capt. Pettigrew served three decades in the U.S. Navy as a Meteorological and Oceanographic Officer and has substantial professional experience in bathymetry, bottom composition, and wind and wave effects throughout the water column.  AR 20277–301, 20712–14.  As for the materials Capt. Pettigrew relied upon, the NPFC provided Suhayda's report, AR 5364–499, and Dr. Bea's et. al *Wave-Induced Slides in South Pass Block 70, Mississippi Delta*, Journal of Geotechnical Engineering (Apr. 1983), AR 20821– 48.  Capt. Pettigrew also conducted extensive, independent research and cited to 25 references within his final report, many of which are relied upon by Taylor Energy in its claim submission.

AR 20030–61.  As to Taylor Energy's objection to Capt. Pettigrew's findings,[26] the United

States notes that the independent expert GZA offered similar opinions as to Capt. Pettigrew's.[27]

### 5.  The NPFC Did Not Err by Considering Post-1983 Data in Its Determination of Whether the Hurricane Ivan Waves Were an Act of God.

Taylor Energy argues that the NPFC erred by considering post-1983 data in its

determination of whether the Hurricane Ivan waves were an act of God.[28]  Pl.'s. Br. at 48.

Taylor Energy argues that this data is irrelevant; what matters, instead, is the American

Petroleum Institute's 100-year-storm design standard—and, more particularly, the standard as it

existed in 1983 when the platform was built.  Because Hurricane Ivan conditions exceeded the

1983 100-year storm standard, Taylor Energy says the conditions constitute an act of God.[29]  In

---

[26] Taylor Energy's only specific objection to Capt. Pettigrew's findings comes down to a single sentence in Capt. Pettigrew's report: "[T]he operational fact is that [mudflows and seafloor failures] are both dynamic movements of the ocean bottom, in this area with a history of subaqueous sediment instabilities (repetitiveness intended), that have caused the loss of offshore platforms."  AR 20283–84.  Taylor Energy says that this "statement is in direct conflict with the expert opinions contained within the administrative record."  Pl.'s Br. at 40 n.32.  However, Taylor fails to offer *any* specific citations to the contrary or explain how the statement is incorrect.  As such, Taylor Energy's contention should be disregarded.

[27] For example, both GZA and Capt. Pettigrew questioned Dr. Suhayda's reliance upon single point climatologic, average environmental information for his 1983 assessment of the MC20; stated that Dr. Suhayda did not consider the full environment of the Gulf of Mexico that could have affected the MC-20 in 2004; and criticized Dr. Suhayda's original design analysis for considering only a single wave condition.  *Compare* AR 20030–61 (Pettigrew report) *with* AR 20305–622 (GZA Report) and AR 20661–72 (GZA Report Appendix K).

[28] This argument is hypocritical because Taylor Energy itself relied upon post-Ivan data within their claim submission and submitted this data to the NPFC for consideration.  *See* AR 371 (Taylor Energy expert Dr. Suhayda relying upon Dr. Forristall's 2015 Hurricane Ivan hindcast results to form the basis of his 2019 MC-20 analysis).

[29] Taylor Energy implies that the API standards were revised solely as a result of Hurricane Ivan. Pl.'s Br. at 49, 54.  This is misleading.  Instead, the standards were revised because of the

other words, Taylor Energy says that any storm beyond the API standards at the time a platform is built is a per se act of God.

There is no support for Taylor Energy's position. The OPA act of God standard is not in any way tied to the API standard. Rather, the proper standard is the statutory definition itself—and that is precisely what the NPFC applied. Accordingly, Taylor Energy's claim that NPFC "retroactively applied" a new standard completely misses the mark.[30]  Pl.'s. Br. at 52.

Even if one could accept Taylor Energy's dubious proposition that the API standard is dispositive in the act of God inquiry, Taylor Energy's claim would still fail because Taylor Energy's platform was likely not built in accordance with the API standards that existed in 1983. The 1983 API standards required platforms to be built to withstand a 100-year storm, which, for the MC-20 platform, depended on site-specific analysis of the local meteorological and oceanographic conditions.[31]  Dr. Suhayda performed this analysis for the MC-20 site, and the

occurrence of "three major hurricanes (Ivan, Katrina and Rita) in a two year period (2004 and 2005)." *See* AR 5408

[30] Taylor Energy's attendant proposition that the NPFC committed a "violation of Taylor Energy's due process rights" is without merit for the same reasons. Pl.'s Br. at 48. There was no new standard applied retroactively. Also, Taylor Energy already conceded its Due Process claim. *Id.* at 18 n.15. And to the extent that Taylor Energy suggests that compliance with law exonerates it from OPA liability, courts have already considered and rejected this argument. *Baby Oil, Inc. v. United States*, 938 F. Supp. 2d 640, 644 (E.D. La. 2013) (rejecting claimant's argument that "full compliance with the law demonstrates that it exercised due care" and upholding NPFC decision).

