# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **TAYLOR ENERGY COMPANY LLC,** | ) | |
| **Plaintiff,** | ) | |
| **vs.** | ) | **CIVIL ACTION NO.: 20-01086 (JDB)** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| **ACTING BY AND THROUGH THE** | ) | |
| **UNITED STATES COAST GUARD** | ) | |
| **NATIONAL POLLUTION FUNDS CENTER,** | ) | |
| **Defendant.** | ) | |
| | ) | |
| | ) | |

## TAYLOR ENERGY COMPANY LLC'S COMBINED REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT

CARL D. ROSENBLUM, T.A.
ALIDA C. HAINKEL
LAUREN C. MASTIO
TAYLOR K. WIMBERLY
Jones Walker LLP
201 St. Charles Avenue, 49th Floor
New Orleans, Louisiana 70170-5100
Telephone: (504) 582-8000
Facsimile: (504) 589-8296
E-mail: crosenblum@joneswalker.com

And

PAUL A. DEBOLT
Venable LLP
600 Massachusetts Avenue, NW
Washington, D.C. 20001
Telephone:  (202) 344-4000
Email: PADebolt@Venable.com

***Attorneys for Taylor Energy Company LLC,
Plaintiff***

{N4388626.2}

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ...................................................................................................1

LAW AND ARGUMENT ......................................................................................3

I.      THE NPFC'S INTERPRETATION OF OPA WAS NOT IN ACCORDANCE WITH THE LAW. ...............................................................................................3

        A.      The NPFC Improperly Applied an Overly Deferential Standard of Review Which is Not Applicable. ...............................................................3

        B.      The NPFC Failed to Apply the Unambiguous Language of the "act of God" Definition in OPA. .......................................................................8

        C.      The NPFC Failed to Apply the Preponderance of Evidence Standard, and Instead Crafted a Statutory Purpose to Support its Overly-Restrictive Interpretation of an "act of God" Under OPA. ...........14

        D.      The Case Law Relied Upon by the NPFC is Clearly Distinguishable. ...................................................................................................................15

II.     THE NPFC'S METHODOLOGIES, FINDINGS AND CONCLUSION IN CONNECTION WITH ITS PURPORTED APPLICATION OF THE ACT OF GOD DEFINITION AND ADJUDICATION OF TAYLOR ENERGY'S CLAIM WAS ARBITRARY AND CAPRICIOUS. ......................................................17

        A.      The "Four General Conclusions" of the NPFC's Experts were Arbitrary and Capricious...........................................................................18

               1.      A "Hurricane" or "Storm" is Not the "Act" that Taylor Energy Contends Constitutes an Act of God.. .................................18

               2.      The NPFC's Selection of a Recurrence Interval based on Post-Ivan Models and Failure to Address Inconsistent Evidence Were Arbitrary and Capricious........................................21

               3.      The Alleged "Flaws" Identified by the NPFC's Experts are Based on a Lack of Information, a Fundamental Misunderstanding of How the 100-Year Design Strom Wave was Calculated and Are Simply Incorrect.............................23

4.    The NPFC Erroneously Concluded that Dr. Suhayda's
Report and Woodward-Clyde's Design Failed to Take
into Account Camille............................................................................27

B.      The NPFC's Position that Taylor Energy Should Be Judicially
Estopped from Arguing that the NPFC Erred by Treating the Failure
Mechanism as a Traditional Mudslide Lacks Merit. ...............................29

C.      The NPFC's Conclusion that Taylor Energy's Failure to Conduct
Seafloor Surveys "Could Have Contributed" to the Platform's
Destruction was Arbitrary and Capricious, an Abuse of Discretion
and Otherwise Not in Accordance with the Law. .....................................35

D.      The NPFC Erred By Relying Upon Post-Ivan Wave Models and
Statistics. .................................................................................................42

CONCLUSION....................................................................................................................44

Plaintiff, Taylor Energy Company LLC ("Taylor Energy"), respectfully submits this combined Reply in support of its Motion for Summary Judgment ("Motion") and Opposition to the Cross Motion for Summary Judgment ("Cross Motion") filed on behalf of the United States Coast Guard National Pollution Funds Center ("NPFC"). For the reasons discussed in Taylor Energy's Motion and herein, the administrative record and the applicable legal principles fully support the granting of Taylor Energy's Motion and the denial of the NPFC's Cross Motion. This Court should therefore vacate and set aside the final agency action of the NPFC, hold that Taylor Energy is entitled to the protections and remedies afforded by the act of God statutory defense, and order that Taylor Energy's Claim be paid forthwith. Oral argument is respectfully requested pursuant to Local Rule 7(f).

## Introduction

This matter seeks judicial review under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, of the NPFC's denial of Taylor Energy's Claim invoking the act of God statutory defense to its liability under the Oil Pollution Act of 1990 ("OPA"), 33 U.S.C. § 2701 *et seq.*, for the costs of responding to an oil discharge in the Gulf of Mexico. In its Motion, Taylor Energy addressed the extensive record evidence provided to the NPFC to support its claim for reimbursement, and addressed the various, independent reasons that the NPFC's denial was arbitrary and capricious, an abuse of discretion and otherwise not in accordance with the law.

Specifically, under the applicable legal standards for this Court's review, the NPFC's denial of Taylor Energy's Claim must be set aside because the NPFC's decision:

(1) improperly applied a *heightened* standard expressly contrary to the plain language of the definition of "act of God" prescribed by Congress in the OPA; and

(2) applied methodology and reached findings and conclusions that were arbitrary, capricious, an abuse of discretion and otherwise not in accordance with the law for various distinct

and independent reasons, including, but not limited to, the NPFC's (i) re-casting and/or misconstruing of what the actual "act of God" event and failure mechanism were; (ii) cherry-picking of information, data and expert findings, and ignoring relevant evidence in the administrative record; and (iii) *retroactive* application of a standard and data points that were not known at the relevant times (*i.e.,* in 1983 or at the time of the Incident), and that were actually informed by Hurricane Ivan's amazing wave statistics. In short, Taylor Energy methodically set forth the various, independent errors of the NPFC and why, based on the administrative record, it is entitled to reimbursement of the uncompensated removal costs it has incurred under the clear language of the OPA. *See* ECF 69-2.

In its combined Opposition and Cross Motion ("Opposition/Cross Motion"), the NPFC continues its practice of re-framing the issues and overstating the deference to be afforded to the NPFC. Most notably, the NPFC continues to analyze the "act" as a hurricane or storm, and to re-cast the failure mechanism as a "mudslide," as opposed to a massive progressive seafloor failure approximately ***100 feet below*** the mudline. Its application of law and reasoning to these distinct natural phenomena was arbitrary and capricious. And to suggest now that Taylor Energy is judicially estopped from distinguishing between a mudslide and the seafloor failure is simply disingenuous. The NPFC is manipulating the terminology while ignoring the reality of the geological event. This is improper.

Additionally, despite acknowledging that the statute is *unambiguous*, the NPFC fails to apply the plain meaning of the elements of an "act of God" as expressly defined by OPA, and instead attempts to justify an overly-restrictive interpretation (of its own creation) through the piecing together of purported legislative history and on the basis that an act of God defense has never been recognized. And, in doing so, the NPFC improperly urges that its interpretation should

be afforded *Chevron* deference or alternatively *Skidmore* deference. There is no doubt that the act of God exception to strict liability in OPA is narrow; Taylor Energy does not dispute that. However, the application and interpretation adopted by the NPFC is overly restrictive and in direct conflict with the plain meaning of the words expressly selected to define an "act of God". The NPFC does not even address the plain meaning of those words. The defense is specifically included in the statute and thus must have some degree of viability in the appropriate circumstance. This is that circumstance.

Furthermore, the NPFC attempts to justify its denial of Taylor Energy's Claim by citing to alleged errors on behalf of Dr. Suhayda back in 1982-1983 based on the opinions of its experts. But it still fails to articulate why it categorically rejects the expert opinions of Taylor Energy's experts in favor of its own. This was improper under the preponderance of evidence standard that should have been applied by the NPFC when adjudicating Taylor Energy's Claim, and is improper now. Indeed, in many cases, the explanations provided in the Opposition/Cross Motion are simply incorrect.

To borrow the NPFC's own language, this was a "textbook case" act of God as defined by OPA. 33 U.S.C. § 2701(1). The NPFC's conclusion to the contrary was erroneous. It was clearly a grave natural disaster or a natural phenomenon that was "of an exceptional, inevitable and irresistible character, the effects of which could not have been prevented or avoided by the exercise of due care or foresight" within the plain meaning of those terms.

## Law and Argument

**I.    The NPFC's Interpretation of OPA was Not in Accordance with the Law.**

    **A.    The NPFC Improperly Applied an Overly Deferential Standard of Review Which is Not Applicable.**

The issue presented here is a question of law: Whether the extraordinarily powerful waves generated by Ivan causing a massive progressive seafloor failure upslope of the MC20A Platform

that migrated downslope to the site of the MC20A Platform destroying the platform's foundation deep beneath the seafloor constitutes an "act of God," as expressly defined by Congress. That is, whether the massive progressive seafloor failure was, as a matter of statutory law, an "unanticipated grave natural disaster or other natural phenomenon of an exceptional, inevitable, and irresistible character, the effects of which could not have been prevented or avoided by the exercise of due care or foresight." 33 U.S. C. § 2701(1).

Under the *Chevron* analysis, a court first asks "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.,* 467 U.S. 837, 842-44 (1984). If the court finds that "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843. Because Congress has defined what an "act of God" is in *unambiguous* terms, its intent is clear, and the Court, as well as the NPFC, must give effect to the unambiguously expressed intent of Congress. *Id*. at 842-43. Where the statute is unambiguous, as here, *no* deference to the agency's interpretation is owed. In *Kisor v. Wilkie*, 139 S.Ct. 2400 (2019), the Supreme Court addressing agency interpretation of its own ambiguous rules, made plain that "the possibility of deference can arise only if a regulation is genuinely ambiguous." *Id.* at 2414. If uncertainty does not exist, there is no plausible reason for deference. The regulation [or statute] just means what it means, and the court must give it effect, as the court would any law. *Id.* at 2415. If the regulation, or in this case, statute, is unambiguous "a court has no business deferring to any other reading, no matter how much the agency insists it would make more sense." *Id.*

The NPFC proclaims that "there is no ambiguity" in the OPA "act of God" definition (ECF 70 at 19) and Taylor Energy agrees.[1] Given that both parties concede that the statute contains no ambiguities and that the plain language controls their application, the NPFC is asserting—incorrectly—deference in a situation where it admits the resolution is step one of *Chevron* review and not entitled to deference. Indeed, the NPFC's claim of deference directly contradicts both its own position that the plain language of the statute controls and the Supreme Court's admonition:

> The judiciary is the final authority on issues of statutory construction and must reject administrative constructions, which are contrary to clear congressional intent. If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect.

*Chevron,* 467 U.S. at 843, n. 9.

Despite the undisputed fact that *no* deference is owed when an unambiguous statute is at issue, the NPFC tells this Court that *Chevron* deference is owed "because OPA authorizes the NPFC to make rules, regulations and decisions in administering OPA, and the NPFC's statutory interpretation arose out of that delegation." ECF 70 at 21. Notably, the NPFC does not identify any rule, regulation, or decision that it is interpreting and, in fact, the NPFC has never adopted any regulations interpreting the "act of God" defense. Nevertheless, it cites *Gonzales v. Oregon*, 546 U.S. 243 (2006) and *Fox v. Clinton*, 684 F.3d 67, 83 (D.C. Cir. 2012), as supporting its entitlement to *Chevron* deference. Neither support the NPFC's erroneous position.