[31] Though Taylor Energy relies heavily on the API standards, Taylor Energy's claim submission does not include them, and they are not in the administrative record. Rather than citing the standards themselves, Taylor Energy relies on its expert, who says that, "[i]n 1976, the API formally adopted the 100-yr. storm design wave as part of its RP2A design standards for offshore structures in the Gulf of Mexico." AR 3895. He says that for certain areas within the Gulf, the API standards prescribed general parameters for a 100-year design wave, but sites in the Mississippi River Delta required a site-specific design wave because the Delta is "a region where storm waves strongly interact with sediments that underly [sic] the seafloor, which changes the storm wave parameters." AR 3895.

analysis had substantial flaws.  *See* Section II.A.2 of the Argument, *supra*.  Thus, Dr. Suhayda

likely failed to properly account for a 100-year storm—so even with Taylor Energy's own

dubious API-based rubric, the Hurricane Ivan conditions were not an act of God.

## III.  Plaintiffs' Requested Relief Exceeds the Scope of the APA's Limited Review.

Although it is respectfully submitted that the NPFC's determination should be upheld, in

the event the Court finds in favor of Taylor Energy, the appropriate remedy is to set aside the

NPFC's determination and remand the matter to the NPFC for further proceedings not

inconsistent with the Court's reasons for doing so.  *See* 5 U.S.C. § 706(2); *Gonzales v. Thomas*,

547 U.S. 183, 185-87 (2006); *Metro. Stevedore Co. v. Rambo*, 521 U.S. 121, 140 (1997); *Florida*

*Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985); *FCC v. ITT World Comm. Inc.*, 466

U.S. 463, 468–69 (1984); *Camp v. Pitts*, 411 U.S. 138, 142 (1973); *Citizens to Preserve Overton*

*Park v. Volpe*, 401 U.S. 402, 415 (1971); *see also Bean Dredging*, 773 F. Supp. 2d at 78 (stating

"an agency is not restricted from reopening the administrative proceedings after the grounds

upon which it once relied are drawn  into question by the reviewing court") (citing *PPG Indus. v.*

*United States*, 52 F.3d 363, 366 (D.C. Cir 1995)).

Plaintiff Taylor Energy nonetheless requests that the Court hold that Taylor Energy is

entitled to the protections of the act of God defense and grant the monetary relief requested.

Pl.'s Br. At 56.  Specifically, Taylor Energy asks that the Court award Taylor Energy

$353,881,719, the sum for which it submitted its claim to the NPFC, plus interest, costs, and

attorney fees.[32]  Compl. at 70.  Because the NPFC determined that Plaintiff had failed to meet its

burden of demonstrating that it was entitled to a defense to liability, the NPFC did not adjudicate

---

[32] Neither OPA nor the APA authorize Taylor Energy to recover attorneys' fees, expert fees, costs, interest and disbursements from the Fund.

whether the particular removal costs and damages alleged by Plaintiff are compensable under OPA,[33] *see, e.g.*, 33 U.S.C. §§ 2702(b), 2712(a)(4), and its regulations, 33 C.F.R. Part 136.  This question would be for the NPFC to determine in the first instance, along with any other issues raised by this Court's decision.  Should this Court set aside the NPFC's decision, the appropriate course is remand to the NPFC.  Taylor Energy's request for an order holding that Taylor Energy is entitled to the act of God defense and a monetary award should be denied.

## CONCLUSION

For the foregoing reasons, the Court should DENY Plaintiff's motion for summary judgment and GRANT the Federal Defendants' cross-motion for summary judgment.

Respectfully submitted,

FOR THE UNITED STATES OF AMERICA

/s/ *Elliot Higgins*
ELLIOT HIGGINS
MARK L. WALTERS
U.S. Department of Justice
Environmental & Natural Resources
Division
Environmental Defense Section
P.O. Box 7611
Washington, DC 20044
Phone: (202) 598-0240
Fax: (202) 514-8865
elliot.higgins@usdoj.gov
mark.walters@usdoj.gov

OF COUNSEL:

---

[33] For instance, the NPFC had no occasion to reach the question whether Taylor Energy has liability under Section 1004(c)(3) of the Oil Pollution Act, 33 U.S.C. § 2704(c)(3) ("Notwithstanding the . . . the defenses of section 2703 of this title, all removal costs incurred by the United States Government . . . in connection with a discharge or substantial threat of discharge of oil from any Outer Continental Shelf facility . . .  shall be borne by the owner or operator of such facility . . . .").

SCOTT C. HERMAN
Attorney Advisor
National Pollution Funds Center, US Coast Guard
2703 Martin Luther King Jr. Avenue SE
Washington, DC 20593

HEATHER S. KENNEALY
Attorney Advisor
U.S. Coast Guard Headquarters
Office of Claims and Litigation (CG-LCL)
2703 Martin Luther King Jr. Avenue, SE, Stop 7213
Washington, DC 20593-7213

**<u>CERTIFICATE OF SERVICE</u>**

I certify that on this 12th day of April, 2021, a true and correct copy of the foregoing

pleading was filed electronically with the Clerk of Court of the District of Columbia by using the

CM/EDF system, which provides notice of fling to all counsel of record by electronic means.


_____/s/ Elliot Higgins_____

Elliot Higgins