In *Gonzales*, the Supreme Court held that the Attorney General's interpretation of the Controlled Substances Act to declare illegitimate a medical standard for care and treatment of patients that was specifically authorized under state law was entitled to *no* deference. As in this

---

[1] The NPFC never found in its Claim Determination or Reconsideration Denial that the act of God definition was ambiguous. *See* ECF 69-2 at 23.

case, the question presented in *Gonzales* was not the meaning of a regulation but the meaning of the statute. *Id.* at 257. In *Fox*, the Court held it owed no deference to the agency's interpretation of its own regulations covering applications for a Certificate of Loss of Nationality because there were no agency regulations at issue. "This case involves nothing more than the agency's interpretation and application of the [Immigration and Nationality Act] in an informal adjudication." *Id.* at 76. Similarly, here, the sole issue is the meaning of the congressionally defined "act of God" statutory exception to liability under OPA.

The NPFC then suggests that the fact that it made its interpretation through informal adjudication does not preclude *Chevron* deference. ECF 70, p. 21 (*citing Barnhart v. Walton*, 535 U.S. 212 (2002)). While that may well be true **where an ambiguous statute is involved**, no deference is required where the statute is unambiguous. *Kisor,* 139 S. Ct. 2414 ("the possibility of deference can arise only if a regulation is genuinely ambiguous.").[2]

Disregarding the fact that *Barnhart* involved an ambiguous statute, making it inapplicable here, the NPFC suggests that this Court should nevertheless apply the *Barnhart* factors and abdicate its duty on review to determine the applicability of the "act of God" defense by deferring

---

[2] In footnote 9 (ECF 70 at 21), the NPFC cites irrelevant cases where *Chevron* deference was granted to the agency's statutory interpretation arising from informal adjudications **because the statutes did not address the precise question at issue, making them ambiguous.** *Menkes v. U.S.Dep't of Homeland Sec.*, 637 F. 3d 319, 330 (D.C. Cir. 2011) (statute did not address precise question at issue); *Mylan Labs., Inc. v. Thompson*, 389 F.3d 1272, 1280 (D.C. Cir. 2004) (involved ambiguous statutory provisions); *Buffalo Marine Servs. Inc. v. United States,* 663 F.3d 750, 754 (5th Cir. 2011) (Congress has not defined "contractual relationship" in OPA); *Gatlin Oil Co. v. United States*, 169 F.3d 207, 210 ("The controversy is fueled by an ambiguity that exists within the Act . . . ."); *Am. Steamship Owners Mut. Prot. & Indem. Ass'n, Inc. v. United States,* 489 F. Supp. 3d 106, 132 (E.D. N.Y. 2020) (finding ambiguity). Here, because Congress defined "act of God" in precise, unambiguous terms (to which the NPFC agrees), *no* deference is owed to the NPFC's interpretation during an informal adjudication.

to the NPFC's interpretation that there is no legitimate act of God defense under OPA because the burden is so high. This is simply incorrect as a matter of law.[3]

Finally, seemingly recognizing that *Chevron* deference does not apply, as an alternative, the NPFC then suggests that its determination deserves respect to the extent it has the power to persuade. ECF 70 at 22 (citing *Skidmore v. Swift & Co*. 323 U.S. 124, 140 (1944)). The NPFC's interpretation of the act of God defense is that it should never be an exception to strict liability under OPA because "no claimant raising an act of God defense under the three environmental statutes has *ever* been successful." ECF 70 at 24. But the fact that no claimant has ever been successful, and that the bar is high, does not mean that an act of God defense will never be

---

[3] Although the B*arnhart* factors, discussed in the Opposition/Cross Motion at 21-22, are not applicable, out of an abundance of caution, Taylor Energy addresses them and shows why no deference is owed regardless. As to the initial factor—"the interstitial nature of the legal question," *Barnhart,* 535 U.S. at 222, the Court can decide the legal questions of how to construe exceptions to liability and the application of the elements of the "act of God" defense to the facts. The NPFC does not, and cannot, explain why it is better suited than this Court to apply an unambiguous statute. As to the second factor—"the related expertise of the Agency," *id.*, the NPFC also fails to explain what expertise it has in determining whether a given natural geological phenomena constitutes an "act of God." Indeed, it is quite apparent that the NPFC did not believe it had the requisite ability or expertise as evidenced by its retention of multiple experts. In all other "act of God" cases decided under the three environmental statutes, no expert evidence was required to make the determination of whether the elements of the statute were met because application of the plain words of the statute make that determination evident. Nevertheless, the NPFC tasked its experts with making a determination of whether Taylor Energy should have anticipated a seafloor failure. As to the third factor—"the importance of the question to administration of the statute," *id.*, the NPFC suggests that "determining how to construe the defenses and whether common law applies are of great importance to the administration of the statute." ECF 70 at 22. To the contrary, the "act of God" defense is construed by applying the clear and unambiguous terms of the statute. As to the fourth factor—"complexity of administration," *id.*, while determining what the actual event giving rise to the "act of God" defense may involve technical analysis, the NPFC admittedly lacks technical expertise as evidenced by its reliance on experts. It is in no better position than the Court to apply the unambiguous terms of the statutory defense to the facts. As to the final factor—"the careful consideration the Agency has given the question over a long period of time," *id.*, the NPFC's sole reliance on *Apex Oil Co. v. United States*, 2001 WL 34784466 (E.D. La. 2001), does not somehow supplant the plain meaning of the unambiguous statute. While it is apparent that the NPFC's position is that there has never been and should never be a viable "act of God" limitation to liability, Congress established the opposite by its placement in OPA. No deference is owed.

successful. The NPFC's position would effectively "amend" OPA to delete an express statutory defense. In enacting the OPA, Congress recognized that acts of God do occur, and under some circumstances, unanticipated natural phenomena will be exceptional, inevitable and irresistible in character, the effects of which could not have been prevented or avoided by the exercise of due care or foresight. Strict liability under OPA is limited by a viable "act of God" defense. Here, the wave conditions that resulted in the massive progressive seafloor failure were clearly an "unanticipated grave natural disaster or other natural phenomenon of an exceptional, inevitable and irresistible character" within the plan meaning of those words and the "act of God" definition expressly set forth in OPA. Applying the clear unambiguous statutory text, Taylor Energy proved an act of God. *Skidmore* deference has no place here.

### B.    The NPFC Failed to Apply the Unambiguous Language of the "act of God" Definition in OPA.

The NPFC devotes many pages of its Opposition/Cross Motion to its red-herring assertion that the common law definition of act of God does not apply. However, nowhere in its Complaint or Motion does Taylor Energy contend that the common law definition of "act of God" applies.[4]

---

[4] The NPFC misconstrues Taylor Energy's argument in its Claim where it discussed the relevance of common law cases when adjudicating an act of God claim under OPA. OPA expressly defines an "act of God" setting forth several specific elements (*e.g.,* "irresistible", "inevitable", and "unanticipated"), – and Taylor Energy has never disputed that it had to prove that the force that toppled the platform must meet the statutory definition of an act of God. But common law cases that interpret these individual elements are of value. Indeed "[Taylor Energy] acknowledges that some common law decisions have found that natural phenomenon constituted acts of God that would not qualify as such under OPA's definition of that term." CGAOGAR_0000070. But, many common law and maritime law decisions have considered one or more of the elements set forth in OPA's "act of God" definition and/or have otherwise considered applicable industry standards.

As discussed in its Claim, courts have held that when Congress uses common law terms in a statute, the statute must be construed with the presumption of retaining the meaning of those common law terms, unless the statute specifies otherwise. CGAOGAR_0002375 (citations omitted). As noted, Congress' definition of an act of God comes straight out of common law cases. It did not create any new elements. While it is correct that Congress required that a claimant establish that all of the elements are satisfied in a particular case, that doesn't somehow change the meaning of those elements, or make them harder to establish. Thus, a common law case

Rather, Taylor Energy has always maintained that "act of God" is expressly defined in OPA, and "The NPFC Erred as a Matter of Law When it Failed to Apply the Unambiguous Language of the 'act of God' Definition in OPA." ECF 69-2 at 22. Simply stated, the NPFC ignored the plain language of the definition, and instead used legislative history to justify its own construction of the definition that is overly restrictive and inconsistent with the plain meaning of the statutory elements.

There is no dispute that an "act of God" is defined in OPA to mean "an unanticipated, grave natural disaster or other natural phenomenon of an exceptional, inevitable and irresistible character, the effects of which could not have been prevented or avoided by the exercise of due care or foresight." 33 U.S.C. § 2701(1). The law is clear that the plain meaning of the words in the text of a statute constitute the proper starting point for interpreting the statute. *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438 (1999). Notwithstanding, the NPFC ignored the plain meaning of

---

addressing whether hurricane waves in the Gulf of Mexico were "unanticipated" should be persuasive authority when examining whether those very same waves meet the "unanticipated" element in an OPA act of God claim. For instance, the court in *Pioneer Natural Resources v. Diamond Offshore Co.*, found that Hurricane Ivan generated waves that exceeded the 100 year storm conditions, and the court specifically found that the owners of the rig "could not have foreseen that it [Ivan] would generate the aforesaid extreme conditions." 638 F. Supp. 2d 665, 672 (E.D. La. 2009); *see also* ECF 70 at 18 ("The NPFC explained that the first element – whether the incident was 'unanticipated' – was akin to foreseeability.") (citing CGAOGAR_0002212). Relatedly, the NPFC's contention that the API standards have no role here is arbitrary and capricious, as discussed *infra. Pioneer Natural Resources.*, 638 F. Supp. 2d at 677-678 (relying on API standards for the design of rig mooring systems to determine whether the rig's owner had taken reasonable precautions to guard against the effects of the storm).

The notion that the NPFC can disregard all common law act of God cases because OPA and CERCLA somehow created new definitions for each of the elements of the act of God definition finds no support in OPA or CERCLA. The NPFC's argument is primarily based on *dicta* in the *Apex Oil* case, in which the Court said that the OPA definition of act of God is "much more limited in scope than the common law definition." In addition to being *dicta*, that passage is not helpful in that it fails to provide a working definition of what constitutes an act of God. Other than requiring that each of the elements of the definition of act of God be met, how is the definition of act of God different under OPA than under the common law? If Congress intended to create new definitions for these elements, it surely would have defined them in CERCLA and OPA. It did not.

the terms in both its adjudication of Taylor Energy's Claim and in its Opposition/Cross Motion. *See* CGAOGAR_0000065 (setting forth the definitions of "grave", "irresistible", "inevitable", and "unanticipated"); ECF 69-2 at 24 (same). Rather than applying (much less even addressing) the plain meaning of these terms, the NPFC "improperly applied a heightened standard expressly contrary to the plain language of the definition of 'act of God' prescribed by Congress in OPA." *See* ECF 69-2 at 23-34. The NPFC mis-applies *Apex Oil*, then just reverts to purported legislative history that it pieces together in an effort to support its overly restrictive (or "singularly limited") definition or interpretation of its own creation. This is what Taylor Energy contends is error. Taylor Energy does not contend that it is improper to look to legislative history, *per se*, but that it is improper to cherry-pick or use selective portions of legislative history to suggest that Taylor Energy had a *heightened* burden of proof.

The 1970 Congressional Report prior to the CWA relied upon by the NPFC in connection with what it classifies as the "first element – whether the incident was 'unanticipated,'" merely recognizes that "grave natural disasters which could not be anticipated in design, location, or operation of the facility or vessel by reason of historic, geographic, or climatic circumstances or phenomena would be outside the scope of the owner's or operator's responsibility." ECF 70 (citing AR 2213) (additional citation omitted). Indeed, if the amazing waves and resultant massive progressive seafloor failure approximately 100 feet below the seafloor were foreseeable by anyone - MMS, numerous experts, Sohio, BP, or Taylor Energy - the MC20A Platform would have never been constructed in the first place. When one considers that actual "act", this is a "textbook case" that "would be outside the scope of the owner's or operator's responsibility." *See id*. The NPFC's reliance on this purported legislative history only reinforces the fact that, while it may not be a

hurricane or storm in the most general sense, there are disasters that "would be outside the scope of the owner's or operator's responsibility." *Id.* This is such a disaster.

The NPFC then conflates its interpretation of what it classifies as "the third element – 'exceptional, inevitable and irresistible character, the effects of which could not have been prevented or avoided by the exercise of due care or foresight'" and the second element – grave natural disaster or other natural phenomenon, and relies upon the legislative history from an act of God provision in CERCLA as bearing on "this element." ECF 70 at 19. However, the House Report relied upon merely provides that "a major hurricane may be [a common law[5]] 'act of God,' but in an area (and at a time) where a hurricane should not be unexpected, it would not qualify as a 'phenomenon of exceptional character.'" *Id.* (citing AR 3308) (additional citation omitted).[6] This coupled with "claimants' uniform failure to successfully invoke the defense"[7] (ECF 70 at 19), is

---

[5] The NPFC inserted the "common law" reference. The House Committee was not saying that hurricanes or other natural disasters are not "acts of God," but rather made clear that to assert a viable defense to liability under OPA, the "Responsible Party" has to prove more: that the natural disaster ("act of God") was unanticipated, grave, and of an exceptional, inevitable and irresistible character, the effects of which could not have been prevented or avoided by the exercise of due care or foresight. 33 U.S. C. § 2701(1).

[6] Furthermore, this principal cannot be translated over to the context of the massive progressive seafloor failure because such a deep subsurface seafloor failure was never expected, unlike hurricanes in the Gulf of Mexico during hurricane season.

[7] Surely, the intent of the statute is not that there can ***never*** be an event that qualifies as an "act of God." Otherwise, the statutory defense would not exist. The statute on its face provides that "[a] responsible party **is not liable . . . if** the responsible party establishes, by a preponderance of the evidence, that the discharge . . . and the resulting damages or removal costs were **caused solely by . . . act of God.**" 33 U.S.C. 2703(a)(1) (emphasis added). Statutes are to be read to give effect to their clear meaning. *Star Athletica, LLC. v. Varsity Brands, Inc.,* 137 S.Ct. 1002, 1010 (2017) ("The controlling principle in this case is the basic and unexceptional rule that courts must give effect to the clear meaning of statutes as written.") (internal quotations omitted). Indeed the statute would not have created the express exception if there was ***no*** intent for it to ever apply, no matter what. Stated differently, a heavy burden requiring that all elements of the definition be satisfied does not mean that it is an impossible for an event to ever be an "act of God." The situation presented here is that situation.

what the NPFC argues justifies its overly restrictive interpretation. But none of the cited legislative history provides guidance as to the interpretation of the plain words of the statutory definition, which the NPFC ignores in favor of an interpretation of its own crafting.

Additionally, in piecing together purported legislative history to support its overly restrictive interpretation, the NPFC relies on the wrong "act." *See* ECF 70 at 18 ("The NPFC observed that the legislative history of analogous provisions in CERCLA and the CWA – which both include an 'unanticipated' prong – indicate that if a ***storm*** was foreseeable, predicted or not unusual at the time and place it occurred, the defense should not apply.") (citing AR 2213) (emphasis added); *id.* at 19 ("a major ***hurricane*** may be [a common law] 'act of God,' but in an area (and at a time) where a ***hurricane*** should not be unexpected, it would not qualify as a 'phenomenon of exceptional character.'") (emphasis added) (citations omitted). Again, Taylor Energy has never contended that a "hurricane" or "storm" was the "act." Taylor Energy has repeatedly acknowledged "that the occurrence of hurricanes in the Gulf of Mexico 'is not an unusual occurrence' and 'is not an unanticipated event.'" ECF 69-2 at 35-36 (citing CGAOGAR_0000074, CGAOGAR_0000082, and CGAOGAR_0002327); *see also id.* at 35-37. Instead, it is the unprecedented *waves* (the combination of the height of the waves and the long periods) that generated extreme downward pressures on seafloor sediments in over 400 feet of water resulting in a massive seafloor failure approximately 100 feet *below* the seafloor that toppled the MC20A Platform. *See id.* at 37-38. This is the "act" justifying application of the OPA defense.

The NPFC instead applied an overly restrictive definition of its own creation and impermissibly inserted additional elements into the statutory definition of "act of God." The NPFC tries to explain its reliance on the term "unprecedented" by claiming that it was only in response to Taylor Energy's arguments. *See* ECF 70 at 24. But, the NPFC just recycles the same explanation

in its Opposition/Cross Motion as earlier set forth in its Reconsideration Denial. Such explanation is simply not accurate. The NPFC stated that the event must not only be *"unprecedented,"* but it must be more than "unprecedented." *See e.g.,* CGAOGAR_0002209 ("[T]he weather event must not simply be...unprecedented...."). While there is no question that this event was unprecedented, it is not proper to read that requirement in as a statutory element of an "act of God."

In applying the plain meaning of the statute, the fact that the act of God defense has never been successful has no bearing on the unambiguous definition of "act of God" as defined in OPA. Hence, to read in the notion that the act or event must be "***one of the most grave***, exceptional, inevitable and irresistible [natural phenomena] ***of all time***" CGAOGAR_0002212 (emphasis added); *see also* CGAOGAR_0002189, is also improper. Finally, whether the NPFC itself or the experts upon which it relied (and quoted) used the term "freak conditions" to explain why the waves were not "an unexpected event" is a distinction without a difference. The plain meaning of "unanticipated" does not require that something present "freak conditions." Notwithstanding, the waves were truly exceptional and unanticipated.[8] The statutory "act of God" defense only requires that Taylor Energy prove that the natural phenomenon—the waves and associated massive progressive seafloor failure—met each element of the statutory definition of an "act of God" (without additional terms or qualifiers) by a preponderance of the evidence. It satisfied that burden.

---

[8] Indeed, no waves of the height or period of those generated by Ivan had ever been measured previously. Furthermore, even with the most experienced experts in their respective fields conducting numerous studies, waves and resultant bottom pressures *nowhere near* those generated during Ivan were predicted or anticipated. *See* CGAOGAR_0005392-5402. And, even after the fact, no expert could re-create waves of such magnitude without inputting Ivan's unique meteorological data into their models, and even those models did not accurately predict the worst of Ivan's waves. *See* CGAOGAR_0000076-77 (citing CGAOGAR_0000368-370).

**C.**     **The NPFC Failed to Apply the Preponderance of Evidence Standard, and Instead Crafted a Statutory Purpose to Support its Overly-Restrictive Interpretation of an "act of God" Under OPA.**

The NPFC also argues that because OPA is a strict liability environmental statute, the purpose of the statute (internalizing the costs of oil spill responses within the oil industry) would best be served by interpreting the act of God defense strictly, *i.e.,* applying a heightened standard. The NPFC erred in rewriting the statutory definition. The United States Supreme Court has squarely rejected application of a heightened standard where the statute does not so provide. *Halo Elecs., Inc. v. Pulse Elec. Inc.,* 136 S.Ct. 1923, 1927 (2016) (decision vacated because heightened standard of review was applied instead of preponderance of the evidence); *Octane Fitness, LLC v. Icon Health Fitness, Inc.*, 572 U.S. 545, 558-59 (2014) (a clear and convincing standard for awards of attorney's fees was rejected because the statute supplied no basis for a heightened standard). In OPA, Congress specified that a Responsible Party must establish its entitlement to an affirmative defense "by a preponderance of the evidence." 33 USC 2703(a). If Congress had meant to establish a higher standard of proof, it would have specified one such as the "clear and convincing evidence" standard. It did not do that, and it defined an act of God using elements with plain meanings commonly addressed in the jurisprudence. The NPFC erred by rewriting the statutory evidentiary standard.

Where a party with the burden of proof, like Taylor Energy, comes forward with a prima facie and substantial case, that party should prevail, unless the evidence is discredited or rebutted. *See Steadman v. SEC*, 450 U.S. 91, 101, (1981). "In the simplest of terms, preponderance of the evidence means more likely than not[.]" *La Botz v. Fed. Election Comm'n*, 889 F. Supp. 2d 51, 59 (D.D.C. 2012). The standard "demands only 51% certainty." *Nat'l Lime Ass'n v. Environmental Protection Agency,* 627 F.2d 416, 453 n.139 (D.C. Cir. 1980). The NPFC does not articulate why Taylor's evidence does not meet that 51%.

While the NPFC says that it applied OPA's definition of act of God in adjudicating Taylor Energy's Claim, it devoted several pages of the Claim Determination to explaining why the definition is much harder to meet under OPA, and "singularly limited." *See* ECF 70 at 6-10, 17-19. When rejecting Taylor Energy's position for why Ivan's waves were unanticipated, exceptional, inevitable and irresistible, it did not mention or even attempt to apply the preponderance of the evidence standard. It also did not discuss the conflicting evidence and explain why, based on the preponderance of the evidence, Taylor Energy had failed to meet its burden. Whenever its experts' opinions differed from the opinions of Taylor Energy's experts, the NPFC adopted its experts' opinions, with no discussion as to why those opinions were correct and the opinions of Taylor Energy's experts were wrong. Nor did it address why it ignored certain evidence presented by Taylor Energy or its experts. As a result, based upon the evidence in the administrative record, it is clear that the NPFC applied an improper heightened standard. It asks this Court to adopt its decision, rational or not, just because it has chosen to credit its own experts over Taylor Energy's experts. But, as addressed below, many of its experts opinions were simply incorrect.

### D. The Case Law Relied Upon by the NPFC is Clearly Distinguishable.

In its Motion, Taylor Energy specifically discussed each of the cases relied upon by the NPFC (*see* ECF 69-2 at 27-34). In its Opposition/Cross Motion, the NPFC fails to address the important distinctions raised by Taylor Energy, rendering those cases inapposite. There can be no question that the facts of those cases are clearly distinguishable from the MC20 Incident. And, that is particularly the case when analyzing the MC20 Incident based on the actual "act" and failure mechanism (*i.e.,* the waves and resulting massive progressive seafloor failure) as opposed to the NPFC's mischaracterization of the act as a "storm" or "hurricane" or "mudslide."

Despite the NPFC's conclusory position that "*Apex Oil* is directly on point" (ECF 70 at 28), it simply is not. In *Apex Oil*, the court found that "a swift unpredictable current on the Mississippi River at or about the time of heavy rains which caused the Mississippi River to rise to flood stage can not constitute an act of God within the meaning of the OPA." *Apex Oil v. United States*, 208 F. Supp. 2d 642, 657 (E.D. La. 2002). The court attributed the most apparent cause of the oil release to the "underpowered Apex tug" and the tug captain's choice to negotiate the bridge with this tug in spite of the intensifying current. *Id.* Therefore, the court concluded that the act of God was not the sole cause of the oil spill. *Id.* at 658.

Here, in contrast, a truly extraordinary natural phenomenon occurred that was unanticipated and inevitable and was the sole cause of the discharge. It was not just a storm or hurricane in an area that was prone to storms or hurricanes, or even a mudslide in an area where there was a historical known chance of mudflow.[9] Rather, here, the waves were unrivaled in combined height and period (as recognized by all experts), exerting such extraordinary pressure on the seafloor bottom hundreds of feet down (in over 400 feet of water) so as to trigger a massive progressive seafloor failure approximately 100 feet below the seafloor commencing upslope and migrating down and across the platform site (as also recognized by all experts).[10] The facts in *Apex* and in the other cases relied upon by the NPFC in its Claim Determination and Reconsideration

---

[9] Woodward-Clyde determined that waves might cause sediments upslope of the platform site on the seafloor bottom (not 100 feet below) to fail and descend down across the platform site as a mud *overflow or overrun* event that would flow sediments *over* the seafloor at the platform site. *See* CGAOGAR_0005891. This is *not* what happened here. Woodward-Clyde determined that a maximum likely mudflow could be 35 feet thick and might drag an additional 10 feet of bottom sediments along with it as it proceeded downslope. CGAOGAR_0002320 (citing CGAOGAR_0003908; CGAOGAR_0005948-5949, CGAOGAR_0005954); *see also* ECF 69-2 at 10-11 (discussing the platform's design features including an over-strengthened steel frame platform jacket, as well as the detailed design review and approval process, and compliance with all applicable industry standards and government regulations).

[10] *See* ECF 69-2 at 38-42 and Section II.B., *infra*.

Denial are a far cry from the facts presented by Taylor Energy in the administrative record. When

the actual "act" and failure mechanism are considered and properly evaluated (*i.e.,* the waves and

resulting massive progressive seafloor failure), these cases have no bearing on the facts at hand.

Accordingly, the NPFC erred in relying upon them for its claim denial. It erred as a matter of law.

## II. The NPFC's Methodologies, Findings and Conclusion in Connection with its Purported Application of the Act of God Definition and Adjudication of Taylor Energy's Claim was Arbitrary and Capricious.

"Notably, 'an agency's refusal to consider evidence bearing on the issue before it

constitutes arbitrary agency action within the meaning of § 706,' as does ignoring 'evidence

contradicting its position.'" *Water Quality Ins. Syndicate v. United States*, 225 F. Supp. 3d 41, 63

(D.D.C. 2016) (quoting *Butte Cty., Cal. v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010)).

Furthermore, this Court cannot adequately discharge its duty to engage in a substantial inquiry by

just taking the agency's word that it "considered all relevant matters." *Asarco, Inc. v. EPA*, 616

F.2d 1153, 1160 (9th Cir. 1980); *see Huff v. Vilsack*, 195 F. Supp. 3d 343, 352 (D.D.C. 2016)

(noting that, even under the deferential standard of review, "courts retain a role, and an important

one, in ensuring that agencies have engaged in reasoned decisionmaking, which means the court

*must* ensure that the decision was based on a consideration of the relevant factors…." (internal

quotation marks, brackets, and citation omitted)). Courts must consider "whether the agency acted

within the scope of its legal authority, whether the agency has explained its decision, whether the

facts on which the agency purports to have relied have some basis in the record, and whether the

agency considered the relevant factors." *Fund for Animals v. Babbitt*, 903 F. Supp. 96, 105 (D.D.C.

1995) (citing *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378, 109 S. Ct. 1851, 104 L. Ed. 2d

377 (1989)). The NPFC's adjudication of Taylor Energy's Claim fails all of these standards.

"An agency's decisions may be said to be arbitrary and capricious if any one of the following apply: (i) its explanation runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference of view or the product of agency expertise; (ii) the agency entirely failed to consider an important aspect of the problem or issue; (iii) the agency relied on factors which Congress did not intended the agency to consider; or (iv) the decision otherwise constitutes an error of judgment. *Bean Dredging, LLC v. United States*, 773 F. Supp. 2d 63, 73 (D.D.C. 2011) (citing *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43). In its Motion, Taylor Energy addressed various distinct reasons that the NPFC's methodologies, findings and conclusions were arbitrary, capricious, an abuse of discretion and otherwise not in accordance with the law. Under the foregoing applicable standards, which are largely ignored in the NPFC's Opposition/Cross Motion, the NPFC's action is in error and should be vacated by the Court upon its APA review.

### A.    The "Four General Conclusions" of the NPFC's Experts were Arbitrary and Capricious.

The NPFC claims that its experts reached "four general conclusions that refuted Taylor Energy's contention that Ivan's waves were 'unprecedented' and could not have been anticipated" ECF 70 at 31. Each of these "conclusions" was either of no significance to whether the MC20 Incident constituted an "act of God" under OPA, ignored important evidence that was contrary to the conclusion reached by the experts, or was flatly incorrect.

#### 1.    A "Hurricane" or "Storm" is Not the "Act" that Taylor Energy Contends Constitutes an Act of God.

First, the NPFC's "experts concluded that a hurricane of Ivan's intensity is not rare within the Gulf of Mexico." ECF 70 at 31. As addressed in great length in Taylor Energy's Motion (*see* ECF 69-2 at 35-38) and above (*see* Section I.B.), the fact that Hurricane Ivan was not rare, is of no moment. Indeed, the hurricane or storm is not the "act" at issue. While the NPFC contends that

it did not err in considering Hurricane Ivan (ECF 70 at 35), it did to the extent that its adjudication of Taylor Energy's Claim analyzed the "act" as a hurricane or storm, as opposed to applying the unambiguous elements of an "act of God" statutory definition under OPA to the geological phenomenon that Taylor Energy actually contends was the "act of God." *See e.g.,* CGAOGAR_0002208 ("Congress believed that the majority of hurricanes should not fall within the domain of the statutory defense."); CGAOGAR_0002208-2209 (comparing the frequency of named storms in the Atlantic Ocean, Caribbean Sea and/or the Gulf of Mexico to the frequency of a flow rate in *Sabine Towing & Transp. Co.*, where the flow rate on the day of the incident was equaled or exceeded on twenty-five percent of all days that year and finding that "[s]imilarly, there were 87 days in 2018 where a named storm was in the Atlantic Ocean, Caribbean Sea and/or the Gulf of Mexico, which is roughly also one-quarter of the time."); CGAOGAR_0002212 ("The legislative history of both CERCLA and the CWA are clear that if the storm was foreseeable, predicted, or not unusual at the time and place it occurred, the defense should not apply"); CGAOGAR_0002213 (CERCLA's legislative history also addresses the idea of a hurricane being unanticipated...."); CGAOGAR_0002220 ("It is nearly inconceivable that a facility that deals with oil or hazardous substances in the region will succeed by arguing that it was unaware of the strong possibility of a tropical storm or a hurricane disrupting or disabling operations" (citation omitted)); *see generally* CGAOGAR_0002213-2214 (discussing the frequency of hurricanes in the Atlantic and Gulf Regions). All of this discussion misses the mark.

And, the NPFC's decision is based on this incorrect premise. CGAOGAR_0002212 ("Ivan . . . was nowhere near one of the most severe, grave nor exceptional hurricanes of all time."); CGAOGAR_0000016 ("Hurricane Ivan was not a rare event . . . ."); CGAOGAR_0000024 (stating that "[t]he Gulf of Mexico itself is highly conducive to the generation of major hurricanes" and

discussing the recurrence interval of storms); CGAOGAR_0000025 ("Taylor either was aware, or should have been aware, of the propensity for hurricanes within the Gulf of Mexico and the unstable sedimentation conditions within the Mississippi Canyon."); CGAOGAR_0000027 (extrapolating from the general premise that hurricanes in the Gulf of Mexico are not acts of God under OPA and stating that "at a minimum, there was a chain of causation from the hurricane itself, to winds, to waves, to a failure of the subseafloor"). This fundamental error renders the NPFC's reliance upon certain legislative history and jurisprudence (*e.g., Sabine Towing*, *Apex*, *Kyoei Kaiun Kaisha*, *M/V Santa Clara I*, and *Liberian Poplar Transports*), its reliance on certain expert findings, as well as its ultimate finding that Taylor Energy is not entitled to the "act of God" statutory defense, arbitrary and capricious.

The NPFC's self-proclaimed summary of "its factual findings and conclusions" that "Taylor Energy failed to prove by a preponderance of the evidence that the MC-20 oil discharge was caused solely by an act of God under OPA" highlights the fundamental flaws underlying its denial of Taylor Energy's Claim. Its "summary" stated:

> Hurricanes are common occurrences, especially in the Gulf of Mexico. In fact, there have been over 300 hurricane strikes in the Atlantic and Gulf coast regions since 1851. They are certainly not unanticipated. Hurricanes bring with them several known characteristics, including high winds, high waves, and high wave pressures. While the intensity may vary from storm to storm, it is unquestioned that these characteristics are attendant, in one way or another, with all hurricanes. There can be little doubt that Taylor was well-aware of the propensity and intensity of hurricanes in Gulf of Mexico.
>
> The unstable subsea conditions at MC-20 were also well-known. Research was clear far before Taylor assumed the lease that the submerged delta apron consisted of thick, very weak sediments that are inherently unstable and vulnerable to hurricane wave-induced failure and that even a small change in prevailing conditions, such as wave input, can trigger a mudflow. As a result, wave-induced bottom pressures accompanying large hurricanes can cause spectacular failures of the accumulated sediments. Yet despite this research Taylor made the decision to acquire the lease. It cannot later successfully claim that this instability was unanticipated.

ECF 70 at 34. Indeed, this entire "summary" is based on the improper predicate that the "act" was a hurricane (or a traditional mudslide as addressed separately in Taylor Energy's Motion and

herein). And, there can be no question that much of its reasoning related exclusively to "hurricanes" or "storms" generally, as opposed to the truly extraordinary natural phenomenon at issue here – the waves and resulting massive progressive seafloor failure.[11] Stated differently much of the NPFC's denial was based on the "act" being a hurricane or storm, and both the NPFC and its experts opined as to the elements under this improper predicate. Notably for the Court's review, the NPFC does not make similar findings relating to the waves or the resulting massive progressive seafloor failure which is what does constitute an "act of God."[12] Its action was arbitrary and capricious within the meaning of the APA.

### 2. The NPFC's Selection of a Recurrence Interval based on Post-Ivan Models and Failure to Address Inconsistent Evidence Were Arbitrary and Capricious.

Second, the NPFC's "experts estimated that the recurrence interval for the Hurricane Ivan-Induced waves was approximately 100 years." ECF 70 at 32. But, this finding by GZA was based on *post-Ivan* models that incorporate the wave parameters of Ivan, Katrina, and several other powerful hurricanes that have passed through the Gulf of Mexico since 2004. CGAOGAR_0020305-20622. Specifically, GZA claims that the height of the 100 year design wave used by Dr. Suhayda is significantly smaller than current 100 year wave parameters, after those parameters were updated in *2007*. *See* CGAOGAR_20484-20496. It therefore concludes that the design wave used by Dr. Suhayda was "significantly lower than the *updated*

---

[11] Specific examples are set forth in ECF 70 at 35-36 as well as herein.

[12] The unrefuted fact raised by Taylor Energy was that the wave height and period combinations during Ivan generated bottom pressures and a resulting seafloor failure that were unanticipated, exceptional, inevitable and irresistible. *See* CGAOGAR_0002276-2401; CGAOGAR_0005371-5372, 5413. Further, while the intensity of Ivan was not rare within the Gulf of Mexico, the wave bottom pressures produced by Ivan's waves were rare, *i.e.*, unprecedented and inconsistent with the magnitudes of the wave bottom pressures produced in the past by hurricanes with the same intensity as Ivan. CGAOGAR_5417-5418.

100 year wave statistics" implying that the original design is associated with a recurrence interval of less than 100 years. *Id.* (emphasis added). And, based on *post*-Ivan models and studies, it argues that Ivan's waves have a recurrence interval of around 100 years. Such "Monday morning quarterbacking" is arbitrary and capricious. *See* Section II.D., *infra* (addressing why reliance upon *new, recent* wave models and standards, which were informed by Hurricane Ivan itself was arbitrary and capricious, an abuse of discretion and otherwise not in accordance with the law).

This finding is inconsistent with Dr. Suhayda's estimate of the recurrence interval of 2,000 years. CGAORAR_0005417-5418. Moreover, several of the post-Ivan research papers also contained estimates of the return intervals for Ivan's waves that were longer than 100 years, contradicting GZA. *See* CGAOGAR_0005408 (citing Pachang and Lee estimate of a return interval of 10,000 years (CGAOGAR_0020856)), CGAOGAR_0005405 (citing Cooper estimate of 3,000 year return interval (CGAOG_AR0019887; CGAOGAR_0019890)); *see also* CGAOGAR_0005391 ("Ivan's waves far exceeded the characteristics of a 100-year wave."). So the return interval predicted by GZA, is much lower than the return intervals predicted by various other experts, even using post-Ivan data. However, with no real discussion, the NPFC simply adopted GZA's "after the fact" estimate as correct.[13]

Finally, it is important to note that there is a basic inconsistency between the recurrence interval of Ivan's characteristics; the central pressure had a return period of about 300 years, its

---

[13] This is also an example of the NPFC's cherry picking. Cooper states that the waves generated by Ivan had a return interval of 3,000 years (CGAOGAR_0019887; CGAOGAR_0019890), while Panchang and Lee estimated that Ivan's waves had return intervals exceeding 10,000 years (CGAOGAR_0020856). The NPFC relied on these authors' statements that their models could predict waves at other locations (not at MC20) with characteristics similar to Ivan after the fact, but dismissed their statements, based on the same models, that Ivan's waves had return intervals in the thousands of years, which is a completely separate issue (*e.g.,* cherry-picking only the statements that support the NPFC's denial, and disregarding the statements that support the Claim). *See* CGAOGAR_0000077.

peak winds had a return period of about 500 years, and the peak waves had a return period of about 3,000 years (Cooper 2005). CGAOGAR_0005405-5407. While the recurrence interval of the waves is of import here, these discrepancies demonstrate the exceptional and unpredictable characteristics of Ivan's waves. *Id.* And, the recurrence interval based on *post*-Ivan models does not alter the fact that Ivan's waves were the highest and longest period waves ever encountered in the Gulf of Mexico, or that the bottom pressures were completely unanticipated. Dr. Suhayda explained as follows:

> It must be stressed that these bottom pressures are truly unique and exceptional given the fact that the MC20 platform's foundation was 482 feet deep and that Ivan was not an exceptional hurricane in terms of its' meteorological characteristics. Again, it is generally accepted that: "In shallow water (less than 400 feet), large storm waves can cause significant increases and decreases in the pressure on the ocean floor … [however, when] the water depth **is greater than about 400 feet,** the change in pressure on the seafloor due to the wave at the water surface is **essentially inconsequential**." (Nodine et. al. (2007) (emphasis added)). "In water deeper than about 400 feet, bottom pressures **are so small that they have little influence on the ocean floor**." (Nodine et. al. (2007) (emphasis added)).

CGAOGAR_0005414. Thus, they were the most powerful waves ever experienced in the Gulf of Mexico, clearly meeting the statutory definition of exceptional since they were never experienced in the United States before or after Ivan. CGAOGAR_0000075.

### 3. The Alleged "Flaws" Identified by the NPFC's Experts are Based on a Lack of Information, a Fundamental Misunderstanding of How the 100-Year Design Storm Wave was Calculated, and Are Simply Incorrect.

Third, the NPFC states that its "experts concluded that Dr. Suhayda's 1983 analysis contained substantial flaws, and but for these flaws, the analysis could have forecast the Hurricane Ivan-induced conditions at the site." ECF 70 at 32. This misunderstands the work performed by Dr. Suhayda and Woodward-Clyde, and completely disregards the API Standard in effect ***at the time*** that the site specific 100-year storm wave was calculated for the MC20A Platform. *See* Section II. D., *infra*.

The NPFC's criticisms of Dr. Suhayda's 100-year design storm wave is misguided and inaccurate. *See* CGAOGAR_0000078 (citing CGAOGAR_0000358-526). The design storm wave provided by Dr. Suhayda to Sohio in 1983 was derived from the "wave of record" *at the time*. It was a wave measured during Hurricane Camille at a platform on South Pass 72. *Id.* (citing CGAOGAR_0000371-372; CGAOGAR_0000391). Thus, the criticism that Dr. Suhayda's 1983 design wave for MC20 did not take into account this "most dangerous" or "worst case" scenario is simply incorrect. In its Opposition/Cross Motion, the NPFC has abandoned this criticism (which was based on Pettigrew), likely recognizing that no such standard exists. *See* CGAOGAR_0000079 (citing CGAOGAR_0000363-364; CGAOGAR_0000400); CGAOGAR_0020283 (Pettigrew subsequently conceding that no such standard exists). It is just another example of the NPFC's arbitrary and capricious overly-restrictive application of the "act of God" defense.

The NPFC now claims that Dr. Suhayda's 100-year storm wave failed to accurately forecast the most extreme bottom pressures a site would experience. ECF 70 at 32. The NPFC then relies on GZA for the proposition that "[w]hile the combination selected by Dr. Suhayda might have been a good choice to compute extreme forces on the MC-20A *platform*, . . . longer periods should have been selected associated with smaller wave heights in order to find the maximum bottom pressure during a given storm segment." ECF 70 at 32 (quoting AR 17) (emphasis added).

The NPFC has a fundamental misunderstanding of the work performed by Dr. Suhayda. Contrary to the NPFC's criticism (*see* ECF 70 at 32), the administrative record clearly reflects that Dr. Suhayda's analysis did not rely "…on a single wave condition – a single wave with a single wave height and a single wave period." CGAOGAR_0005463. Rather, he provided several wave height, period and direction combinations for the platform design (CGAOGAR_0005462) and

several water depth and wave period combinations for the design wave bottom pressures for the foundation design (CGAOGAR_0005463).

More importantly, the NPFC did not understand that the 100 year design wave height was the focus of the API methodology and the focus of Dr. Suhayda's work. The objective of Dr. Suhayda's work was to determine the single 100 year maximum wave height at the MC20 Site and other *design* related qualities such as the associated wave periods, bottom pressures, currents, wave levels and wave forces. Dr. Suhayda developed a storm that produced the 100 year maximum wave height in deep water so that he could compute the 100 year design wave height at the MC20 Site. *See* CGAOGAR_0005381-5386. While Dr. Suhayda considered the various meteorological characteristics for purposes of the platform design, bottom pressure and slope stability issues were specifically addressed by Woodward-Clyde, independent of the platform design, for purposes of the foundation design.[14] *See* CGAOGAR_0005896-5897; CGAOGAR_0005947; *see also* CGAOGAR_0020529-20530 (GZA acknowledging that "[t]he 100-year recurrence interval wave-induced stress was modified slightly for the analysis of the mudnose by increasing the wavelength (i.e., wave period) and bottom pressure.") Though the NPFC chose not to disclose it to its experts (and likely itself did not understand the work performed in 1983), Dr. Suhayda never intended to address foundation design parameters.

---

[14] When the forces of a storm hit an area, the platform is designed for the maximum wave. Additionally, you need to know what is going to happen to the foundation. That is where Woodward-Clyde (Hooper) fits in. At bottom, the NPFC is confusing a 100-year storm design wave (*i.e.,* that apply to the platform design) with a soil design wave (*i.e.,* that apply to the foundation design). Dr. Suhayda recommended a design wave based upon oceanographic considerations for the combined structural design work and foundation design work. Identifying the maximum bottom pressure during the storm was not part of the scope of Dr. Suhayda's work. It was the job of the structural and geotechnical engineers to actually select the wave conditions they were going to use in their work. Notably, Woodward-Clyde considered additional wave conditions in its analysis. CGAOGAR_0005947.

As explained by Dr. Suhayda, using smaller wave heights (instead of the 100 year design wave height) with a long period wave would have resulted in *lower* wave forces and bottom pressures. This would have violated the industry standard practice, as specified by the API, *i.e.,* that the platform should be designed to withstand the 100 year maximum wave height. CGAOGAR_0005379; CGAOGAR_0000360. Using a smaller wave height would have resulted in *under estimating* the wave hydrodynamic forces on the platform and an unsafe design. Dr. Suhayda cannot be faulted for following the applicable API Standard.

Woodward-Clyde considered the effect of wave height and period combinations in its analysis of the slope stability in the area of the platform. CGAOGAR_0005947. Therefore, the NPFC's erroneous criticism of Dr. Suhayda's work can only be attributed to a fundamental misunderstanding of the work actually performed by Dr. Suhayda and/or the NPFC's failure to provide its experts with all relevant evidence.[15] Simply by way of example, if the SMEs had been provided with a copy of Jim Hooper's reports, they would have understood that Hooper performed geotechnical work that Pettigrew incorrectly attributed to Dr. Suhayda's scope of work and that Dr. Suhayda was accused of having not performed. CGAOGAR_0003873-4006.[16]

---

[15] While GZA was provided with Dr. Suhayda's February 5, 2018 report, it was not provided with his July 19, 2019 report (CGAOGAR_0000358-379). *See* CGAOGAR_0000006, n. 26. Nor was GZA provided either of the expert reports of Jim Hooper (CGAOGAR_0000164-174 and CGAOGAR_0003873-4006), which clearly explained the geotechnical work performed. *Id.* The NPFC's decision to selectively conceal relevant technical information from GZA was arbitrary and capricious.

[16] Relatedly, Taylor Energy is not seeking to impose any additional burden on the NPFC beyond that required at law. It fails to meet the basic requirements set forth herein. The NPFC's strained efforts to cast this issue as one where Taylor Energy is seeking to impose a procedural requirement that is beyond what is statutorily mandated misses the mark. *See* ECF 70 at 40-41. Notably, this is not an effort by Taylor Energy to "re-litigate" the issue addressed in its Motion to Strike. That was a distinct issue relating to the NPFC's manipulation of the Administrative Record by withholding the identity and opinions of the NPFC's experts until its Reconsideration Denial such that Taylor Energy was deprived of any right to address or otherwise respond to those reports.

Finally, the NPFC completely ignored GZA's conclusion that "[i]n our opinion, the design team was highly qualified and the exploration scope of work and analysis methods were consistent with the contemporary industry standards of practice." At bottom, the work performed by Dr. Suhayda and Woodward-Clyde, when properly understood and viewed as a whole, was not flawed.

### 4. The NPFC Erroneously Concluded that Dr. Suhayda's Report and Woodward-Clyde's Design Failed to Take into Account Camille.

Fourth, the NPFC's "experts opined that Dr. Suhayda's report and Woodward-Clyde's design of the MC-20 platform failed to take in to account Hurricane Camille." *See* ECF 70 at 33. That is simply incorrect as Camille's experience was extensively evaluated. *See* CGAOGAR_0000168 (discussing why "Pettigrew is mistaken to think that we [Dr. Suhayda and Woodward-Clyde] did not consider the failure of the seafloor at SP70 [during Camille] when . . . assessing the risk of such failure at MC20" and why "Pettigrew is also mistaken to comment that the conditions at the Shell Oil Company's platform sites in SP70 were not materially different than those at MC20."). This error is likely attributable to the NPFC's experts' lack of experience with platform projects in the Gulf of Mexico, and the NPFC's failure to send its experts Hooper's original report. *See* CGAOGAR_0020279 (Pettigrew "agree[ing]" that "I have not worked in the offshore industry in this capacity"); ECF 69-2 at 45-46 (including citations for this proposition). Hooper's original report went into great detail about the failure of the seafloor at SP70 during Camille, the resulting extensive research performed by industry and the government into the causes of the seafloor failure during Camille, the development of new methods and techniques for determining whether it was safe to install platforms in an area as a result of Camille, the moratorium on leasing in certain areas of the Gulf of Mexico until these issues were resolved, and the eventual adoption of new enhanced design standards for offshore structures as a result of all of that work evaluating lessons learned from Camille. *See* CGAOGAR_0003886-3902. Notably, Dr.

Suhayda and Hooper were among the many scientists and engineers who participated in that research. *See e.g.,* CGAOGAR_0003890; CGAOGAR_0005427-5457. It was only after that work was performed and factoring in Camille that the government agreed to lease offshore areas with potential geohazards. *See* CGAOGAR_0003902.

The USGS and industry reached agreement about how to evaluate offshore tracts to determine whether it was safe to install a platform there (*see* CGAOGAR_0003886-3902), and Sohio employed those methods to evaluate whether it was safe to install a platform at MC20. *See* CGAOGAR_0003902 (Hooper who led Woodward Clyde's project team stating "Woodward-Clyde Oceaneering used the methods and techniques developed post-Camille to assess the seafloor stability at MC20 and to provide design recommendations for the platform foundation."); CGAOGAR_0005420. Thus the statement that Sohio and its consultants failed to take hurricane Camille into account when assessing whether it was safe to install a platform at MC20 is just wrong. It reflects a staggering lack of understanding of (i) the history of the offshore industry in the Gulf; (ii) the reason that Sohio was required to assess the geohazards at MC20 before it would approve its plan to install a platform there; and (iii) the basis of the studies that Sohio's consultants performed there. All of this was done precisely because of lessons learned from Camille and the failure at SP70.

Based upon the Administrative Record, there is no question that Camille was considered in the design of the MC 20 platform in terms of defining the height of the 100 year design wave (CGAOGAR_0005382) and in the development of a methodology for assessing the effects of storm waves on bottom sediments (CGAOGAR_0005377). *See also e.g.,* CGAOGAR_0005921 (Woodward-Clyde). The NPFC's experts apparently didn't understand that Camille helped the oil industry define a critical oceanographic parameter related to assessing the impact of storms waves

on seafloor stability, the "soil design wave." This was a wave with the 100 year maximum wave height and associated wave periods for a particular platform site. *See* CGAOGAR_0005379.

Dr. Suhayda and Ward also reject the notion that Camille's wave wasn't incorporated in Dr. Suhayda's design wave by showing that Dr. Suhayda's design wave exceeded the largest waves measured during Camille. *See* CGAOGAR_0000371-372; CGAOGAR_0000391. Gilbert and Nodine also rebut this point by showing that the largest wave measured during Camille would not have caused the seafloor failure at MC20. CGAOGAR_0000186. Accordingly, the NPFC's assertion that Camille was not considered is just wrong.

Again, "[a]n agency's decisions may be said to be arbitrary and capricious ***if any one of the following apply***: (i) its explanation runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference of view or the product of agency expertise; (ii) the agency entirely failed to consider an important aspect of the problem or issue; (iii) the agency relied on factors which Congress did not intended the agency to consider; or (iv) the decision otherwise constitutes an error of judgment. *Bean Dredging, LLC*, 773 F. Supp. 2d at 73 (citing *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43) (emphasis added). In its Motion and herein, Taylor Energy has presented evidence as set forth in the administrative record of ***each of the foregoing***. As such, this Court should find that the NPFC's denial of Taylor Energy's Claim was arbitrary and capricious.

**B.     The NPFC's Position that Taylor Energy Should Be Judicially Estopped from Arguing that the NPFC Erred by Treating the Failure Mechanism as a Traditional Mudslide Lacks Merit.**

It appears that the NPFC is arguing that Taylor Energy should be estopped from arguing that the platform was toppled by a seafloor failure rather than a mudslide because Taylor Energy did not make this distinction in the claims process. *See* ECF 70 at 36-38. But the administrative record is replete with examples of this distinction. Throughout the administrative proceedings,

Taylor Energy has repeatedly discussed the geological event as a seafloor failure, slope failure or deep-seated mudslide. It has never claimed that it was solely a mudflow or mud overflow event. For example, the Claim repeatedly attributes the failure of the platform to a "massive regional seafloor failure."[17] This same position is reflected throughout the Reconsideration Request.[18] The NPFC's argument to the contrary is just wrong.

Moreover, throughout the administrative proceeding, Taylor Energy expressly distinguished between a traditional mudslide or mudflow as opposed to a deep-seated mudslide or seafloor failure. This distinction was made clear in the Claim, *see e.g.*, CGAOGAR_0002389-2390 (discussing why seafloor failure was an act of God and quoting MMS Conference which

---

[17] *See e.g.,* CGAOGAR_0002281; CGAOGAR_0002283; CGAOGAR_0002285; *see also e.g.,* CGAOGAR_0002290 (describing "seafloor collapse and failure"); CGAOGAR_0002337(describing "seafloor failure at MC20" discussed in Gilbert & Nodine's 2006 reports commissioned by MMS); CGAOGAR_0002338 - 2342(summarizing the conclusions of Taylor Energy's experts that a seafloor failure had caused the platform to topple rather than a mudslide); CGAOGAR_0002382 (referring to the "MASSIVE SEAFLOOR FAILURE"); CGAOGAR_0002383 (referring to "regional seafloor failure", "seafloor failure", "massive seafloor failure", and "deep seated seafloor failure" as the cause of the platform toppling); CGAOGAR_0002389 ("The shifting of deep subsurface sediments related to failure of a large block of seafloor, especially at water depths greater than 400 feet, had never been observed or predicted in the Gulf."); *id.* ("The unanticipated nature of the seafloor failure at MC20 was recognized by other experts in the field who reviewed the events that caused the destruction of MC20" and "determined that: . . 'this event was more likely an entire slope failure rather than a typical mudslide, (i.e., a very extreme event).'"); CGAOGAR_0002390 ("[T]he experts at this conference – which was convened in part by the MMS – attributed the MC20A Platform Incident to a slope failure, not a mudslide."); CGAOGAR_0002392 (referring to "seafloor failure"); CGAOGAR_0002393 (referring to "regional seafloor failure"); CGAOGAR_0002398 (same); CGAOGAR_0002400 (same).

[18] *See e.g.,* CGAOGAR_0000073 ("The height and period of those waves caused a massive seafloor failure hundreds of feet below the sea surface."); *id.* ("The capacity of such waves to produce great harm or danger is obvious as they caused an enormous seafloor failure at MC20 in waters deeper than 400 feet."); CGAOGAR_0000083 ("The failure of the seafloor at MC20, and the fact that there are no other documented incidents in which a hurricane wave caused a seafloor failure in water deeper than 400 feet establishes that the pressure imparted by hurricane Ivan's waves was far greater than normal, and that it was irresistible to the seafloor at MC20.").

specifically distinguished between slope failure and mudslide)[19], as well as in the expert reports submitted in support of the Claim. *See e.g.,* CGAOGAR_0003881 ("The seafloor failure was materially different than a mudslide."). In addition, Taylor Energy's counsel's letter to the NPFC of March 15, 2019 responding to the NPFC's request for any periodic surveys of the MC20 area (CGAOGAR_0017428-17432), expressly noted that "the MC20A platform was not toppled by a large mudflow event that exceeded the platform's capacity. It was toppled by a seafloor failure." CGAOGAR_0017431. The NPFC was referred to specific sections of Jim Hooper's report that made this distinction. *Id.*

Likewise, the Reconsideration Request specifically addresses the distinction between a traditional mudslide and a seafloor failure, and the significance of same:

> The NPFC next notes that mudflow deposition occurred in the MC20 area before the MC20A platform was built, citing to Woodward Clyde Oceaneering's 1983 report. However, in doing so the NPFC is confusing a mudflow with a seafloor failure. As was explained in the reports of Jim Hooper and Robert Gilbert, Mary Nodine and Stephen Wright, the two phenomenon are different. A mudflow originates from upslope in deeper water and moves downslope through mudline gullies until it spills out of the terminus of the gully and overruns the seafloor. A seafloor failure is a failure of the existing seafloor below the seafloor surface that causes a large slab of the existing seafloor to fail and move downslope. The fact that a mudflow that originates in shallow water flows into deeper waters does not mean that a hurricane wave imparted significant pressures on the seafloor in those deeper waters. It means that the wave mobilized sediments in shallower waters and caused them to flow downslope into deeper water.
>
> Moreover, the MC20A platform was not knocked over by a mudflow. As established in Jim Hooper's report, and in the report by Gilbert, Nodine and Wright, the MC20A platform was toppled by a seafloor failure. A slope failure is a different geohazard than a mudslide. Yet the NPFC's determination repeatedly conflates and confuses these separate and distinct geotechnical phenomenon.

CGAOGAR_0000082; *see also* CGAOGAR_0000080-81 ("[Woodward Clyde] also concluded that the geohazard that posed the greatest risk to the platform was a mudslide descending from upslope across the platform site, not a seafloor failure."). And, the expert reports submitted by Taylor Energy in connection with its Reconsideration Request expressly address this distinction.

---

[19] Notably, the experts at the 2005 Hurricane Readiness and Recovery Conference, which was convened in part by the MMS (*see* CGAOGAR_0014812), attributed the MC20A Platform incident to a slope failure, not a mudslide and concluded that since slope failures are extreme events, there was no need to modify other existing platforms in the same mudslide regions of the Gulf of Mexico. *See* CGAOGAR_0002390; *see also* CGAOGAR_0014832.

*See e.g.*, CGAOGAR_006309-6325; CGAOGAR_0001590 ("In my January 8, 2018 report, I concluded that the MC20A platform was not toppled by such a mudflow"); *Id.* ("In general 'mudslide' forces against a jacket structure are much smaller than those that would be imposed by the type of landslide failures that occurred during Hurricane Ivan."); *Id.* ("Delta front mudflows are a very different phenomenon, compared to a sub-seafloor type of landslide failure."); CGAOGAR_0003881 ("The seafloor failure was materially different than a mudslide.").

Finally, the NPFC's own experts agreed that a seafloor failure, as distinct from a traditional mudslide, was the failure mechanism. CGAOGAR_0020120-20121 (NGI agreeing as to the failure mechanism and actually finding that an overrunning mudslide was not likely as the "60 ft mudslide overrun needed for mechanism 2 does not agree with the present seafloor level at the original platform location."); CGAOGAR_0020340 (GZA stating that "the consensus appears to be that failure of the oil platform was the result of a progressive stability failure" and that "[g]eophysical data showed shearing to a depth of 100 to 150 feet below the pre-hurricane seafloor....").

To now claim that Taylor Energy should be judicially estopped from arguing that the NPFC's (i) mischaracterization of the geological event as a simple mudslide; (ii) ignoring of evidence to the contrary; or (iii) failing to address how the distinction between a mudslide and the actual geological event (*i.e.,* seafloor failure) impacts its findings was arbitrary and capricious, is incomprehensible.[20]

"Judicial estoppel 'prevents a party from asserting a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous proceeding.'" *See* ECF 70 at p. 37 (citing

---

[20] In addition to the administrative record clearly supporting Taylor Energy's position before this Court, Taylor Energy's Complaint set forth this mischaracterization as a specific basis for its APA claim. *See* ECF 1 at ¶¶ 16, 96-98, 157, 168-171; *see also id.* at ¶¶ 29, n.5 and 30, 33, 36, 57-60, 86, 168. Notwithstanding, the NPFC's Answer did not raise judicial estoppel as an affirmative defense. *See* ECF 55 at 21-22.

*Marshall v. Honeywell Tech. Sys. Inc.,* 828 F.3d 923, 928 (D.C. Cir. 2016) (quoting *New Hampshire v. Maine,* 532 U.S. 742, 749 (2001))). Although the "the circumstances under which judicial estoppel may appropriately be invoked are probably not reducible to any general formulation or principle," *New Hampshire,* 532 U.S. at 750, courts often consider three factors when determining whether to apply the doctrine in a particular case:

> First, a party's later position must be "clearly inconsistent" with its earlier position. *United States* v. *Hook*, 195 F.3d 299, 306 (CA7 1999); *Browning Mfg. v. Mims (In re Coastal Plains, Inc.),* 179 F.3d 197, 206 (CA5 1999); *Hossaini* v. *Western Mo. Medical Center*, 140 F.3d 1140, 1143 (CA8 1998); *Maharaj* v. *Bankamerica Corp.*, 128 F.3d 94, 98 (CA2 1997). Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create "the perception that either the first or the second court was misled," *Edwards*, 690 F.2d at 599. . . . A third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped. *See Davis*, 156 U.S. at 689; *Philadelphia, W., & B. R. Co.* v. *Howard*, 54 U.S. 307, 13 HOW 307, 335-337, 14 L. Ed. 157 (1852); *Scarano*, 203 F.2d at 513 (judicial estoppel forbids use of "intentional self-contradiction . . . as a means of obtaining unfair advantage").

*Id*. Here, none of the foregoing factors weigh in favor of judicial estoppel applying here.

First, as demonstrated extensively above, Taylor Energy's position is not "**clearly inconsistent** with its earlier position." *Id.* (emphasis added). It is not the generic use of the term "mudslide" *per se*, as the seafloor failure was essentially a subsurface or submarine or deep-seated mudslide. Rather, it is how that term was used by the NPFC to mischaracterize the actual geological event at issue. Indeed, it is the NPFC's mischaracterization of the geological event and its application to its finding that the event does not constitute an "act of God" that is arbitrary and capricious.[21] The NPFC relies on Taylor Energy's use of the term "mudslide" and "massive sea

---

[21] In fact, the NPFC recognized in its Claim Determination that Taylor Energy asserted "that a massive seafloor failure" (rather than a traditional mudslide) toppled its platform. *See* CGAOGAR_0002193. Yet it proceeds to re-cast the event in an effort to fit its generic narrative that the MC20A Platform was constructed in an area of known mudslides hence the disaster was

floor mudslide" in a 2009 case filed by Taylor Energy against Underwriters at Lloyd's London relating to a specific insurance coverage issue and a 2012 case filed by certain environmental groups against Taylor Energy alleging citizen-suit claims under the Clean Water Act.[22] In neither of those cases did Taylor Energy ever claim that the platform was toppled by simply "mudflow overrunning the platform site." But, more importantly, there was absolutely no reason to delve into the details of the failure mechanism in two prior cases having ***absolutely nothing to do with the cause of the discharge***. Indeed, Taylor Energy had not yet retained its experts to even opine on the technical aspects of the failure mechanism, much less had it submitted a claim to the NPFC.

Likewise, addressing the second factor, Taylor Energy did not "[p]ersuad[e] a court to accept that party's earlier position," and there would certainly be no perception that either of those courts or this Court were misled. *New Hampshire,* 532 U.S. at 750. Again, the two cases relied upon by the NPFC had nothing to do with causation or the technical issues related thereto.

Finally, to now rely on two instances involving completely distinct issues as a basis for judicial estoppel here, when the distinction between a simple mudslide and a seafloor failure was made clear throughout the administrative process before the NPFC, is improper. Taylor Energy did not "assert an inconsistent position" in the first place, but even if it had, it would not "derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." From the outset of the claims process, the NPFC was well aware of Taylor Energy's position and had every opportunity to address the issues during that process.

---

not unanticipated and the failure to conduct certain surveys intended to monitor sediment accumulations "could have contributed to" the discharge. *See e.g.,* CGAOGAR_0000027.

[22] Moreover, neither of these cases are part of the administrative record before this Court and the NPFC's use of cases to raise a factual point outside of the administrative record is improper. *Holy Land Found for Relief & Dev. v. Ashcroft*, 219 F.Supp. 2d 57,65 (D.C. Cir. 2002) (It is well settled that judicial review is confined to the administrative record.).

At bottom, the NPFC's position is one of semantics. It is the actual geological event (not the words), that is of import here, and how the NPFC has applied that geological event to the adjudication of Taylor Energy's Claim. The NPFC cannot now attempt to use the principal of judicial estoppel to avoid or otherwise explain away its failure to address the distinct geological event and why that distinction is of significance as it relates to its findings that the actual natural phenomenon does not constitute an "act of God."[23] The NPFC's judicial estoppel assertion lacks merit.

C.     **The NPFC's Conclusion that Taylor Energy's Failure to Conduct Seafloor Surveys "Could Have Contributed" to the Platform's Destruction was Arbitrary and Capricious, an Abuse of Discretion and Otherwise Not in Accordance with the Law.**

The NPFC relies upon its finding that the area was prone to mudslides (*see e.g.,* CGAOGAR_0002213; CGAOGAR_0002219-2220; CGAOGAR_0002222) and relatedly Taylor Energy's alleged failure to conduct certain surveys (*see e.g.,* CGAOGAR_0002218). However, as discussed in Section II.B., it is undisputed, and the administrative record clearly reflects, that a deep seated sediment failure caused the platform to topple, not a mudslide. Taylor Energy presented evidence that the seafloor surveys were intended to detect the buildup of sediments upslope of the platform that could result in a mudflow or mudslide. *See* CGAOGAR_0000165 ("I was the author of the Woodward Clyde/Oceaneering report that contained that recommendation, and was responsible for including that recommendation in the report. The purpose of the recommendation was to monitor areas of seafloor located upslope of the MC20A platform site to detect any buildup of sediment. . . . "). The NPFC offered no evidence to contradict Taylor

---

[23] The NPFC's effort to re-cast the events at issue (*e.g.,* as a hurricane or storm and a mudslide), and apply law and reasoning to these generic natural phenomena that are distinct was arbitrary and capricious.

Energy's evidence that the requirement for the surveys was to ensure significant sediment was not building up in the area upslope of the platform that could descend down across the platform site as a mudslide. In short, the survey requirement was intended to monitor a *different* phenomenon than the one that caused the platform to topple. Consequently, the issue of periodic surveys is irrelevant to Taylor Energy's Claim and the issue before the Court. Since it is undisputed that a mudslide did not topple the platform, the failure to conduct the surveys to guard against a mudslide could not have been a cause of the incident.

Taylor Energy further presented evidence that any such surveys would not have provided warning of the actual geologic event that toppled the MC20A Platform. *See* CGAOGAR_0000408 (specifically addressing this issue and concluding that "[p]eriodic surveys that could have detected an advancing mudflow would not have provided warning that the platform would be toppled by a failure of the sea floor in Hurricane Ivan waves."). Again, the NPFC failed to offer any evidence to the contrary other than the conclusory statement of an expert who admittedly lacks any geotechnical experience. *See* CGAOGAR_0020712-20714. Specifically, the NPFC states:

> The difference between a mudflow and a seafloor failure are certainly academically and technically important. However, the operational fact is that they are both dynamic movements of the ocean bottom, in this area with a history of subaqueous sediment instabilities (repetitiveness intended), that have caused the loss of offshore platforms. Enabling alignment of this knowledge across the whole design process should have been ensured.

CGAOGAR_0000020 (citing CGAOGAR_0020283-20284). This conclusory statement is in direct conflict with the expert opinions contained within the administrative record as detailed herein and lacks any basis whatsoever. The NPFC cites to Pettigrew for this proposition; however, Pettigrew lacks any expertise in geotechnical matters. *See* CGAOGAR_0020712-20714. And, Pettigrew does not cite to any authority whatsoever for his conclusory and generic statement that

a mudflow and seafloor failure are both "dynamic movements of the ocean bottom." Nor does he elaborate as to how or why that may be significant here. CGAOGAR_0020283-20284.

Furthermore - and notwithstanding the fact that the surveys and sediment buildup are irrelevant and would have provided no warning of the geologic event that toppled the platform - Taylor Energy presented evidence that there were no significant accumulations of sediments or any significant sediment movement around or upslope of the MC20A Platform. Specifically, Taylor Energy submitted evidence from two surveys that showed no evidence of significant sediment accumulation upslope of the platform: a 1996 bathymetric survey and a 2001 bathymetric survey. CGAOGAR_0000085-86; CGAOGAR_0000166-167. Neither showed evidence of a buildup of sediments, even though many hurricanes and tropical storms passed through the area between 1984 and 2001. *Id.* In fact, the 2001 survey detected a *decrease* in the elevations of the mudlobe crests located upslope of the MC20A Platform of up to 30 feet, meaning that the risk of a large mudflow originating on those mudlobe crests during a hurricane had *decreased* since the platform was erected in 1984. *See* CGAOGAR_0003909 ("To the north from MC20A along the edge of the map, there is between 20-ft. and more 30-ft. of erosion or subsidence. Thus, there was no significant build-up of sediments in the area immediately upslope from the platform between 1979 and 2001 that would have presented a threat to the platform sight from future mudflow activity."); *see also* CGAOGAR_0000085-87 (citing CGAOGAR_0000113-134; CGAOGAR_0000164-174; CGAOGAR_0000183-244).

The contention that Taylor Energy "completely ignores the Fugro survey it commissioned and submitted with its claim reflecting that "[b]athymetric changes between 2001 and 2004 show an elevation increase (sediment accumulation) of about 50 ft at the MC 20 'A' – Structure" is both false and misguided. *See* ECF 70 at 39, n. 20; *see also* CGAOGAR_0007651 (clearly discussing

the "mass transport events" during Ivan). As Taylor Energy explained, it commissioned Fugro GeoServices to prepare isopach maps that show changes in the seafloor elevations upslope of the MC20A platform between 1982, 1996, 2001 and 2004 (***post-Ivan***)." CGAOGAR_0000085 (emphasis added); *see also* CGAOGAR_0003923-3926. The NPFC seemingly fails to understand that the accumulation was ***the result of*** Ivan and the turbidity currents, clay and silt-filled slurries and debris flows associated therewith. *See* CGAOGAR_0003918 ("During Hurricane Ivan, and probably for days afterwards, sediment-filled flows apparently swept through Block MC20 in the form of (a) turbidity currents, (b) clay and silt-filled slurries, and (c) debris flows that were composed of clay fragments in a fluid-like clay matrix."); CGAOGAR_0003925 ("The areas in which the seafloor gained elevation correspond with areas of seafloor uplift and areas in which sediment flows deposited layers of fine sediment turbidities during and immediately after Hurricane Ivan."); CGAOGAR_0003952-3953 ("These processes caused a progressive seafloor failure that extended from the top of the mudlobe crest, across the platform site, and downslope into the pedestal and staircase areas. . . Turbidity flows, sediment flows, and small mudflows then flowed over the platform area, pushing the jacket downslope and raising the elevation of the seafloor by over 40-ft. in the vicinity of the old platform sight. . . The 'new' seafloor about the 1982 seafloor elevation consists of multiple thin layers, which is consistent with a series of relatively thin turbidity flow, slurry flows and debris flows descending across the area after the platform toppled, rather than a large mudflow."). This complex process and extensive studies and analyses are explained in detail in the report of Hooper beginning on page 41 of 79 and continuing through page 75.[24] CGAOGAR_0003917-3951.

---

[24] Again, one of the issues is that this is a highly complex and technical matter yet the NPFC's experts were never provided Hooper's reports.

Despite the detailed discussion of the existing surveys, isopach surveys commissioned by Taylor Energy and the expert opinions of leading experts, the NPFC completely ignores this evidence. Doing so was arbitrary and capricious. *See* CGAOGAR_0000027; *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43; *Water Quality Ins. Syndicate*, 225 F. Supp. 3d at 64 ("Notably, 'an agency's refusal to consider evidence bearing on the issue before it constitutes arbitrary agency action within the meaning of § 706,' as does ignoring 'evidence contradicting its position.' *Butte Cty.,* 613 F.3d at 194."). This Court should find that the NPFC acted arbitrarily and abused its discretion to the extent its decision was based on the "failure to conduct seafloor surveys."

Furthermore, this issue is yet another example of how the NPFC failed to apply the preponderance of the evidence standard. The NPFC did not challenge the foregoing or address the evidence to the contrary. Instead, it asked Pettigrew to "[r]esearch all of the Hurricanes/Tropical Storms that passed through the Gulf of Mexico for calendar years 2001, 2002, 2003, and prior to Hurricane Ivan in 2004 and comment if any of those storm ***could*** have" caused any significant sediment movement in the areas upslope of the MC20 platform site or significant sediment accumulation on the mudlobe crests off the platform."[25] CGAOGAR_0020035 (emphasis

---

[25] Taylor Energy presented a detailed explanation and concrete evidence to support its experts' conclusion that no major hurricanes passed through the MC20 area between 1996 and 2004 that would have caused a significant amount of sediment to accumulate upslope of the platform. *See* CGAOGAR_0000086-87; CGAOGAR_0005377 (finding that the waves generated by Hurricane Lili and tropical storm Isidore would not have been powerful enough to cause any significant movement of the bottom sediments in or around MC20); CGAOGAR_0000365 ("Mr. Pettigrew did not identify any hurricanes between 2001 and Ivan that that could have caused any significant sediment movement in the area upslope of the MC20 site or significant sediment accumulation on the mudlobe crests. Furthermore, there were no major hurricanes (Cat 3 or higher) between 1996 and 2001 that significantly affected the MC20 area (Resio (2007))"); CGAOGAR_0000184 ("Furthermore, Hurricane Andrew in 1992, which would have been more likely than Lili or Isidore to disturb the sea floor at the Mississippi Canyon due to its path and intensity, caused no significant changes to sea floor elevations in the vicinity of the Mississippi Canyon 20 based on the 1982 and 1996 surveys and no reported pipeline damage in the vicinity of Mississippi Canyon 20.").

added). Pettigrew concluded that an unspecified "impact" "might be possible." CGAOGAR_0020284-20285. However, Pettigrew's opinion is contradicted by the opinions of Dr. Suhayda and Gilbert and Nodine. *See* n. 25, *supra*. Under the preponderance of the evidence standard, the NPFC should have considered the conflicting opinions and evidence and determined whether, on a more probable than not basis, Taylor Energy's failure to conduct a survey within two years of Ivan was a *cause* of the incident. It failed to do so.

None of Pettigrew's qualifications or experience indicate that he has any expertise in predicting whether tropical storms will cause sediment movements 10 miles off the coast in hundreds of feet of water.[26] *See* CGAOGAR_0020712-20714. In contrast, Dr. Suhayda and Gilbert and Nodine have specific experience measuring sediment strengths and assessing whether hurricane waves will cause the sediments to move. CGAOGAR_0005427-5452; CGAOGAR_0000183-244; *see also* CGAOGAR_0020279 (Pettigrew stating his "utmost respect for Dr. Suhayda's outstanding history of research and academic excellence in the study of the offshore environment."). And more importantly, Pettigrew's opinion does not find that any storms would likely have caused sediment movements, nor does he state that those sediment movements would likely have been significant enough to cause a threat to the MC20 platform. With no discussion or analysis, the NPFC simply accepted Pettigrew's generic conclusion and determined that since the storms "might" have caused "some" unspecified impact to offshore sediments,

---

[26] And, to the contrary, Pettigrew candidly admits that he can only comment as to the "industry belief", not that he had personal experience or specialized expertise, and back-stepped when one of his prior statements relating to storms that could have had an impact on sediment accumulation was challenged. *See* CGAOGAR_0000081 and CGAOGAR_0020285 ("My statement was in relation to the industry belief that significant bottom pressures could not be exerted below 400 feet, but that in 1969, three platforms were lost in 325 feet of water and that belief should be re-examined. It was never meant to imply that there is no significant difference in the pressure that a wave would exert on the seafloor at these different depths").

Taylor Energy had failed to disprove that its failure to conduct surveys was not a cause of the platform loss. In short, Taylor Energy's experts were more qualified to express opinions on these issues and based their opinions that the storms would not cause significant impacts to offshore sediments on the lack of any impacts to pipelines in the MC20 area and the fact that the waves generated from the storms would not have been powerful enough to cause such impacts. In contrast, Pettigrew, who appears unqualified, simply looked for any storm that tracked through the area and said that because the storm went somewhere within 100 miles of MC20, it could have had some impact on sediments.[27] This is woefully insufficient under the applicable legal principles.

Finally, the NPFC never found that the fact that Taylor Energy did not perform periodic geophysical surveys actually *caused* the platform to topple. Rather, it merely stated that "the failure to conduct these surveys ***could have contributed*** to the collapse of the MC-20A platform." CGAOGAR_0000027 (emphasis added). Indeed, a failure to conduct a survey cannot constitute a "cause"- the element at issue - and this is a far cry from the "fault of man" in the cases addressed by the NPFC. *See* CGAOGAR_0002221-0002222. The NPFC abused its discretion in this regard. As set forth above, the NPFC has (i) failed to acknowledge the distinction between a typical mudslide and a seafloor failure and the impact that has on its reasoning; and (ii) offered no evidence that the surveys would have any probative value, much less that they "could have contributed to" the platform's destruction.

---

[27] After being asked to review all Hurricanes/Tropical Storms from 2001 to Ivan, and only identifying two storms that "could" have had "some impact" in his original report (*see* CGAOGAR_0020035-20039), Pettigrew issued another report that was not produced until the Reconsideration Denial, in which he identified several additional tropical storms that he claimed "could" have caused some offshore sediment movements. *See* CGAOGAR_0000025; CGAOGAR_0020067-20088. Again, this "could have" expert opinion is insufficient under the applicable standard and is in conflict with the findings and conclusions of experienced experts.

### D.      The NPFC Erred By Relying Upon Post-Ivan Wave Models and Statistics.

The NPFC completely misstates Taylor Energy's position relating to its use of *post*-Ivan wave models and statistics, and the standard against which to consider whether the waves and resulting massive progressive seafloor failure satisfy the elements of an "act of God." It is not Taylor Energy's position "that any storm beyond the API standards at the time a platform is built is a per se act of God."[28] ECF 70 at 46. Rather, it was the NPFC's reliance upon *new, recent* wave models, which were informed by Hurricane Ivan itself, that was arbitrary and capricious, an abuse of discretion and otherwise not in accordance with the law. How can the very natural phenomenon that Taylor Energy contends was an "act of God" – *i.e.,* completely unanticipated and exceptional (among other things) at the time it occurred – be used to support the finding it could have been anticipated or was not exceptional? Under that impossible standard, there certainly would never be an "act of God" as hindsight is 20/20.[29] The act of God defense requires the "exercise of due care." And, the standard of due care must be drawn from established and existing standards at the time (*i.e.,* the API standard then in effect), not new standards conceived or informed *after* the act of God occurrence to deny a valid act of God defense.[30]

---

[28] In fact, Taylor Energy states that "the API design standards for oceanographic environmental data for the Gulf of Mexico were significantly increased *after* Ivan. CGAOGAR_0002330 (citing CGAOGAR_0005407). . . .[and] [e]ven with these increases, the current API recommended design standards do not reach the magnitude of the wave heights and periods generated by Ivan. *Id.*" ECF 69-2 at 49-50.

[29] Importantly, waves of this magnitude have never been measured in the Gulf of Mexico (or anywhere in the United States), and even experts post-Ivan could not re-create waves of such magnitude without inputting Ivan's unique meteorological data into their models (and even those models did not accurately predict the worst of Ivan's waves). *See* CGAOGAR_0000076-77 (citing CGAOGAR_0000368-370).

[30] The NPFC apparently recognized the importance of using 1983 metocean standards, *see* CGAOGAR_0020034 (tasking for Pettigrew instructing that he use "1983 metocean standards"), yet later abandoned that approach when it realized it did not support its desired predetermined outcome.

It is well established that such a retroactive approach is an erroneous application of the law. *See Mamiye Bros. v. Barver S.S. Lines, Inc.*, 360 F.2d 774, 780 (2d Cir. 1966) ("[I]t is necessary to resist the strong human temptation to review action by looking backward with the wisdom born of the event." (internal quotations omitted)); *see also Sea-Land Serv., Inc. v. Dep't of Transp.*, 137 F.3d 640, 646 (D.C. Cir. 1998) ("An agency action, however permissible as an exercise of discretion, cannot be sustained 'where it is based not on the agency's own judgment but on an erroneous view of the law.'" (citation omitted)). The NPFC does not cite a single administrative decision or case wherein a *new* (post-event) standard was retroactively applied to determine whether an event was exceptional, unanticipated, or otherwise could have been prevented or avoided by the exercise of due care or foresight. Additionally, while conclusorily stating that "[t]here is no support for Taylor Energy's position" (ECF 70 at 46), the NPFC ignores the various cases cited by Taylor Energy that demonstrate that in other contexts, courts have applied the standard in place at the time of design/construction. *See, e.g., Graves ex rel. W.A.G. v. Toyota Motor Corp.*, No. 2:09cv169KS-MTP, 2012 U.S. Dist. LEXIS 1623 (S.D. Miss. Jan. 5, 2012) ("[T]he relevant focus in a products liability case is on the condition of the product and/or the conduct of the manufacturer at the time of the product's manufacture or sale…Toyota cannot be held to…any ratings system…that was not in place at the time the subject vehicle was manufactured.").[31]

---

[31] Furthermore, the NPFC's strained attempt to tie this argument to Taylor Energy's due process claim relating to the NPFC's failure to disclose the existence/identities and opinions of certain experts until the Reconsideration Denial, is unavailing. These are two distinct issues. And for purposes, of clarifying the record, Taylor Energy never "conceded its Due Process claim" as the NPFC states. ECF 70 at 46, n. 30. It merely indicated that it would not re-urge those claims that were the subject of the Motion to Strike in the context of this Motion and respectfully preserves the issue for appeal. ECF 69-2 at 18, n. 15.

Finally, without any proof, the NPFC boldly states that even if the API standard should have been applied, "Taylor Energy's claim would still fail because Taylor Energy's platform was likely not built in accordance with the API standards that existed in 1983." ECF 70 at 47. This baseless criticism has many issues, but notably, it completely ignores the extensive record evidence and argument of Taylor Energy relating to the fact that the MC20 platform was ***over-strengthened*** beyond API standard design. *See* ECF 69-2 at 10-11.

**<u>Conclusion</u>**

For the foregoing reasons, Taylor Energy's Motion for Summary Judgment should be granted and the NPFC's Cross Motion should be denied. The administrative record is replete with instances where the NPFC's action was arbitrary and capricious, an abuse of discretion and/or otherwise not in accordance with the law. This Court should vacate and set aside the NPFC's denial of Taylor Energy's Claim, find that Taylor Energy is entitled to the protections and remedies afforded by the statutory act of God defense, and award Taylor Energy its uncompensated Removal Costs, as of August 31, 2017, in the amount of $353,881,719.[32] Or, alternatively, this Court should remand this matter to the NPFC, directing that the NPFC recognize Taylor Energy's statutory act of God defense, and ordering that it adjudicate the amount of Removal Costs that Taylor Energy is entitled to be reimbursed from the OSLTF.

---

[32] As to the relief requested, the NPFC ignores the jurisprudence cited by Taylor Energy for the relief it seeks. *See* ECF 69-2 at 56 (citing *NAACP v. Trump*, 298 F. Supp. 3d 209, 245 (D.D.C. 2018); *See Bowen v. Massachusetts*, 487 U.S. 879, 895 (1988); *Holly Sugar Corp. v. Veneman*, 355 F. Supp. 2d 181, 197 (D.D.C. 2005).

Respectfully submitted,

*/s/ Carl D. Rosenblum*
CARL D. ROSENBLUM, T.A. (LA #02083)
(Admitted *Pro Hac Vice*)
ALIDA C. HAINKEL (LA #24114)
(Admitted *Pro Hac Vice*)
LAUREN C. MASTIO (LA #33077)
(Admitted *Pro Hac Vice*)
TAYLOR K. WIMBERLY (LA #38942)
(Admitted *Pro Hac Vice*)
Jones Walker LLP
201 St. Charles Avenue, 49th Floor
New Orleans, Louisiana 70170-5100
Telephone: (504) 582-8000
Facsimile: (504) 589-8296
E-mail: crosenblum@joneswalker.com

And

PAUL A. DEBOLT (DC Bar No. 450904)
Venable LLP
600 Massachusetts Avenue, NW
Washington, D.C. 20001
Telephone:  (202) 344-4000
Email: PADebolt@Venable.com

***Attorneys for Taylor Energy Company LLC, Plaintiff***

## CERTIFICATE OF SERVICE

I certify that on this 17th day of May, 2021, a true and correct copy of the foregoing pleading was filed electronically with the Clerk of Court of the District of Columbia by using the CM/ECF system, which provides notice of filing to all counsel of record by electronic means.

*/s/ Carl D. Rosenblum*
CARL D. ROSENBLUM